UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

MARK NORDLICHT,
DAVID LEVY,
URI LANDESMAN,
JOSEPH SANFILIPPO,
JOSEPH MANN,
DANIEL SMALL, and
JEFFREY SHULSE,

        Defendants.

No. 16 Cr. 640 (BMC)

---

**MEMORANDUM OF LAW IN SUPPORT OF MARK NORDLICHT'S MOTION TO
SUPPRESS MATERIALS SEIZED DURING THE JUNE 22, 2016 SEARCH**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ..........................................................................................................3

    A.    The Government Seeks A Warrant To Search Platinum's Office And Seize A Broad Cache Of Documents And Electronic Data................................................3

    B.    Following The Search, The Government Undertakes No Effort To Segregate Materials Covered By The Warrant From Materials Outside The Scope..............................................................................................................4

ARGUMENT ...............................................................................................................6

I.    THE GOVERNMENT'S FAILURE TO EXECUTE THE WARRANT REQUIRES SUPPRESSION.......................................................................................6

    A.    The Government's Conduct Violates The Fourth Amendment............................6

    B.    This Government's Conduct Equally Violates The Fifth Amendment. .................8

    C.    Suppression Is The Appropriate Remedy. ..............................................9

    D.    At A Minimum, The Court Should Hold An Evidentiary Hearing......................11

II.    THE FRUITS OF THE SEARCH MUST BE SUPPRESSED BECAUSE THE WARRANT ITSELF IS DEFECTIVE.................................................................12

    A.    The Warrant Is Overbroad. ...............................................................12

    B.    The Warrant Violates The Fourth Amendment's Particularity Requirement........................................................................................14

    C.    The Affidavit Lacks Probable Cause. ...................................................16

        1.    Employee 1 did not Opine on Platinum's Valuation of Black Elk. ...........17

        2.    Unprofitability and Falling Oil Prices do not Provide Probable Cause of Fraudulent Overvaluation. ...........................................18

        3.    There is Nothing Unusual About Predicting Strong Returns in a Particular Month or Seeking a More Stable Investment Base. .................19

        4.    Platinum's Intra-Year Bank Transfers and Year-End Balances are Irrelevant. ....................................................................20

    D.    Evidence Seized Pursuant To The Warrant Should Be Suppressed. ....................21

III.    THE DEFENDANTS HAD LEGITIMATE EXPECTATIONS OF PRIVACY IN THE AREAS SUBJECT TO THE SEARCH.................................................22

i

A.    The Defendants Understood That Platinum's Offices And Emails Would Remain Private From The Police. ........................................................................ 23

B.    It Is Well Established That Individuals Have Reasonable Expectations Of Privacy In Their Workspaces. ................................................................................ 24

CONCLUSION ............................................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Arizona v. Gant*,
556 U.S. 332 (2009)...........................................................................................23

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971)...........................................................................................2

*Herring v. United States*,
555 U.S. 135 (2009)...........................................................................................10

*Illinois v. Gates*,
462 U.S. 213 (1983)...........................................................................................16

*In re Salomon Analyst Level 3 Litig.*,
373 F. Supp. 2d 248 (S.D.N.Y. 2005) ...............................................................17

*Mancusi v. DeForte*,
392 U.S. 364 (1968)...........................................................................................24

*U.S. Postal Serv. v. C.E.C. Servs.*,
869 F.2d 184 (2d Cir. 1989) ..............................................................................14

*United States v. Bershchansky*,
788 F.3d 102 (2d Cir. 2015) ..............................................................................9

*United States v. Broward*,
594 F.2d 345 (2d Cir. 1979) ..............................................................................10

*United States v. Burke*,
718 F. Supp. 1130 (S.D.N.Y. 1989) ..................................................................14

*United States v. Chuang*,
897 F.2d 646 (2d Cir. 1990) ..............................................................................24

*United States v. Cuervelo*,
949 F.2d 559 (2d Cir. 1991) ..............................................................................11

*United States v. Estepa*,
471 F.2d 1132 (2d Cir. 1972) ............................................................................11

*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013) .........................................................................15, 22

*United States v. George*,
975 F.2d 72 (2d Cir. 1992) ................................................................................15

*United States v. Hamilton*,
538 F.3d 162 (2d Cir. 2008) ........................................................................22, 23

iii

*United States v. Harvey*,
  392 F. App'x 607 (9th Cir. Aug. 24, 2010) .......................................................... 11

*United States v. Hickey*,
  16 F. Supp. 2d 223 (E.D.N.Y. 1998) .................................................................. 13

*United States v. Liu*,
  239 F.3d 138 (2d Cir. 2000) .................................................................................. 9

*United States v. Marti*,
  421 F.2d 1263 (2d Cir. 1970) ............................................................................ 13

*United States v. Metter*,
  860 F. Supp. 2d 205 (E.D.N.Y. 2012) ......................................................... passim

*United States v. Odinga*,
  576 F. Supp. 1038 (S.D.N.Y. 1983) ...................................................................... 9

*United States v. Rahman*,
  189 F.3d 88 (2d Cir. 1999) .................................................................................... 8

*United States v. Reeves*,
  11 Cr. 520, 2012 WL 1806164 (D.N.J. May 17, 2012) ................................... 7, 25

*United States v. Rosa*,
  626 F.3d 56 (2d Cir. 2010) ............................................................................ 21, 22

*United States v. Rutherford*,
  71 F. Supp. 3d 386 (S.D.N.Y. 2014) .................................................................. 16

*United States v. Schmidt*,
  105 F.3d 82 (2d Cir. 1997) .................................................................................... 8

*United States v. Seabrook*,
  16 Cr. 467 (S.D.N.Y. Sept. 18, 2017) ................................................................... 5

*United States v. Struckman*,
  No. 04 Cr. 229 (W.D. Wash. Oct. 19, 2007), *aff'd*, 611 F.3d 560 (9th Cir. 2010) ................. 11

*United States v. Van Sichem*,
  No. SS 89 Cr. 813, 1990 WL 144210 (S.D.N.Y. Sept. 26, 1990) ......................... 11

*United States v. Vilar*,
  3 05 Cr. 621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ............................. 13, 14

*United States v. Wey*,
  256 F. Supp. 3d 355 (S.D.N.Y. 2017) .......................................................... passim

*United States v. Zemlyansky*,
  945 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................................................ 13, 14, 15

## Statutory Authorities

18 U.S.C. § 3500.................................................................................................................. 16

## Treatises

2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a)
    (5th ed. 2012).............................................................................................................. 16, 22

## Constitutional Provisions

U.S. Const. amend. IV ...................................................................................................... 12

Defendant Mark Nordlicht respectfully submits this Memorandum of Law in support of his Motion to Suppress Materials Seized During the June 22, 2016 Search.

