UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>MARK NORDLICHT,<br>DAVID LEVY,<br>URI LANDESMAN,<br>JOSEPH SANFILIPPO,<br>JOSEPH MANN,<br>DANIEL SMALL, and<br>JEFFREY SHULSE,<br><br>        Defendants. | No. 16 Cr. 640 (BMC) |

**MEMORANDUM OF LAW IN SUPPORT OF MARK NORDLICHT'S MOTION TO
<u>DISMISS THE INDICTMENT</u>**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ............................................................................................................................3

ARGUMENT ..................................................................................................................................6

I. THE GOVERNMENT'S DELIBERATE DISTORTION OF EVIDENCE REQUIRES DISMISSAL. ..........................................................................................6

II. AT A MINIMUM, THE GOVERNMENT'S MISCONDUCT REQUIRES REVIEW OF GRAND JURY MATERIALS. .................................................................10

CONCLUSION .............................................................................................................................12

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) .................................................................................................... passim

*United States v. Bari*,
    750 F.2d 1169 (2d Cir. 1984) ................................................................................................ 6

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005) .................................................................................................... 9

*United States v. Ciambrone*,
    601 F.2d 616 (2d Cir. 1979) .................................................................................................. 2

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) .................................................................................................. 8

*United States v. Estepa*,
    471 F.2d 1132 (2d Cir. 1972) ................................................................................................ 7

*United States v. Gallerani*,
    68 F.3d 611 (2d Cir. 1995) .................................................................................................... 9

*United States v. Guadagna*,
    183 F.3d 122 (2d Cir. 1999) .................................................................................................. 9

*United States v. Hill*,
    No. S1 88 Cr. 154, 1989 WL 47288 (S.D.N.Y. Mar. 22, 1989) ..................................... 7, 8, 10

*United States v. Hogan*,
    712 F.2d 757 (2d Cir. 1983) .......................................................................................... 6, 7, 8

*United States v. Koschtschuk*,
    No. 09 Cr. 96, 2011 WL 3295817 (W.D.N.Y. Aug. 1, 2011) .............................................. 11

*United States v. Malachowski*,
    623 F. App'x 555 (2d Cir. 2015) ........................................................................................... 6

*United States v. Peralta*,
    763 F. Supp. 14 (S.D.N.Y. 1991) .......................................................................................... 8

*United States v. Tagliaferri*,
    820 F.3d 568 (2d Cir. 2016) .................................................................................................. 9

*United States v. Twersky*,
    No. S2 92 Cr. 1082, 1994 WL 319367 (S.D.N.Y. June 29, 1994) ...................................... 10

*United States v. Vetere, Judge Sweet*,
    663 F. Supp. 381 (S.D.N.Y. 1987) .................................................................................. 8, 10

*United States v. Wilde*,
 No. 12 Cr. 144, 2012 U.S. Dist. LEXIS 111513 (N.D. Cal. Aug. 8, 2012) ............................. 11

*United States v. Williams*,
 504 U.S. 36 (1992) .............................................................................................. 6, 7, 8

**Rules and Regulations**

Fed. R. Crim. P. 6(e) ............................................................................................................. 5

Fed. R. Crim. P. 6(e)(3)(E) ................................................................................................. 10

**Additional Authorities**

Jewish Calendar: December, 2015, Chabad.org, https://goo.gl/1QcjyY ........................................ 4

Press Conference, Platinum Partners' Founder & CEO among 5 Indicted in a $1 Billion
 Investment Fraud, U.S. Dep't of Justice (Dec. 19, 2016), https://goo.gl/LnS6ZP ..................... 5

Press Release, U.S. Dep't of Justice, Platinum Partners' Founder And Chief Investment
 Officer Among Five Indicted In A $1 Billion Investment Fraud (Dec. 19, 2016),
 https://goo.gl/wJ8pXZ ................................................................................................ 5

Rob Copeland & Rebecca Davis O'Brien, *Platinum Partners Plans to Unwind Main
 Hedge Fund Amid Kickback Probe*, Wall St. J. (June 14, 2016), https://goo.gl/B2y9X9 .......... 4

Zeke Faux, *No Blow Up Is Big Enough To Tarnish Platinum Partners' Returns*,
 Bloomberg (Oct. 21, 2015), https://goo.gl/9wxWjA ................................................................. 4

Defendant Mark Nordlicht respectfully submits this Memorandum of Law in support of his Motion to Dismiss the Indictment.

