UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

                              16 CR 640 (DLI)

- against -

MARK NORDLICHT,
DAVID LEVY,
DANIEL SMALL,
URI LANDESMAN,
JOSEPH SANFILIPPO,
JOSEPH MANN and
JEFFREY SHULSE,

              Defendants.

-----------------------------------------------------------X

## DEFENDANTS' AMENDED MOTION FOR EVIDENTIARY HEARING REGARDING GOVERNMENT LEAKS

Pursuant to this Court's January 17, 2019 Scheduling Order, Defendants Nordlicht and SanFilippo submit the following Amended Motion for Evidentiary Hearing Regarding Government Leaks. This Court is well aware of the long history of litigation related to the Defendants' claims of government leaks that greatly contributed – if not entirely caused – a decrease in the value of Platinum's assets and precluded Platinum investors from recoupment of their investments. However, recently produced emails between the lead prosecutor in this case, Winston Paes, and the journalists in which Paes disclosed grand jury secrets, which then appear in published articles has tipped this allegation into a certainty. The relationship between the disclosed emails of Paes in this matter and members of the press, as well as the articles published containing leaked grand jury information establish a *prima facie* case, entitling defendants to a hearing. While these

1

emails strongly suggest a 6(e) violation by the government, at the very least there remains outstanding demands for additional relevant documents, and accordingly a hearing is necessary to resolve any outstanding material factual uncertainties.

EVIDENCE OF GOVERNMENT LEAKS BASED ON THE RECENT FOIA
DISCLOSURES AND CONNECTIONS TO CITED ARTICLES

As this court is aware, Nordlicht has vigorously and repeatedly raised concerns that government officials engaged in the improper dissemination of confidential grand jury material causing a precipitous drop in the value in Platinum's assets and making their monetization more difficult. On multiple occasions, the government represented both to Nordlicht's prior counsel and to the Court that it had conducted a thorough investigation regarding Nordlicht's claims:

> MR. BURCK: Yes, Your Honor. Excuse me. The Southern District US Attorney's office, has said that they believe he may have leaked in other cases. We want to be able to explain to the Court our view on this. And, again, we can do it first in a letter format and seek a motion thereafter, or we can go straight to the motion. Whatever the Court's preference is.
> THE COURT: What is the status of the government's investigation into this allegation?
> MS. COOLEY: Your Honor, when we received counsel's letter, "we obviously took it seriously and we began a process of looking into it, which is ongoing". We have begun that process, and it continues.
> *See Hearing March 27, 2017, pg. 35.*

Ms. Cooley eventually represented to the court that their investigation had concluded, and that they had determined there had been no leaks of such material. Ms. Cooley specifically represented to this Court that Paes *did not* disclose any such information to any reporter. (*See* Cooley Affidavit, attached as Exhibit A). But sixty-three pages of emails recently provided to Nordlicht in response to his FOIA request show communications between former prosecutor Winston Paes and multiple reporters, each

of whom is credited as either authoring or contributing to articles that disclosed confidential grand jury information that all but prove Paes disclosed information about his investigation into Platinum. (See FOIA production attached as Exhibit B). Indeed, these sixty-three pages of communications between Paes and the reporters of these articles demonstrate a questionable relationship (certainly in violation of 1.7000 of the USAM), one which apparently led to Paes' believing that he could direct some of these reporters on what to write about. On one occasion he instructed Bloomberg Reporter, Christie Smythe, to write about a case he was filing, writing "I know you're probably writing something about Shkreli now but you have to also write about a big take down today. 9 individuals arrested." When the reporter asked if the indictment was *unsealed*, Paes acknowledged that everything was still sealed, but that it would be public shortly. Paes did not just release sealed information shortly before it was unsealed but rather throughout his investigation into Platinum (and other cases).

One of the most detrimental disseminations of confidential grand jury information occurred with the June 22, 2016 *Wall Street Journal* article written by Christie Smythe and Zeke Faux, titled, *Platinum Partners Said to Be Raided by FBI Amid Bribes Probe*. Emails show former prosecutor Winston Paes planning and meeting for dinner at a restaurant named "Atrium Dumbo" with Bloomberg Reporter Christie Smythe at 6:35pm on the night before she authored this article. The emails show that Paes requested a dinner, rather than just drinks, which they had, establishing that the two of them spent at least an hour together that evening. Christie Smythe had never previously written on Platinum.

