

April 28, 2019

<u>*Via CM/ECF*</u>

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    *United States v. Nordlicht, et al.*, Docket No: 1:16-cr-00640 (BMC)

Dear Judge Cogan:

    Defendants respectfully submit this reply letter in further support of their April 24, 2019 letter motion *in limine* (the "April 24 Letter"), seeking to strike (with appropriate instructions to the jury) certain irrelevant, immaterial, confusing, and highly prejudicial testimony from investor John Huth, as well as to preclude similar testimony in the future.

    The Government's opposing papers [Dkt. No. 666] make only a feeble attempt to address Defendants' constitutional concerns, and is rife with inaccuracies concerning the principal facts at issue. But first, as a threshold matter, the Government's basic argument is premised on an improper reading of *Weaver v. United States*, 860 F.3d 90 (2d Cir. 2017). *Weaver* involved a fraudster who sold vending machines, at $10,000 apiece, to unsuspecting customers, many of whom lost their entire investments. Weaver was indicted for fraud and convicted on all counts following a six-week trial. His main defense was that his victims had signed contracts acknowledging that no verbal promises, or earlier representations had "influenced" their decisions to purchase the machines, and so any extra-contractual representations were not material as a matter of law. *See* 860 F.3d at 92-94. The Court rejected Weaver's argument, explaining "fraudsters may not escape criminal liability for lies told to induce gullible victims to make worthless investments by inducing them to sign a contract containing disclaimers of reliance." The Court held that the disclaimers "were relevant to the jury's determination of Weaver's guilt," but "they did not render extra-contract misrepresentations immaterial as a matter of law" after finding that Defendants specifically instructed customers to ignore the "unimportant" "legalese" and "mumbo jumbo." *Id*. at 95-97.

    *Weaver* is inapposite here. The Government attempts to use *Weaver* to open the door to testimony as to any beliefs or conclusions held by Platinum investors, no matter how mistaken, misinformed, speculative, or at variance with the fund's governing documents. But, unlike *Weaver*, Defendants here are *not* trying to use "gotcha" disclaimer language as a legal shield to criminal exposure. Rather, they are pointing to the *substantive* disclosures in the governing fund

documents (PPMs, subscription agreements, financial statements and the like) to preclude (or strike) testimony so far afield from fact or common sense that, under *Litvak* and similar cases, it should not fairly be considered by the jury in determining materiality or any other relevant fact. Indeed, unlike in *Weaver*, Defendants here are not asserting that prior misleading statements are immaterial because of subsequent disclosures, but that truthful accurate information was contained in the fund documents and audited financial statements and therefore investor testimony that they either did not read or understand the disclosures renders their erroneous beliefs that are contrary to them immaterial and irrelevant.

This impermissible testimony falls under one of two broad headings: beliefs that are flatly at variance with important representations in Platinum's governing documents; and beliefs that are for other reasons "ridiculous, absurd, or idiosyncratic," as this Court phrased it [4/25/19 Tr. at 517].

    1.    *Huth Testimony That Was at Variance With the Fund's Governing Documents*

One of the most glaringly inaccurate aspects of Huth's testimony was with respect to his supposed unilateral ability to opt out of the side pocket. [Tr. 04/24/19, Huth – Direct – Hein, at 272-73, 274, 275] As this Court recognized, "I've never heard of an LP that gives every limited partner absolute veto right as their interest to kill the deal… [And if that is also the case here], then Dr. Huth's understanding that he could keep his interest no matter what the other 51 percent or 66 percent or 75 percent of the partners wanted to do would be just flat-out wrong." [4/25/19 Tr. at 518]

The controlling Fund documents show that in fact Huth's belief was "flat-out wrong." Accordingly, Huth's subjective belief that if he merely did not sign the consent he would not be bound by side-pocket is utterly wrong. What is worse, it was presented to the jury by the Government and Huth as some type of fraudulent conduct on the part of Defendants, when in fact it was conduct expressly permitted by the contract Huth signed. The Government's opposition letter fails to show otherwise.

