

U.S. Department of Justice

United States Attorney
Eastern District of New York

ALC/DCP/LHE/PTH
F. #2016R00505

271 Cadman Plaza East
Brooklyn, New York 11201

May 7, 2019

BY ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Mark Nordlicht et al.
                Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in response to the defense objection to the anticipated testimony of Joseph Bruno.

I.      The Proposed Testimony

      As discussed earlier today, the government intends to elicit from Mr. Bruno testimony about a conversation he overheard between the defendants David Levy and Jeffrey Shulse in or around late 2014, at which time there was a plan to transfer Black Elk's remaining oil and gas assets to another Platinum-owned company, Northstar. Specifically, Mr. Bruno will testify that, one day, Shulse asked him and two other Black Elk employees to come into Shulse's office. Once they arrived, Shulse put the phone on speaker; Levy was already on the phone and Shulse did not alert Levy to the fact that anyone besides himself was in the room. Levy discussed Northstar and an attorney who signed off on the opinion letter relating to the Black Elk/Northstar transaction. Mr. Bruno will testify that he heard Shulse say something to the effect of "I can't do this you know . . . this is fraud," to which Levy responded "So what if this is fraud, do you know how long it will take for them to find this out?" Shortly after this comment, Mr. Bruno left Shulse's office.

      The government respectfully submits that the foregoing proffered testimony is inextricably linked with and probative of (1) the Platinum Partners Value Arbitrage Fund ("PPVA") Investment Scheme as charged in the Indictment, (2) the Black Elk Bond Scheme as charged in the Indictment, and (3) Levy's modus operandi of obtaining legal sign-off on fraudulent transactions through deceptive means, which is admissible to rebut the defendants' argument—advanced in defense counsel's opening statements with respect to the Black Elk Bond scheme—that the defendants were honest and fulsome with an experienced corporate

attorney (Robert Shearer), the attorney merely made a mistake and the defendants relied on the attorney's advice in good faith.

II.     Factual Background

As alleged in the Indictment, in or about September 2014, PPVA acquired 100 percent of the equity of Northstar Offshore Group, LLC ("Northstar").  Indictment ¶ 7.  At the end of 2014 and into 2015, the defendants used Northstar as a vehicle for obscuring the bleak financial picture of the oil-and-gas investments that purportedly made up the majority of PPVA's portfolio: Black Elk and Golden Gate.  Indictment ¶ 51.  Specifically, the defendants "(i) caus[ed] Northstar to purchase many of Black Elk's remaining assets; and (ii) combin[ed] Golden Gate and Northstar (including the Black Elk assets) under a new name "PPVA Oil & Gas," to be valued as one asset.  Id.  The government has alleged that Northstar's purchase of Black Elk's residual assets and repackaging of those assets, together with Golden Gate's, as PPVA Oil & Gas, was a means of perpetuating the PPVA Investment Scheme because it allowed PPVA to obfuscate the deterioration of these individual assets, and instead present to PPVA's investors a series of purportedly beneficial, accretive transactions that yielded this supposedly "new" entity—PPVA Oil & Gas.

In addition, as the evidence at trial has already shown, in 2014, Black Elk was struggling and on the brink of bankruptcy.  In anticipation of this, the defendants and their co-conspirators at Platinum conceived a plan to extract the remaining value from Black Elk prior to its entering bankruptcy.  First, in 2014, they arranged to sell the majority of Black Elk's best-performing assets to Renaissance, and for the Series E preferred equity to be paid out of the Renaissance proceeds via the Black Elk bond scheme.  Importantly, on August 18, 2014, Mr. Shearer alerted Shulse days after the consent solicitation process ended, but before the defendants had repurchased Platinum's Series E equity with the Renaissance proceeds, to a Texas statute that prohibited distributions to members of a company that could render the company insolvent.  GX 773.  When Shulse forwarded that email to Nordlicht, Levy, Small and a co-conspirator, writing, "Advice of counsel … we need to be mindful of this in our planning," Nordlicht forwarded that email to Levy alone, writing, "David-get these wires out!!!!! Call him right now please!!!!"  Nordlicht had also changed the subject of the email to "urgent."  The evidence at trial will show that Nordlicht was referring to the wires of the Renaissance proceeds to pay out the Platinum entities that held Series E preferred equity.

