

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

ALC/DCP/LHE/PTH
F. #2016R00505

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 12, 2019

BY ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Mark Nordlicht et al.
                Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in response to the defendants' motion requesting that the Court strike highly probative evidence related to the defendants' manipulative trading in Black Elk bonds in December 2014: namely, Government Exhibit 884 and related trial testimony of government witness Naftali Manela, both of which Your Honor previously admitted into evidence after hearing argument from the parties at trial.  See ECF Docket No. 699, filed on May 8, 2019 (hereinafter, "Defs' Mot."); Trial Transcript ("Trial Tr.") 930-52.  The defendants also seek to preclude the government from offering additional evidence related to the defendants' manipulative trading in Black Elk bonds.  Defs.' Mot. at 1.  As discussed herein, Your Honor appropriately admitted Government Exhibit 884 and related emails and testimony because they are direct and powerful evidence of the defendants' commission of the two fraudulent schemes charged in the Indictment, their relevance is not substantially outweighed by a risk of unfair prejudice to the defendants, and their admission will not confuse the jury or require a mini-trial.  Accordingly, the defendants' motion should be denied in its entirety.

I.      Background

      a.      The Two Interrelated Fraud Schemes

      The Indictment charges the defendants Mark Nordlicht, David Levy and others with two interrelated fraud schemes: the "Investment Scheme" and the "Black Elk Bond Scheme."[1]  In connection with the Investment Scheme, the defendants and other employees of

---

[1] Defendant Joseph SanFilippo has been charged only with participating in the

Platinum Partners L.P. ("Platinum") engaged in a scheme to defraud investors and prospective investors in the Platinum Partners Value Arbitrage Fund ("PPVA") through material misrepresentations and omissions relating primarily to the performance, liquidity and preferential redemption process of PPVA, as well as transactions involving PPVA and Platinum Partners Credit Opportunities Fund ("PPCO").  See Indictment ¶¶ 42-72.  The defendants' misconduct included executing loans and transfers between PPVA and PPCO in order to conceal Platinum's dire liquidity problems from its funds' investors.  Id. ¶¶ 53-59.

In connection with the Black Elk Bond Scheme, the defendants engaged in a scheme to defraud the holders of 13.75 percent senior secured notes due on December 1, 2015 (the "BE Bonds"), which were issued by Black Elk Energy, one of the portfolio companies in which PPVA held a substantial investment.  Id. ¶¶ 73-87.  Specifically, the defendants rigged a bondholder vote in the summer of 2014 (the "consent solicitation") to ensure that Platinum received the proceeds of the sale of Black Elk's best assets.  The defendants accomplished this scheme by lying to bondholders about the number of bonds Platinum controlled and thus were not permitted to vote: namely, the defendants falsely disclosed that Platinum controlled only approximately $18 million of the $150 million of bonds, when it in fact controlled $98 million of the bonds.  While PPVA held the $18 million of BE Bonds that Platinum disclosed, the remaining $80 million of bonds that Platinum did not properly disclose were held by PPCO, Platinum Partners Liquid Opportunities Fund ("PPLO") and Beechwood, a company that the defendants secretly controlled.  The defendants voted these $98 million in bonds, thus guaranteeing that the majority vote passed and that the asset sale proceeds were awarded to Platinum.  Id. ¶ 85.  Following this rigged vote, Black Elk was left with substantially fewer and less valuable assets.  The market price of the remaining BE Bonds thereafter plummeted in late 2014.

      b.      <u>The Government Exhibits and Testimony At Issue</u>

Government Exhibits 273, 884, 889 and 890 (collectively the "BE Exhibits"), as well as Manela's related testimony, show how the defendants responded to the large margin calls resulting from the plummeting price of the BE Bonds: by lying to the brokerage firms and artificially inflating the price of the BE Bonds in order to conceal Platinum's dire liquidity problems from its investors.[2]

---

Investment Scheme.

