# TUCKER LEVIN, PLLC

DUNCAN P. LEVIN
DIRECT DIAL: 646-445-7825
DLEVIN@TUCKERLEVIN.COM

230 PARK AVENUE, SUITE 440

NEW YORK, NEW YORK 10169

212-330-7626

FACSIMILE: 212-422-3305

June 10, 2019

ELECTRONICALLY FILED

Hon. Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

           Re: <u>United States v. Mark Nordlicht, et al.</u>,
              16-Cr.-640 (BMC)

Dear Judge Cogan:

  Mark Nordlicht writes by this letter to respond to the government's letter motion dated early this morning. *See* Docket Entry No. 741. The government's sixteen-page letter brief earlier this morning completely misses the point. We respectfully submit that the case must be dismissed, and a judgment of acquittal entered, as a matter of law.[1]

  **I.** **Introduction**

  **First**, the government failed throughout its entire lengthy case to present sufficient evidence from which any rational juror could have concluded that any alleged misstatement or omission from Mr. Nordlicht was material. This is true on two bases: (1) The government did not introduce any testimony from which a jury could have concluded that anything would have been materially different but for the alleged misstatements or omissions; and (2) Any alleged misrepresentation would only be material to the degree Mr. Nordlicht fraudulently overvalued positions at Platinum. In the absence of any competent evidence of mis-valuation, alleged illiquidity and/or decisions on whom to redeem, in and of itself, cannot possibly provide proof beyond a reasonable doubt of the charged crimes. This fatal flaw provides an independent basis for granting judgment of acquittal.

  Since the government is no longer alleging that Platinum mis-valued any positions, it is difficult to comprehend how it can demonstrate that any reasonable juror would find any material misrepresentations or omissions <u>as a matter of law</u>. As set forth below, the testimony at trial shows representations and/or omissions that were, at the very most, immaterial to any reasonable investor's behavior. There is simply not enough evidence in this record to permit a factual conclusion otherwise.

---

[1] Selected pertinent exhibits are attached hereto as Exhibit A.

Hon. Brian M. Cogan
June 10, 2019
Page 2

Put differently: there are many funds that suffer from liquidity issues, which Platinum has never contested, or that selectively redeem investors. If a fund secretly overvalues positions, then lying to investors about liquidity or redemption preferences would clearly be material to the investors. However, absent any evidence of mis-valuation, which is clearly the case here and as set forth in more detail below, there is no logical way for representations about liquidity or selective redemptions to be material. Furthermore, all of the fund documents gave sole discretion over these issues to Mr. Nordlicht.

**Second**, and closely related to the sufficiency problems, the government has shifted theories of the case so dramatically as to violate Mr. Nordlicht's constitutional rights to know what the charges against him are, and to have those charges presented to a grand jury. Throughout the course of this prosecution, the government has shifted its theories from a mis-valuation case (in which it failed entirely to call any witnesses, including any expert witnesses, on valuation) to a case about *other* statements or omissions regarding liquidity and preferential redemptions to its investors, which it now contends were *material* misrepresentations or omissions sufficient to support criminal charges and imprison Mr. Nordlicht. The government proceeded in this manner because, grasping for straws, it presumably could find no expert witnesses to testify about mis-valued positions, nor did they present any evidence that any of the independent service providers were presented false information that led to wrong values. In fact, the independent valuation agent's and independent auditor's work remains unchallenged. Clearly, as brought forth at trial, Mr. Nordlicht had absolute discretion over valuation, and the evidence did not show any mis-valued positions whatsoever; in fact, to the contrary, all evidence suggested that Platinum mis-valued nothing.

**Third**, as another independent basis for a judgment of acquittal, the government did not establish proper venue for any of the counts, which is an element of the charged offenses. Despite their contentions to the Court otherwise, the government elicited no evidence that any defendant committed any of the crimes charged in the Eastern District of New York. The only document or evidence whatsoever that was introduced into evidence is a single email that is difficult to make out but that purports to be a list of bondholders and their addresses, a few of whom are in the Eastern District -- and nothing more showing that any crime took place in the Eastern District. What's more, the email attaching this bond holder list predates the consent solicitation by more than three months, and there is no evidence that the bondholders listed in this email participated in the consent solicitation. As the Court knows, absence of venue is a matter of constitutional import and compels dismissal. Venue is an element of the crime and was simply *unproven* during the government's case.

