UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                              :

  UNITED STATES OF AMERICA,              :
                                              :

                  - against –             :       **MEMORANDUM DECISION AND**
                                              :       **ORDER**

  MARK NORDLICHT and               :
  DAVID LEVY,                      :      16-cr-00640 (BMC)
                                              :

              Defendants.          :
                                              :
------------------------------------------------------------ X

**COGAN,** District Judge.

      Defendants Mark Nordlicht and David Levy were both convicted of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud. They have both moved for a judgment of acquittal, or in the alternative, for a new trial. They have also both moved for the Court to direct the Government to provide them with grand jury minutes. For the reasons stated below, Nordlicht's motion for acquittal is denied but his motion for a new trial is granted; Levy's motion for acquittal is granted and his motion for a new trial is granted in the alternative; and Nordlicht's and Levy's motion to inspect the grand jury minutes is denied as moot.

## BACKGROUND

      The indictment in this case charged Mark Nordlicht, David Levy, and Joseph SanFilippo, among others, with participation in two alleged schemes: the "Investment Fraud Scheme" and the "Black Elk Scheme." Nordlicht, Levy, and SanFilippo were tried separately from their co-defendants. From *voir dire* to verdict, the trial lasted almost three months and included witness testimony and other evidence relating to both schemes. Nordlicht and Levy were only convicted

of the counts relating to the Black Elk Scheme.  Below is a summary of aspects of the indictment and trial related to the Black Elk Scheme.

## I.      The Indictment

On December 14, 2016, seven individuals were indicted for their alleged participation in the Fraudulent Investment and Black Elk Schemes.  Both schemes related to Platinum Partners ("Platinum"), a New York-based hedge fund that was founded in 2003.

Platinum managed multiple funds, including Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), and Platinum Partners Liquid Opportunity Master Fund L.P. ("PPLO").  The Black Elk Scheme also involved Black Elk – an oil and gas company that Platinum controlled from August 2010 through September 2015 – and Beechwood, a group of entities that was established in 2013. Beechwood included:  Beechwood Re, Ltd.; Beechwood Bermuda International Ltd. ("BBIL"); Beechwood Bermuda Investment Holdings; and B Asset Manager L.P. ("BAM").

The indictment charged the following individuals:

- Mark Nordlicht, one of Platinum's founding partners and its Chief Investment Officer ("CIO").  Nordlicht also became a stakeholder in Beechwood in 2013.

- David Levy, a senior executive at Platinum who:  served as Platinum's co-portfolio manager for Black Elk from 2011 to 2014; became a minority partner in Beechwood in 2013; served as BAM's Chief Investment Officer in 2014; and became co-CIO of Platinum in 2014.

- Uri Landesman, the Managing Partner and President of PPVA.

- Joseph SanFilippo, PPVA's Chief Financial Officer ("CFO") from 2005 through 2016.

- Joseph Mann, who worked in Platinum's marketing department from 2013 until 2016.

- Daniel Small, who was a managing director at Platinum and a co-portfolio manager for Black Elk.

- And Jeffrey Shulse, who was Black Elk's Chief Financial Officer from January 2014 through September 2014 and Black Elk's Chief Executive Officer from September 2014 until April 2015.

In the portion dedicated to the Black Elk Scheme, the indictment alleges that, between November 2011 and December 2016, Nordlicht and Levy, among others, engaged in a scheme to defraud holders of Black Elk bonds and deprive them of the proceeds of the sale of a significant portion of Black Elk's most lucrative assets. Beginning in July 2009, PPVA entered into various agreements and transactions with Black Elk that led to Platinum's ownership of a majority of Black Elk's common equity and control of Black Elk's operations.

In November 2010, Black Elk raised $150 million by issuing bonds. In the first quarter of 2013, Platinum invested $50 million into Black Elk in exchange for the vast majority of its Series E preferred stock. According to the indictment, by late 2013, defendants realized that Black Elk was effectively insolvent but still possessed valuable assets. Defendants allegedly then pursued opportunities to sell Black Elk's assets while diverting the funds of any asset sale to the preferred equity holders, including Platinum, rather than the bondholders – although under Black Elk's indenture agreement, the bondholders would be paid ahead of the equity holders in the event of a significant asset sale.

In March 19, 2014, Platinum and related parties purchased $19 million of Black Elk bonds. By April 2014, $98,730,500 of Black Elk bonds was controlled by Platinum and Beechwood entities. Around March and April 2014, Platinum and related parties also purchased additional preferred equity to obtain almost 100% of the preferred equity.

By May 2014, defendants transferred some Black Elk bonds owned by PPVA to Beechwood. On July 26, 2014, Black Elk announced that it commenced a public offer for the Black Elk bonds. The consent solicitation provided, among other things, that:

- Black Elk had commenced a cash tender offer to purchase outstanding Black Elk bonds at par value;

- Black Elk was soliciting the consent of the bondholders to modify certain restrictive covenants contained in the indenture agreement governing the Black Elk bonds;

- The bondholders who tendered their Black Elk bonds would be considered to have consented to amending the indenture agreement;

- Bondholders could also consent to the proposed amendments without tendering their bonds;

- The consent solicitation was being made in connection with a sale of Black Elk assets and Black Elk would use the net proceeds of the sale to purchase the tendered Black Elk bonds;

- The offer expires at 5:00 PM New York time on August 13, 2014;

- Under Section 316(a) of the Trust Indenture Act of 1939 (the "TIA"), any Black Elk bonds "owned by the Company or any person directly or indirectly controlling by or under direct or indirect common control with the Company shall be disregarded for the purposes of determining the majority" (the "affiliate rule"); and

- PPVA "and its affiliates, which own approximately 85% of our outstanding voting membership interests, own[ed] approximately $18,321,000 principal amount of the outstanding" Black Elk bonds.  "Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any" Black Elk bonds.

Defendants, together with others, caused PPCO, PPLO, BAM, and BBIL to consent to the proposed amendments to the indenture agreement but not tender their Black Elk bonds. When the offer expired on August 13, 2014, bondholders holding $11,333,000 of Black Elk bonds had tendered and were paid.  In total, the holders of $110,565,000 in Black Elk bonds (about 73.71% of the bonds) had consented to the consent solicitation.

Thus, the indenture agreement was amended to allow the preferred equity holders to get paid from the proceeds of Black Elk's sale of its assets.  On August 11, 2015, Black Elk's creditors filed a petition to place the company into an involuntary Chapter 7 bankruptcy, which

was converted on September 1, 2015 to a voluntary Chapter 11 bankruptcy.  As of December 2016 (the month of the indictment), a number of bondholders who did not tender their bonds had not received the principal amount of their holdings.

The indictment included eight separate counts.  Counts one to five of the indictment related to the Investment Fraud Scheme and counts six to eight related to the Black Elk Scheme.  Specifically, count six charged Nordlicht and Levy, among others, with conspiracy to commit securities fraud; count seven charged Nordlicht and Levy, among others, with conspiracy to commit wire fraud; and count eight charged Nordlicht and Levy, among others, with securities fraud.