## PRELIMINARY STATEMENT

The government's search and seizure of the contents of the Platinum Partners office was unreasonable and unconstitutional because it directly violated Chief Judge Irizarry's seminal decision in *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012). *Metter* put the government on notice that when it collects a business's electronic data, it must execute the warrant by setting aside any materials not within the scope of the warrant within a reasonable time following the seizure. The government's failure to do so for more than 15 months required suppression in *Metter*. Here, more than 16 months have passed, and not only has the government failed to execute the warrant, it has even produced to co-defendants and other third parties essentially everything it collected, including extremely personal and private information outside the scope of the warrant and wholly irrelevant to this case. In doing so, the government carried out "the assault on [] privacy concerns" that the rule articulated in *Metter* was designed to avoid. *Id.* at 215. The government's conduct in this case thus amounts to an "utter disregard for and relinquishment of its duty to insure that its warrants are executed properly." *Id.*

In addition to the Fourth Amendment concerns, the government's flagrant disregard for these long-established, clearly articulated constitutional strictures constitutes a more fundamental violation. The government is acutely aware of its obligations, and that is why it promised the magistrate judge its review of the materials would stay within the bounds of the warrant. Without that commitment, no magistrate judge would have issued so broad a warrant. But once it obtained the warrant, the government rummaged through Platinum personnel's extremely personal information and disclosed it to people who had no business seeing it. The government's systemic and repeated constitutional violations are outrageous and require suppression.

1

The government's conduct after the seizure is particularly prejudicial because the warrant itself was defective from the start.  While the alleged grounds for probable cause were limited to two specific investments, one investor, and two bank accounts, the warrant on its face was vague and overbroad, authorizing seizure of, among other things, *every* record concerning *every* Platinum investment, *every* communication with *every* investor, and *every* bank record.  For an asset manager that exists to pool capital, make investments, and distribute returns (if any) to investors, it is difficult to imagine any document not covered by such a sweeping warrant.  But the government's application failed to justify such a broad seizure.  The government's failure to articulate a connection between the alleged grounds for probable cause and the materials to be seized violates the Fourth Amendment.  Indeed, the terms of the warrant are so broad that they violate the Fourth Amendment particularity requirement.  By authorizing seizure of essentially every document involved in running Platinum's business, the warrant was the kind of general warrant "abhorred by the colonists" that enabled "general, exploratory rummaging" through the defendants' affairs.  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  Finally, the justification for the warrant offered to the magistrate judge was misleading and insufficient to establish the requisite probable cause.

Suppression is the appropriate remedy for the government's serious constitutional violations.  The government's actions in this case are nearly identical to, if not worse than, the conduct that the *Metter* Court held warranted "blanket suppression."  860 F. Supp. 2d at 216.  Failure to adhere to *Metter*'s mandate for complying with the Fourth Amendment when executing warrants in the digital age is inexcusable.  Additionally, the warrant's excessive breadth and lack of probable cause are textbook examples of constitutional infirmities that courts routinely remedy with suppression.  Moreover, even if such an overbroad warrant were

2

constitutionally acceptable, there is no conceivable rationale for seizing personal and intimate communications regarding marital issues, the defendants' children (many of whom are minors and had their names widely disclosed), and familial healthcare issues. In these circumstances, the deterrent value of the exclusionary rule far outweighs any cost of suppressing evidence. In the alternative, defendants request a hearing to present further evidence on these issues.

## BACKGROUND

### A.    The Government Seeks A Warrant To Search Platinum's Office And Seize A Broad Cache Of Documents And Electronic Data.

On June 21, 2016, the government applied for a warrant to search the Platinum Partners office and seize post-January 1, 2010 records relating to nine identified topics:

- Platinum organizational charts;

- List of employees and contractors and their roles and responsibilities;

- Performance and valuation summaries for two Platinum funds;

- List of investors and related information;

- Communications with investors;

- Communications to investors and auditors concerning Platinum's assets under management;

- Records concerning Platinum's investments;

- Policies, procedures, training materials, and related documents; and

- Bank records for Platinum entities.

Dkt. No. 152, Att. B, ¶ 1. Beyond these categories, however, the government sought authorization to seize or copy "entire computers or storage media" that "reasonably appear to contain some or all of" the materials described above. *Id.* ¶¶ 37, 39.

Recognizing the risk that this approach would result in collecting material well outside the scope of the warrant, FBI Special Agent Craig Minsky explained in his affidavit in support of the application that the government would conduct its review "consistent with the warrant" by

using "techniques, including but not limited to computer-assisted scans of the entire medium . . . to determine whether it is evidence described by the warrant." *Id.* ¶ 39; *see also id.* ¶ 38 ("off-site review" of physical media would be conducted "consistent with the warrant").

The affidavit recited allegations that purported to "establish probable cause to believe that from at least 2010 to the present," a number of individuals associated with Platinum, including certain defendants in this case, "engaged in a scheme to defraud investors and potential investors in Platinum through material misrepresentations and omissions about, among other things, the performance, liquidity, ownership, control, and use of investments of Platinum's funds." *Id.* ¶ 8.

The magistrate judge issued the warrant, and the search and seizure occurred the next day, June 22, 2016.  The government copied entire email boxes from at least 18 individuals, seized materials from at least 74 desks, filing cabinets, bookcases, and other locations in the office, and imaged at least 45 computers, hard drives, and other electronic devices.  *See* Ex. 1.[1]

### B.  Following The Search, The Government Undertakes No Effort To Segregate Materials Covered By The Warrant From Materials Outside The Scope.