**PRELIMINARY STATEMENT**

To secure Mr. Nordlicht's indictment for fraud and conspiracy to commit fraud in this case, the government needed to convince a grand jury that Mr. Nordlicht acted with the requisite scienter—that he, in effect, knew that his actions were wrongful. Beyond perfunctory and conclusory allegations that Mr. Nordlicht intended to defraud Platinum's investors, the government provides only one concrete factual allegation going to Mr. Nordlicht's mental state. The government points to a December 2015 email exchange in which Mr. Nordlicht stated that he was "on [his] way to jfk with kids for their 6 pm flight to Israel," which his wife "is literally making [him] get on," as well, to which Defendant Uri Landesman responded that he hoped Mr. Nordlicht's daughters "will reacclimate [sic] quickly." Indict. ¶ 67. The government alleges this exchange shows that Mr. Nordlicht intended to "flee[] from the United States" and thus "illustrate[s] [his] knowledge and awareness of the fraudulent scheme perpetrated on Platinum's investors and prospective investors." *Id.*

The duplicity and deception behind this allegation are shocking. As the government had known for months, Mr. Nordlicht and his family ***lived in Israel***. Mr. Nordlicht's move to Israel was widely reported in the press, and six months earlier one of Mr. Nordlicht's co-defendants explained to the government that Mr. Nordlicht and "his entire family" "moved to Israel in or around August 2015 . . . because he always wanted to live there for a short while and because he is very religious." Gov't Mem. of Interview (June 8, 2016). It is disingenuous to suggest that Mr. Nordlicht flying back to his home after a brief visit to New York over Hanukkah is evidence of his intent to flee the United States.

1

But the government went further than simply *concealing* this crucial exculpatory fact. Its addition of "[sic]" after "reacclimate," as if Mr. Landesman mistyped and meant to say "acclimate," reflects a deliberate effort to *obscure* this fact. If the grand jury knew that Mr. Nordlicht lived in Israel—as reflected in Mr. Landesman's comment that "hopefully the girls will reacclimate quickly"—it would have seen through the government's contrived allegation that Mr. Nordlicht "contemplated fleeing from the United States." *Id.* So the government altered the evidence and falsely made it seem as though the email reflected discussions about Mr. Nordlicht's children acclimating to life on the lam in a foreign country, rather than *re*acclimating to the home in Israel to which they were *returning*, which the government knew to be the truth.

The government's insidious creation of a false impression in order to mislead the grand jury is outrageous. And in this case, it was a consequential factor in persuading the grand jury to indict. Without the doctored email exchange, the Indictment boils down to the government's disapproval of Platinum's valuations of a handful of oil and gas investments, inter-fund loans, and challenging liquidity profile. The conclusory, factually unadorned allegations that Mr. Nordlicht had the requisite scienter never could have justified a sweeping, eight-count indictment alleging that a hedge fund that made its investors hundreds of millions of dollars year-in and year-out for more than a decade was actually a fraud.

The government's affirmative act to distort the December 2015 email exchange casts a pall of illegitimacy and impropriety over this case. Through this conduct, the government "misle[d]" and "engage[d] in fundamentally unfair tactics before" the grand jury, *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979), thereby creating "grave doubt that the decision to indict was free from the substantial influence of such violations," *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quotations marks omitted). As the only particularized factual allegation in

2

the Indictment bearing on Mr. Nordlicht's alleged criminal intent, the government's distortion of his religious and familial obligations to fabricate the appearance of a getaway taints the grand jury's decision to indict. This misconduct requires dismissal of the Indictment. *Id*. If, however, the Court is not prepared to dismiss on the current record, it should order disclosure of relevant grand jury materials to ascertain the extent of the government's misconduct and its effect on the grand jury's deliberations.