After Paes' and Smythe's dinner at the Atrium, on June 22, 2016 at 12:54 p.m., Christie Smythe and Zeke Faux released the Bloomberg article headlining that Platinum

Partners was raided. The article revealed that Platinum offices had been "raided by federal agents looking into the hedge fund's operations...according to a *person familiar with the matter*." The article also revealed that the "investigation, *also* involves the U.S. Attorney's office in *Brooklyn*." The article then explains that "[t]he raid is *separate from the bribery probe, the person said*." Again, the article explains "[b]oth people requested anonymity because they're *not authorized to speak publicly* on the matter."

Prior to the release of this article, Zeke Faux emailed Nordlicht at 10:17 a.m. on June 22, 2016 and asked: "Was the FBI at platinum today Hearing they were. What did they take what are they looking for." This email was sent to Nordlicht well before anyone within Platinum or outside the government would have had an opportunity to tip off the reporter, because when agents arrived at Platinum Partners to conduct the search, computers and telephones were taken from every Platinum employee present at the office. Further, the employees were not allowed to leave or communicate with anyone during the execution of the warrant. The FOIA documents suggest Faux "heard" about this raid from his colleague, who dined with Paes the night before.

In addition, the article's reference to the USPI agents seen in the *lobby* of the building where Platinum's offices were located does not explain how the reporters knew that the agents were going to conduct a search of Platinum Partners, as opposed to another company with offices in the skyscraper. It also does not explain how the reporters knew that FBI agents were *also* involved in the search of Platinum's offices.

The government previously pointed to the search warrant as a potential source of the information that was given to reporters. However, the specific details contained in the June 22 article could not have come from the search warrant. (*See* Search Warrant, attached as Exhibit C). The search warrant was issued by the Southern District of New

York. Thus, there would have been no indication in the warrant that it was the *Brooklyn Office*, or *even* the Eastern District of New York, that was investigating the "operations" of Platinum Partners. This information could have only come from someone with knowledge of the investigation. That Paes and the lead journalist of the article dined the night before is strong enough circumstantial evidence to order a hearing without more. But there is more.

The widespread knowledge regarding the raid, and the raid being "separate from the bribery probe," caused a clear and significant degradation of Platinum's publicly traded and private equity positions. In addition, Platinum's prime brokerage relationships across the board were greatly alarmed and raised margins significantly, creating devastating consequences for Platinum's liquidity profile. (See attached Exhibit D). In fact, one key Platinum holding (Echo Therapeutics) had its Nasdaq listing threatened. (See attached Exhibit E).

In an email exchange prior to another leak article, Christopher M. Matthews invited Paes to "catch up soon? Have a couple items." Matthews and Paes agreed to meet the following week at their "usual spot." That Winston Paes had an ongoing relationship with *The Wall Street Journal* Staff Reporter and agreed to meet him at their "usual spot" is unnerving. However, even *more* troubling is the fact that this same *Wall Street Journal* Reporter, Christopher M. Matthews, contributed to one of the main leak articles that Nordlicht has *repeatedly* brought to the government's attention for disclosing confidential grand jury information and causing losses to Platinum's asset values.

An earlier *Wall Street Journal* article written by Rob Copeland and Christopher M. Matthews who contributed to the July 25, 2016 article, was the first major dissemination

5

of confidential grand jury information in Nordlicht's case. The article entitled *Platform Partners Plans to Unwind Main Hedge Fund Amid Kickback Probe*, was published on June 14, 2016. The first notion that there was a separate investigation into Platinum "from U.S. prosecutors into its business, *according to people familiar with the matter*," was revealed in this article.

The article also revealed that "[a] *second group of federal prosecutors*, assisted by the Federal Bureau of Investigation, are pursuing an investigation of Platinum itself, *people familiar with the matter* said." And the article disclosed that the "inquiry is led by the U.S. attorney's office in *Brooklyn* and focuses on *Platinum's operations* rather than the alleged bribery scheme, *the people said*." The most significant detail revealed by the article is that "[t]he *Brooklyn office has sent subpoenas in connection with the probe, the people said*."