The Government attempts to avoid this obvious truth by arguing that there is no reference to Huth being bound by the terms of the side pocket in "the November 23, 2015 cover email" to him. But, of course, the relevant and controlling language was contained in the very document attached to the email, which he testified to not reading, and in the LP agreement. [Dkt. No. 666 at n.4] The Government also suggests that because the fund's liquidity situation was not fully disclosed in the body of the email, this too, suggests some failure to disclose. But this argument is completely beside the point as the issue is whether the controlling Fund documents permitted a consent vote that would be binding on Huth – which they did. Moreover, the Government's reference to the content of a cover email as purportedly concealing the liquidity status of the Fund ignores that PPVA had just published its audited financial statements on September 17, 2015, which clearly set forth the liquidity status of the Fund – as had all the prior audited financial statements – additional documents that Huth elected not to read.

Equally glaring was Huth's misguided belief that he had the untrammeled right to redeem his holdings for cash at any time, subject only to the 60 day (plus 30 day) notice period.[1] The governing documents make very clear that he had no automatic right to cash redemptions at all and that illiquidity could prevent timely redemption payments within 90 days. As Huth acknowledged, the offering memorandum that he signed and agreed to be bound by provided "Substantial withdrawals of capital by the Partnership from the Master Fund in connection with Limited Partner withdrawals could require the Master Fund to liquidate investments more rapidly than otherwise desirable which could adversely affect the value of Interests and cause the Partnership to make distributions in kind rather than in cash."

Moreover, Huth's incorrect assumptions about redemptions and the impact of illiquidity taint numerous other improper assertions in his testimony, including:

- Huth A: "…And I liked that PPVA had a hedge fund approach, that they were specifically targeting to achieve good returns *without being exposed to the market*." (Tr. 04/24/19, Huth – Direct – Hein, pg. 198) (emphasis added).

- A: "The fund had favorable liquidity terms…Quarterly opportunity to redeem…and I didn't want this investment to be tied up for many years without my being able to access that." (*Id.* at 199)

- Q: "And were these redemption terms important to you when you decided to invest in PPVA?" A: "They were. Again, you know, an investment you make you really don't want that money tied up indefinitely…If it had been the terms of something like, you can't touch your money for two years, I wouldn't have invested…" (*Id.* at 208).

- Q: "Mr. Huth, were these redemption terms of the PPM important to your investment?" A: "Yes." Q: "Why?" A: "Again, it's important to be able to have access to your money and not have it locked up unaccesible [*sic*]. It's important to have the ability to withdraw money from an investment if the investment is not performing like it has performed in the past or if you see something that is not in line with what you thought you had gotten into." (Tr. 04/24/19, Huth – Direct – Hein, at 220)

- A: "I believe that the document specifies 30 days in order to make the payment, and so 30 days should be – it should take no longer than that for them to return the money." (Tr. 04/24/19, Huth – Direct – Hein, at 237)

---

[1] The Government's argument here, that investors expected all redemptions to be paid in cash, because historically the fund had met all its cash redemptions, is an attempt to rewrite the controlling documents between PPVA and its investors, which explicitly provide for redemptions to be made at Nordlicht's sole discretion and only under limited circumstances, and explicitly provided for "in-kind" redemptions.

All of these assertions reflect Huth having a belief concerning redemptions that was contrary to the governing documents, which specifically and repeatedly warned Huth that his investment could be tied up for an extended period of time, as provided for in the PPM "As a result, the Master Fund may be required to hold such securities despite adverse price movements and *thus unable to make timely redemption payments. Even those markets that the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity. Occasions have arisen in the past where previously liquid investments have rapidly become illiquid*."

As a final example – and perhaps the most remarkable one – Huth also suggested that PPVA was marketed to him as a "liquid" fund and that he reasonably believed that to be the case. While PPVA was certainly more liquid in 2007 than it was during 2011-2016, Huth's purported belief is flatly contradicted by both the PPM and the relevant PPVA financial statements, which represent in detail that the fund's illiquid investments were never below 85% and nearly 104 % of net assets by the end of 2014.  Huth, however, actually testified that he never read the financial statements, although he conceded that like every investor, he received one every year of his investment. (Tr. 04/24/19, Huth – Cross – Sommer, at 436-437)

Out of desperation, the Government suggests that the audited financial statements – the most important financial documents issued by PPVA each year – are somehow not governing documents, or otherwise not important enough to be required reading by investors.  [Doc. No. 666 at n.7]  That would be news to any mainstream sophisticated investor and contrary to the law of this circuit.  Indeed, as the Government must know, courts impose a more stringent standard on "sophisticated" "accredited" investors, such as Huth, and every investor who was permitted to invest in PPVA, holding that they have an enhanced duty to obtain available information material to investment decisions, including audited financial statements. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.1997); *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997). Similarly, when the plaintiff "'was placed on guard or practically faced with the facts' " when entering a transaction, courts require a "heightened degree of diligence." *Banque Franco–Hellenique de Commerce v. Christophides,* 106 F.3d 22, 27 (2d Cir.1997) (quoting *Mallis,* 615 F.2d at 81).  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001).