Then, in early 2015, Platinum directed that Black Elk would sell certain of its remaining oil and gas assets to Northstar in exchange for Northstar's assuming approximately $70 million of the Senior Secured Notes issued by Black Elk and owned by Platinum and its affiliates.[1]  Robert Shearer, Black Elk's counsel, and one of the government's upcoming trial witnesses, exchanged an email with Shulse relating to the transaction on February 19, 2015 that was subsequently forwarded to Levy and Nordlicht.  GX 1036.  In this email, Shearer advised that, "[b]ecause [Black Elk] is currently insolvent and these transactions are with affiliates, there

---

[1]     These are the same Senior Secured Notes that are the subject of the Black Elk Bond Scheme described in the Indictment.

is definitely a risk that the transactions are characterized as 'fraudulent transfers.'" Id. One of Mr. Shearer's associates then prepared a statutory analysis, which was also forwarded to Nordlicht and Levy, in which he quoted the Fraudulent Transfer Act, which in the excerpted portion provides that "transfers are fraudulent as to present creditors if: (a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer, and (b) the debtor was insolvent at the time of the transfer or the debtor became insolvent as a result of the transfer." Id. In response to receiving these messages, Nordlicht sent an email to Levy writing "Who is rob shearer? Who says the company is currently insolvent?" to which Levy replied "Rob is company lawyer. I don't know what this is. I'll discuss with Jeff [Shulse] in the am" Id. Mr. Shearer ultimately declined to provide an opinion letter on the Northstar transaction, and Black Elk ultimately obtained a legal opinion letter signing off on the deal from a different attorney.

On March 31, 2015, Shulse, then the CEO of Black Elk, sent a letter to Northstar's CEO notifying Northstar that it was to remove his signature from all documents related to the proposed sale of assets from Black Elk to Northstar because "I have been advised by counsel that the Transaction would qualify as a Fraudulent Transfer under the Uniform Fraudulent Transfer Act as adopted by the State of Texas."[2] Nevertheless, the transaction ultimately closed.

III. Argument

Levy's statement regarding the Black Elk/Northstar fraud is inextricably linked with and probative of the government's allegations in this case because:
(1) the statement reflects Levy's willingness to engage in fraud in pursuit of his and his co-conspirators' goal of masking the performance crisis of PPVA's oil and gas positions; ; (2) it completes the story of, and demonstrates Levy's intent, knowledge, lack of accident or mistake and modus operandi with respect to the Black Elk Bond Scheme in the wake of the August 18, 2014 email chain relating to distributions of Renaissance sale proceeds; and (3) it rebuts known defense arguments regarding good-faith reliance on counsel, with respect to the Black Elk Bond scheme in particular, by demonstrating Levy's repeated use of lawyers to create the appearance of legitimacy for transactions, even when they simultaneously are in fact ignoring or fraudulently obtaining that advice..

As to the first reason, Levy's statement is probative of the PPVA Investment Scheme in that is an inextricable part of the story of Black Elk and Golden Gate's ultimately being combined with Northstar under the new name of PPVA Oil & Gas. As described above, the Indictment charges that this repackaging of underperforming and/or insolvent assets into an ostensibly new, highly valued asset was a component of the Investment Scheme, because it allowed Platinum to obfuscate the fact that its investments into these various oil and gas companies were unsuccessful and could not be sold at the values at which the defendants marked them. The fact that Levy wanted to pursue this transfer of Black Elk assets into Northstar, despite being warned that doing so was a fraud, demonstrates that Levy and his co-conspirators

---

[2] The government does not intend to introduce this letter or elicit testimony relating to it at the instant trial; this information is provided to the Court solely as background.