  [2] As explained further <u>infra</u> in footnote 4, the Court has held Government Exhibit 273, which begins with Bates-stamp EDNY-PP-SW1-000004997, and Government Exhibits 884, 889 and 890 to be relevant and admissible.  Trial Tr. 930-52.  The government first referenced its intention to introduce Government Exhibit 273 into evidence in a motion it filed on May 30, 2018, <u>see</u> ECF Docket No. 340 at 2, and then again at trial on April 30, 2019, <u>see</u> Trial Tr. 937.  The government provided Government Exhibit 273 as a marked exhibit to the defendants on May 12, 2019.

On December 5, 2014, brokerage firm Nomura notified Manela of a margin call of over a million dollars for PPCO related to the falling price of the BE Bonds, and Manela informed Nordlicht. See Gov't Ex. 884. After stating that Nomura was pricing the BE Bonds lower than they should be priced, Nordlicht directed Manela: "but worse comes to worse, move might be to send from PPVA or pplo 'by accident' as long as they are not hit by same issue." Id. (emphasis added). When Nordlicht sent this email to Manela, Nordlicht copied Harvey Werblowsky—an attorney who worked at Platinum as a portfolio manager and who, in Manela's experience, did not provide legal advice on such issues, see Trial Tr. 946-47—and changed the subject heading to "Atty client privilege" in a disingenuous effort to protect his communication from future disclosure. See Gov't Ex. 884. Manela then responded with his understanding that Nomura had properly priced the BE Bonds at 64, which is where Bloomberg had priced the bonds. Id.

A few days later, on December 8, 2014, after market close, an employee from Beechwood—the reinsurance company Platinum secretly controlled and which was left holding tens of millions of dollars of BE Bonds after the defendants executed the Black Elk Bond Scheme—wrote to Manela that IDC had priced the BE Bonds at 87 while Bloomberg had priced them at 30.86. See Gov't Ex. 273. Manela wrote to Nordlicht and Levy that "we got IDC up. Bloomberg price makes no sense." Nordlicht replied that "Trades shd not be under 88, period. How does this happen? Some poor guy sold 30's this means? David- is our bid in or not." A co-conspirator ("Co-Conspirator 7" in the Indictment) who worked at Platinum and executed Nordlicht's plan to manipulate trading of the BE Bonds to artificially inflate their price, responded: "I don't know how this is happening. We have our bid out there." Nordlicht—attempting to cover up his own involvement in artificially propping up the price of the BE Bonds—wrote: "Naftali [Manela] – someone alert Bloomberg then that there might be some fraud going on." Id. After another co-conspirator who worked at Platinum ("Co-Conspirator 8" in the Indictment) emailed that he was seeing a BE bond bid for 22 on Bloomberg, Nordlicht wrote on the morning of December 9, 2014, "We are only set up with one broker? Please advise," indicating his desire that Platinum purchase BE Bonds to artificially inflate the price. When Co-Conspirator 7 replied that he just logged into the platform he used to trade for the fund in 2010, Nordlicht asked if they had a password for that old account, and Co-Conspirator 7 confirmed that "I am bidding 90 but nobody hitting me yet." Nordlicht then instructed Co-Conspirator 7 at 10:37 a.m. on December 9, 2014 where to bid: "On the system u can back off a little. Bid 70 or 80…u can go up later in day… there are specs that just brought 30's and 40's."

About an hour later, at 11:34 a.m. on December 9, 2014, Co-Conspirator 7 sent an email entitled "latest black elk market" to Levy, Nordlicht, Manela and Co-Conspirator 8, attaching a Bloomberg screenshot showing an offer at 87-91 for the BE Bonds by a broker from Seaport Global Holding.[3] See Gov't Ex. 890. Upon receiving the Bloomberg screenshot, Levy directed Manela and another Platinum employee to send it to Nomura, to try to convince Nomura

---

[3] The government has evidence that Platinum paid Gourlay a significantly higher fee than was typical for a broker so that he, and not Platinum, would make an offer to purchase BE Bonds at 87-91 to make it appear as if this attempt to artificially inflate the price of the BE Bonds was an independent market bid.