## II. Standard of Review

Even viewing all reasonable inferences in the light most favorable to the government, the evidence does not demonstrate any *material* misrepresentations or omissions to any investors so as to support a conviction on any charge. Furthermore, the government failed entirely to establish venue.

In order for Mr. Nordlicht's conviction to withstand scrutiny under Federal Rule of Criminal Procedure 29, the Court must be satisfied that, at trial, the government "introduce[d] sufficient

evidence to allow the jury to reasonably infer that each essential element of the crime charged ha[d] been proven beyond a reasonable doubt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). It is not enough for the government to introduce evidence "'at least as consistent with innocence as with guilt.'" *Id.* (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury [would have] necessarily entertain[ed] a reasonable doubt,'" and the Court must enter a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). The government's evidence fell well short of this mark. The Court therefore should enter a judgment of acquittal on each count.

The Second Circuit has explained that, "while [courts] defer to a jury's assessments with respect to credibility and conflicting testimony, and its choice between the competing inferences that can be drawn from the evidence, the jury's inferences must be reasonably based on evidence presented at trial, not on speculation; specious inferences are not indulged." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir.2010) (internal quotation marks and citations omitted). In this case, the jury was not permitted to draw a factual inference which was supported by the evidence in the record. Therefore, dismissal of the charges is warranted.

### III. Application of Law to Facts of Case

i. Constructive Amendment

The case clearly began as a valuation case, and, given that the government had no evidence of mis-valuation, it abandoned this theory mid-prosecution. However, instead of going back to a grand jury, the government simply shifted its theory of the crime to allege that *other* things were misrepresented. Before even turning to the weakness of the "material misrepresentations" that the government is left with, it is clear that Mr. Nordlicht's Fifth and Sixth Amendment rights to know the charges against him and to prepare an adequate defense against those charges were violated, resulting in a violation of his due process rights. The government's theories as to Mr. Nordlicht's charges changed continually both before and during trial, and now the government is left trying to explain why a weak and misleading case should proceed.

"No person shall be held to answer for a . . . crime, unless on a presentment or indictment of a grand jury[.]" U.S. Const. amend V. "In all criminal prosecutions, the accused shall . . . be informed of the nature and cause of the accusation[.]" U.S. Const. amend. VI. Constructive amendment of a charge in a grand jury indictment violates the Fifth Amendment's Grand Jury Clause. *See Stirone v. United States*, 361 U.S. 212, 215–16 (1960). A constructive amendment occurs when the government seeks to admit evidence, argument, or jury instructions that "broaden [] the possible bases for conviction" beyond those provided in the indictment. *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005). "The theory of 'constructive amendment' is based on the fundamental principle that 'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.'" *United States v. Davis*, No. 13 Cr. 923 (LAP), 2017 WL 3328240, at *28 (S.D.N.Y.

Hon. Brian M. Cogan
June 10, 2019
Page 4

Aug. 3, 2017), *appeal withdrawn*, No. 17-3190, 2017 WL 6803303 (2d Cir. Dec. 7, 2017) (*quoting Stirone*, 361 U.S. at 215–16). "[C]onstructive amendments to an indictment are generally considered prejudicial per se," *United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988), and district courts in the Second Circuit will vacate convictions based on either the constructive amendment of the grand jury indictment or prejudicial variance from it. *See generally Davis*, 2017 WL 3328240, at *28–35 (collecting cases). In *Davis*, the court vacated a conviction on constructive amendment grounds, reasoning that the government's shifting theories were such that the Court was "uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Id.* at *32. Because "no allegation in the indictment encompass[ed]" the government's newfound factual allegations, the indictment did not "put the Defendants fairly on notice" of the charges against them. Id. at *33.