## II.     The Government's Opening

When describing the Black Elk Scheme, the Government indicated that "to get the money from the asset sale, Platinum had to leapfrog the bondholders in line."  Thus, according to the Government, "Nordlicht and Levy hatched a plan to get the money from the asset sale … [b]y lying to the bondholders."  The Government claimed that the evidence would show that, under this plan, defendants rigged the Black Elk bond consent solicitation.  Specifically, the Government alleged:

> The defendants wanted to leave no doubt that they would win the vote and get the money. So what did they do? They rigged the vote behind the scenes by hiding over half of the voting bonds in companies they secretly controlled. By doing that, they made it look like they weren't participating in the vote, like the rules were being followed. They then promised unsuspecting bondholders that Platinum would not participate in the vote and that the vote would be fair, but when the vote took place, it was a complete sham. The result was guaranteed from the start. This is because the defendants actually voted all of those bonds that they hid away in companies they secretly controlled, bonds that alone made up more than half of the total number of bonds and guaranteed the vote would pass.

> As a result of the defendants' fraud, the vote passed and Platinum, including PPVA, got millions and millions of dollars from the sale of Black Elk's best assets, money the defendants stole.

### III.    Testimony of Daniel Mandelbaum

Mandelbaum was a Chief Financial Officer at Platinum.  Mandelbaum testified that Levy informed him that there was insufficient cash to pay Black Elk invoices, and Mandelbaum asked Levy if Black Elk would go bankrupt.  Levy indicated that they would wait a year before declaring bankruptcy because in June or July of 2014, Platinum had obtained $100 million from Black Elk.  Levy explained that if they did not wait a year before declaring bankruptcy, then the $100 million could be clawed back.

### IV.    Testimony of Naftali Manela

Manela was an employee of both Platinum and Beechwood.  When Manela was at Platinum, Nordlicht asked Manela to also work at Beechwood, a reinsurance company with offices a few blocks away from Platinum's offices.  Beechwood was founded by Mark Nordlicht, as well as Murray Huberfeld, David Bodner, Mark Feuer, and Scott Taylor.  David Levy was going to be the CIO of Beechwood.  Nordlicht and Levy decided which investments would be transferred from Platinum to Beechwood.

Manela confirmed that "Nordlicht didn't have the final say and Beechwood could have said no as to whatever Nordlicht recommended."  Feuer and Taylor ran the reinsurance aspect of Beechwood and were the "ultimate bosses at Beechwood in that sense."

Feuer and Taylor wanted Beechwood to be set up to not be an affiliate of Platinum, and had lawyers review the structure of Beechwood to ensure that it would not be a Platinum affiliate.  Feuer told Manela that lawyers were working to create a clear division between Beechwood and Platinum, such that they are not affiliates.  When Feuer and Taylor told Manela that Platinum and Beechwood were not affiliates, Manela took them at their word.  Levy was

6

present during a meeting when individuals talked about how Beechwood was not a Platinum affiliate.

Manela also testified that Platinum sold Black Elk bonds to Beechwood.  Further, on July 8, 2019, Levy or Small asked Manela to send them a list of the amount of Black Elk bonds held by Platinum and Beechwood.  A trader for Platinum then compiled this information and sent it to Manela, who sent the information to Levy and Small.

On July 23, 2014, Manela emailed Levy a list of investments Beechwood held that were related to Platinum, including $31,051,000 in "Black Elk Energy Public Debt 13.75%," with the following comment: "Purchased 3,335,000 each from PPCO and PPLO and 24,381,000 from PPVA."  On August 16, 2014, Manela emailed Levy to ask, "did Black Elk sale go thru yesterday??" and Levy responded: "Sale closed. 135 mln Cash will be in the account at black elk Monday am."

## V.    Testimony of Arthur Garza

Garza was the Chief Technical Officer at Black Elk.  Garza testified that Black Elk began selling several oil and gas wells in 2014.  One of the buyers was a company called Renaissance Offshore, LLC ("Renaissance").

## VI.    Testimony of Clifford Joseph Bruno

Bruno was the Vice President of Operations at Black Elk.  Bruno indicated that Black Elk faced serious challenges, including its debt and inability to pay vendors.  Bruno told Levy that Black Elk may have to file for bankruptcy and Levy responded that "[w]e cannot do that. It's a lot of money to lose."

Bruno also testified that, at a Black Elk management meeting in early 2014, an individual stated, in relation to bondholders consenting to the consent solicitation, "no one in their right

mind will do it. You're not going to hear anything."  Bruno testified that Levy appeared "a little

agitated" and walked with Shulse towards Shulse's office.  While Levy and Shulse were

speaking, Bruno heard Levy say, "[i]t's covered, covered."  When discussing the consent

solicitation, Bruno also testified that he "had no idea what it meant, what it is."

### VII.    Testimony of Israel Wallach

Wallach was a portfolio manager at Beechwood from January 2014 until March 2016.

Nordlicht introduced Wallach to Beechwood.  Wallach believed Nordlicht was trying to help

Beechwood when it was a startup.  Wallach focused on high-yield debt, whereas Levy, who was

CIO, had a different focus.  Wallach did not need Levy's permission to make trades.

Wallach testified that Feuer and Taylor ran Beechwood the whole time Wallach worked

there, including the spring and summer of 2014.  Wallach did not perceive Nordlicht as having

the authority to order Wallach to buy a particular position; Wallach never believed that Nordlicht

forced him to do anything; and Nordlicht did not instruct Wallach to vote the Black Elk bonds.

Rather, Wallach testified that Nordlicht "maintained an advisory role" at Beechwood.

Nonetheless, Levy and Nordlicht both worked at and had offices at both Platinum and

Beechwood.

Wallach first learned about Black Elk when Nordlicht asked Wallach to get the third-

party market pricing for the Black Elk bonds so that they could see the price on a daily basis.

During April 2014 and May 2014, Nordlicht asked Wallach multiple times about the price of the

Black Elk bonds and whether Beechwood had the capacity to purchase those bonds.  On May 13,

2014, Nordlicht instructed Wallach to purchase $8 million Black Elk bonds on Beechwood's

behalf, and instructed a trader at Platinum to sell $4 million Black Elk bonds from Platinum

accounts at Credit Suisse and Nomura.

On June 23, 2014, the public consent solicitation process began.  Also on June 23, 2014, Nordlicht asked Wallach how many Black Elk bonds Beechwood owned, and Wallach informed him the figure was $13,360,000.  Between April 8, 2014 and July 7, 2014, Nordlicht directed the sale of almost $32 million in Black Elk bonds from Platinum funds to Beechwood.  On July 28, 2014, Beechwood voted its Black Elk bonds to consent without tendering.

On August 11, 2014, Wallach reminded Nordlicht of the August 13, 2014 at 5:00 p.m. voting deadline for the consent solicitation.  Nordlicht replied the same day to Wallach on August 11, 2014: "Will let u know our advice."  Wallach replied: "You can just let us know what you decided to do. Just wanted to make sure u didn't forget."  Having not heard again from Nordlicht regarding the consent solicitation vote, Wallach wrote Nordlicht and Levy at 10:46 a.m. on August 13, 2014: "Assuming we are allowing 5pm deadline for BLELK bonds tender to expire w/o us tendering any of them, correct? If u need us to do anything, just let us know."  Nordlicht replied at 12:12 a.m. on August 14, 2014: "Thx."

### VIII.   Testimony of Rob Shearer

Shearer, an attorney who had been a partner at BakerHostetler and counsel to Black Elk during the relevant time period, administered the consent solicitation.  It was his job to ensure that the number of bonds voted were sufficient for the consent to pass.  However, Shearer relied on Black Elk to provide the number of Black Elk bonds that PPVA and its affiliates owned.  Shearer would then exclude votes by Platinum affiliates because they could not be counted under the Trust Indenture Act or the bond indenture.