Six months after the search, the government obtained the Indictment in this case and one month later began producing documents obtained from the June 22, 2016 search.  Among the documents the government produced were emails that clearly fell outside the scope of the warrant.  For example, the government produced an email containing links to Hanukkah songs (Ex. 2); a calendar appointment for a graduation party (Ex. 3); an email attaching a portion of the script of the film *Rosemary's Baby* (Ex. 4); an email discussing safety precautions when eating at restaurants in Jerusalem (Ex. 5); instructions for how to use a printer (Ex. 6); an announcement from a synagogue (Ex. 7); and an email relating to charitable support (Ex. 8).  Indeed, the

---

[1]  Citations to "Ex." refer to the exhibits to the Declaration of William A. Burck in support of the motion to suppress.

government even disregarded the date restrictions of the warrant, producing more than 50,000 documents from prior to January 1, 2010, which it could have avoided simply by applying a date filter.  Burck Decl. ¶ 3.

More alarmingly, the government produced extremely private emails solely regarding health issues, children's education, intimate conversations between spouses, and marital strife. *See, e.g.*, Exs. 9–11.  Moreover, the government produced these exceedingly private (and, of course irrelevant) documents not only to all the parties to this action, but also to the parties to *United States v. Seabrook, et al.*, 16 Cr. 467 (S.D.N.Y.), an entirely separate action.[2]

As the government produced these documents, the defendants repeatedly voiced their concerns regarding the dissemination of sensitive private information and the government's production of documents that appeared to be outside the scope of the warrant.  For example, defense counsel raised their privacy concerns at the August 28, 2017 status conference, Tr. 33– 35 (Aug. 28, 2017), and reiterated these points in letters in September and October 2017, Exs. 12–13.  The government, however, consistently has refused to explain what, if anything, it has done to cull documents not subject to the warrant and instead has asserted, without elaboration, that "the execution of the warrant was lawful."  Ex. 14.

As of the filing of this brief—more than 16 months after the search, and after the government already has produced the vast majority of the data seized during the search to all the defendants in this case (save potentially privileged documents held back for a taint team review), as well as to defendants in an unrelated case in another district—the government has still not indicated that it has undertaken or completed a review of the seized material to determine

---

[2]  Gov't Opp. to Mot. in Limine at 4 n.1, *United States v. Seabrook*, 16 Cr. 467 (S.D.N.Y. Sept. 18, 2017) (Dkt. No. 90) (emails obtained during the search "at Platinum's offices executed by the FBI and Eastern District of New York . . . were provided to the Southern District of New York and then to Seabrook and Huberfeld in connection with the discovery produced in this case").

whether any of its falls outside the scope of the warrant.

## ARGUMENT

**I.   THE GOVERNMENT'S FAILURE TO EXECUTE THE WARRANT REQUIRES SUPPRESSION.**

### A.   The Government's Conduct Violates The Fourth Amendment.

The government's production of documents seized from Platinum, without any review to determine whether the materials fell within the scope of the warrant, violates the Fourth Amendment.  When the government conducts a seizure of materials, it must review those materials within a reasonable period of time to determine whether any of the seized items fall outside the scope of the warrant.  *Metter*, 860 F. Supp. 2d at 211–12.  This constitutes the execution of the warrant.  *Id.* at 215 ("[T]he Fourth Amendment requires the government to complete its review, *i.e.,* execute the warrant, within a 'reasonable' period of time."); *United States v. Wey*, 256 F. Supp. 3d 355, 383 (S.D.N.Y. 2017) (same (quoting *Metter*)).  Producing seized documents without taking steps to cull the documents not covered by the warrant violates the Fourth Amendment reasonableness requirement.  *Metter*, 860 F. Supp. 2d at 215.

In *Metter*, the government seized and imaged dozens of computers and email accounts pursuant to warrants to search the defendant's office.  *Id.* at 208–09.  Following the searches, the government argued that it could produce documents to the defendants prior to reviewing the materials to determine whether they were within the scope of the warrant.  *Id.* at 211.  The defendants objected to this practice and "the notion that the government can seize dozens of entire hard drives, fail to conduct any review of the extent to which the material far exceeds the scope of a warrant, but then disseminate that material to others."  *Id.* (quotation marks omitted).  The court agreed and held that, although there is no precise amount of time in which the government must review seized documents for responsiveness to the warrant, a 15-month delay

is not reasonable:

> The government's retention of *all* imaged electronic documents, including personal emails, without *any* review whatsoever to determine not only their relevance to this case, but also to determine whether any recognized legal privileges attached to them, is unreasonable and disturbing.  Moreover, the government repeatedly asserted its intent to release indiscriminately the imaged evidence to *every* defendant, prior to conducting any review to determine if it contained evidence outside the scope of the warrants.  The Court agrees with Defendant that the release to the co-defendants of any and all seized electronic data without a predetermination of its privilege, nature or relevance to the charged criminal conduct only compounds the assault on his privacy concerns.  ***It underscores the government's utter disregard for and relinquishment of its duty to insure that its warrants are executed properly.***

*Id.* at 215 (emphasis added) (citations omitted).

The government's conduct in this case is even worse than the conduct at issue in *Metter*. Here, more than 16 months have passed since the June 22, 2016 warrant, yet the government does not appear to have complied with *Metter*'s requirement that it review the seized materials to determine if they are within the scope of the warrant.  It has not undertaken even the most basic step of limiting the production of seized materials to those within the time period prescribed in the warrant.  *See* Burck Decl. ¶ 3.  Indeed, that failure alone violates the Fourth Amendment. *See United States v. Reeves*, 11 Cr. 520, 2012 WL 1806164, at *10 (D.N.J. May 17, 2012) (suppressing evidence where the government made "no efforts to comply with the temporal scope of the warrant and disregarded the express date limitation contained therein.").  Failure to limit the production to the timeframe articulated in the warrant requires suppression because the government's failure to "minimize[] unwarranted intrusions upon privacy" turns the search into a "'general, exploratory rummaging' in [the business's] computer files rather than a particular search in accordance with the express limitations of the search warrant."  *Id.*

In addition to ignoring the warrant's temporal restrictions, the government has neglected its duty to execute the warrant by separating out irrelevant materials.  And whereas in *Metter* the

government expressed its *intent* to produce the unreviewed evidence to other defendants but had yet to do so, here, the government *already has produced* innumerable documents that contain deeply sensitive and irrelevant information to all of the defendants in this case and to the parties in at least one other case. *See supra* at 4–6. In other words, while in *Metter* there was only a *potential* "eviscerat[ion of] the Fourth Amendment's privacy protections," the government's conduct here amounts to an actual, ongoing assault on privacy. 860 F. Supp. 2d at 211.