## **BACKGROUND**

The Indictment alleges multiple, years-long fraudulent schemes that Mr. Nordlicht supposedly perpetrated on his own investors by overvaluing Platinum's investments and offering favorable redemption terms that created liquidity challenges. Yet despite drawing from five years of facts, numerous witness statements, and nearly 21 million pages of documents (and counting) seized from Platinum, the Indictment provides only one concrete allegation suggesting that Mr. Nordlicht had any intent to deceive. In paragraph 67, the Indictment alleges that Mr. Nordlicht and Mr. Landesman "engaged in an email exchange that contemplated" Mr. Nordlicht and an unindicted co-conspirator "fleeing from the United States," thereby "illustrat[ing] their knowledge and awareness of the fraudulent scheme perpetrated on Platinum's investors and prospective investors." Indict. ¶ 67. The email exchange in question unfolded in relevant part as follows:

- The unindicted co-conspirator sent Mr. Nordlicht and another individual an email on December 13, 2015 at 11:23 am, stating: "Please let's all have just carry on for this trip. No check in luggage. Pls confirm," to which Mr. Nordlicht responded, "I never travel with anything but carry on."

- The unindicted co-conspirator then sent another email, stating: "Don't forget books. Assume we are not coming back to ny Just to be safe. Depends on miami we can fly straiggt to europe from miami on tuesday Take passport."

- Mr. Nordlicht responded 37 minutes later: "Listen. We need to get to jan 1. We have significant issues. I spoke to [my wife] and i am ready to take 7.5 from second mortgage ( pay holdback, ppne interest and play a little offense on positions) but I need 2.5 tommorow to deal with margin. . . . This is what we need to give us chance and I am willing to do my part but can't manage alone and we have immediate issue tommorow morning."

3

- A few hours later, at 3:30 pm, Mr. Nordlicht emailed the unindicted co-conspirator and another individual: "Am on my way to jfk with kids for their 6 pm flight to Israel. [Another individual is] ducking my calls. Major shalom bayis situation. [My wife] is literally making me get on Israel flight if we don't connect and agree what we are doing ."

- Mr. Nordlicht then forwarded this exchange to Mr. Landesman, who responded: "You should get on the flight if there is no bridge, probably even if there is, [the unindicted co-conspirator] didn't set up any meetings for this week? We need to go through the mehalech of how we are going to share this with clients and employees, going to be very rough, big shame, I suggest you partner with more reliable people if you ever do Nordlicht III, tzeischem lishalom, it was nice seeing you, hopefully the girls will reacclimate quickly."

Ex. 1.

At the time of these emails, Mr. Nordlicht lived in Israel. He and his family had moved several months earlier in order to fulfill a lifelong dream of living there for a period of time. On December 13, 2015, when he corresponded with Mr. Landesman, Mr. Nordlicht was driving his family to the airport to return to Israel after a brief visit to New York during Hanukkah. *See id.* ("Am on my way to jfk with kids for their 6 pm flight to Israel."); Jewish Calendar: December, 2015, Chabad.org, https://goo.gl/1QcjyY (Hanukkah ran from Dec. 7 to Dec. 14, 2015). He was also in the midst of a worldwide marketing campaign to raise additional investment in Platinum.