Another article, posted on July 25, 2016 in the *Wall Street Journal*, was titled *Fraud Probe Ricochets Through Platinum Partners, a Hedge Fund With Ties to Jewish Community*, represents another significant dissemination of confidential grand jury material. *Wall Street Journal* Reporter Rob Copeland authored the article, while *Wall Street Journal* Staff Reporter, Christopher M. Matthews, "contributed" to the article. Emails produced pursuant to Nordlicht's FOIA request show a continuous and close relationship between Winston Paes and contributing author Christopher M. Matthews.

The article describes a "fraud investigation" into Platinum "separate from the bribery investigation." The article further discloses that -- "[a]mong questions investors seek to answer is whether Platinum misstated values of some holdings, the *people familiar with the probe said*," *and* that "[i]nvestigators now are looking into whether,

6

before the suspension, Platinum had been paying some reported investment gains to exiting investors with money from incoming ones, *according to people familiar with the probe.*" This suggestion that Platinum was a ponzi scheme in July 2016 (six months before any indictments) was devastating to Platinum's ability to monetize their assets. The article attributes the detailed information from "audits and other documents reviewed by the Wall Street Journal," from "interviews with current and former investors and employees of Platinum," and finally, from "*others familiar with the investigation.*"[1]

Another set of emails confirm that Paes met with Hurtado on July 29, 2016 in the lead up to another devastating article containing grand jury leaks. Paes sent Hurtado an email suggesting they meet at Starbucks, and Hurtado replied "I'm here. See you soon. Found a table." Days later, on August 5, 2016, Bloomberg Reporter Zeke Faux emailed Nordlicht with specific questions pertaining to the investigation. There is simply no way that Mr. Faux could have asked the questions he did unless someone was feeding him confidential grand jury information.

The obvious leaks of confidential information was raised with Paes in real time. In a telephone conversation with Paes on August 1, 2016, Nordlicht's prior counsel, Andrew Levander, demanded that Paes stop leaking confidential information about the investigation because it was having an adverse impact on the value of Platinum's assets. Then on August 8, 2016, Levander had a meeting with Paes, during which he reiterated the impropriety and destructive nature of the leaks. Paes' response – like the one he

---

[1] An interview of *Wall Street Journal* Reporter Rob Copeland, *5 Answers with Rising Star Rob Copeland*, WSJ (Apr. 11, 2017), supports Nordlicht's repeated complaint that grand jury information was disseminated to the media by the government. In response to a question, Copeland says "I worked on Platinum for months until we had something concrete to tell readers." Of import, in one of Copeland's final answers, he says "The ability to convince strangers to tell you things they shouldn't is a transferable skill."

apparently told Ms. Cooley during their investigation into the leaks – was that he was not at all involved in the dissemination of confidential grand jury information. We now know that this was a false denial. Plainly, emails negate Winston Paes' contention.

It appears that Levander's complaints stayed in Paes' mind and kept him awake. On August 10, 2016, Paes sent an email to Bloomberg Reporter Patricia Hurtado at 5:44 a.m. The email did not contain any substance in the body, and there is no visible subject line, as is the case with the majority of the emails that the Government recently produced. The subject line of Hurtado's direct reply to Paes' email reads "Re: What's your cell #?," evidencing the fact that Paes had reached out to the Bloomberg Reporter by email to ask for her cell phone number. In other words, following Levander's demands that Paes stop leaking information learned during his investigation to the press, Paes switched his mode of communication with this journalist from government email to his phone through voice calls and text presumably text messages.

Several hours later Hurtado replied -- "Sorry! It's [REDACTION]. I'm in LA visiting [REDACTION]. I'm available." Paes replied shortly thereafter and says -- "Sorry, was in meetings until now. *You probably now know what is was about.*" On the same day, Hurtado noted in an email to Paes stating that "a colleague of mine heard something about Platinum and asked that I run something by you. Do you have a moment where I could give you a call?" Paes replied "*[s]orry, I can't talk about Platinum.*"

The evidentiary record, however, suggests that in fact he did talk about Platinum that day. The next day, August 11, 2016, Bloomberg released an article authored by Zeke Faux with contribution by "*Patty Hurtado*" entitled *Platinum's California Oil Fields Said to Be Subject of Probe*. The article disclosed in detail the very allegations regarding Platinum's holdings in Golden Gate Oil that are now in the indictment and which could

8

have only been known as a result of the grand jury investigation. While the article describes in detail almost everything about Platinum's investment and valuation of Golden Gate, Hurtado makes clear in the article that the information did not come from Golden Gate, who "did not return messages seeking comment." The article credits the information as being obtained from "a person with *direct knowledge of the matter.*"

The following day, on August 12, 2016, Hurtado emailed Paes with the subject line "*God forgot to say thank you*" and in the body of the email, Hurtado wrote "[t]hank you for thinking of me and for the head's up!" Winston Paes replied -- "*Sure, no problem.*" In context, it is clear that Paes' comment, "Sorry. I can't talk about Platinum," was not evidence of an honorable act to protect the sanctity of the grand jury process, rather it appears to be a cover email.