In any case, the fund's financial statements *are* mentioned as governing documents in the subscription agreement, both for Huth's second subscription in March 2011, which he signed and which provides he agrees to be bound by the offering memorandum and subscription agreement in effect at the time of signature, and for all other investors after June 2010.  That subscription agreed provides that "The subscriber…acknowledges that…the Subscriber is not relying upon any information or representations other than as expressly contained in the Limited Partnership Agreement, the Offering Memorandum, any supplements thereto and ***any financial statements provided to Subscriber by the General partner*** (or its agents)." (Ex. A and B at ¶ 3) (emphasis added).

The Audited Financial statements for 2011 to 2014 (published September 2015, with all subsequent events up to that date), which every investor received every year, painted an accurate picture of the fund's liquidity. (See SS&C emails to Huth attaching financials, Ex. C, D) As Huth acknowledged even though he did not read the audited financials, they clearly disclosed that the fund was 94% illiquid in 2011, 87% illiquid in 2012, 89% illiquid in 2013, and 104% illiquid in 2014. The 2013 audited financials, published February 11, 2015 (including subsequent events up to that date), plainly discloses that while the fund was 89% illiquid meaning that it held only $75 million in liquid assets as of December 31, 2013, that the fund had borrowed $95 million from affiliate funds and related entities of which it had only paid back $54 million.

For Huth to take the stand and assert that he thought Platinum was a "liquid fund" is "ridiculous, absurd, and idiosyncratic." It is also unhelpful for the jury, and entirely irrelevant to any fact in issue in this case: Huth's testimony must therefore be stricken, and all such future testimony should be precluded.

Huth's other testimony – which Defendants also seek to strike here, illustrates how irrelevant future investor testimony is on redemptions, liquidity, or any other issue that is explicitly disclosed in the fund's governing documents, including the audited financial statements.

> 2. *The Government's Direct Examination of Huth Relied Almost Exclusively On Non-Operative, Summary Marketing Materials that Directed Huth to the Operative Documents, And Which Huth Expressly Disavowed Relying on When He Signed the Subscription Agreement*

An "accredited investor" and "qualified purchaser" (that is, a "sophisticated investor") may not disclaim a prior representation that she is an accredited investor/qualified purchaser. *See, e.g.*, *SEC v. Ishopnomarkup.com, Inc.*, 2007 WL 2782748, at *9 (E.D.N.Y. Sept. 24, 2007) ("Investors, who affirmed in writing that they met the accreditation requirements, [may] not 'disavow their representations that they were accredited investors."); *Goodwin Properties, LLC v. Acadia Grp., Inc.*, 2001 WL 800064, at *7-8 (D. Me. July 17, 2001) (individuals "may not disavow their representations to the defendants that they were in fact accredited investors"). Indeed, the SEC defines an "accredited investor" as a "sophisticated investor." The Government's argument that the investors in PPVA were only wealthy, not "sophisticated" is wrong as a matter of law, every investor signed subscription documents attesting to being accredited investors and qualified purchasers.

Nor can an investor hide from prior disclaimers disavowing that she relied on disclosures contained in non-operative entity docs. *See, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, (2d Cir. 2016) ("sophisticated investors" may not claim "surprise" when it is revealed that the agreement they signed "meant what it said"); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278–79 (Ct. App. 2011) ("As sophisticated entities, they negotiated and executed an extraordinarily broad release with the eyes wide open. They cannot now invalidate that release by claiming ignorance…."); *Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp.

324, 333-36 (S.D.N.Y. 1993) ("Given abundant warnings in the PPMs," sophisticated investor may not claim to have been misled by "bullish statements" or even "financial projections" contained in non-operative documents).

The PPM explicitly states that the partnership will only accept subscriptions from "sophisticated investors." Notwithstanding these black letter principals, the Government spent nearly the first two hours of Huth's testimony eliciting responses suggesting that the basis for investing in Platinum were statements contained in a "Presentation" from 2007 – which falls outside the scope of the statute of limitations in any event[2] – even though the Presentation disclaims that it should not be relied on when investing, that statements are solely for illustrative purposes, and investors must rely only on statements contained in the operative entity documents.