3

were willing to make this transaction happen at any cost.  Further, not only was the transaction not arms-length given that Platinum controlled both the buyer and the seller, but also, the chosen consideration for the asset sale—Northstar's assumption of Black Elk Bonds—reflects an attempt by the defendants to shift around bonds of an insolvent company without having to acknowledge their worthlessness.  These aspects of the fraudulent transaction are probative of the charged offenses because they show the desperation of the defendants to conceal the true circumstances of their oil and gas investments and present a more appealing picture than that which would be revealed if they were forced to present the truth.

   Second, the proffered evidence completes the story of the Black Elk Bond scheme and rebuts known defense arguments relating to that scheme.  The government will be presenting evidence in connection with the Black Elk Bond scheme, alleged in the Indictment at Paragraphs 73-87, that Levy, together with his co-conspirators, deceived attorneys working on the Black Elk consent solicitation in order to fraudulently obtain legal imprimatur and create the appearance of propriety with respect to the bondholder consent solicitation.  Based on Nordlicht's and Levy's counsel's opening statements in this trial, the government expects the defendants to rely heavily on the fact that lawyers were involved in the Black Elk Bond transactions and to argue, resultantly, that they lacked the requisite intent to defraud.  To rebut this argument, the government seeks to present evidence of another occasion on which Levy and his co-conspirators did not obtain legal advice in good faith, but rather manipulated lawyers or disregarded their advice in order to achieve their desired outcome.  As noted above, in connection with the Black Elk consent solicitation relevant to the Black Elk Bond scheme, on August 18, 2014, Mr. Shearer wrote an email to Shulse with legal advice regarding prohibited distributions to members of an LLC, which Shulse then forwarded on to, among others, Nordlicht and Levy, commenting "advice of counsel . . . we need to be mindful of this in our planning."  GX 773.  Nordlicht' s reply to Levy— "David- get these wires out!!!!! Call him right now please!!!!"—reflected the defendants' unwillingness to even consider Mr. Shearer's guidance and their singular intent to reap the rewards of their fraudulent bondholder vote and pay out the Platinum Series E preferred equity holders.  Id.  Likewise, in connection with the Northstar transaction implicated here, Levy showed a similarly dismissive attitude toward legal hurdles that might intervene between him and his and his co-conspirators' desired business result, casting aside warnings about fraud in pursuit of profits.  This modus operandi evidence is probative of some of the central issues of dispute in this case, including the defendants' knowledge and intent in his dealings with Black Elk's lawyers.[3]

---

[3]  Finally, Mr. Bruno's testimony about Levy's statement is admissible under Federal Rule of Evidence 404(b) as probative of Levy's intent and knowledge—both of which remain in dispute—as well as his modus operandi and lack of accident or mistake with respect to both of the charged fraud schemes and the Black Elk Bond scheme in particular (which also involved counsel for Black Elk).  To the extent Levy intends to argue that he lacked the requisite state of mind in connection with the charged schemes, his state of mind regarding the Northstar transaction is probative to show that Levy is not unsophisticated or naïve, but rather a sophisticated player in the finance industry who understood the concept of fraud and was willing to resort to it.  The government respectfully submits that, even if not noticed as Rule 404(b) evidence, the defense has been sufficiently on notice of the government's intent to offer this testimony at trial for several months and, accordingly, its admission would be proper under Rule

IV. Conclusion

        For the foregoing reasons, the government respectfully submits that Mr. Bruno's testimony about Levy's statement should be admitted.

                                            Respectfully submitted,

                                            RICHARD P. DONOGHUE
                                            United States Attorney

By:   /s/
        Alicyn L. Cooley
        David C. Pitluck
        Lauren Howard Elbert
        Patrick T. Hein
        Assistant U.S. Attorneys
        (718) 254-7577

cc:    Clerk of the Court (BMC) (by ECF)
       Defense counsel (by ECF)

---

404(b).