3

that the BE Bonds were actually worth more and thus that PPCO's margin call should be lower. Nomura responded that it believed the price of 22 was a valid price. The other Platinum employee emailed with Nomura and finally stated at 2:02 p.m.: "we are working on getting the appropriate quotes and backup but if that doesn't work for you I've been informed by our CO-CIO we will meet the call before EOD." Id. At 3:28 p.m., defendant SanFilippo wrote to Levy, Nordlicht and Manela: "CS [Credit Suisse] repriced Black Elk at 46. We have also paid down some of the calls already with excess cash and futures account excess." SanFilippo then listed Platinum's outstanding margin calls, including more than $4 million for PPVA, $400,000 for PPLO and $7 million for PPCO. See Gov't Ex. 889. At 3:34 p.m., Nomura again reached out to the other Platinum employee for an update on the margin call and he wrote to Levy, Nordlicht and Manela: "I can't avoid – how do you want to answer?" See Gov't Ex. 890.

    c.    <u>The Court Appropriately Ruled that the Evidence At Issue Is Admissible</u>

At trial, pursuant to the Court's order, the government orally renewed its motion to admit evidence related to the defendants' manipulative trading of the BE Bonds, including the BE Exhibits. See ECF Docket No. 340 at 2; Trial Tr. 934. In its motion, the government explained that this evidence is probative because it shows the defendants' intent, knowledge and motive in carrying out the Investment Scheme and the Black Elk Bond Scheme. Specifically, in December 2014, when Platinum's hedge funds faced large margin calls as a result of the plummeting price of the BE Bonds in the wake of the defendants' Black Elk Bond Scheme, the defendants tried to artificially prop up the BE Bonds' price to conceal from Platinum's investors Platinum's inability to pay the brokerage firms their margin calls and their investors their redemptions. Trial Tr. 934-36. Rejecting the defendants' arguments, the Court granted the government's motion and held the BE Exhibits to be admissible:

> Here's why I'm disagreeing with you, Ms. McCarthy. The problem is, one way or [] another, the key issue in the case is going to be the defendants' intent. It's not a mini trial, in whatever context it comes up with. Okay? It's the issue. If you've got to put on more evidence to explain something, then I think you have to because it's not some collateral circumstantial fact, it is an emergency situation that could well arguably, according to the government, form the motivation. So I'm going to allow the exhibits to come in.[4]

Trial Tr. 937:5-14.

---

[4] The defendants misleadingly assert in their motion that the "Court has already ruled Government Exhibits 889 and 890 as admissible and relevant," when the record makes clear that the Court also ruled Government Exhibits 884 and 273 are admissible and relevant. See Defs' Mot. at 1 n.1; Trial Tr. 930-38. The government subsequently introduced, and the Court admitted, Government Exhibits 884, 889 and 890 into evidence. Trial Tr. 939-52. The Court instructed, and the government agreed, to admit Government Exhibit 273 into evidence through a different witness at a later date. Id. 937.

II.        Applicable Law

Evidence of uncharged criminal activity is not considered "other acts" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted). The Second Circuit has interpreted this category of evidence to include acts that provide necessary background or context for the charged crimes. See United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (admitting evidence of uncharged burglary because, inter alia, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)). Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

Further, it is "well settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'" United States v. Barret, No. 10-CR-809 (S-3) (KAM), 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (stating that, in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Such acts are therefore inextricably intertwined with and direct evidence of the charged conspiracy and not subject to Rule 404(b). See Barret, 2011 WL 6704862, at *4, *6-*7 (concluding that evidence of, inter alia, uncharged attempted murder and contract for murder was "direct evidence" of drug distribution conspiracy).

Alternatively, evidence of the defendants' manipulative trading in Black Elk bonds in December 2014 is also admissible under Rule 404(b). Evidence of a defendant's other acts is admissible under Rule 404(b) if relevant to an issue at trial other than the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). To be admissible, the probative value of such evidence must not be substantially outweighed by the risk of unfair prejudice. See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000). This Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial. Evidence admissible pursuant to Rule 404(b) should not be excluded on the ground of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]"). United States v. Paulino,

445 F.3d 211, 223 (2d Cir. 2006). Thus, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test. See, e.g., id.; United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).