Of course, here, there is little similarity between the indictment and the facts brought forth at trial. The evidence showed clearly that Mr. Nordlicht had absolute discretion over valuation decisions, such decisions were reasonable, and Mr. Nordlicht's valuation decisions were supported by independent valuation companies. Inasmuch as the government called no expert witnesses to the contrary, and no witness testified in any way to anything vaguely approaching the charges that the grand jury returned, the case should be dismissed in its entirety.

  ii.  <u>Sufficiency & Materiality</u>

Materiality is gauged not by whether a misstatement affects a financial metric that "matters," but by whether the misstatement itself "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citation omitted). The government presented no evidence that reasonable investors would care — much less consider it critical to their investing decisions — to learn that liquidity was tight or that the fund was making selective redemptions in the absence of the government's original underlying allegation that Platinum fraudulently overvalued its positions. Since the government has shown no evidence of mis-valuation, they are left with nothing to show that the impact on any investors of what it purports to be material.

Any doubt about the inadequacy of such evidence to establish materiality is highlighted by *United States v. Goyal*, 629 F.3d 912 (9th Cir. 2010). In that case, a principal of a software company was charged with securities fraud and making false filings with the SEC on the ground that the company improperly recognized revenue on large quarter-end sales to its largest distributor. *Id.* The Ninth Circuit held — viewing the evidence in the light most favorable to the Government — that no rational trier of fact could have found the essential element of materiality beyond a reasonable doubt. *Id.* at 914-16. The prosecution argued that NAI materially overstated its revenue because (1) the company recognized revenue at a different time than it should have; and (2) its accounting produced artificially high revenue figures in certain periods. *Id.* at 915. The court concluded that, "[w]ithout evidence of how much less revenue NAI would have recognized on the [quarter-end] deals if it had used sell-through [point-of-sale] accounting, the jury had no basis to conclude that the misstatement of reported revenue resulting from the [quarter-end] transactions was material." *Id.* The Court concluded that,

"[b]ecause Goyal's jury had no competent evidence of materiality before it, it could not have properly convicted him on any of the securities counts." *Id.*

The government's testimony here suffers from the very fatal defect identified by the Ninth Circuit in *Goyal*: it completely failed to address, much less quantify, the effect on any investor of the issues of liquidity or preferential redemptions. The evidence at trial clearly illustrates the problem with the sufficiency of the government's case and its overreach. There simply were no material misrepresentations or omissions adduced at trial.

The Master Fund LPA grants the general partner, Mr. Nordlicht, the absolute and sole discretion to grant or deny an investor's redemption request. (DX-1130.017). Daniel Mandelbaum's testimony clarified that the PPVA USA PPM instructs prospective investors to read "the master fund agreement, as defined below, and consult with their own advisor before deciding whether to invest in the partnership." (Transcript 4380, quoting DX-8750.034). What's more, Naftali Manela's testimony showed that the PPVA INTL PPM explicitly informs investors of the Master Fund LPA's grant-or-deny redemption language. (Transcript 1090-1091). The PPVA INTL PPM includes a section that summarizes the "material agreements." (DX-1133.077). This summary section in the PPM identifies the Master Fund Agreement as a material agreement and summarizes the twenty-seven page document in roughly one page. (DX-1133.080.081) Included in this brief summary is the relevant redemption language: "No Limited Partner will be allowed to withdraw amounts from its capital account without the prior written consent of the General Partner, which may be withheld or granted in its absolute and sole discretion." (DX-1133.080). Finally, Mr. Mandelbaum's testimony further showed that the PPVA USA Limited Partnership Agreement, which is entered into by the investor and the fund, also contains language giving the general partner discretion over investor withdrawals. (Transcript 4376). The LPA clearly states: "Subject to the prior written consent of the General Partner, which may be withheld or granted in its sole discretion, a Limited Partner may request the right to withdraw from the Partnership…" (GX-1828, p .94).