The bond indenture defined an "affiliate" of "any specified Person" as "any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person," and defined "control" as "the possession, directly or indirectly, of the

power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control."

Shearer knew that Platinum had purchased Black Elk bonds with an eye toward "flipping [them] to friendlies who will [d]o right by the company" in case Black Elk later sought to change the covenants.  Mr. Shearer understood "friendlies" to mean bondholders that had a relationship with Platinum "such that if Platinum asked these friendly bondholders to vote in a certain way, that the friendly bondholders would then vote in that way … ."  Shearer indicated that flipping bonds to "friendlies" was proper as long as the "friendlies" were not Platinum affiliates.

In April or May 2014, Shulse told Shearer that Platinum owned about $100 million out of the $150 million in Black Elk bonds.  Shearer had no reason to doubt the information Shulse gave him and did not attempt to independently verify the information.

Black Elk initially attempted to carry out a private consent process to amend the bond indenture in the spring of 2014.  However, the private process never closed because the trustee was uncomfortable with the way in which it was conducted.  In June 2014, Nordlicht emailed Levy, Shulse, and Small about the failed private process and stated, "David you f'd this up bad for no reason."

Black Elk then pursued a public consent solicitation process, in which all of the independent bondholders would be informed of the proposed amendments to the indenture and would be given an opportunity to vote on them.  The amendments would, among other things, modify the restrictions on Black Elk's use of proceeds from the Renaissance sale.  Before the amendments, the bond indenture required Black Elk to use proceeds from the sale to either pay Black Elk's indebtedness or invest in the oil and gas industry.  After the amendments, if they

passed, Black Elk could also use the proceeds of an asset sale to purchase at par value any Black

Elk bonds that the bondholders elected to tender and then use the remaining asset sale proceeds

to repurchase or redeem preferred equity of Black Elk.

The public consent solicitation process began on June 23, 2014, when Small sent Shearer

an email and copied Levy.  On July 1, 2014, BakerHostetler prepared a memorandum to Black

Elk personnel indicating that $90 million in Black Elk bonds were held by companies "friendly"

to Platinum.  The July 1, 2014 memo was based on discussions between BakerHostetler

attorneys and Black Elk.  However, Shearer did not receive this memo while he was

administering the public consent process.

On July 3, 2014, Small asked Shearer and his colleague, Brittany Sakowitz, to confirm

"that under the TIA if $5MM of the bonds were owned by an affiliate then in order for the

consent to be approved a majority of $145MM (greater than $72.5MM) would need to consent

rather than greater than $75MM."  Sakowitz replied:  "Correct. Securities owned by the obligor

or by any person directly or indirectly controlling or controlled by or under direct or indirect

common control with the obligor must be disregarded for purposes of calculating the vote

required to approve the proposal. (Trust Indenture Act, Section 316(a))."  Small then forwarded

this exchange to Nordlicht and Levy, stating "[s]ee below regarding the majority consent

calculation."

On Monday, July 7, 2014, Small forwarded the draft consent solicitation from Shearer to

Nordlicht and Levy, stating "[a]ttached is the next turn of the consent which we are reviewing.

The company must disclose how many bonds are owned by affiliates in order to establish the

requisite number to constitute a majority. . . . Let's discuss asap in order to finalize and launch by

Thursday."  On July 9, 2014, Small wrote to Shearer and Sakowitz, among others, that

"$18,321,000 bonds are controlled by PPVA and should be disclosed and excluded from the calculation. I believe this implies that $65,840,000 bonds are required to obtain a majority consent."

On July 13, 2014, Small reiterated to Shearer and Sakowitz that "$18,321,000 bonds are controlled by and should be disclosed and excluded from the calculation." On July 16, 2014, Shearer's firm distributed the consent solicitation statement to the bondholders. The consent solicitation statement offered to buy back Black Elk bonds at par value and sought the bondholders' consent to amend the indenture to, among other things, allow Black Elk to use the proceeds of an asset sale to redeem preferred equity of Black Elk.

The consent solicitation statement disclosed that there were $150 million worth of Black Elk bonds outstanding under the bond indenture. Out of those $150 million, PPVA and its affiliates – which owned 85% of Black Elk's outstanding voting membership interests – owned $18,321,000 of the Black Elk bonds. The consent solicitation added that "[o]therwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any" Black Elk bonds.

On August 1, 2014, Shearer requested that Small provide Shearer with a signed Officer Certificate that affirmed the amount of Black Elk bonds that PPVA and its affiliates owned. Shearer recommended "Platinum go ahead and submit its consent in the consent solicitation" since Shearer "would like to be able to show that we have a majority both including and excluding the Notes held by Platinum."

Shearer followed up on his August 1, 2014 email on August 13, 2014, at 6:05 p.m – approximately an hour after the consent voting period expired. Twenty minutes later, Small

wrote to Nordlicht and Levy with the subject heading "Officer Certificate" and stated "[s]ee

attached wording and let me know if you are ok. Below is a table that shows under all three

scenarios there is 50% approval."[1]

At 8:51 a.m. the next morning, August 14, 2014, Small resent his email to Nordlicht and

Levy and wrote "[t]rustee wants to see this this morning in order to finalize results of

tender/consent which ended last night. U ok with language?"  Nordlicht responded to Small and

Levy at 11:08 a.m. on August 14, 2014 by writing "K".  On August 14, 2014, at 12:36 p.m.,

Small wrote to Shearer with a cc to Shulse: "Rob, see attached officer's certificate and below

analysis which is also set forth on the attached spreadsheet. Let me know if you have any

comments and we will have executed."

The three scenarios included in a table in this email were largely identical to those Small

had shared with Nordlicht and Levy approximately an hour and a half earlier.  Small's email

identified the $43 million in bonds held by PPCO and PPLO as held by entities "Not Deemed

Affiliates" of Black Elk.  Small and Shearer believed it was ambiguous whether those bonds

should be excluded from the vote, but decided to exclude those bonds when determining whether

the consent solicitation passed.

Shearer planned on releasing a press release shortly after he received Small's email.  The

first draft of the press release indicated that $18.3 bonds had been excluded from the calculation.

---

[1] These three scenarios included counting (1) all $110 million consenting votes ($11.4 million tendered bonds plus
the $98.6 million bonds that voted to consent only); (2) all consenting votes except the $18 million PPVA-owned
bonds; and (3) all consenting votes except the $18 million PPVA-owned bonds and the $43 million PPCO- and
PPLO-owned bonds (although Small referred to these bonds as owned by entities that were "Not Deemed
Affiliates").  In none of these three scenarios did Small include the $37 million Black Elk bonds that Beechwood
owned as bonds held by a Platinum affiliate.

In the final draft of the press release, Shearer removed all references to the amount of bonds affiliated with Platinum in light of the uncertainty about which entities were Platinum affiliates.

However, Shearer did not stop the consent solicitation process or reissue the consent solicitation statement, which only disclosed the $18.3 in PPVA bonds as bonds held by a Platinum affiliate.  Shearer testified that he did not stop the consent solicitation process because "[t]he goal of the process was to get a majority vote" and the amendment would have passed even excluding bonds held by PPVA, PPLO, and PPCO.