**B.    This Government's Conduct Equally Violates The Fifth Amendment.**

The government's conduct here is also unconstitutional given the way in which it unfolded. As described above, the government assured the magistrate judge that it would comply with its *Metter* obligations; without that assurance, it is inconceivable that any magistrate judge would have authorized seizure of every computer at Platinum and wholesale imaging of Platinum's electronic servers. After the raid, however, the government deliberately, and in the face of repeated objections from the defense, did not fulfill its promise. Such flagrant abuse of the judicial process and violation of the terms of the warrant is outrageous and inconsistent with the Fifth Amendment Due Process Clause. *See, e.g.*, *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (the "due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." (citations and quotation marks omitted)); *see also United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (government conduct that "shocks the conscience" violates due process).

Moreover, the fact that the government engaged in this conduct notwithstanding its undeniable awareness of its Fourth Amendment obligations indicates that this is a pattern of recurring misconduct. Indeed, not only did Special Agent Minsky acknowledge the

8

government's *Metter* obligation in his affidavit, testimony in *United States v. Wey*, a similar case discussed in more detail below, makes clear the government is aware of these obligations. 256 F. Supp. 3d at 374 (discussing testimony by Assistant U.S. Attorney that "he was concerned about the pace at which the review was proceeding," as "emergent district court case law," specifically including *Metter*, "requir[es] the Government to review and make use of digital search takes within a reasonable period of time"). The government's repeated, unrepentant disregard for its constitutional obligations violates the Fifth Amendment Due Process Clause. *See, e.g.*, *United States v. Odinga*, 576 F. Supp. 1038, 1042 (S.D.N.Y. 1983) ("pattern" of unconstitutional conduct can amount to Due Process Clause violation).

## C.    Suppression Is The Appropriate Remedy.

This Court should, as it did in *Metter*, suppress the fruits of the warrant because the government (1) effected a "widespread seizure of items that were not within the scope of the warrant" and (2) did "not act in good faith." 860 F. Supp. 2d at 215–16 (citing *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). Here, there can be no dispute that the method of collection the government used—wholesale collection and imaging of entire computers, email accounts, hard drives, file cabinets, and other materials—resulted in the seizure of an indeterminable number of documents outside the scope of the warrant. *See supra* at 4–6.

Nor can there be any serious dispute that the government lacked good faith when it simultaneously (1) failed for more than 16 months to execute the warrant by making some effort to cull those documents not within the scope of the warrant, yet (2) disseminated those documents to the parties in at least two cases in two judicial districts. Chief Judge Irizarry's decision five years ago in *Metter* prohibiting this exact conduct deprives the government of any claim of good faith. *See United States v. Bershchansky*, 788 F.3d 102, 113–14 (2d Cir. 2015) (government cannot claim good faith where it repeats conduct previously deemed

9

unconstitutional).   Indeed, Special Agent Minsky's affidavit and the government's own testimony in *Wey* demonstrates there is no confusion about the government's obligations.  *See supra* at 9.  The government's persistence in violating the Fourth Amendment, notwithstanding direct, on-point authority of which the government was acutely aware, is textbook "deliberate, reckless, or grossly negligent conduct"—or, at the very least, "recurring or systemic negligence"—to which the exclusionary rule applies.  *See Herring v. United States*, 555 U.S. 135, 144 (2009).

Moreover, the benefits of deterrence clearly outweigh the costs of suppression.  *See Wey*, 256 F. Supp. 3d at 394–95 (citing *Herring*, 555 U.S. at 141).  The same cost-benefit analysis that led the *Metter* Court to apply the exclusionary rule weighs overwhelmingly in favor of suppression here.  The constitutional violation in this case is even more egregious than it was five years ago: here, the government was fully aware of, yet disregarded, its constitutional obligations, and in the process widely disseminated extremely sensitive and personal emails that are wholly irrelevant to the case.  Suppression can be expected to deter similar violations in the future.  *See, e.g.*, *Wey*, 256 F. Supp. 3d at 374–75 (noting impact of *Metter* on search practices).

Although suppression is never without a cost, here any costs are outweighed by the need to ensure the government does not continue to trample Fourth Amendment rights.  "Otherwise, the Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant and its subsequent dissemination."  *Metter*, 860 F. Supp. 2d at 216.

Suppression is also appropriate under the Fifth Amendment.  Indeed, many courts have remedied such government misconduct by dismissing the indictment.  *See, e.g.*, *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) (recognizing that government misconduct justifies

the dismissal of an indictment when dismissal will achieve one of several objectives, including deterrence of systematic government misconduct); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (concluding that dismissal was warranted to "help to translate the assurances of the United States Attorneys into consistent performance by their assistan[ts]").  While there may be additional misconduct that that the defense intends to raise with the Court in a subsequent motion, the government's conduct with respect to the search justifies suppression of the fruits of the search.  *See, e.g.*, *United States v. Struckman*, No. 04 Cr. 229, slip op. (W.D. Wash. Oct. 19, 2007), *aff'd*, 611 F.3d 560 (9th Cir. 2010) (suppressing evidence attributed to informant and exclusion of witness and documents as remedy for constitutional violation); *United States v. Harvey*, 392 F. App'x 607, 609 (9th Cir. Aug. 24, 2010) (affirming district court's suppression of evidence in lieu of dismissal on the basis of outrageous government conduct); *United States v. Van Sichem*, No. SS 89 Cr. 813, 1990 WL 144210, at *1 n.3 (S.D.N.Y. Sept. 26, 1990) (recognizing suppression of evidence appropriate if obtained under circumstances that "shock the conscience" and thus violate the Due Process Clause).

### D.      At A Minimum, The Court Should Hold An Evidentiary Hearing.

If the government disputes these facts or the Court is not prepared to suppress on the current record, the Court should hold an evidentiary regarding the circumstances under which the government failed to abide by its promise to the magistrate judge, including the reasons for its conduct and the impact on the investigation and prosecution.  *See, e.g.*, *Wey*, 256 F. Supp. 3d at 366 (hearing warranted to address potential Fourth Amendment violations); *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) ("conducting a hearing is the preferred course of action in cases where disputed factual issues exist" as to outrageous government misconduct).