The government was well aware that Mr. Nordlicht was living in Israel. A number of news articles about Platinum Partners and Mr. Nordlicht dating back to October 2015 discussed it. *See* Zeke Faux, *No Blow Up Is Big Enough To Tarnish Platinum Partners' Returns*, Bloomberg (Oct. 21, 2015), https://goo.gl/9wxWjA, (Mr. Nordlicht "recently started splitting his time between New York and Israel") (Dkt. No. 122-4, at 4); Rob Copeland & Rebecca Davis O'Brien, *Platinum Partners Plans to Unwind Main Hedge Fund Amid Kickback Probe*, Wall St. J. (June 14, 2016), https://goo.gl/B2y9X9 (Mr. Nordlicht "lives part time in Israel") (Dkt. No. 107-6, at 3). Moreover, as reflected in the government's investigation files, on June 8, 2016, one of Mr. Nordlicht's co-defendants explained that:

4

> NORDLICHT moved to Israel in or around August 2015 . . . . [He] said NORDLICHT moved his entire family to Israel. [He] said he heard that NORDLICHT was planning to move back. [He] understood that NORDLICHT went to Israel because he always wanted to live there for a short while and because he is very religious.

Gov't Mem. of Interview (June 8, 2016).[1]

Notwithstanding its awareness that Mr. Nordlicht lived in Israel and that his possible trip on December 13 involved returning to his home, as well as the fact that Mr. Nordlicht moved back to the United States in the summer of 2016, the government characterized these emails in the Indictment as Mr. Nordlicht "contemplat[ing] . . . fleeing from the United States." Indict. ¶ 67. Since then, this allegation has been a focal point for the government. In his December 19, 2016 press conference announcing the Indictment, former United States Attorney Robert L. Capers specifically highlighted the "December 2015 email between Nordlicht and Landesman," in which Mr. Nordlicht purportedly "talks about how his wife urged him to fly to Israel," and he later commented that he "can't say whether [Mr. Nordlicht] did or not" buy a ticket to Israel. Press Conference, Platinum Partners' Founder & CEO among 5 Indicted in a $1 Billion Investment Fraud, *U.S. Dep't of Justice* (Dec. 19, 2016), https://goo.gl/LnS6ZP. Similarly, the government's press release announcing the Indictment claimed that Mr. Nordlicht's mental state was "perhaps best illustrated" in the email Mr. Nordlicht forwarded to Mr. Landesman "where he had informed a co-conspirator that his wife was convincing him to get on a flight to Israel if he was unable to get a loan from his partners to save the fund." Press Release, U.S. Dep't of Justice, Platinum Partners' Founder And Chief Investment Officer Among Five Indicted In A $1 *Billion Investment Fraud* (Dec. 19, 2016), https://goo.gl/wJ8pXZ. The government even resorted to this allegation in a non sequitur in its opposition to Mr. Nordlicht's motion regarding Federal Rule of Criminal

---

[1] On March 27, 2017, the government produced to all defendants memoranda of interviews conducted with certain defendants during the government's investigation. Dkt. No. 101.

5

Procedure 6(e), stating that Mr. Nordlicht "contemplated fleeing with his family to Israel." Dkt. No. 122, at 22.

## ARGUMENT

**I.  THE GOVERNMENT'S DELIBERATE DISTORTION OF EVIDENCE REQUIRES DISMISSAL.**

The government's distortion of Mr. Nordlicht's and Mr. Landesman's email exchange requires dismissal of the Indictment. Dismissal is appropriate where, as here, the government's presentation to the grand jury violates "one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States v. Williams,* 504 U.S. 36, 46 (1992) (quotation marks omitted), and the violation "substantially influenced the grand jury's decision to indict, or [raises a] grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quotation marks omitted). An indictment obtained on the basis of spurious premises or "statements or argu[ments] [made] in a manner calculated to inflame the grand jury unfairly against an accused" should be dismissed. *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983). This bedrock principle is so fundamental that it applies even where the government misleads the grand jury unintentionally. *See United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984) (even "reckless misleading of the grand jury as to an essential fact" is impermissible); *accord United States v. Malachowski*, 623 F. App'x 555, 558 (2d Cir. 2015) (summary order).