It is thus clear that Winston Paes' unwillingness to discuss Platinum in the indelible format of email was directly related to Mr. Levander's very recent and persistent demands that the disseminations stop. It is also evident that Paes almost immediately gave Bloomberg Reporter Patricia Hurtado a "heads up" as to avoid leaving a further electronic record from which the disseminations could be traced back to him.

Not only do the produced emails solidify Nordlicht's repeated assertions that Paes' was involved in improper dissemination of grand jury material, and that these leaks decreased the value of Platinum's assets, they also prove that *another* government official was leaking confidential grand jury information to the media.

On December 13, 2016, Hurtado emailed Paes and asked if he has "anytime in the next few days to catch up?" In the same email, Hurtado emailed "*… just wanted to check in on what I might need to get ready for.*"

9

A few days later, on December 19, 2016 at 6:13 a.m., the morning of Nordlicht's arrest, Paes replied to Hurtado's email, "Big arrests this morning." At 7:45 a.m., Hurtado replied *"Thank you! Spoke to JM."* By 9:08 am, Hurtado sent Paes an email with the subject heading "this sure sounds like a ponzi scheme, no?" To which Paes replied "Yes, it does."

Indeed, the totality of the email exchanges between Paes and Bloomberg Reporters Hurtado and Smythe demonstrate that Paes was driven to maximize press coverage of his cases not for any legitimate law enforcement purpose, but rather simply to feed articles to journalists for his own publicity, in violation of the United States Attorney's Manual, Eastern District office policy, and perhaps the law. For these efforts, he was rewarded by the journalists well versed in the practice of "access journalism," agreeing to drinks and dinners with Paes, showering him with compliments and flattery over email, and even writing lionizing press articles about him to assist in his search for a private sector job (Paes was hired by Debevoise & Plimpton shortly after the Platinum indictment) by portraying him in their articles as a "top prosecutor."

While the FOAI production only provided documents from 2016, the relationship between Paes and Smythe went back since at least May 2015 when she wrote an article about him entitled, *Look Out Wall Street: There's a New White-Collar Cop in Brooklyn*. The article includes a picture of Winston Paes in a courtroom, *"taken by Christie Smythe."* The article written by Smythe also includes a quote that Paes made "over pizza at *Bevacco* near his office in Brooklyn," – another frequent spot Winston Paes met with reporters based on the FOIA disclosures. (Emails from March 21, 2016 show Smythe and Paes arranging to meet later in the day "to chat." While the record needs to be developed, it is possible Paes' willingness to disclose grand jury information to Smythe

predated this article, or perhaps started following it because Paes felt indebted to her for writing such a flattering article focused on him that was published around the world.

The FOIA emails recently provided to Nordlicht by the Department of Justice coupled with the previously cited news articles substantiate Nordlicht's repeated allegations of rampant government leaks. The information Paes shared with reporters could have only been obtained through the Grand Jury process. At a minimum, the Defendants have established a prima facie case of government leaks that requires a hearing.

## MEMORANDUM OF LAW

Rule 6(e)(2)(B) prohibits government attorneys and agents from disclosing any "matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). This is because "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," which encourages voluntary participation in investigations, enables witnesses to testify fully and frankly, safeguards the investigative process from undue outside influence, and spares uncharged investigatory targets from public ridicule. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979).

"The determination of whether something is a matter occurring before a grand jury for purposes of applying Rule 6(e) is a 'fact-specific inquiry.'" *United States v. Skelos*, No. 15 CR 317 KMW, 2015 WL 6159326, at *10 (S.D.N.Y. Oct. 20, 2015). Significantly, "information that reveals the strategy or direction of a grand jury investigation" constitutes "a matter occurring before the grand jury." *Id*. Likewise, a "matter occurring before the grand jury" is one that "reveals the nature, scope, or direction of the grand jury inquiry." *Dassault Systemes, S.A. v. Childress*, No. 09-10534, 2009 WL 1447670, at *2

(E.D. Mich. May 22, 2009) (quoting *In re Grand Jury Proceedings,* 851 F.2d 860, 867 (6th Cir.1988)).