(Tr. 04/24/19, Huth – Direct – Hein, at 202). None of this testimony is relevant or helpful in determining what a "reasonable sophisticated investor" would have deemed material, and future investor witnesses should be precluded from testifying in this manner.

> 3. *Huth Repeatedly Set Forth Misinformed, Idiosyncratic, and Flat-Out Wrong "Viewpoints" that Contradict "the Mainstream Thinking of Investors in the Market"*

At the Government's prompting, Huth repeatedly misinformed the jury concerning the significance of a pie chart entitled "Target Risk Allocation" contained in the Presentation, repeatedly suggesting that the chart suggested the fund was liquid. (Tr. 04/24/19, Huth – Direct – Hein, at 205-07)  Ignoring the bizarre fact that the government chose to focus Huth's view of the fund's investments in 2007, seven years before the relevant events and any allegations of wrongdoing, this point of view, too, is not only idiosyncratic, but misleading and wrong, as the very document indicates that these were only "*targeted* risk allocation[s]" which has absolutely nothing to do with liquidity. Moreover, the PPM expressly informed Huth (and all investors) that the investment strategies were subject to change.  (Tr. 04/24/19, Huth – Cross – Sommer, at 443). As such, investor testimony suggesting that a review of any targeted risk allocation pie chart could have lead them to have any understanding as to the fund's illiquidity is immaterial as a matter of law.

Even more egregiously, Huth testified that he invested in PPVA because he believed it was similar to investing in low risk bonds, because a singular slide in the 2007 presentation used the clause "bond like volatility."  Huth, apparently confused himself and now the jury by claiming volatility and risk are synonyms, which they are not.  Dr. Huth explained, "So bonds are typically considered a very low risk instrument, doesn't move a lot and is considered to be sort of a safe place to put one's money and my understanding of this description was that they

---

[2] Of course, the Government will present no evidence at trial that any information in the 2007 (or any other) Presentation was false or misleading.

were operating strategies that yield a nice return, 15 to 23 percent, but with safety that could be compared to bond type of investment." (Tr. 04/24/19, Huth – Direct – Hein, at 204).

      Not only is this backdoor expert testimony, it is objectively false and the type of testimony that certainly confused the jury. Besides the fact that PPVA never marketed itself as "very low risk" investment that is "considered to be sort of a safe place to put one's money" as if it were a bond, this Court may take judicial notice of the S&P, Moody, and Fitch bond rating systems.  Under S&P's rating system, for example, debt securities such as bonds may be rated anywhere from AAA (Prime) to CCC (Substantial risks, extremely speculative) to D (In default), and anywhere in between – all of which can be bought and sold at various levels of yield depending on an investor's risk appetite. Thus, Huth's idiosyncratic belief that "bonds are typically considered a very low risk" and "sort of a safe place to put one's money" and that he believed investing in PPVA is just like investing in a "very low risk" bond in which he could earn between 15% and 23% annual return is idiosyncratic and absurd given the governing documents, including audited financial statements that plainly showed PPVA to be a high-risk, high-reward fund. Huth's testimony, prompted by the government, painted a misleading and objectively false impression concerning risks associated with hedge funds investments in general and specifically PPVA.  This testimony alone tainted the trial. And, future investor witnesses should not be able to take the stand and testify that they failed to understand the actual investments the fund was making, or its actual risk profile.

***

      The takeaway from all these examples is unavoidable:  Huth's testimony on materiality was riddled with so much error and self-serving blindness to the terms of the fund's governing documents – including its audited financial statements – that it cannot be permitted to go uncorrected by the Court, or perpetuated by other Government witnesses. The thought that the Defendants, and specifically its CFO, Joseph SanFilippo, should have to sit through three of the next six witnesses on the Government's list testifying that they did not know the fund was illiquid or know that they did not have an absolute right to a cash redemption in 90 days because

they did not read or understand the audited financial statements and fund documents and instead believed it was liquid based on whatever absurd and idiosyncratic viewpoints they hold is precluded by *Litvak,* as Your Honor has already rightly identified.

Dated:  New York, New York
April 28, 2019

Respectfully submitted,

Kevin J. O'Brien
Adam C. Ford
Matthew A. Ford
Anjula Prasad
FORD O'BRIEN LLP
575 Fifth Avenue 17th Fl.
New York, New York 10017

8