III.    Analysis

The Court appropriately ruled that the BE Exhibits, as well as Manela's related testimony, are admissible and relevant because they are direct and probative evidence of the defendants' commission of the two fraudulent schemes charged in the Indictment, their relevance is not substantially outweighed by a risk of unfair prejudice to the defendants, and their admission will not confuse the jury or require a mini-trial.

    a.    Evidence Related to the Defendants' Manipulative Trading of BE Bonds Is Direct Evidence of the Charged Crimes

The defendants' response to the large margin calls Platinum's hedge funds faced in early December 2014 due to the falling price of the BE Bonds that Platinum held post-consent solicitation—namely, to direct subordinates to manipulate trading of the BE Bonds and lie to the brokerage firms—is highly probative of the defendants' intent, knowledge and motive in executing the Black Elk Bond Scheme and the Investment Scheme.

As an initial matter, the BE Exhibits are direct evidence of the defendants' participation in the Black Elk Bond Scheme because this evidence arose out of same series of transactions as the charged schemes, and it is inextricably intertwined with and necessary to complete the story of the schemes. As described in the Background section above, the defendants rigged a bondholder vote in the summer of 2014 (the "consent solicitation") that enabled Platinum to receive the proceeds from the sale of Black Elk's best assets; the defendants accomplished this by concealing from Black Elk bondholders, and improperly voting, $80 million of BE Bonds held by PPCO, PPLO and Beechwood, which Platinum controlled. After the defendants stole for Platinum the proceeds from the sale of Black Elk's best assets, Black Elk had little remaining value and thus the BE Bonds plummeted in price in late 2014. Because PPCO, PPLO and Beechwood still held tens of millions of dollars in BE Bonds—the defendants had not tendered these bonds as part of the rigged vote so that Platinum's preferred equity holders could instead be paid with the asset sale proceeds—the defendants were motivated to keep the price of the BE Bonds as high as possible. Accordingly, the defendants manipulated the BE Bond trading to artificially inflate the price of those bonds.

The BE Exhibits are also direct evidence of the Investment Scheme because they show that the defendants directed others to lie to brokerage firms and artificially inflate the price of the BE Bonds in order to lower the margin calls and thereby continue to conceal Platinum's dire liquidity problems from its investors. As Manela has testified and other evidence has and will corroborate, the defendants faced significant liquidity issues in late 2014 as investors increasingly sought redemptions and Platinum did not have cash to pay them. Trial Tr. 821-24. The millions of dollars in margin calls in early December 2014 exacerbated this liquidity crisis. When Nordlicht became aware of the Nomura margin calls, Nordlicht instructed Manela that if Platinum could not convince Nomura that the margin call should be lower, he should send

payment to Nomura "from PPVA or pplo <u>'by accident'</u> as long as they are not hit by same issue." See Gov't Ex. 884 (emphasis added). Nordlicht wrote "by accident" precisely because he knew it was not permitted to have PPVA or PPLO pay margin calls that PPCO owed, and if Nomura discovered that PPVA or PPLO had paid the margin call he and his team would deny that they intended that payment. Furthermore, Nordlicht attempted to hide his communication from future disclosure to regulators by changing the subject heading to "Atty client privilege"—a tactic of concealment that Nordlicht commonly used during the conspiracy period, as several other emails the government intends to offer at trial will show. Government Exhibit 884 is thus highly probative of Nordlicht's deceptive conduct in the face of Platinum's liquidity crisis.