In its brief, the government attempts to use Mr. Gulkowitz's testimony to show material misrepresentations, but their brief is misleading and mistaken. The government's brief fails to note that Mr. Gulkowitz is a sophisticated investor with substantial experience in financial investment, forty to fifty years to be exact, with more than $200 million of assets under management and in fact sold his firm to Morgan Stanley. Most importantly, during cross examination, Mr. Gulkowitz admitted that Mr. Nordlicht had the ability to pay him in kind, and that is how he got paid for Black Elk. (May 2, 2019 transcript page 1507, lines 14-19.) Mr. Gulkowitz further admitted during cross examination that "contracts should be honored." (May 2, 2019 transcript page 1524, line 16.) Lastly, and importantly, during the time period of August to September 2014, when supposed material misrepresentations were made to Mr. Gulkowitz, redemptions were not behind at all. It is simply unclear exactly what the misrepresentation that government claims was made to Mr. Gulkowitz since the only thing he seemed to remember during his testimony was a meeting with Messrs. Fuchs, Nordlicht and Kalter in summer of 2014 when he was allegedly told that he could withdraw his money whenever he wanted; yet, in meetings with the government, he acknowledges being told about the lock-up period. Last, with respect to Mr. Gulkowitz, the government points to GX-1629, where Mr. Kaplan sends an email to

Mr. Gulkowitz in which he represented that "we anticipate paying/wiring the whole 3/31 class together sometime in July…"; however, the government fails to recognize that Mr. Gulkowitz's position would not have changed even if Mr. Kaplan had been making a misrepresentation. Mr. Gulkowitz's own fund documents, in evidence as DX-2278, have extremely similar language to Platinum's, and he acknowledged during cross examination that if an investor in his fund came along and tried to get a redemption during an illiquid period, and the only way to get cash would be to sell something in a fire sale, that could have a material adverse impact on the remaining investors. (May 6, 2019 Transcript at page 1582.)

Next, Mr. Mandelbaum acknowledged that, based on his experience and familiarity with the industry, hedge funds can be risky investments. (Transcript at 4431) He further admitted being aware that the fund documents allowed Platinum Partners to pay in cash or kind, and most importantly that the fund had assets to pay investors back, if they chose to not pay in cash. In fact, Mr. Mandelbaum testified as follows: "There were enough assets while I was there that, based on the value of those assets, he could pay them in kind." (Transcript at 4382-85) With respect to the government interfering in the fund and shutting it down prematurely, Mr. Mandelbaum testified that his solution would have been to just wait until one day the fund could sell these assets and hopefully get as much money as possible and give his money back. (Transcript at 4461-62).

Mr. Shaked acknowledged during direct testimony that the quarterly calls replaced the quarterly commentaries, and, during the same quarterly calls, investors were made aware of the state of the fund. In fact, at no point does his testimony reflect that there was anything affirmatively relayed in contradiction to the quarterly calls. (Transcript at 1976.) Evidence also included Mr. Shaked's email where he is advised he can be paid in kind (GX-1543), the side pocket call (1-DX-4410; duplicate is DX-4410/GX4512), and the heartfelt email to investor Fredrick Ljungstrom, where Mr. Nordlicht tells him that "regardless of what documents say, we are using common sense to do the right thing."(DX-1730)

The government, in its brief, points to GX-1332, where Mr. Landesman writes to investor Oosterbosch, that as with all redemptions from that point, he would be paid 35 percent in cash with the rest subject to monetization and tries to draw a material misrepresentation out of that statement. However, this again fails to recognize that there would not be a shift in Mr. Oosterbosch's position, even if we concede that there was a misrepresentation made. He was already invested in an illiquid fund and nothing was changing that irrespective of that representation. Further, in the same email, Mr. Landesman explains and asserts his right under the fund documents by explaining to Oosterbosch that Platinum had not decided definitively to request shareholder approval in implementing the side pocket.

The government also references an October 2015 representation to an existing investor, which according to the government purports that PPVA was "50/50 liquid and illiquid, and advised that the fund was experiencing normal inflows and outflows at that time." The government failed to recognize, or perhaps intentionally omitted, that Mr. Nordlicht was not on the telephone call when this asserted misrepresentation was made. Furthermore, this statement is an accurate representation, not a

Hon. Brian M. Cogan
June 10, 2019
Page 7

misrepresentation, as Platinum was seeking to be 50/50, and that was actually the goal. Additionally, the "inflows and outflows" the government referenced in its brief, deals directly with the make-up of the fund, not the misleading spin that the government attempts to make of it. (See GX 7119, GX 7120)

Even as late as January 7, 2016, Mr. Nordlicht believed he could come back from the liquidity crisis, which Platinum has not contested, evidenced by his intent to rally and make a final heartfelt plea to advisors to raise money. In GX-1405, he encourages the alleged co-conspirators to step up and help save the fund. Mr. Nordlicht is in Israel when he asks them to go the extra mile to keep the business afloat. This is evidence of a businessperson, continuing to fight for his business, making tough business decisions during a critical time, not a fraudster.