### IX.    Testimony of Dixon Yee

Yee worked for Phoenix Investment Adviser, a fund that invested in Black Elk bonds.  In the consent solicitation, Yee decided not to consent to the amendments or tender his bonds.  Yee was "shocked and flabbergasted" when he learned that many bondholders would consent to the amendment to the bond indenture without tendering since they "g[a]ve up … their rights for nothing," which would be "kind of stupid."  Yee testified that whether "a dominating portion of the $150 million in Black Elk bonds was controlled by Platinum and voted to consent to paying the Black Elk preferred security first" would have been "important information" to know at the time of the consent solicitation process.

### X.    Testimony of Todd Pulvino

Pulvino worked for CNH, another fund that invested in Black Elk bonds.  Pulvino decided not to tender these Black Elk bonds in the consent solicitation, at least in part because of his assessment of the probability that the amendments would pass.  If CNH had known that more than $18.3 million were controlled by Platinum affiliates, then CNH "would have thought more about tendering our notes because we wouldn't have wanted to hold these notes without the protective covenants that were in place."  Pulvino explained:

Suppose that rather than 18 million they owned a 120 million, just suppose, this is our thinking, then so that would mean there's 30 million bonds, only 30 million that get to vote. That means if you divide that by two you need only 15 million to vote for the consents. Well, that's a lot more likely than getting 66 million to vote. So in that case we would have thought more about tendering our notes because we wouldn't have wanted to hold these notes without the protective covenants that were in place. So that was a key – that was a key part of our thinking. And I think if we – you know, if the numbers were different we would have either tendered our notes or I mean if we – if we thought that there were notes that were not properly categorized, we would have contacted the indenture trustee to make sure that the notes that were being voted were not affiliate notes.

### XI.    Additional Emails Regarding Beechwood and the Consent Solicitation

On March 20, 2013, Murray Huberfeld wrote to Mark Feuer, in reference to Beechwood, that "Nordlicht group will run the invest allocation side."  On March 5, 2014, Shulse forwarded to Nordlicht an email from Shearer regarding the affiliate rule.  Nordlicht stated, "when we say we have friendly holders we will be fully compliant with this provision."

On May 28, 2014, Nordlicht wrote to a potential investor that "besides Platinum we have [a] reinsurance mandate and I'd like to split it among entities, though all controlled by us." When discussing a potential investment with this individual, Nordlicht later wrote "[i]f it helps we shd be b asset manager as opposed to platinum on these things."

On July 29, 2014, during the public consent solicitation, Nordlicht wrote to himself with the subject heading "To do today": "Black elk – 1 – need budget for post renaissance properties. We need immediate p and a plan. We need plan as to how to distribute money to the right places (preferred, preferred, preferred[).]"  Later that day, Nordlicht asked Small and Levy, "how is partial close renaissance talks going?" and also wrote, "David – I have Beechwood at 36,422,400 in terms of ownership of bee bonds. Dan – Do u know respective funds?"  Small replied with the following spreadsheet:

| BlackElk Bond Holders | | | | | |
|---|---|---|---|---|---|
| | Nomura | Credit Suisse | Wilmington Trust | Total | |
| PPCO | 29,582,000 | | | 29,582,000 | |
| PPVA | | 18,321,000 | | 18,321,000 | |
| PPLO | | 13,711,000 | | 13,711,000 | |
| BAM | | | 13,360,000 | 13,360,000 | |
| BBIL | | | 23,657,000 | 23,657,000 | |
| Total | | | | 98,631,000 | |
| | | | | | |
| | | | | 80,310,000 | 150,000,000 |
| | | | | | 131,679,000 |
| | | | | | 65,839,500.0 |

On August 18, 2014, Shearer wrote to Shulse and another individual advising them to review a provision of a Texas statute regarding prohibited distributions to members.  Shulse forwarded his email to Nordlicht, Small, Levy and Samuel Salfati and stated: "Advice of counsel . . . we need to be mindful of this in our planning."  Nordlicht then forwarded Shulse's email to Levy and stated "David – get these wires out!!!!! Call him right now please!!!!"  Twenty minutes after this email, Small wrote to Shulse and Salfati that Shulse is "hereby authorized to wire $70MM in partial payments of Preferred E units."

In April 2015, in response to a request for information about Beechwood from Platinum's auditor, Elliot Feit, the Finance Director of Beechwood, wrote, "we have no obligation to provide this information to you nor do we characterize any Beechwood Investor (as we have defined below) as a related party or an affiliate of any Platinum Entity."

### XII.   The Government's Summation

During its summation, the Government claimed that defendants told a "big lie to the bondholders that only $18.3 million in bonds were affiliated or insider bonds."  The Government also claimed that defendants "also lied by leaving out [] bonds held by that company, Beechwood."  The Government indicated that "[t]he reason that was also a lie is the defendants

controlled Beechwood, just like they did Platinum, and that meant Beechwood's bonds were

ban[ne]d from influencing this vote."  The Government also told the jury that "[c]ontrol is pretty

cut and dry. You can use your common sense, your experience in your own lives, when you

think about control."

However, the Government acknowledged that "[a]t the end of the day, there were certain

bonds that were not counted" because Shearer removed "61 million in bonds … out of the math"

after defendants disclosed that those bonds were affiliated with Platinum.  The Government

suggested that the defendants disclosed the bonds held by PPLO and PPCO but not Beechwood

because the vote would still pass excluding the PPLO and PPCO bonds, but not by excluding the

Beechwood bonds.

### XIII.   Jury Verdict

The jury found Nordlicht and Levy guilty on counts six to eight – which related to the

Black Elk Scheme – but not guilty on counts one to five – which related to the Investment Fraud

Scheme.  The jury also found SanFilippo not guilty on counts one to five; he was not charged in

counts six to eight.  Nordlicht and Levy moved for a judgment of acquittal under Federal Rule of

Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33 on the

day of the verdict.  The Court deferred ruling on these motions until Nordlicht, Levy, and the

Government fully briefed their respective positions.

### <u>DISCUSSION</u>

### I.   Motions for a Judgment of Acquittal

Under Rule 29(c), "[i]f the jury has returned a guilty verdict, the court may set aside the

verdict and enter an acquittal."  "When a defendant moves for a judgment of acquittal, the Court

must determine whether upon the evidence, giving full play to the right of the jury to determine

credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).

"A reasonable mind must be able to conclude guilt on each and every element of the charged offense." Id. "However, all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." Id. (internal quotation marks omitted). "The evidence is to be viewed not in isolation but in conjunction." Id. (internal quotation marks omitted).

Thus, a convicted defendant "bears a heavy burden" when challenging the sufficiency of the evidence. United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted). This standard is particularly important in a conspiracy case "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks omitted).

### A. Nordlicht's Motion for a Judgment of Acquittal

Nordlicht claims there was insufficient evidence for the jury to determine: that he had criminal intent; that Beechwood was affiliated with Platinum; or that the consent solicitation statement lacked material information. But when viewed in the light most favorable to the Government, the Government adduced sufficient evidence as to each of these grounds as to make a judgment of acquittal under Rule 29 inappropriate.

First, viewing the evidence in the light most favorable to the Government, Nordlicht's actions during and leading up to the consent solicitation were sufficient for the jury to find that

he acted with criminal intent.  Nordlicht knew about the affiliate rule and he indicated as much in

the March 2014 email in which he said that he will be "fully compliant" with the affiliate rule.

Drawing reasonable inferences in the Government's favor, this email indicated a desire to create

a favorable paper trail, rather than a good faith desire to comply with the affiliate rule.