11

## II.   THE FRUITS OF THE SEARCH MUST BE SUPPRESSED BECAUSE THE WARRANT ITSELF IS DEFECTIVE.

The warrant was unconstitutional even before the government failed to execute it.  *First*, by authorizing the wholesale imaging of Platinum's electronic servers and seizure of essentially every document concerning its business, the warrant is unconstitutionally overbroad.  *Second*, the warrant's limitless reach violates the requirement that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  *Third*, the allegations in the search warrant affidavit are insufficient to establish probable cause.

### A.   <u>The Warrant Is Overbroad.</u>

The warrant in this case is unconstitutionally overbroad because the expansive categories of documents sought to be seized far exceed what would be reasonably necessary to investigate the allegations of fraud offered as probable cause for the search.  Under the overbreadth doctrine, the authority to search and seize is limited by the scope of the probable cause showing that justified the issuance of the warrant.  *See Wey*, 256 F. Supp. 3d at 382  ("The doctrine of overbreadth represents . . . [the] intersection point for probable cause and particularity principles: it recognizes . . . that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause.").

While the alleged grounds for probable cause were limited to two specific investments, one investor, and two bank accounts, the warrant authorized seizure of a stunningly broad swath of documents.  For example, the warrant covers *every* record concerning *every* one of Platinum's investments, Dkt. No. 152, Att. B, ¶ 1(f)–(g); *every* communication with *every* investor, *id.* ¶ 1(e); and *every* bank record, *id.* ¶ 1(i).  This is the functional equivalent of seizing every document involved in running Platinum, a company whose purpose is to gather funds from investors, invest those funds, and distribute returns back to investors.

The affidavit, however, never articulates why, for example, the allegations of overvaluing two particular investments, Black Elk and Golden Gate, necessitate seizing "[a]ny and all records . . . concerning Platinum's investments," or why the alleged suspicious prediction of strong returns in a given month necessitates seizing "[a]ny and all communications with investors in Platinum." Dkt. No. 152, Att. B. This failure to articulate a connection between the alleged grounds for probable cause and the materials to be seized violates the Fourth Amendment. *United States v. Vilar* is illustrative. There, a warrant application set forth allegations of probable cause involving specific investment vehicles, corporate entities, accounts, suspects, and groups of alleged victims. S3 05 Cr. 621, 2007 WL 1075041, at *19–*20 (S.D.N.Y. Apr. 4, 2007). Although these allegations provided "probable cause to conduct some form of search," the court held that the warrant was overbroad because, like the warrant in this case, it "authorize[d] the seizure of, among other items, *all* client files, *all* investment advisory agreements, and *all* documents concerning communications with [the entire business's] clients, regardless of whether those documents had any relation to the funds, accounts, and individuals addressed by the Warrant application." *Id.* Similar decisions abound.[3]

Here, there was an obvious, narrower scope of materials that would have enabled the government to pursue its investigation without reaching every document involved in running

---

[3]    *See, e.g.*, *Wey*, 256 F. Supp. 3d at 390–93 (warrant overbroad where probable cause showing related to "a scheme implicating, at most, five or six discrete deals involving specifically identified Issuers," in "roughly defined timeframe," but warrant authorized seizure of essentially all records involved in running financial services firm); *United States v. Zemylansky*, 945 F. Supp. 2d 438, 463–66 (S.D.N.Y. 2013) (warrant overbroad where probable cause was established as to five particular clinics that submitted invoices to billing company that was subject of warrant, but warrant authorized seizure of "*all* patient care records, bank account information, and patient appointment information within" office of billing company); *United States v. Hickey*, 16 F. Supp. 2d 223, 241–43 (E.D.N.Y. 1998) (warrant overbroad where probable cause showing related to use of shell companies to conceal the control of garbage collection by debarred individuals, but warrant authorized seizure of "all business records"); *United States v. Marti*, 421 F.2d 1263, 1267–69 (2d Cir. 1970) (probable cause based on four obscene films does not sustain warrant permitting seizure of all obscene material).

Platinum's business.  For example, records relating to Platinum's investments in Golden Gate and Black Elk and records relating to redemptions and requests for redemptions would have been more appropriately tailored to the probable cause showing the affidavit attempted to make.  *See Vilar*, 2007 WL 1070541, at *19–*20.  Indeed, properly particularized requests would have obviated the need to seize entire computers and email accounts and prevented the ongoing invasions of privacy caused by the government's conduct following the seizure.  *See supra* at 4–11.

The so-called "all records" exception cannot save the warrant here.  For a search or seizure of "all records" of a business to be appropriate, a warrant must establish "probable cause to believe that the '*entire* [business] operation is a scam.'"  *Zemylansky*, 945 F. Supp. 2d at 461 (quoting *United States v. Burke,* 718 F. Supp. 1130, 1140 (S.D.N.Y. 1989)).  Only "[u]nder those limited circumstances, [will] 'broad language used in warrants'" pass constitutional muster.  *Wey*, 256 F. Supp. 3d at 388 (quoting *U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989)).  The affidavit, however, never even attempts to establish that Platinum "was merely a front for [a fraud] scheme or that the scheme infused or was otherwise 'inseparable' from the balance of [Platinum]'s corporate advisory activities."  *Id.* at 390.  To the contrary, the affidavit reports that Platinum "is an investment adviser registered with the SEC" and alleges fraud in only one of "several" funds that "Platinum manages."  Dkt. No. 152, ¶ 9.  Platinum was not a front.  It was a legitimate asset manager, as evidenced by its extensive, tangible investment portfolio, and the warrant affidavit confirms as much.