The government's mischaracterization of the emails cited in paragraph 67 of the Indictment is the kind of knowing or reckless misleading of the grand jury that requires dismissal. The government cannot deny that it knew, for at least six months and potentially more than a year, that Mr. Nordlicht lived in Israel. *See supra* 3–6. Yet notwithstanding its knowledge of this essential,

6

exculpatory information, the government applied a false and inflammatory interpretation to otherwise innocuous emails.

But the government went even further than just applying a baseless sinister spin; it affirmatively altered the email to make it consistent with its knowingly false allegation. Specifically, in paragraph 67, the government added "[sic]" to the portion of Mr. Landesman's email to Mr. Nordlicht that said, "hopefully the girls will reacclimate [sic] quickly." Indict. ¶ 67. The addition of "[sic]" aims to create the impression that what Mr. Landesman really meant was that he hoped Mr. Nordlicht's children would *acclimate* to their *new* home in Israel. But the government knew full well that they would be *re*acclimating to their *existing* home where they had lived for several months. The government's insidious insertion of "[sic]" in order to bolster a knowingly false and inculpatory interpretation of the evidence is outrageous and indefensible.

The government's misconduct was not a mere failure to provide exculpatory information. Instead of simply omitting the extremely exculpatory fact that Mr. Nordlicht and his family lived in Israel, the government *intentionally obscured* that fact by suggesting Mr. Landesman mistyped *re*acclimate, in service of its knowingly false and incendiary allegation that Mr. Nordlicht contemplated fleeing the United States. Whereas the former would violate Department of Justice policy but not necessarily the Constitution, *Williams*, 504 U.S. at 51, the latter violates both and requires dismissal. *Hogan*, 712 F.2d at 762 ("Although the government was not required to anticipate a defense of entrapment and introduce evidence of predisposition, having elected to do so it was duty bound not to introduce false and misleading testimony."); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (reversing conviction and instructing trial court to dismiss indictment where the grand jury was misled regarding basis of knowledge of agent who testified); *United States v. Hill*, No. S1 88 Cr. 154, 1989 WL 47288, at *6–*7 (S.D.N.Y. Mar. 22, 1989)

7

(dismissing counts of indictment where government presented letter to grand jury that contained irrelevant and inflammatory statements that government had been informed were not true). The government cannot seek refuge under *Williams*.

The government's deception requires dismissal. In *United States v. Hogan*, the Second Circuit reversed convictions and remanded with instructions to dismiss an indictment in part because law enforcement had provided "false and misleading testimony" on defendants' predisposition to possess heroin, even though the inaccuracy may have been "inadvertent." 712 F.2d at 761–62. In *United States v. Vetere*, Judge Sweet dismissed an indictment because testimony before the grand jury that the defendant "ha[d] a history of using drugs and drug related arrests" was proven misleading and exaggerated, even though there was "no indication that the government was deliberately proceeding by proffering erroneous information." 663 F. Supp. 381, 383–87 (S.D.N.Y. 1987). And in *United States v. Peralta*, the court dismissed an indictment because the government erroneously stated the law of constructive possession and then elicited "inaccurate" testimony on the location of law enforcement's confrontation with the defendants and defendants' position relative to certain contraband. 763 F. Supp. 14, 21 (S.D.N.Y. 1991). This case presents misconduct that is even more flagrant: as discussed further below, Mr. Nordlicht was indicted on the basis of an affirmative mischaracterization of the government's primary *mens rea* allegation.

The impact of the government's mischaracterization cannot be overstated. Facts about Mr. Nordlicht's mental state undoubtedly are essential to each count of the Indictment. Had the government established that Mr. Nordlicht made "[m]isrepresentations amounting only to deceit," it would not have been sufficient to indict him. *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (quotation marks omitted). Instead, the government was required to show that Mr.