Here, the FOIA disclosures connected to the cited articles clearly establish that Paes leaked matters occurring before the grand jury to members of the press. Based on the circumstances described above, Paes leaked information related to grand jury subpoenas, disclosed the targets of the investigation, the theories of wrongdoing that the government was presenting to the grand jury, specific practices and investments that the grand jury was investigating, as well as specific facts, strategy, direction, and scope of the investigation gleaned through the grand jury process. The results of these leaks were critical, and these articles caused damaging publicity that tainted the evidence available to the grand jury. While this Court has previously ruled any claims of leaks were speculative based on the record without the recently produced FOIA records, the timing and content of the recent FOIA disclosures makes it obvious the former lead prosecutor in this matter routinely fed grand jury matters to the press, to the detriment of the integrity of the Platinum investigation, and in violation of the law.

Importantly, at this stage in the proceedings, the law does not require a showing of prejudice. However, the Defendants have apprised this Court of real and measurable prejudice caused by the leaks in multiple other pleadings. Right now, all that is required for a hearing is a *prima facie* showing of a Rule 6(e) violation. The FOIA disclosures coupled with the connection to the leaks-based articles meets this "light" requirement.

## NORDLICHT HAS IRREFUTABLY MADE A PRIMA FACIE SHOWING THAT ENTITLES HIM TO A HEARING

As this Court is aware, it is only necessary the Defendants make a *prima facie* showing of government leaks. The point of the evidentiary hearing in Rule 6(e) cases is to

allow the defendant to develop the record and establish prejudice. Therefore, all that is needed to require a hearing is a *prima facie* case. *See Barry v. United States,* 865 F.2d 1317, 1321 (D.C. Cir. 1989) ("once a prima facie case is shown, the district court must conduct a 'show cause' hearing"). As the D.C. Circuit has explained "this determination will typically be based solely on an assessment of news articles submitted by the plaintiff." *In re Sealed Case No. 98-3077,* 151 F.3d 1059, 1067 (D.C. Cir. 1998) (emphasis added). This is because a "Rule 6(e)(2) plaintiff could not be "expected to do more at this juncture of the litigation" given that he or she would "almost never have access to anything beyond the words of the news report." *Id.* (quoting *Barry,* 865 F.2d at 1326). Therefore, there is a "relatively light" burden to establish a *prima facie* case of Rule 6(e) violations.

Here the Defendants have made a much stronger showing than is necessary under established law. Through separate FOIA litigation, proof of the existence of the communications between Paes and the press, and a subsequent request under *Brady* and *Giglio*, Nordlicht was able to ultimately obtain concrete evidence suggesting government leaks. Had this Court and the original Judge in this matter been provided this information by the government when it was first raised, a hearing most certainly would have ensued. Instead, the Court was provided an affidavit from a member of the prosecution swearing that no leaks occurred. That affidavit is now called into question. More troubling, there is no assurance that the communications provided purportedly under FOIA, and not pursuant to Brady and Giglio, are the full extent evidence of the government leaks in this matter. A separate Motion to Compel is currently pending before this Court to address this concern. (*See* Dkt. #491). Undoubtedly, a hearing is necessary to establish the extent of the leaks and the prejudice caused by the leaks. Simply put, an assertion of government

13

leaks of grand jury material requires the Defendant make a showing of smoke, not fire. Nordlicht has made that showing.

## CONCLUSION

For all of the foregoing reasons, Nordlicht respectfully requests that the Court grant this Amended Motion to Evidentiary Hearing Regarding Government Leaks and order a hearing to determine the extent of the leaks and the prejudice stemming from the leaks.

Respectfully submitted,

Dated January 22, 2019

*/s/ Lisabeth J. Fryer*
LISABETH J. FRYER
LISABETH J. FRYER, P.A.
250 International Pkwy, Suite 134
Lake Mary, Florida 32746
Telephone (407) 960-2671
Florida Bar No. 89035
lisabeth@lisabefryer.com
(One of the Attorneys for Mark Nordlicht)

Cc: All counsel of record (by ECF)