Government Exhibits 273, 889 and 890 likewise demonstrate Nordlicht's and Levy's deceptive efforts to lower the margin calls. On December 8 and 9, 2014, as the price of the BE Bonds continued to fall, Nordlicht instructed co-conspirators to artificially inflate the price of the BE Bonds to ease Platinum's liquidity concerns. For example, on December 8, 2014, when made aware that Platinum had "got[ten] IDC['s price] up" but that Bloomberg had priced the BE Bonds at 30.86, Nordlicht directed his co-conspirators that "Trades shd not be under 88, period. . . . [Co-Conspirator 7]- is our bid in or not." See Gov't Ex. 273. Co-Conspirator 7 responded to Nordlicht by expressing surprise that Platinum's manipulative trading had not fully succeeded: "I don't know how this is happening. We have our bid out there." Id. When the BE Bonds had not risen by December 9, 2014, Nordlicht asked Co-Conspirator 7 if he had a password for an old trading account and Co-Conspirator 7 responded that "I am bidding 90 but nobody hitting me yet." Id. Nordlicht then instructed Co-Conspirator 7 precisely where to bid, while also acknowledging that actual market bids were in the 30-40 price range, not in the 80-90 price range to which Nordlicht sought to inflate the BE Bonds: "On the system u can back off a little. Bid 70 or 80…u can go up later in day… there are specs that just brought 30's and 40's." Id. Levy also directed subordinates to use artificially inflated bids as a deceptive means of inducing Nomura to recognize a higher BE Bond price and lower the margin call. See Gov't Ex. 890 (when Co-Conspirator 7 circulated a Bloomberg screenshot of an offer to buy BE Bonds at 87-91 that Platinum had paid a broker an unusually high fee to execute, Levy directed Manela and another Platinum employee to send it to Nomura to try to convince them that their pricing of the BE Bonds was incorrect).

Finally, contrary to the defendants' assertions, see Defs' Mot. at 6, 9, Nordlicht, Levy and their co-conspirators did not in fact believe that the BE Bonds were mistakenly or fraudulently priced too low. As the BE Exhibits and related evidence make clear, despite Nordlicht's assertions that the pricing was "wrong" or that "there might be some fraud going on," neither the defendants' and their co-conspirators' emails nor their conduct support that they believed those false exculpatories. To the contrary, in the very next emails in the email chains contained in those BE Exhibits, Nordlicht directed his co-conspirators to artificially inflate the BE Bonds to specific prices double or triple those at which Nomura and Credit Suisse stated the bonds were trading, and directed payments to be made "by accident" from other Platinum hedge funds to brokers when those brokers would not accept Platinum's artificially inflated prices as the actual price of the bonds. In sum, the defendants' words and conduct reflected in the BE Exhibits are direct evidence of their engagement in the two fraudulent schemes charged in the Indictment.

      b.      <u>The Highly Probative Nature of the Evidence At Issue Is Not Substantially Outweighed By Risk of Unfair Prejudice and Admission of the Evidence Will Not Confuse the Jury</u>

Contrary to the defendants' assertions, see Defs' Mot. at 11, the admission of the BE Exhibits and related testimony regarding the defendants' manipulative trading of the BE Bonds in December 2014 is not unfairly prejudicial nor will it confuse the jury or require a mini-trial. There is nothing confusing or complicated raised by this evidence. Rather, the BE Exhibits and related evidence show clearly that the defendants faced over $11 million in margin calls, and that they directed co-conspirators to lie to brokers and manipulate trading in the BE Bonds to increase the value of the BE Bonds Platinum's hedge funds held and lower the margin calls that cash-strapped Platinum was struggling to pay. The defendants' assertions that mini-trials regarding bond pricing and related issues will be necessary is a desperate attempt to complicate and preclude straight-forward direct evidence of the defendants' commission of the charged crimes.

IV.    <u>Conclusion</u>

For the foregoing reasons, the defendants' motion should be denied in its entirety.

                                                    Respectfully submitted,

                                                    RICHARD P. DONOGHUE
                                                    United States Attorney

By:   /s/_____
        Alicyn L. Cooley
        David C. Pitluck
        Lauren Howard Elbert
        Patrick T. Hein
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of the Court (BMC) (by ECF)
        Defense counsel (by ECF)