Not a single one of these alleged misrepresentations or omissions rises to the level of a *material* one. As mis-valuation is absent from the case, there is nothing here that supports a theory that any of these representations or omissions somehow changed anything. For the foregoing reasons, the Government failed to prove beyond a reasonable doubt that any allegedly false statement was material, and the Court should enter a judgment of acquittal.

    iii.    <u>Venue</u>

Despite the government's conclusory statements to the contrary, the evidence presented in its case in chief was insufficient to prove that venue was appropriate in the Eastern District of New York. The only evidence showing anything to do with venue was incredibly one single email, GX-566, which is difficult to even make out, but appears to be a list of bond holders. Of the eighty-plus bond holders listed, only a handful appear to maintain addresses in the Eastern District of New York. What's more, the email attaching this bond holder list predates the consent solicitation by more than three months, and there is no evidence that the bondholders listed in this email participated in the consent solicitation. Clearly, this singular email, with no additional information or evidence, is plainly insufficient to uphold these charges. No act or transaction underlying these charges took place in this District, and no evidence in the record supports venue.

Criminal defendants have the Constitutional right to be tried in "the state and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see also* 15 U.S.C. § 78aa. That crimes be prosecuted where committed is a bedrock constitutional principle. *United States v. Cabrales*, 524 U.S. 1, 6 & n.1 (1998); *see also United States v. Novak*, 443 F.3d 150, 161 (2d Cir. 2006) (noting "constitutional underpinning and importance of proper venue" and reversing conviction due to improper venue) (internal quotation marks and citation omitted); Federal Rule of Criminal Procedure 18) ("[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18 (emphasis added)). Where multiple offenses are alleged, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989). "The burden is on the government to prove that the crime was committed in the district in which the prosecution is brought." *Id.*; *accord United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

Hon. Brian M. Cogan
June 10, 2019
Page 8

Courts must "'initially identify the conduct constituting [each] offense' and then 'discern the location of the commission of the criminal acts.'" *Ramirez*, 420 F.3d at 138 (*quoting United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)); *United States v. Brennan*, 183 F.3d 139, 144 (2d Cir. 1999) ("to determine whether prosecution was proper in the Eastern District, we therefore must ascertain where the crimes with which [the defendants] were charged were committed"). "Venue is proper only where the acts constituting the offense — the crime's 'essential conduct elements' — took place." *Tzolov*, 642 F.3d at 318. Therefore, "[a] prosecution may only occur . . . in a district 'in which an act occurs that the statute at issue proscribes.'" *United States v. Wilson*, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *4 (S.D.N.Y. July 13, 2001) (emphasis added) (*quoting United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999)). In contrast, venue will not be proper "in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Beech-Nut*, 871 F.2d at 1190; *Tzolov*, 642 F.3d at 319 ("preparatory acts . . . were not acts 'constituting' the violation" for purposes of venue). This is the case even where the government alleges the substantive offense was continuing in nature, such as in a conspiracy charge. *Ramirez*, 420 F.3d at 141 ("'[w]hether the crime be continuing or noncontinuing' . . . 'venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense'") (*quoting Beech-Nut*, 871 F.2d at 1190).

Because the Government has not proven that any event underlying the crime occurred in the Eastern District of New York, the case should be dismissed for lack of venue.

### IV. Conclusion

For all these reasons, we respectfully submit that the Court should grant Mr. Nordlicht's motion pursuant to Rule.

Respectfully submitted,

Duncan P. Levin, Esq.
*Counsel for Mark Nordlicht*
(212) 330-7626

cc: All parties (via ECF)