Nordlicht also indicated that Platinum had purchased Black Elk bonds with an eye toward

"flipping [them] to friendlies who will [d]o right by the company."  Between April 8, 2014 and

July 7, 2014, Nordlicht directed the sale of almost $32 million in Black Elk bonds from Platinum

funds to Beechwood.  If Beechwood had been merely a "friendly" company but not a Platinum

affiliate, there may not have been anything inculpatory about Nordlicht's decision to move the

bonds to Beechwood.  However, the Government adduced evidence to suggest that Nordlicht

knew or should have known that Beechwood was not only "friendly" with Platinum but also a

Platinum affiliate.

On May 28, 2014 – shortly before the public consent solicitation – Nordlicht wrote to a

potential investor that "besides Platinum we have reinsurance mandate and I'd like to split it

among entities, though all controlled by us."  On its face, the email is ambiguous about whether

Nordlicht meant "control" in a colloquial sense here or "control" as the legal term under the TIA

and the bond indenture.  But drawing inferences in the Government's favor, Nordlicht was at

least on notice that Beechwood's status could potentially implicate the affiliate rule.  Nordlicht

thus could have disclosed the extent of Platinum's ties to Beechwood and sought Shearer's

advice as to whether Beechwood qualified as a Platinum affiliate.

Instead, Nordlicht and his colleagues played their cards close to their vests by providing

limited and potentially contradictory information to Shearer about PPCO and PPLO while

concealing the extent of Beechwood's ties to Platinum.  On the one hand, in April or May 2014,

Shulse told Shearer that Platinum owned about $100 million out of the $150 million in Black Elk bonds.  Further, on July 1, 2014, BakerHostetler prepared a memorandum to Black Elk personnel indicating that Platinum owned approximately $90 million Black Elk bonds that were "friendly" to Platinum – although Shearer did not receive this memo while he was administering the consent solicitation.

But on the other hand, on multiple occasions, Small emailed Shearer and Sakowitz and indicated that the $18 million in PPVA bonds should be excluded from the vote, but did not mention excluding the PPLO, PPCO, BAM, or BIL bonds.  Nordlicht contends that these disclosures were sufficient to inform Shearer about PPLO's and PPCO's affiliate status, but it is the role of the jury, not the Court, to weigh evidence of the mixed signals Shearer received.

Nordlicht also failed to timely correct the July 16, 2014 consent solicitation statement, which only disclosed that Platinum held the approximately $18 million in PPVA bonds but did not disclose the bonds held by PPLO, PPCO, BAM, and BBIL.  Although Small disclosed to Shearer that PPLO and PPCO may be PPVA affiliates[2] on August 14, 2019 – almost a month after the consent solicitation and a day after the voting deadline – this untimely disclosure was too little and too late to sanitize the process.  Drawing inferences in favor of the Government, the jury could have reasonably concluded that Small waited until after the voting deadline and identified PPLO and PPCO – but not BAM or BBIL – as potential affiliates because the consent solicitation would have passed by counting votes from BAM and BBIL but not PPLO or PPCO.

Nordlicht nonetheless claims that he and his co-defendant, Small, were justified in relying on Shearer to advise them on the administration of the consent solicitation.  Had

---

[2] Specifically, Small identified bonds held by PPCO and PPLO as bonds held by entities "Not Deemed Affiliates" of Platinum.  Drawing inferences in favor of the Government, the jury could have reasonably inferred that this was a half-hearted disclosure meant to maintain the façade that Beechwood was not a Platinum affiliate.

Nordlicht and his colleagues been more communicative with Shearer – for instance, by asking him which entities qualify as Platinum affiliates, or by disclosing the close relationship between Platinum and Beechwood – Shearer may have been in a position to provide advice that Nordlicht could rely on in this case.  See United States v. Scully, 877 F.3d 464, 476 (2d Cir. 2017) ("In a fraud case … the claimed advice of counsel is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent.") (internal quotation marks omitted). Since Shearer was kept in the dark instead, his involvement is not sufficient to support a judgment of acquittal.

Nordlicht also questions what motive he could have had to enter into the Black Elk Scheme in the first place.  If Black Elk paid the proceeds of the Renaissance sale to the preferred equity holders rather than the bondholders, Black Elk would have violated the bond indenture. But the bondholders' recourse would be to receive par value of the bonds plus accrued interest – which is exactly what Black Elk offered to bondholders in the tender offer.  Nordlicht also indicates that the evidence showed that he hoped and expected the bondholders to tender and receive par value plus accrued interest.

Nordlicht is correct that, under the Government's theory, he had a motive to not only commit fraud but also breach the bond indenture.  But the possibility that Nordlicht could have obtained the same result by breaching a contract rather than committing a crime does not preclude the jury from concluding that Nordlicht nonetheless had a motive to commit fraud.

To the extent Nordlicht seeks for the Court to infer that he could not have committed a crime because he could have breached a contract instead, his argument requires the Court to draw an inference in his favor – which the Court cannot do when resolving his Rule 29 motion.

Further, the jury could reasonably have concluded that Nordlicht would have rather secretly defrauded investors – provided he thought he could get away with it – than openly caused Black Elk to breach the bond indenture, which would have further damaged Black Elk's reputation among investors.

Second, viewed in the light most favorable to the Government, the Government adduced sufficient evidence for the jury to conclude that Beechwood was under common control with Platinum.  Specifically, the Government adduced evidence that:  Beechwood and Platinum shared personnel, including Nordlicht, Levy (Beechwood's CIO), and Manela; Nordlicht was one of Beechwood's founders; Feuer and Taylor ran Beechwood's reinsurance side, whereas Nordlicht and Levy ran the investment side; Beechwood and Platinum had offices a few blocks away from each other; and Wallach looked to Nordlicht for guidance on how Black Elk should vote its Beechwood bonds.

Whether Nordlicht actually influenced how Beechwood voted is not dispositive or even particularly significant here.  Nordlicht may have had the authority to direct Beechwood how to vote its Black Elk bonds without possessing overall control of Beechwood.  But drawing inferences in the Government's favor, and deferring to the jury's role in weighing evidence, the Government adduced sufficient evidence of Beechwood's common control with Platinum for the jury to conclude that Beechwood was a Platinum affiliate under the bond indenture and TIA.

The email in which Nordlicht described Beechwood as "controlled by us" also strengthens the Government's case but is not dispositive here, notwithstanding the Government's argument that this "email alone, without more, surpassed Rule 29's standard of establishing Beechwood's affiliate status."  Although this email is probative of Nordlicht's state of mind – i.e., whether he considered Beechwood to be a Platinum affiliate – it does not establish whether

Beechwood was actually an affiliate of Platinum under the TIA or the bond indenture.  Allowing Nordlicht's views about Beechwood's affiliate status to control whether Beechwood is an affiliate would usurp the role of the jury as the factfinder.[3]  But viewed in the light most favorable to the Government, Nordlicht's email, in conjunction with the additional evidence the Government adduced, was sufficient for the jury to determine that Beechwood was a Platinum affiliate.

Nordlicht nonetheless contends that the Government misled the jury into applying the wrong standard when determining whether Beechwood and Platinum were under common control.  In particular, Nordlicht admonishes the Government for arguing to the jury that the jury should use "common sense" to determine "[w]hat is control" under the affiliate rule.  However, the Government also informed jurors that they "will have the definition of affiliate" and "should ask for it, it is in the indenture, but it is the power to control."