### B.    The Warrant Violates The Fourth Amendment's Particularity Requirement.

Necessity is the touchstone of the particularity requirement, and the warrant in this case fails to justify such a broad seizure.  The Fourth Amendment requires warrants to provide "assurance that the permitted invasion of a suspect's privacy and property are no more than

14

absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). Warrants like the one in this case that "fail[] to describe the items to be seized with as much particularity as the circumstances reasonably allow" are invalid. *Id.* Moreover, because a "hard drive [is] akin to a residence in terms of the scope and quantity of private information it may contain," the particularity requirement "assumes even greater importance" in searches involving computers, iPads, and other electronic devices. *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

As described above, the warrant authorized seizure of essentially every document involved in running Platinum's business. *See supra* at 12–13. This lack of particularity violates the Fourth Amendment. In Judge Nathan's recent decision in *United States v. Wey*, the court suppressed evidence obtained from a warrant that, as here, authorized seizure of "capacious buckets" of information without "actual limitations or constraints." 256 F. Supp. 3d *at* 386. In *Wey*, the list of property to be seized included, among other things, all "financial records," "notes," "memoranda," "records of internal and external communications," and "correspondence." *Id.* All of these materials, and more, were authorized to be seized from Platinum, as well. *See* Dkt. No. 152, Att. B. But such "[w]arrants are—in function if not in form—general warrants" prohibited by the Fourth Amendment. *Wey*, 256 F. Supp. 3d at 386; *see also Zemylansky*, 945 F. Supp. 2d at 457 (lack of particularity unconstitutional where "warrant contains excessively broad categories of items to be searched for and seized, and thereby permits a searching officer to rummage through and seize nearly any conceivable paper and electronic document at" a business office). Indeed, the officers conducting the search here appear to have understood the terms of the warrant to authorize seizure of all records. For example, they seized a CD marked "2003 tax return," even though that fell well outside the warrant's time period of 2010 to the present. Ex. 1 at -0042.

Moreover, as in *Wey*, "the property listed is hardly, by 'its particular character, contraband'" and instead is, "from top to bottom, 'the type of property' that is 'generally in lawful use in substantial quantities.'"  256 F. Supp. 3d *at* 385 (quoting 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.6(a) (5th ed. 2012)).  This calls for "even 'greater care in [its] description.'"  *Id*.  And "[t]his deficiency, while concerning under any circumstances, is only exacerbated by the fact that the [w]arrant[] target[s], in significant measure, the contents of electronic devices, such as computers, internal and external hard drives, and smartphones."  *Id.* at 386.  As a result, just as in *Wey*, the lack of particularity of the search warrant in this case violates the Fourth Amendment.

### C.    The Affidavit Lacks Probable Cause.

The warrant suffers from further, more fundamental, defects.  The foundation of any warrant is probable cause, and here there is no such underpinning.  By conflating issues, concealing key facts, and misleadingly casting innocent facts in a negative light, the warrant affidavit's probable cause showing is a mere façade.  As a result, the magistrate judge did not have a "substantial basis" for a finding of probable cause, and the issuance of the warrant was unconstitutional.  *See United States v. Rutherford*, 71 F. Supp. 3d 386, 391–92 (S.D.N.Y. 2014) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  Here, four allegations critical to the finding of probable cause are illusory, without which the affidavit does not establish probable cause.[4]

---

[4]   In light of the Court's October 25, 2017 order concluding that the affidavit's discussion of CW-1 did not provide a "basis for a *Franks* challenge," the moving defendants do not challenge those statements again here.  The moving defendants, however, reserve their right to challenge the affidavit's representation of CW-1's statements once they receive the government's memoranda of interview with CW-1, which the government has committed to producing with other material subject to 18 U.S.C. § 3500.  *See* Tr. 28–29 (Aug. 28, 2017) (stating that the government would "provide to the defense at the time of 3500 disclosures every witness interview that was generated in connection with our investigation . . . whether or not we will be calling all of those people as witnesses").

#### 1.       *Employee 1 did not Opine on Platinum's Valuation of Black Elk.*

As discussed in prior briefing, *see* Dkt. No. 190, at 3–4, Special Agent Minsky's affidavit improperly attributes to Employee 1 the Special Agent's own misguided theories about Platinum. Specifically, Special Agent Minsky cites information provided by Employee 1, a "former Black Elk officer," as purported "confirm[ation]" of the Special Agent's own conclusion that Black Elk was a key example of Platinum's "fraudulent overvaluations."  Dkt. No. 152, ¶ 21.  The affidavit states:

> Employee 1 informed me that Black Elk had no positive cash flow or net profit in 2013 or 2014, and few assets in 2015 following the sale of its best assets in August 2014 to [Renaissance].  Indeed, Employee 1 stated that from approximately 2012 through 2014, Black Elk was not generating sufficient revenue and could barely pay its vendors and creditors.

*Id.*  The affidavit leaves the unmistakable impression that Employee 1 expressly stated or agreed with Special Agent Minsky's view that Black Elk was fraudulently overvalued.  The government's memoranda of interview with Employee 1,[5] however, say no such thing.

Special Agent Minsky misleadingly suggests that the information Employee 1 did provide—concerning his views on Black Elk's financial results—is tantamount to a view on valuation.  But, it is a well-established principle of finance (undoubtedly known to Special Agent Minsky) that valuation of an investment is not based solely on financial performance factors like cash flow and revenue, but on a number of other inputs and factors.  *See, e.g.*, Dkt. No. 193, at 3–4 (quoting *In re Salomon Analyst Level 3 Litig.,* 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005)

---

[5]   Although the government has not revealed Employee 1's identity, he can be identified based on other information in the affidavit.   For example, the affidavit discusses an email that Defendant Daniel Small sent on August 14, 2014 to Employee 1 and an individual whose name has been redacted in public filings.  Dkt. No. 152, ¶ 29.  An email matching the description in the affidavit, including date, sender, recipients, and content, reveals the identity of Employee 1.  In an abundance of caution given that the government withheld Employee 1's name in its search warrant application, we have continued to use "Employee 1" instead of the individual's name.

(discussing the difference between facts about a company and valuation of a company)). Contrary to the misimpression left by the affidavit, Employee 1 did not opine at all on whether Black Elk was "fraudulently overvalued," much less "confirmed" that. In fact, when the government did ask Employee 1 to discuss valuation one month after the search warrant was issued, he expressly *disclaimed* knowledge of how Platinum was valuing Black Elk: "[Employee 1] did not have any insight into how [Platinum Management] valued [Black Elk] in 2014. [Employee 1] was not sure what [Platinum Management] told PPVA the value of [Black Elk] was." Gov't Mem. of Interview of Employee 1 (July 26, 2016).