8

Nordlicht realized that his conduct was wrongful and that he acted with "a conscious knowing intent to defraud . . . and contemplated or intended some harm to the property rights of" Platinum's investors. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (wire fraud) (quotation marks omitted); *see also United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (criminal securities fraud requires a "realization on the defendant's part that he was doing a wrongful act" (quotation marks omitted)); *United States v. Tagliaferri*, 820 F.3d 568, 575 (2d Cir. 2016) (criminal investment adviser fraud requires a defendant's "knowledge that his conduct was unlawful"); *United States v. Gallerani*, 68 F.3d 611, 617–18 (2d Cir. 1995) (conspiracy requires a knowing participation in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy). To demonstrate the required consciousness of guilt, the government must show "a realization on the defendant's part that he was doing a wrongful act." *Cassese*, 428 F.3d at 98 (quotation marks and citation omitted). Mental state is critical to that showing.

The government's bogus allegation that Mr. Nordlicht contemplated fleeing to where he lived is the only particularized factual allegation in the Indictment suggesting that Mr. Nordlicht was conscious of the wrongful nature of his conduct. Beyond conclusory allegations tracking the elements of the crimes alleged, the Indictment contains no other allegations outside of paragraph 67 even vaguely suggesting Mr. Nordlicht had a "conscious knowing intent to defraud." For example, the Indictment notes that Mr. Nordlicht was aware that a Golden Gate engineer had a different opinion about that company's value, Indict. ¶ 46; persuaded investors to cancel or delay redemptions, *id.* ¶¶ 60–65; and was aware that Platinum's illiquid investments and favorable redemption terms created an asset-liability mismatch, *id.* ¶¶ 70–72. At best, these allegations reflect the government's disagreement with Platinum's valuation of certain oil and gas investments

9

and disapproval of how Platinum operated its hedge fund business. They do not, however, indicate that Mr. Nordlicht subjectively believed he was engaged in wrongdoing.

The government's fabrication of a plot to flee to Israel undoubtedly "help[ed] push a wavering grand jury over the edge" and thus requires dismissal. *Vetere*, 663 F. Supp. at 387. The government distorted innocuous facts to create a provocative (and false) allegation that constitutes the Indictment's only persuasive factual allegation of scienter. There is thus "grave doubt" that the grand jury's "decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia,* 487 U.S. at 256; *Hill*, 1989 WL 47288, at *7 (finding "grave doubt" where remaining evidence, without government's prejudicial presentation, was not persuasive). The Indictment must be dismissed.

## II. AT A MINIMUM, THE GOVERNMENT'S MISCONDUCT REQUIRES REVIEW OF GRAND JURY MATERIALS.

If the Court is not prepared to dismiss the Indictment outright, it should order a review of the grand jury minutes before ruling. Courts "may authorize disclosure" of matters occurring before a grand jury "at the request of the defendant who shows that a ground may exist for a motion to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii); *see United States v. Twersky*, No. S2 92 Cr. 1082, 1994 WL 319367, at *5 (S.D.N.Y. June 29, 1994) (reserving judgment on defendants' motion to dismiss indictment pending *in camera* review of grand jury minutes where motion raised question about whether grand jury received erroneous information). As discussed above, deliberate deception of the grand jury that influences its decision to indict is grounds for dismissal, *see supra* 6–8, and thus for disclosure under Rule 6(e)(3)(E)(ii).

The government's instructions to the grand jury, any testimony related to Mr. Nordlicht's state of mind or consciousness of guilt, any testimony related to Israel, and a description of the

10

context in which such testimony was given are all relevant to determining the extent to which the government's mischaracterization of the December 13, 2015 email exchange infected the grand jury proceedings. *See United States v. Wilde*, No. 12 Cr. 144, 2012 U.S. Dist. LEXIS 111513, at *3 (N.D. Cal. Aug. 8, 2012) (ordering disclosure of testimony relevant to government's misstatement, government's argument to grand jury, any instructions given to the grand jury referencing the misstatement, and a description of when the testimony was given); *United States v. Koschtschuk*, No. 09 Cr. 96 , 2011 WL 3295817, at *1–*5 (W.D.N.Y. Aug. 1, 2011) (*in camera* review of grand jury testimony required in order to determine extent of prejudice to defendant where prosecutor mentioned his "understanding" of an event in front of the grand jury and that account of events was contradicted by facts known to prosecutor). Before Mr. Nordlicht is tried under this tainted and infirm Indictment, the full extent of the government's misconduct and its prejudicial effect should be determined. That requires, at minimum, impartial review of the grand jury materials.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment or, in the alternative, order disclosure of grand jury materials.