There is nothing improper about the Government directing the jury to use the proper standard but also reminding the jury not to leave its common sense at the door.  To the extent Nordlicht suggests that the jury took one part of the Government's directive to heart (to use common sense when applying the affiliate rule) but totally disregarded another part (to look up the definition of "affiliate"), Nordlicht's argument is too speculative to be the basis of a judgment of acquittal under Rule 29.

Third, the amount of bonds held by Platinum affiliates was material to bondholders because it altered the calculus of consent.  The bondholders knew the total number of bonds

---

[3] Similarly, the fact that the Finance Director of Beechwood wrote to Platinum's auditor that "we … do [not] characterize any Beechwood Investor (as we have defined below) as a related party or an affiliate of any Platinum Entity" is of limited probative value regarding whether Beechwood was, in fact, a Platinum affiliate.

involved in the vote – $150 million.  If no bonds were held by Platinum affiliates, then the consent solicitation would only pass if the bondholders representing over $75 million in bonds voted in favor of it.

But the more bonds held by Platinum affiliates, the lower the threshold for the consent solicitation to pass since fewer bondholders have to vote in favor of the amendment for it to pass. If the bondholders who opposed the amendment but thought it would fail had known that PPCO, PPLO, BAM, or BBIL – in addition to PPVA – were Platinum affiliates, they would have inferred that the amendment would be more likely to pass.  The probability that the amendment would pass mattered to Black Elk bondholders because of the stakes of the amendment:  the bondholders gave up their rights to get paid before the preferred equity holders from the Renaissance sale.  If the bondholders who opposed the amendment knew the amendment was more likely to pass, they would then be more likely to tender their bonds in the consent solicitation if they decided it would not be worth investing in Black Elk in light of the amended indenture.

Even if Black Elk had taken the position that Beechwood was not a Platinum affiliate, Black Elk could have disclosed the relationship between Platinum and Beechwood in the consent solicitation – thereby putting bondholders on notice about a potentially contentious legal issue at the heart of the consent solicitation.  The fact that the consent solicitation only passed by counting votes from BAM and BBIL further underscores the materiality of Beechwood's potential status as a Platinum affiliate.  If reasonable Black Elk bondholders knew about the increased probability of the amendment passing because of Platinum's close relationship with Beechwood, they would have considered this information in deciding how to respond – including

by potentially tendering their bonds, contacting the trustee to ensure the propriety of the vote (as Pulvino suggested he would have done), or even instigating litigation.

The Court need not, and does not, decide whether it would have been sufficient for Black Elk to disclose the relationship between Beechwood and Platinum without identifying Beechwood as a Platinum affiliate.  But Black Elk could not conceal the relationship between Beechwood and Platinum in light of the importance of this relationship to the bondholders affected by the consent solicitation.  See Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.") (internal quotation marks omitted); United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015) ("A misrepresentation is material … where there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision.") (internal quotation marks and alterations omitted). Pulvino and Yee echoed this reasoning on the witness stand, and the jury acted within its discretion in deciding this information was material.  See id. ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination.") (internal quotation marks omitted).

Nordlicht contends that the amount of Platinum-affiliated bonds was immaterial, but his arguments are not persuasive.  Nordlicht claims that the "amount of bonds that would not be counted in the vote—whether $18.3 million or $98.6 million—makes no difference" since these "bonds would not be counted anyway."  This argument proves too much, since it suggests that the amount of affiliate-held bonds is never material.  To the contrary, the jury reasonably could

have adopted Pulvino's reasoning for why the amount of bonds needed for the consent

solicitation to pass was important:

> Suppose that rather than 18 million they owned a 120 million, just suppose, this is
> our thinking, then so that would mean there's 30 million bonds, only 30 million
> that get to vote. That means if you divide that by two you need only 15 million to
> vote for the consents. Well, that's a lot more likely than getting 66 million to vote.
> So in that case we would have thought more about tendering our notes because we
> wouldn't have wanted to hold these notes without the protective covenants that
> were in place. So that was a key – that was a key part of our thinking. And I think
> if we – you know, if the numbers were different we would have either tendered
> our notes or I mean if we – if we thought that there were notes that were not
> properly categorized, we would have contacted the indenture trustee to make sure
> that the notes that were being voted were not affiliate notes.

In other words, it was important for bondholders to know the number of bonds excluded from the

vote because the more votes that were excluded, the lower the threshold for the amendment to

pass.

Nordlicht also observes that the July 16, 2014 offering circular disclosed additional risks

about Black Elk, and it was no secret that Black Elk was in distress.  Nonetheless, both Pulvino

and Lee continued to acquire more Black Elk debt after the consent solicitation.  Although

Nordlicht's observation is correct, he merely demonstrates that the total mix of available

information included, among other things, the risks associated with investing in Black Elk.

These risks do not preclude the jury from concluding that the total mix of available information

for Black Elk bondholders also included the number of Black Elk bonds held by Platinum

affiliates.

Nordlicht further observes that Shearer decided not to reissue the consent solicitation to

inform bondholders that $62 million in bonds – not $18.3 million in bonds – were controlled by

Platinum.  When asked whether Shearer did not reissue the consent solicitation because he "did

not believe the $18.3 million number was material for the bondholders to know," Shearer

replied, "[t]he goal of the process was to get a majority vote, right."  Nordlicht seeks for the Court to infer that Shearer thus did not believe that the amount of bonds held by Platinum-affiliates was material.

This argument is unsuccessful for multiple reasons.  First, even if Shearer truly believed that the amount of Black Elk bonds held by Platinum affiliates was immaterial, his beliefs are only relevant here to the extent they are probative of those of a reasonable investor.  Although the jury may consider Shearer's beliefs when determining what a reasonable investor would have believed, weighing evidence is for the jury, not the Court.

Second, drawing inferences in the Government's favor, Shearer's testimony that "[t]he goal of the process was to get a majority vote" reflected what was material for Shearer – a lawyer administering the consent solicitation – and not a bondholder deciding how to vote in the consent solicitation.  Since Shearer's goal was determining whether there were enough votes for the amendment to pass, whether PPCO and PPVO bonds should be excluded from the vote was immaterial to Shearer since there were enough votes for the amendment to pass anyway.

Third, even if Shearer believed that PPCO's and PPLO's affiliate status was immaterial, nothing in the record suggests that Shearer thought it was immaterial whether BAM and BBIL – whose votes were necessary for the consent solicitation to pass – were Platinum affiliates.  Of course, Nordlicht's position is that BAM and BBIL were not Platinum affiliates – but as noted above, the Government adduced sufficient evidence for the jury to find that they were.

### B.  Levy's Motion for a Judgment of Acquittal

Levy's motion for a judgment of acquittal is granted.  Even making reasonable inferences in favor of the Government, and deferring to the role of the jury in weighing evidence and

assessing credibility, the Government failed to meet its burden of proving beyond a reasonable doubt that Levy had criminal intent.

The Government's evidence of Levy's criminal intent falls into the following categories: testimony from Bruno and Mandelbaum; evidence that Levy was involved in processing wire transfers after the Renaissance sale; and evidence that Levy received emails about Black Elk bonds and the consent solicitation. Even taken as a whole, and viewed in the light most favorable to the Government, this evidence of Levy's criminal intent is insufficient to sustain a guilty verdict.