The affidavit contains other mischaracterizations of Employee 1's statements. Employee 1 did not describe the assets sold to Renaissance as Black Elk's "best" assets; in fact, he described them as some of the company's more "volatile" assets. Gov't Mem. of Interview of Employee 1 (June 20, 2016). Similarly, Employee 1 stated, with respect to the time period prior to his employment at Black Elk, that he "was not sure" whether Black Elk was paying its vendors because he "did not have any inside knowledge"; there was no statement that the company did not generate enough revenue during that period to pay its vendors. *Id.*

### 2. *Unprofitability and Falling Oil Prices do not Provide Probable Cause of Fraudulent Overvaluation.*

The affidavit's basis for concluding that Platinum fraudulently overvalued investments consists of discussing two of Platinum's oil and gas investments, Black Elk and Golden Gate, and asserting they were struggling financially as a result of (1) falling oil prices, (2) Golden Gate's low current oil production, and (3) an accident at a Black Elk platform years earlier. Dkt. No. 152, ¶¶ 20–21. *First*, as discussed at length previously, the fact that Golden Gate and Black Elk were unprofitable or otherwise in distress is wholly insufficient to establish probable cause that Platinum intentionally and fraudulently overvalued them. *See, e.g.*, Dkt. No. 228, at 3–4.

*Second*, dynamics in the oil market in 2014–15 do not demonstrate that Platinum overvalued Golden Gate and Black Elk.  The gravamen of Special Agent Minsky's discussion of falling oil prices—echoed in the Indictment—is that when the spot prices of oil fell in 2014, Platinum did not reduce the value of its oil and gas positions enough.  Dkt. No. 152, ¶ 20; Indictment ¶¶ 47, 50 (spot prices for oil fell from $105 per barrel at the end of 2013 to $60 per barrel at the end of 2014, and Platinum's valuation of Golden Gate dropped from $191 million to $149 million during same period).  But as Special Agent Minsky surely knew from the valuation report he discussed in paragraphs 19 and 20 of his affidavit, the vast majority of Golden Gate's value derived from its non-producing reserves, which are insulated from spot market volatility. Indeed, in the very report Special Agent Minsky relied on, Platinum's independent valuation consultant noted that Golden Gate's PV10—an industry metric that represents the present value of estimated future oil and gas revenues, net of estimated direct expenses, discounted at an annual discount rate of 10 percent—was approximately $615 million, of which only a small fraction related to reserves exposed to the spot price of oil.  Ex. 15 at -0526 (developed producing reserves contribute approximately $16 million toward overall PV10 of $615 million). This demonstrates that Special Agent Minsky's "simple objective analysis," Dkt. No. 152, ¶ 20, was not only a gross oversimplification, but one that was deeply misleading.

**3.      *There is Nothing Unusual About Predicting Strong Returns in a Particular Month or Seeking a More Stable Investment Base.***

In paragraph 23 of his affidavit, Special Agent Minsky recounts purported statements from an unidentified Platinum investor suggesting that the investor perceived "red flags" because (1) in March 2015, a Platinum executive persuaded the investor to defer a redemption request because April would be a "big month"; and (2) in the summer of 2015, Platinum marketed to investors a class of shares with fewer redemption periods.  Dkt. No. 152, ¶ 23.  Although Special

19

Agent Minsky fails to specify what crime these events supposedly evidence, the allegations are completely benign. *First*, Platinum's ability to forecast returns over a month is not suspicious in the least—money managers can often predict returns with reasonable accuracy over short-term horizons such as a month. For example, one of Platinum's investments could have been close to finalizing a profitable exit or had a financially successful quarter. Indeed, one or more of these events could already have occurred that month and would be reflected in April's statements.

*Second*, to the extent the affidavit seeks to base probable cause on Platinum's liquidity difficulties, this is a red herring. Platinum had "considerable flexibility in seeking the most profitable investment opportunities," including "private equity investments" and other "opportunities in investment vehicles that are not presently contemplated for use by the Master Fund." Ex. 16 at 21. Indeed, investors were informed that:

> The sale of restricted and illiquid securities often requires more time . . . than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. The Master Fund may not be able to readily dispose of such illiquid investments . . . . ***As a result, the Master Fund may be required to hold such securities despite adverse price movements and thus unable to make timely redemption payments***.

*Id.* at 30 (emphasis added). Moreover, as discussed previously, Platinum's offering materials made clear that investors were not guaranteed cash redemptions and may instead receive redemptions "in kind," that is, with direct ownership interests in the fund's investments. *See* Dkt. No. 190, at 2–3. As a result, neither the fact of Platinum's liquidity challenges, nor its marketing of investments with less frequent redemptions, provide evidence of fraud.

### 4. *Platinum's Intra-Year Bank Transfers and Year-End Balances are Irrelevant.*

Finally, the affidavit discusses Platinum's bank accounts at length and alleges it is "particularly odd" that the accounts had year-end balances in the low six- and seven-figures but transfers throughout 2014 and 2015 of substantially more, with inflows and outflows "essentially

identical." Dkt. No. 152, ¶¶ 24–25. The affidavit provides no explanation of how these bank transfers supposedly provide evidence of fraudulent overvaluation of investments or other misrepresentations to investors—the asserted basis for probable cause, *id.* ¶ 8. To the extent the bank transfers provide evidence of anything, they show that Platinum, consistent with its fiduciary duty to investors, quickly deployed incoming cash to maximize returns. Indeed, it would make little sense for a hedge fund to retain cash—either that money should be invested in assets promising a rate of return higher than the risk-free rate, or, if no such opportunities are available, it should be returned to investors. Stockpiling cash is exactly what investors pay hedge fund managers *not* to do, so contrary to Special Agent Minsky's unsupported conclusion, it would have been "particularly odd" had Platinum's accounts showed a buildup of cash.

*        *        *

Absent these four foundational—and deeply flawed—elements of Special Agent Minsky's affidavit, the document fails to establish probable cause.

### D.     <u>Evidence Seized Pursuant To The Warrant Should Be Suppressed.</u>

The Court should suppress the evidence seized pursuant to this overbroad, unparticularized, and unsupported warrant. Suppression of the fruits of a search is appropriate where, as here, the warrant "authorized essentially limitless search and seizure" of documents at an asset manager, "regardless of their potential connection to any criminal conduct and bounded only by the illusory 'limitation' that they relate to" the business and the investigation's targets. *Wey*, 256 F. Supp. 3d at 410. The government's search here "reflects, at least, grossly negligent or reckless disregard of the strictures of the Fourth Amendment," which "are precisely the sort of circumstances, rare or not, that call for blanket suppression." *Id.* Likewise, there is no evidence here that these violations were the result of "isolated negligence." *See id.* at 397 (citing *United States v. Rosa*, 626 F.3d 56, 64–66 (2d Cir. 2010)). In particular, none of the so-called *Rosa*

factors apply because (1) there was no exigency involved in obtaining the warrant; (2) the presence of Special Agent Minsky at the search does not appear to have "*actually impacted* the overwhelming majority of seizure decisions made;" (3) on-site seizure decisions were not "in any way practically constrained by" any limitations, *see, e.g.*, Ex. 1 (reflecting collection of "2003 tax returns" notwithstanding 2010 date limit); and (4) as discussed above at 4–11, the government clearly collected numerous items "'unrelated to the crimes for which probable cause had been shown.'" *See id.*, at 400–03 (quoting *Rosa*, 626 F.3d at 65)).