| | |
|---|---|
| DATED: New York, NY<br>February 1, 2018 | QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br><br>/s/ William A. Burck<br>William A. Burck<br>Alexander B. Spiro<br>Daniel R. Koffmann<br>51 Madison Ave, 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7000<br>Facsimile: (212) 849-7100<br>williamburck@quinnemanuel.com<br>alexspiro@quinnemanuel.com<br>danielkoffmann@quinnemanuel.com<br><br>*Attorneys for Defendant Mark Nordlicht* |

# EXHIBIT 1

| | |
|---|---|
| **From:** | Uri Landesman |
| **Sent:** | Sunday, December 13, 2015 3:37 PM |
| **To:** | Mark Nordlicht |
| **Subject:** | Re: Fwd: Re: |

You should get on the flight if there is no bridge, probably even if there is, ▬ didn't set up any meetings for this week?  We need to go through the mehalech of how we are going to share this with clients and employees, going to be very rough, big shame, I suggest you partner with more reliable people if you ever do Nordlicht III, tzeischem lishalom, it was nice seeing you, hopefully the girls will reacclimate quickly.

Sent from my iPad

On Dec 13, 2015, at 3:31 PM, Mark Nordlicht ▬ wrote:

> Fyi, see below
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Mark Nordlicht ▬
>> **Date:** December 13, 2015 at 3:30:32 PM EST
>> **To:** ▬
>> **Cc:** ▬
>> **Subject: Re:**
>>
>> Am on my way to jfk with kids for their 6 pm flight to Israel. ▬ ducking my calls. Major shalom bayis situation. ▬ is literally making me get on Israel flight if we don't connect and agree what we are doing .
>> Sent from my iPhone
>>
>> On Dec 13, 2015, at 12:41 PM, ▬ wrote:
>>
>>> Will call u when I land
>>>
>>>
>>> Sent from my Verizon Wireless 4G LTE smartphone
>>> -------- Original message --------
>>> From: Mark Nordlicht ▬
>>> Date: 12/13/2015 12:37 PM (GMT-05:00)
>>> To: ▬
>>> Subject: Re:
>>>
>>> Listen. We need to get to jan 1. We have significant issues. I spoke to ▬ and i am ready to take 7.5 from second mortgage ( pay holdback, ppne interest and play a little offense on positions) but I

1

need 2.5 tommorow to deal with margin. We had issues whole week last week , I pushed off as far as I can. Can't lose swap relationships or we are done. Will have more indo stock but not until later in week. Trying to reach d now but he not answering. This is what we need to give us chance and I am willing to do my part but can't manage alone and we have immediate issue tommorow morning.

Sent from my iPhone

On Dec 13, 2015, at 12:00 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Don't forget books. Assume we are not coming back to ny Just to be safe.    Depends on miami we can fly straiggt to europe from miami on tuesday  Take passport



Sent from my Verizon Wireless 4G LTE smartphone
-------- Original message --------
From: Mark Nordlicht ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: 12/13/2015 11:24 AM (GMT-05:00)
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Re:

I never travel with anything but carry on

Sent from my iPhone

On Dec 13, 2015, at 11:23 AM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:



Please let's all have just carry on for this trip.  No check in luggage.   Pls confirm



Sent from my Verizon Wireless 4G LTE smartphone



THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY

2

UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE
INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND
DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED
RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY
UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE
INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND
DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EDNY-PP-SW1-001191393