First, Bruno and Mandelbaum testified that Levy made comments that the Government contends are inculpatory, but the Government's interpretation is too speculative to sustain a guilty verdict. Bruno testified that, when he suggested to Levy that Black Elk may have to file for bankruptcy, Levy indicated that they "cannot do that" since "[i]t's a lot of money to lose." The Government interprets this email as evidence of "Levy's corresponding willingness to resort to defrauding the Bondholders," but the mere recognition that bankruptcy may harm stakeholders in Black Elk – including the bondholders – does not indicate intent to break the law to salvage Black Elk. To the extent the Government seeks for the Court to infer that Levy was implying that fraud was preferable to bankruptcy as a means of addressing Black Elk's financial difficulties, the Government's interpretation is too speculative to sustain a guilty verdict.

The Government also seeks for the Court to draw a similarly speculative inference from another comment that Levy made about Black Elk's potential bankruptcy. Specifically, the Government points to Mandelbaum's testimony that Levy informed Mandelbaum that Black Elk would wait until a year after June or July 2014 (the approximate time period for the consent solicitation) to avoid a claw-back of $100 million that Platinum took out of Black Elk. But as

28

the Court indicated at trial, businesses may legitimately consider the risk of a claw-back when deciding when to conduct a certain transaction. The intent to schedule a transaction to avoid a claw-back does not indicate that Levy had criminal intent.

Further, the Government characterizes Bruno's testimony that Levy told Shulse "[i]t's covered," in early 2014 after a meeting in which Black Elk officers discussed the consent solicitation, as "directly show[ing] Levy's deep involvement in the Black Elk Bond Scheme and his leadership role within, given his ability to reassure co-conspirator Shulse that the vote was guaranteed to pass in Platinum's favor." The Government's interpretation is based on multiple layers of speculation, not reasonable inferences from witness testimony.

Bruno testified that this conversation occurred in early 2014, which is around the time of the failed private consent solicitation but not the public consent solicitation that began in June 2014. Further, and in part for that reason, there is no reason to believe that the "[i]t" was a reference to the public consent solicitation. Bruno did not connect this comment to the consent solicitation; rather, Bruno testified that he "didn't know what it all meant … ." Even assuming Levy was referring to the public consent solicitation, there is no reason to believe that "covered" meant "rigged" – as opposed to indicating that Levy believed that the amendments would pass in a legitimate manner because there were enough votes for it to pass.

Second, the Government also notes that Nordlicht asked Levy to process the wire transfers with the proceeds from the Renaissance sale after the indenture was amended. There is nothing unlawful about processing wire transfers, which are a routine aspect of transactions like the Renaissance sale. At most, a jury could reasonably consider the wire transfer as evidence of an action Levy took that furthered a conspiracy, but not intent to join a conspiracy in the first place.

Third, the evidence that Levy received emails about the consent solicitation is insufficient to establish that Levy had criminal intent, even viewed in a light most favorable to the Government and in conjunction with the additional evidence the Government adduced.  The Government identifies an email about the consent solicitation as demonstrating Levy's motive to commit a crime.  In this email, Nordlicht holds himself, Small, and Levy responsible for Black Elk's problems and, in reference to the failed private consent solicitation, tells Levy that he "f'd this up bad for no reason … ."

The Government seeks for the Court to infer that Levy agreed to enter a criminal conspiracy to "redeem himself with Nordlicht."  The inference that Levy was so deeply affected by Nordlicht's cursory criticism, and so concerned about Nordlicht's opinion, that he would enter into a criminal conspiracy to redeem himself is too speculative to sustain a conviction, even in conjunction with additional evidence the Government adduced.

The Government also notes that multiple individuals copied Levy on emails pertaining to the consent solicitation and the number of Black Elk bonds held by Beechwood, but even assuming Levy read these emails, these emails merely show that Levy knew or should have known that Beechwood held Black Elk bonds.  The mere knowledge that Beechwood held Black Elk bonds falls well short of criminal intent.  Many individuals employed at Beechwood, Black Elk, and elsewhere knew or should have known that Beechwood held Black Elk bonds.  That is not enough to prove beyond a reasonable doubt that they intended to commit a crime, at least not without additional evidence of intent – which the Government has failed to adduce.

Specifically, the Government has adduced no evidence that Levy:  considered Beechwood to be an affiliate of Platinum; played any role in shifting Black Elk bonds to Beechwood; or played any role in Beechwood voting its bonds.  Manela even testified that Levy

was present during a meeting where individuals talked about how Beechwood was not a Platinum affiliate.  The Government has not presented any evidence that Levy believed anything to the contrary.

That is why Levy's Rule 29 motion succeeds whereas Nordlicht's does not.  The Government introduced evidence that Nordlicht knew about the affiliate rule and considered Beechwood to be under "our control" but nonetheless parked Black Elk bonds at Beechwood right in time for the bondholder vote.  There is no comparable evidence to demonstrate Levy's criminal intent.

Perhaps in recognition of this asymmetry between the evidence against Nordlicht and against Levy, the Government claims that all of the evidence against Nordlicht also constitutes evidence against Levy.  The Government's theory is that Levy and Nordlicht were co-conspirators, so evidence considered against Nordlicht is relevant to Levy as well.  But the Government's argument begs the question of whether Levy and Nordlicht were co-conspirators in the first place.  The Government cannot evade its obligation to present evidence of a defendant's *mens rea* by adducing evidence of an alleged co-conspirator's *mens rea* because the Government needs to adduce evidence of intent to show that Levy was part of a conspiracy as a threshold matter.[4]

---

[4] The two cases the Government cites here do not hold otherwise.  The Government cites <u>United States v. Bruno</u>, 873 F.2d 555, 562 (2d Cir. 1989), in which the Second Circuit held that "there was abundant evidence that [defendant] was a participant in a conspiracy to sell cocaine" so "[t]he statements and the acts of his co-conspirators were evidence to be considered by the jury in reaching their verdict."  Similarly, the Government cites <u>United States v. Villegas</u>, 899 F.2d 1324, 1347 (2d Cir. 1990), in which the Second Circuit held that because "there was sufficient evidence to connect each [defendant] with the conspiracy, all of the evidence as to each of the other defendants' acts in furtherance of the conspiracy was admissible against each of them."   Here, because the Government failed to meet its burden in showing that Levy was a member of a conspiracy, evidence of his alleged co-conspirators' intent does not constitute evidence of Levy's intent.

The Government also attempts to salvage its case against Levy by noting that Levy was also charged with aiding and abetting securities fraud, but this attempt is not successful. "Guilt may not be inferred from mere association with a guilty party." United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975). Rather, "a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission." Rosemond v. United States, 572 U.S. 65, 77 (2014). "[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." Id. For the reasons above, the evidence of intent the Government adduced is not sufficient to sustain Levy's conviction even an under an aiding and abetting theory.[5]

## II.  Motions for a New Trial

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike the strict confines within which a court must examine a defendant's Rule 29 motion for judgment of acquittal, a court has "broad discretion in ruling on a new trial motion." United States v. Canova, 412 F.3d 331, 348 (2d Cir. 2005) (internal quotation marks omitted).

"In considering whether to grant a new trial, a district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it must be careful not to usurp the role of the jury." Id. at 348-49. "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. … There must be a real concern that an innocent person may have been convicted." Id. at 349 (internal quotation marks omitted).

---

[5] Because the Court grants the motion for a judgment of acquittal, the Court need not and does not reach Levy's additional grounds for moving for a judgment of acquittal.