Nor can the warrant be salvaged by the good faith exception to the exclusionary rule. Reliance on a warrant that "runs afoul of principles that had already been clearly established in binding precedents when [a w]arrant[] w[as] issued and [s]earch[] conducted" is objectively unreasonable. *Id.* at 398. The Second Circuit has made clear that a warrant's "description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quoting LaFave § 4.6(a)). No reasonable agent could have thought Special Agent Minsky's limited fraud allegations supplied probable cause sufficient to justify the limitless reach of the warrant. There is no good faith reliance here.

Moreover, as discussed above, the benefits of deterring unconstitutional searches and seizures outweigh any harm here. *See supra* 10. Suppression is the appropriate remedy.

**III.   THE DEFENDANTS HAD LEGITIMATE EXPECTATIONS OF PRIVACY IN THE AREAS SUBJECT TO THE SEARCH.**

Finally, the defendants have standing to assert Fourth Amendment rights. The Fourth Amendment requires the government to obtain a warrant prior to intruding into an area in which a person has a legitimate expectation of privacy. *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008). Unless conducted pursuant to one of the limited exceptions recognized by the Supreme Court, a warrantless search and seizure is *per se* unreasonable. *Arizona v. Gant*,

22

556 U.S. 332, 338 (2009).   A "legitimate expectation of privacy" comprises two elements: (1) "whether the individual had a subjective expectation of privacy"; and (2) "whether that expectation of privacy is one that society accepts as reasonable." *Hamilton*, 538 F.3d at 167.

### A.   The Defendants Understood That Platinum's Offices And Emails Would Remain Private From The Police.

The defendants subjectively believed that Platinum's workplaces, work computers, and work emails would remain private from the government.   As described in the accompanying Declaration of Mark Nordlicht, Platinum's offices were not open to the public.   Nordlicht Decl. ¶ 3.   Gaining entrance to Platinum's offices required security clearance and specific authorization from Platinum.   *Id.*   Within the office suite there were numerous individual offices and workstations, and while employed at Platinum, each of the defendants had an office or workstation for his exclusive use.   *Id.* ¶ 4.   These conditions ensured that Platinum personnel could expect that their workplaces would remain secure and private.

Platinum also provided its personnel with computers and email accounts for their exclusive use.   Platinum personnel were required to protect their electronic information with a password and to maintain the confidentiality of such information.   *Id.* ¶ 5.   Platinum's compliance policies reserved to Platinum the right to monitor its personnel's electronic information and stated that employees should not expect their electronic information to remain private, but as explained by Mr. Nordlicht, who was the ultimate arbiter of the policy and its implementation, Platinum respected the privacy rights of its personnel.   *Id.* ¶¶ 6–8.   In particular, Platinum permitted use of its computers, email accounts, and other electronic data for personal, non-business purposes and did not routinely audit its employees' personal communications conducted on Platinum-provided computers or email accounts.   *Id.*   Indeed, as demonstrated by the personal and private communications described above, *see supra* at 4–6, the defendants

23

clearly exhibited a subjective belief that messages sent with their Platinum email accounts would remain private.  *See also* Nordlicht Decl. ¶ 10 ("I expected that my Platinum-provided computer, email account, and other electronic information would remain private from law enforcement. Other Platinum personnel, including the Movants, would have been justified in having the same expectation.").

**B.    It Is Well Established That Individuals Have Reasonable Expectations Of Privacy In Their Workspaces.**

The defendants' subjective expectation of privacy is one that society, and the courts, have accepted as reasonable.  The Supreme Court long ago recognized that "one has standing to object to a search of his office."  *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968); *see also United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) (corporate officers and employees may assert a "reasonable expectation of privacy in [their] corporate office[s], and may have standing with respect to searches of corporate premises and records" (citations omitted)).  In *Mancusi*, the police searched a large room that the defendant, a union official, used as a shared office. Although other union officials could access the room, including the records stored in the room that were the subject of the suppression motion, the defendant:

> still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in [the defendant]'s custody.  It is, of course, irrelevant that the Union or some of its officials might validly have consented to a search of the area where the records were kept, regardless of [the defendant]'s wishes, for it is not claimed that any such consent was given, either expressly or by implication.

*Id.* at 369–70.  Moreover, in cases of widespread, systematic violations of privacy, courts have suppressed materials seized from a defendant's workplace, including electronic data seized from the defendant's business computer and email account.  *See, e.g.*, *Wey*, 256 F. Supp. 3d at 379 n.4,

410-11 (suppressing materials, including electronic data and hard drives, obtained from execution of search warrant at office of a private equity fund of which the defendant was the founder and principal executive); *Metter*, 860 F. Supp. 2d at 215–16 (suppressing electronic data seized from computer hard drives and email accounts seized from execution of search warrant at defendant's office); *Reeves*, 2012 WL 1806164, at *8-11 (suppressing electronic documents obtained from execution of search warrant at defendants' office). Accordingly, the Defendants have standing to assert Fourth Amendment rights with respect to the government's search and seizure of materials here.  *See generally* Nordlicht Decl.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the motion to suppress.


DATED:   New York, NY                         QUINN EMANUEL URQUHART &
         November 20, 2017                    SULLIVAN, LLP

                                              /s/ William A. Burck
                                              _____
                                              William A. Burck
                                              Alexander B. Spiro
                                              Daniel R. Koffmann
                                              51 Madison Ave, 22nd Floor
                                              New York, NY 10010
                                              Telephone:  (212) 849-7000
                                              Facsimile:  (212) 849-7100
                                              williamburck@quinnemanuel.com
                                              alexspiro@quinnemanuel.com
                                              danielkoffmann@quinnemanuel.com

                                              *Attorneys for Defendant Mark Nordlicht*