"The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).  "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  Id.  Courts "nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances."  Id. (internal quotation marks omitted).

Further, under Federal Rule of Criminal Procedure 29(d), "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

## A.  Nordlicht's Motion for a New Trial

Although the Government adduced sufficient evidence for a judgment of acquittal to be unwarranted, letting the verdict stand against Nordlicht would be a manifest injustice.  Thus, Nordlicht's motion for a new trial is granted.

The heart of the Government's case against Nordlicht is that he knew – but concealed from the bondholders – that, under the affiliate rule, bonds held by BAM, BBIL, PPCO, and PPLO should be excluded from the consent solicitation.  The evidence suggests that, although Nordlicht knew about the affiliate rule, he and Beechwood went to great lengths to comply with the affiliate rule.  Indeed, Nordlicht stated as much in a March 2014 email when he said that, although some Black Elk bonds are in the hands of "friendly" bondholders, he will be "fully compliant with the affiliate rule."

Of course, Nordlicht's potentially self-serving statement that he will comply with the law does little to indicate that he actually intended to comply with the law.  As noted above,

Nordlicht could have attempted to create a favorable paper trail in the event he is accused of not following the rule, which is the precise situation he is in right now.  But for the Court to sustain the conviction, the Government had to adduce sufficient evidence for the jury to conclude beyond a reasonable doubt that Nordlicht was dissembling, and in light of all of the facts and circumstances, the Government failed to do so.

Even if the jury could fairly conclude that BBIL and BAM were, in fact, properly considered Platinum affiliates under the affiliate rule, there is insufficient evidence that Nordlicht was on notice of their affiliate status.  Although Nordlicht clearly played a role at Beechwood, there is insufficient evidence that his role was so extensive that he realized, or ought to have realized, that Platinum and Beechwood were affiliates in virtue of Nordlicht's role at both companies.

Specifically, as noted above, Manela testified that:  Nordlicht gave recommendations to Beechwood but did not have the final say; Feuer and Taylor were the "ultimate bosses at Beechwood;" and Feuer and Taylor worked to ensure that Platinum and Beechwood were not affiliates.  Wallach also testified that:  Nordlicht maintained an "advisory role" at Beechwood; Nordlicht did not have the authority to order Wallach to buy a particular position or force Wallach to do anything; and Feuer and Taylor "were the ones who ran" Beechwood.

The Government also points to an email in which Nordlicht described Beechwood as "controlled by us."  The Government takes this email as an admission of guilt, even though the Government also maintains that Nordlicht's email indicating his intention to comply with the affiliate rule was merely an attempt to build a favorable paper trail.  The Government does not explain why Nordlicht would dissemble about his intention to comply with the affiliate rule in

34

one email to build a favorable paper trail, but then effectively reveal his intent to break this rule in another email.

There is no reason to believe Nordlicht meant "controlled" in the technical sense of "control" under the TIA or the bond indenture rather than in the more colloquial sense of "friendly" to Platinum.  There would have been nothing unlawful about Nordlicht simply attempting to persuade individuals at Beechwood to vote in a certain manner – Nordlicht may campaign for votes just like any other stakeholder in the consent solicitation.

For this reason, Nordlicht's role in trading in Black Elk bonds, and even his potential role in the manner in which Beechwood voted its Black Elk bonds, does not require the Court to sustain the verdict.  As the Court noted above, Nordlicht may have been able to direct trading in particular bonds at Beechwood without having the power to direct or cause the direction of Beechwood's management or policies.  The Government has adduced no evidence showing that the Black Elk bonds were sufficiently significant for Beechwood that control over these bonds entailed control over Beechwood itself.  And there would have been nothing improper about shifting bonds from Platinum to Beechwood to influence the consent solicitation if Beechwood was not a Platinum affiliate.

It would also be a manifest injustice to sustain Nordlicht's conviction on the basis that Platinum's alleged failure to disclose that PPCO and PPLO were PPVA affiliates demonstrates his intent to defraud the bondholders.  To the contrary, there is insufficient evidence that the affiliate status of PPCO and PPLO was even concealed from BakerHostetler, which was responsible for communication with bondholders and which distributed the July 16, 2014 consent solicitation statement that did not disclose PPCO's and PPLO's affiliate status.

First, Platinum disclosed to Shearer in April or May 2014 that Platinum owned about $100 million of the Black Elk bonds.[6]  Second, on July 1, 2014, BakerHostetler prepared a memorandum indicating that approximately $90 million Black Elk bonds that owned by companies that were "friendly" to Platinum.  Third, Small again informed Shearer on August 14, 2014 about PPLO's and PPCO's bonds, and they decided to exclude these bonds from the consent solicitation vote in light of the potential that PPLO and PPCO were affiliated with PPVA.

Despite receiving this information, Shearer advised that Platinum vote all of its bonds and decided not to stop the consent solicitation process or reissue the consent solicitation statement, which only disclosed the bonds held by PPVA but not PPCO or PPLO.  Black Elk and Platinum could have interpreted Shearer's conduct as demonstrating approval of the consent solicitation process, even if, in retrospect, the better course of action would have been to ask Shearer what entities counted as Platinum affiliates.

Of course, the Court does not find that BakerHostetler and Black Elk had a model attorney-client relationship.  Black Elk provided mixed signals to BakerHostetler about PPCO and PPLO when Small emailed Shearer and Sakowitz and only identified bonds held by PPVA – not PPCO or PPLO – as Platinum-affiliated.  But BakerHostetler attorneys could have communicated better internally (e.g., by sharing the July 1, 2014 memo with Shearer) and externally (e.g., by seeking additional information from their client).

---

[6] The Government notes that these bonds were freely tradeable, and in fact Platinum entities transferred bonds to Beechwood by the time of the public consent solicitation vote.  The Government is correct that that the distribution of Black Elk bonds in April or May 2014 may not reflect the ownership of bonds during the consent solicitation. But even if the exact distribution changed by then, the disclosure from April or May 2014 was sufficient to put BakerHostetler on notice that a substantial portion of the outstanding bonds should not be counted in the vote.

Even if Black Elk never asked Shearer to determine which entities were Platinum affiliates, an attorney may spot and explore a significant legal issue without being prompted by an explicit question from the client – particularly since Shearer's role was to generally provide guidance about and administer the consent solicitation, not just answer isolated legal questions from Black Elk. Under all of the facts and circumstances of the case, Black Elk provided Shearer with sufficient information that the jury could not fairly conclude that Nordlicht intended to conceal PPCO's and PPLO's affiliate status from Shearer.[7]

### B. Levy's Motion for a New Trial

The Court conditionally grants Levy's motion for a new trial in the event that the judgment of acquittal is later vacated or reversed. For the reasons stated when the Court granted Levy's Rule 29 motion, the jury's guilty verdict was a manifest injustice because there was insufficient evidence that Levy possessed criminal intent.

### CONCLUSION

Nordlicht's [786] motion for a judgment of acquittal is denied and his motion for a new trial is granted. Levy's [785] motion for acquittal is granted and his motion for a new trial is conditionally granted. The [782] motion to inspect grand jury minutes is denied as moot.


**SO ORDERED.**


_____
U.S.D.J.


Dated: Brooklyn, New York
       September 27, 2019

---

[7] Because the Court grants the motion for a new trial, the Court need not and does not reach Nordlicht's additional grounds for seeking a new trial.