UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                                                                     :

UNITED STATES OF AMERICA,         :

                                 :      **MEMORANDUM DECISION**

            - against -           :      **AND ORDER**

                                 :

MARK NORDLICHT, and DAVID LEVY,   :      16-CR-640 (BMC)

                                 :

                      Defendants.       :

                                 :

--------------------------------------------------------- X

**COGAN**, District Judge.

Defendants Mark Nordlicht and David Levy renew their Rule 33 and Rule 29 motions following the Second Circuit's recent decision vacating and remanding an earlier order by this Court. The parties' familiarity with the facts as outlined in their letters, briefs, and as discussed in detail by the Second Circuit, is assumed.

Mr. Nordlicht's Rule 33 motion rests on four grounds and Mr. Levy's Rule 33 and Rule 29 motions present five. Three of these positions overlap. First, both defendants contend that relevant evidence discovered since trial demonstrates that the government's theory that Beechwood was affiliated with defendants in violation of the 1939 Trust Indenture Act ("TIA"), 15 USCS §§ 77aaa *et seq.*, is wrong as a matter of law and therefore is not valid evidence of defendants' intent. Second, both defendants argue that the government impermissibly varied from its case-in-chief and constructively amended the indictment. Finally, defendants maintain that a new trial is required because the government's entire theory concerning Platinum's control over the Beechwood entities is challenged by newly discovered evidence.

Separately, Mr. Nordlicht argues his alleged motive for conducting the fraud – to cheat the bondholders – is not supported by the record. For his part, Mr. Levy contends that there is

insufficient evidence to prove his actions misled the bondholders about the circumstances of the consent solicitation and the Black Elk bondholders were not entitled to the proceeds of the company's asset sale.  Finally, Mr. Levy argues that a new trial is necessary because several instances of government misconduct prejudiced him.

For the reasons discussed below, none of these arguments are availing and defendants' motions are denied.[1]

## I.   <u>Applicable Law</u>

### A.  **Rule 33**

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" <u>United States v. Alston</u>, 899 F.3d 135, 146 (2d Cir. 2018) (quoting <u>United States v. Aguiar</u>, 737 F.3d 251, 264 (2d Cir. 2013)).  The court is not only "entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses," <u>United States v. Triumph Capital Grp., Inc.</u>, 544 F.3d 149, 159 (2d Cir. 2008), but it is also obligated to do so: "[T]he court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." <u>Aguiar</u>, 737 F.3d at 264.  In the end, the court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict.  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992).

---

[1] The Court recognizes that the issues defendants raise on these motions were not determined by the Second Circuit. Nevertheless, the Second Circuit's decision serves as the foundation for the findings that a reasonable jury could make on the trial record.

### B.  Rule 29

Federal Rule of Criminal Procedure 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).

"[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).  The Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).  In so doing, the Court views "the evidence presented in the light most favorable to the government[,]" and "[a]ll permissible inferences [are] drawn in the government's favor."  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  Moreover, "the evidence must be viewed in its totality, 'as each fact may gain color from others,'" United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005), and "the Government need not negate every theory of innocence," United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks omitted).

"[I]f the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  Autuori, 212 F.3d at 114 (alterations in original) (internal quotation marks omitted).  The verdict "must [therefore] be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Guadagna, 183 F.3d at 130 (emphasis in original) (quoting United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987)).

## II.   Defendants' Overlapping Rule 29 and Rule 33 Arguments

Mr. Levy's Rule 29 and Rule 33 arguments concerning the TIA's applicability and the government's alleged constructive amendment or prejudicial variance mirror Mr. Nordlicht's Rule 33 positions on those same issues.  For the reasons discussed in this section, defendants fail to demonstrate that the jury's verdict presents a manifest injustice with respect to these two grounds.  Thus, neither defendant's Rule 33 positions are viable.  See Sanchez, 969 F.2d at 1414. For the same reasons he fails to show the "manifest injustice" required to support a Rule 33 motion, Mr. Levy also cannot demonstrate that a rational trier of fact could not have found the essential elements of Mr. Levy's crimes beyond a reasonable doubt as required by Rule 29.  See Guadagna, 183 F.3d at 130.

### A.  The Trust Indenture Act and the Bond Indenture's Terms

In addition to renewing their previous Rule 29 and Rule 33 motions, defendants raise a new challenge to their convictions based on the government's use of the TIA as evidence of defendants' intent to commit fraud and the Second Circuit's reliance on that evidence.  They argue that the government misinterpreted the TIA and introduced false testimony that the law prohibited the actions they took.  But whether defendants violated the TIA is immaterial because their actions, which the Second Circuit also observed violated the terms of the indenture, are still evidence of their intent to defraud the bondholders.

Section 316 of the TIA outlines the procedures by which the trustee of a bond owning class can change certain terms of an indenture or enforce specified bondholder rights.  It also prohibits "affiliates" – a term defined by the act – from deciding how those rights are enforced. For the purposes of the TIA, the "term 'affiliate' means a person controlling, controlled by, or under common control with, another person."  17 C.F.R. § 260.0-2(b).  "The term 'control'

means the power to direct the management and policies of a person, directly or through one or more intermediaries, whether through the ownership of voting securities, by contract, or otherwise." Id. § 260.0-2(f).

For the first time, and long after they submitted their first Rule 29 and Rule 33 motions in July 2019, defendants argue that this Section of the TIA does not apply to them.  If this is right, defendants posit they were prejudiced by the submission of government evidence which the Second Circuit found could prompt a reasonable jury to conclude defendants knowingly disregarded the TIA in order to defraud the Black Elk bondholders.

In the first instance, from the day the indictment was unsealed, defendants could have argued that the TIA was inapplicable, evidence related to it irrelevant, and the government's use of emails referencing it prejudicial.  This is because the government used defendants' alleged violation of the TIA as evidence of fraud in its indictment, unsealed December 19, 2016. Moreover, defendants received the evidence the government intended to use for its case in chief, including evidence related to the TIA, more than six months before trial in 2019.  Finally, the arguments raised by defendants now are not based on newly discovered evidence and were always available.  Defense counsel just needed to read the law carefully.  If defendants wanted to challenge the government's evidence on these grounds, the absolute last time would have been when they filed their original Rule 33 and Rule 29 motions in late-July 2019.  Cf. United States ex rel. Regina v. La Vallee, 504 F.2d 580, 583 (2d Cir. 1974) ("A defendant may not obtain a new trial on the basis of evidence which he could have discovered by reasonable diligence."), cert. denied, 420 U.S. 947 (1975).

Even if the Court ignores defendants' failure to timely challenge the government's evidence and assumes defendants are correctly interpreting the TIA's relevant provisions, the

government's supposedly erroneous interpretation of the TIA does not warrant granting

defendants' motions.  Defendants were not convicted of violating the TIA.  Rather, their

supposedly knowing violation of the TIA was evidence of their fraud.  The Second Circuit has

observed that the terms of the indenture mirrored certain provisions of the TIA and explicitly

prohibited "affiliated" entities from voting their bonds.  See United States v. Landesman, 17

F.4th 298, 306-07 (2d Cir. 2021):

> Section 9.02(a) [of the indenture] permits amendment of the Indenture with the
> consent of the holders of a majority in aggregate principal amount of the
> outstanding bonds.  Section 2.09 (the "Affiliate Rule"), however, explains that –
> when determining consent – bonds held "by the Permitted Holders, the Issuers or
> any Guarantor, or by any Person directly or indirectly controlling or controlled by
> or under direct or indirect common control with the Permitted Holders, the Issuers
> or any Guarantor, will be considered as though not outstanding."  In other words,
> such Black Elk bonds could not be counted in determining whether holders of a
> majority in aggregate principal amount of the bonds consented to any proposed
> amendments.

Id. at 306.  Section 1.01 of the Indenture defines the terms "affiliate" and "control" as follows:

> "Affiliate" of any specified Person means any other Person directly or indirectly
> controlling or controlled by or under direct or indirect common control with such
> specified Person.  For the purposes of this definition, "control" as used with
> respect to any Person, means the possession, directly or indirectly, of the power to
> direct or cause the direction of the management or policies of such Person,
> whether through the ownership of voting securities, by agreement or otherwise;
> provided that beneficial ownership of 10% or more of the Voting Stock of a
> Person will be deemed to be control.  For purposes of this definition, the terms
> "controlling," "controlled by" and "under common control with" have correlative
> meanings.

Id. at 306-07.  The Second Circuit also recounted in extensive detail why the Beechwood entities

met the indenture's definition of "affiliate," id. at 333-37, and then observed that the

government's

> argument or witness testimony regarding the purpose of the Affiliate Rule and the
> TIA [was not] so prejudicial that it would be a manifest injustice to let the verdict
> stand.  The government's evidence concerning the Affiliate Rule was based on the
> text of the Indenture, the Consent Solicitation, and the TIA.

6

Id. at 340.  Thus, the Second Circuit found that the government's TIA-related evidence was not so much a keystone of its case as one of several buttresses, without which the convictions would still stand.

Alternatively, if the evidence demonstrating defendants' awareness of the TIA misinterpreted that law's applicability, communications showing defendants' erroneous conclusion that the TIA applied to them still confirms defendants knew PPCO, PPLO, BAM, and BBIL were not allowed to participate in the consent solicitation.  In other words, even if the TIA's "affiliate rule" did not apply here, the indenture's "affiliate rule" still prohibited defendants from taking the actions that ultimately led to their fraud convictions and defendants knew those actions were improper.  Thus, evidence showing defendants' incorrect understanding of the TIA still supports the scienter requirement for the government's fraud charges and the jury's verdict.  See United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015) (the scienter element is satisfied by evidence showing "a mental state embracing an intent to deceive, manipulate or defraud.").

## B.  Constructive Amendment and Prejudicial Variance During Trial

Mr. Levy and Mr. Nordlicht also argue that in the middle of trial, the government impermissibly shifted its theory of liability, and thus constructively amended the indictment or varied from its allegations in a manner that prejudiced them.  They first posit that the government's original position was that defendants controlled the outcome of the consent solicitation by causing "PPCO, PPLO, BAM, and BBIL to consent to the proposed amendments to the indenture."  Next, when this was challenged at trial, defendants believe the government impermissibly adopted the new theory that defendants only unlawfully influenced the outcome

by causing just the Beechwood entities, BAM and BBIL, to vote to amend the indenture.  This

argument misconstrues the law and misinterprets the nature of the government's claim.

### 1.  The Record

To support finding a constructive amendment of the indictment or a variance from it,

defendants highlight the following excerpts from the record:

- Paragraph 85 of the indictment states that defendants

    caused PPCO, PPLO, BAM, and BBIL to consent to the proposed
    amendments to the indenture but not tender their [Black Elk (BE)] Bonds.
    . . . To the surprise of the remaining Bondholders who were unaware of
    Platinum's control of $98,631,000 or approximately 65 percent of the BE
    Bonds, the trustee revealed that the holders of $110,565,000 or
    approximately 73.61 percent of the bonds had validly consented to the
    Consent Solicitation, thereby causing an amendment to the indenture
    agreement and allowing the Preferred Equity to get paid from the proceeds
    of Black Elk's sale of assets.

- Government's opening:

    The defendants wanted to leave no doubt that they would win the vote and
    get the money.  So what did they do?  They rigged the vote behind the
    scenes by hiding over half of the voting bonds in companies they secretly
    controlled.  By doing that, they made it look like they weren't
    participating in the vote, like the rules were being followed. . . . The result
    was guaranteed from the start.  This is because the defendants actually
    voted all those bonds that they hid away in companies they secretly
    controlled, bonds that alone made up more than half of the total number of
    bonds and guaranteed the vote would pass.

- Testimony of Dixon Yee:

    Q: I want you to assume that a dominating portion of the $150 million in
    Black Elk bonds was controlled by Platinum and voted to consent to
    paying the Black Elk preferred equity first.  Would that have been
    important information to you . . .

    A: yes

- Testimony of Rob Shearer:

Q: [the phrase] "excluding notes held by affiliates of the company," what does that refer to?

A:  That says that [$]92,444,000 [is the] principal amount of the notes or approximately 61.5 percent of the notes had validly consented to the consent solicitation. . . . we were taking the 110 [million] and subtracting the 18.3 million that we understood to be controlled by affiliates of [Black Elk].

*** 

Q: So let's just go through the numbers and do a quick math check then . . . you excluded about [$]62 million right?

A:   yes

Q: Okay if my math is right, that leaves about [$]88 million are you with me so far?

A: yes.

Q: So, in order to pass, about [$]44 million needed to vote in favor of change, correct?

A: yes.

Q: And about [$]48 million did vote in favor right, we know that right?

A: yes.

- Government's closing:

    At the end of the day, there were certain bonds that were not counted. And the reason for that is, Rob Shearer, the lawyer at Beechwood, who was controlling this whole calculation in deciding which numbers not to count when he did the math . . . took out of the math [$]61 million in bonds.  And that is because those were the ones that the defendants told him about.  So he took those out of the math.  And then he did the calculation about whether there was a majority once he took those out of the math and he found that there was.

Based on these excerpts, defendants claim that there was a seismic shift in the government's theory.  But this evidence does not show a constructive amendment or a prejudicial variance.

### 2.   Constructive Amendment and Prejudicial Variance

An indictment is constructively amended when evidence at trial and the jury instructions "so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Lisyansky, 806 F.3d 706, 712 (2d Cir. 2015).  Thus, a constructive amendment must change an essential element of the offense.  See United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002).  "When a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment."  United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003).  The "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment."  United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983).  "[S]ignificant flexibility in proof [is allowed], provided that the defendant was given notice of the 'core of criminality' to be proven at trial."  United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992).

By contrast, "'[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.'"  United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003) (quoting United States v. Frank, 156 F.3d 332, 337 n.5 (2d Cir. 1998)).  A defendant demonstrating a variance, however, must prove prejudice to prevail on his claim.  Id.  A variance between an indictment and the proof at trial is prejudicial, and thus "fatal to the prosecution," when the variance infringes on the "substantial rights" that indictments exist to protect – informing "an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." United States v. D'Anna, 450 F.2d 1201, 1204 (2d Cir. 1971).

### 3. The Government's Case

The indictment here states that defendants "engaged in a scheme to defraud third-party [bond] holders . . . of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over [the bonds]." Thus, whether PPLO and PPCO's votes were counted for purposes of amending the indenture, or whether Mr. Levy and Mr. Nordlicht controlled a majority of the votes, is not central to the charged fraud.

The indictment and trial record also demonstrate that the government never sought to prove that defendants ultimately had the ability to determine the vote's outcome.[2] Rather, the government attempted to show that defendants unlawfully voted a substantial number of bonds by selling those bonds to BAM and BBIL, entities they controlled, and then directing those entities to vote in favor of the indenture without tendering the bonds. As the Second Circuit observed:

> Shearer determined that the Consent Solicitation had passed based on the following votes: $37,017,000 held by the Beechwood funds (which had consented and not tendered); $600,000 of bonds held by unidentified bondholders (which had also consented and not tendered); and $11,333,000 of bonds held by unidentified bondholders (which had tendered and thus consented). Over 99% of the bonds that voted to consent but not tender were controlled by Platinum and Beechwood, which was Platinum-affiliated and controlled. The Consent Solicitation would not have passed without the Beechwood-held bonds that voted to consent.

Landesman, 17 F.4th at 316. Once the indenture passed, PPLO and PPCO's bonds, which defendants also did not disclose and attempted to vote in favor of amending the indenture, were

---

[2] Mr. Nordlicht's argument that new evidence shows he did not control the Beechwood entities, BBIL and BAM, is addressed and rejected below.

counted in Black Elk's subsequent press release.  The press release stated that $110,565,000, or approximately 73.71%, of the outstanding bonds consented to the new indenture – implying that the vote's result was more overwhelming than it was.  Nothing in the indictment was wrong or claims defendants fully controlled the vote's outcome.[3]

Similarly, the government's opening statement that defendants rigged the vote from behind the scenes and hid over half of the voting bonds in companies they secretly controlled, follows the indictment's allegations and is supported by evidence.  Although the trustee only counted the bonds defendants held in the Beechwood entities, over half the bonds that were ultimately reported to have approved the indenture were held by defendant-controlled companies.

Moreover, the successfully-voted Beechwood bonds made up 76% of the counted votes that favored amending the indenture, and constituted over 99% of the votes from bonds favoring the indenture that did not tender.  It is difficult to overstate the decisive impact of the bonds voted by Beechwood-held entities, totaling $37,017,000.  With those votes, defendants only needed approximately $7 million in independently held bonds to tender or vote in favor of the amendment.  Conversely, without the Beechwood bonds, defendants needed approximately $25.6 million in Black Elk bonds to support their amendment.  Without the Beechwood votes, the consent solicitation would have failed.

---

[3] Mr. Levy contends that Shearer's failure to produce an accurate press release or halt the consent solicitation after finding out about the additional Platinum bonds was immaterial.  I agree that Black Elk's failure to disclose the number of affiliated bonds it did not ultimately count as part of the consent solicitation was not central to the charged fraud.  Indeed, the press release stating the number of bonds that agreed with the amendment was accurate, even if a majority of those votes were not counted in order to determine the consent solicitation's outcome. However, the Beechwood entities' bonds and votes were never excluded or disclosed.  Without those affiliated votes, the indenture would never have passed.  Moreover, if independent bondholders knew Beechwood's bonds were voting they might have decided to tender because it would have been clear that the consent solicitation was likely to succeed.  Instead, the only disclosure defendants made failed to mention Beechwood's holdings or its relationship to the Platinum.

If anything, the part of the government's opening statement, asserting defendants "guaranteed" the vote's outcome, was a unique deviation from the government's case and a windfall for defendants.  The statement made the prosecution's case harder to prove and varied from the indictment and the government's evidence.  Instead of arguing that the jury needed to determine if defendants "stuffed the ballot box," the government's error suggested that the jury needed to find that defendants secretly controlled a majority of the voting bonds – which the evidence shows defendants tried and failed to do.  Defendants did not ignore this opportunity.  At closing they stressed this to the jury, stating:

> [T]he government originally told you that] the defendants actually voted all of those bonds [that they] hid away in companies – plural, now [there is] just one [company], okay, but at the beginning of this case it was multiple companies – . . . they secretly controlled. . . . [Those bonds] alone made up [ ] more than half the total number, [ ] guarantee[ing] that the vote would pass.  That's not true.  Even if you just want to count Beechwood, as [the government now maintains], that's not true, okay.

> This is pretty bold to come and tell you that [all] the Platinum votes counted . . . that's what [the government is] saying, [it is] saying multiple companies [owned by the defendants] . . . had more than half [of the bonds.  But] Beechwood only had 37 million.  I think this is more incompetence than it is intentional on their part.  It's just based on the complexity of it all.

Certainly, the government exaggerated in its opening statement when it said that defendants' actions "guaranteed" the outcome of the consent solicitation.  But this error was harmless.  As shown by the indictment's text and the government's statements at closing, the government's theory of the case was, and continued to be, that defendants had unlawfully deceived other Black Elk bondholders by secretly voting affiliated bonds at the consent solicitation.

Not only was the government's theory and evidence provided in advance of trial, but defendants clearly tried to find evidence designed to rebut the government's "ballot box stuffing" theory.  The Second Circuit observed that defendants introduced, and the jury rejected, evidence

13

showing Beechwood was not controlled by Platinum.  See Landesman, 17 F.4th at 329-30.

Furthermore, defendants briefing states that they tried to call Mark Feuer or Scott Taylor as

witnesses to show that Beechwood was not controlled by defendants.  However, this evidence

was never produced because both potential witnesses declined to appear – asserting their Fifth

Amendment privilege against self-incrimination.

Thus, defendants seek to magnify the importance of one statement the government made

during its opening, which conflates defendants' intent with what occurred.  The government

established at trial that the bonds held by PPCO, PPLO, BAM, and BBIL – entities which the

jury found defendants controlled – all voted in favor of the indenture amendment at defendants'

direction, but Shearer determined the votes' outcome by only counting the votes submitted by

BAM and BBIL.  Consequently, defendants did not "control" the outcome.  But the

government's momentary overstatement was neither a constructive amendment nor a prejudicial

variance.  The text of the indictment, the material disclosed in discovery, and the evidence

presented at trial, all demonstrate that the government's theory of culpability never changed.

The government always sought to hold defendants accountable for unlawfully preventing

unaffiliated bondholders from receiving the proceeds of a Black Elk asset sale by using the

bonds they controlled to ensure their preferred equity received compensation before the

company's debt was paid.

### III.    Rule 33

#### A.  The Beechwood Entities' Affiliate Status

Defendants also argue that newly discovered evidence demonstrates that a new trial is

necessary because it shows Beechwood was not an affiliated entity.  This evidence consists of

the deposition testimony of Beechwood's President Scott Taylor, its CEO Mark Feuer, and the

company's General Counsel and Rule 30(b)(6) witness Christian Thomas. Each of these witnesses stated that Mr. Nordlicht merely acted as an advisor to Beechwood and exercised no formal control over the firm. None of these witnesses were available to defendants at trial because they originally informed defense counsel that they would assert their Fifth Amendment right against self-incrimination if called. Defendants believe this new testimony bolsters a key witness's discussion of Beechwood's status as a non-affiliate, which the Second Circuit characterized as vague. Although this new evidence would certainly have strengthened defendants' case, it would not have likely prompted the jury to acquit him.

The text of Rule 33 "specifically contemplates that [motions for a new trial] may be made based on newly-discovered evidence." United States v. Siddiqi, 959 F.2d 1167, 1173 (2d Cir. 1992). Although in all cases the avoidance of manifest injustice remains the "ultimate" criterion, United States v. Romano, 794 F.3d 317, 332 (2d Cir. 2015), courts have developed Rule 33's directive into a five-part test, authorizing a new trial when (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal. United States v. Forbes, 790 F.3d 403, 406-07 (2d Cir. 2015) (alteration in original, internal quotation omitted). Defendants have shown they meet the first four factors of this test, but the Second Circuit's analysis of the evidence shows why they do not meet the fifth.

Another way to articulate the fifth prong of this Rule 33 test is that the Court "must weigh whether or not there is in reality a 'significant chance' that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction." United States v. Zagari, 111 F.3d 307, 322 (2d Cir. 1997) (quoting United States v. Rosner, 516 F.2d 269, 273

(2d Cir. 1975)); see also United States v. Spencer, 4 F.3d 115, 118-19 (2d Cir. 1993); United

States v. Wolfson, No. 00-cr-628, 2008 WL 1969730, at *1 (S.D.N.Y. May 5, 2008), aff'd, 642

F.3d 293 (2d Cir. 2011) (per curiam).  Of the test's five elements, the "probability-of-acquittal"

requirement is "the most difficult for the defendant to meet, and the most difficult for a court to

evaluate," because "[i]t requires looking backwards and forwards."  Alvarez v. United States,

808 F. Supp. 1066, 1094 (S.D.N.Y. 1992).  That is, "the court must evaluate the new evidence,

not just in and of itself, but in the light of the entire record made at the trial and on the motion";

"[t]he strength of the evidence presented at the trial is an important consideration" in this

analysis.  3 C. Wright & A. Miller, Federal Practice and Procedure § 584 (4th ed. 2018).

Although it did not consider this additional evidence, the Second Circuit found that the

record supported the conclusion that "Beechwood was an affiliate and that Nordlicht was on

notice of this status."  Landesman, 17 F.4th at 333.  Specifically, the Second Circuit observed:

> The government presented evidence that Nordlicht founded Beechwood with the
> same partners with whom he founded Platinum (Huberfeld and Bodner), as well
> as two additional investors – Mark Feuer and Scott Taylor.  Upon the creation of
> Beechwood, Nordlicht filled several critical positions at Beechwood with
> Platinum employees.  Levy (who had served as a portfolio manager at Platinum
> and had been heavily involved in managing Platinum's investments in Black Elk)
> joined Beechwood as its CIO and worked at Beechwood while continuing his
> work related to Black Elk at Platinum.  Naftali Manela (who had served as Chief
> Financial Officer of PPCO from 2008 through 2014, and Chief Operating Officer
> of Platinum from late 2014 through 2015) was asked in early 2014 to assist in
> "set[ting] up [Beechwood's] reporting," determining how much money could be
> invested by Beechwood into Platinum, and assessing how those investments in
> Platinum could be made.  Will Slota – another Platinum employee – also worked
> at Beechwood, and Huberfeld acted as an advisor to Beechwood.  And
> Beechwood investment manager Wallach, whom Nordlicht had assisted in
> obtaining a position at Beechwood, followed Nordlicht's instructions regarding
> the tracking and purchase of Black Elk bonds.

Id. at 334-35.  It further noted that emails explicitly referred to the group managing Beechwood's

investments as the "Nordlicht group" and pointed out that Mr. Nordlicht and Mr. Levy directed

Beechwood investments into portfolio companies and securities which Platinum also owned.  Id. at 335.  Additionally, defendants' correspondence demonstrates that they had sufficient control over Beechwood to be able to ensure it purchased over $37 million in Black Elk bonds from Platinum over a three-month period prior to the public consent solicitation process.  Id.

The Second Circuit pointed to more direct evidence showing that Mr. Nordlicht knew Platinum exercised control over Beechwood.  This included

> [a] May 22, 2014 email chain, [where] Nordlicht wrote to Peter Muehlsiegl – a potential business partner – regarding investment opportunities: "Get me good risk adjusted opportunity!! I feel like I sh[oul]d  do some more due diligence on co before I answer rate. . . . On this one I w[oul]d do whole piece by splitting up between our fund [PPVA] and our reinsurance mandate [(Beechwood)] so it's [P]latinum or designees."  After Muehlsiegl notified Nordlicht of a potential investment, Nordlicht wrote to him: "Do you mind if I have my pm [(portfolio manager)] who handles specifics on these kind of trades, Bernie Hutman call u? Obviously, it's large amount, don't want to miss anything. The issue is besides Platinum we have reinsurance mandate and I'd like to split it among entities, though all controlled by us."  Later in the email chain, Nordlicht wrote to Hutman: "If it helps we sh[oul]d be b asset manager [(BAM)] as opposed to [P]latinum on these things."

Id. at 335-36.  In addition, despite this Court's initial conclusion that this evidence did not suggest formal control "in the technical sense of 'control' under the TIA or the bond indenture," the Second Circuit found on appeal that "it was reasonable for the jury to conclude that, in light of Nordlicht's express statements recognizing that Platinum controlled Beechwood, Nordlicht understood that Beechwood likely qualified as an affiliate."  Id. at 336.

Separately, the Second Circuit noted that a "wealth of other circumstantial evidence [supports] an inference that Nordlicht knew Beechwood was an affiliate and intended to use Beechwood to defraud the Black Elk bondholders."  Id. at 337.  This included Mr. Nordlicht's expressed disdain for amending the indenture through any formal process, his directions to co-conspirators not to talk to the lawyers working on the transaction, and his practice of labeling

17

communications with his alleged co-conspirators regarding the Affiliate Rule, Black Elk, and the

Renaissance Sale as "attorney client privilege." Id. Finally (as to Mr. Nordlicht), the Second

Circuit observed that

> as one of the founders of both Platinum and Beechwood, Nordlicht actively
> monitored the number of Black Elk bonds collectively and individually held by
> the Platinum and Beechwood entities, and exercised control over Beechwood's
> investments, including those in Black Elk. And Nordlicht decided to inform
> Shearer of the affiliate status of the two other Platinum entities – PPCO and PPLO
> – only after confirming that the amendments would pass with just Beechwood's
> votes.

Id.

> With respect to Mr. Levy, the Second Circuit stated there was

> sufficient circumstantial evidence to support the conclusion that Levy knew
> Platinum controlled Beechwood. Most notably, Levy was working for Platinum
> on the Black Elk investment and assisting with the public consent solicitation
> process while he was working as Beechwood's CIO. As CIO, Levy controlled
> and exercised final authority over Beechwood's investment decisions. When
> Beechwood was first created, for example, Nordlicht and Levy jointly decided
> which investments would be purchased and transferred from Platinum to
> Beechwood, and Beechwood invested in many portfolio companies and securities
> in which Platinum was already invested, including Black Elk. Levy knew that
> Nordlicht was keeping tabs on how many Black Elk bonds were owned by
> Beechwood, was kept aware of Beechwood's purchases of Black Elk bonds from
> Platinum, and was actively monitoring the number of Beechwood-, PPVA-,
> PPCO-, and PPLO-held bonds to ensure that Platinum secured a sufficient number
> of votes to pass the amendments. In addition, Nordlicht gave Levy instructions
> while he was working at Beechwood, and Levy was aware that Nordlicht also
> directed and received reports from other Beechwood employees. As mentioned
> above, there was also evidence supporting an inference that Levy directed
> Beechwood's voting of Black Elk's bonds while he was simultaneously CIO of
> Beechwood and working for Platinum on Black Elk, and that Beechwood
> employees deferred to Levy and Nordlicht when voting Beechwood's Black Elk
> bonds. This evidence, viewed collectively, provides an ample basis to conclude
> that Levy understood that Black Elk and Beechwood were under the common
> control of Platinum and that Beechwood therefore likely qualified as an affiliate.

Id. at 329.  "This substantial evidence indica[es] that Levy knew that Platinum exercised control over Beechwood (and [ ], in fact, played a pivotal role in the exercise of such control)."  Id. at 330.

Given the Second Circuit's analysis of the direct and circumstantial evidence, it is doubtful that the newly discovered testimony from the Beechwood witnesses would have changed the jury's verdict.  Indeed, the extensive level of coordination among Beechwood, Black Elk, Mr. Levy, and Mr. Nordlicht, recounted by the Circuit, demonstrates that a jury would most likely view the testimony of Beechwood's executives and the firm's Rule 30(b)(6) witness as self-serving attempts to create distance from defendants, and not an accurate depiction of Beechwood's role.  Thus, defendants cannot show that the new evidence they offer is likely to result in an acquittal.  Forbes, 790 F.3d at 406-07.

### B.  Evidence of Mr. Nordlicht's Motive

On the issue of the government's failure to demonstrate his motive, Mr. Nordlicht contends that there is no factual basis for the government's claim that he tried to steal Black Elk assets from the bondholders.  Specifically, Mr. Nordlicht stresses that he did not receive any personal benefit from the sale and the proceeds from the asset sale were sufficient to repay both the bondholders and the preferred equity.  Moreover, Mr. Nordlicht maintains that if he intended to defraud the bondholders, he would not have given them the option to tender their bonds and receive par value for them.  I disagree.

Although a jury could have found Mr. Nordlicht lacked the requisite motive or intent because he did not derive any direct personal benefit from successfully changing the indenture's terms, the circumstantial evidence supports a finding that he derived substantial secondary benefits from ensuring the preferred equity held by Black Elk was paid first.

Under the prior indenture, any asset sale proceeds could only be used for four activities: (1) buy back debt or pay interest (2) acquire the assets of another gas or oil company; (3) acquire the majority of another gas or oil company's voting stock; and (4) make capital expenditures and long term purchases.  By changing this indenture and having Black Elk buy back the Series E Preferred Equity first, Mr. Nordlicht was able to give Platinum an influx of badly needed liquidity.  A reasonable jury could conclude that Mr. Nordlicht was motivated to do this because amending Black Elk's indenture would keep Platinum open and ensure Mr. Nordlicht remained employed with a substantial salary.

Similarly, a reasonable jury could also find that the government's evidence of Mr. Nordlicht's improper motive outweighed the evidence suggesting that he expected the other bondholders to tender or believed Black Elk's asset sale would reimburse all the investors. Specifically, the jury saw that Mr. Nordlicht decided to hold the indenture amendment vote before the Black Elk asset sale and improperly attempted to vote a majority of the outstanding bonds in favor of the amendment (although only a substantial minority of those were ultimately counted).

The jury could then observe that the amendment's terms ensured Platinum's preferred equity was paid first.  This protected Mr. Nordlicht's company if the asset sale did not reimburse both the debt and equity.  In the end, the sale's proceeds were unable to pay back both the preferred equity and bonds.  Because the amended indenture passed before the asset sale, Black Elk's preferred equity got paid first.  Given these facts, a jury could have viewed Mr. Nordlicht's decision to only disclose a fraction of the voting affiliated bonds as further evidence that Mr. Nordlicht intentionally violated the indenture's terms to the detriment of independent bond owners.

20

Todd Pulvino and Dixon Yee – bondholders who lost money as a result of the Black Elk bond vote – provided testimony that further supports this reasoning.  In addition to observing that the amended indenture ultimately protected the preferred equity to the detriment of the bonds, their testimony also noted that the indenture's choices included an "irrational" option that only functioned to benefit owners of the preferred equity if the amendment passed.  This option allowed bondholders to vote for the amendment without tendering their bonds.  As the Second Circuit noted,

> Pulvino explained that it made no financial sense for a bondholder to consent and retain his or her bonds because the bondholder would be giving up protections and allowing the preferred equity holders to have priority over the bondholders' interests without getting anything in exchange for giving up those protections. Yee similarly testified that it would have been "kind of stupid" for a bondholder to agree to the changes without tendering his or her bonds, because the bondholder would be giving up his or her rights without getting anything in return.

Landesman, 17 F.4th at 322.

Pulvino and Yee's statements could have led a reasonable jury to conclude that the amendment's sole purpose was to protect Platinum's preferred shares over the bonds.  In particular, unaffiliated individuals who voted for the amendment without tendering illogically waived the right to be paid first for nothing in return.  The obvious, and better, alternatives would be to either tender or vote against the indenture (i.e., vote to keep the bond and retain the right to be paid first).

But the jury saw that every bond controlled by Platinum and Beechwood voted, or tried to vote, for the supposedly irrational option.  Moreover, apart from these entities, only $600,000 worth of bonds (0.7% of the voting bonds) chose to support the amendment and not tender.  This low number would suggest that very few unaffiliated bondholders thought that this option made any sense.  The fact that all the affiliated bonds, and almost no others, voted for the amendment

21

and did not tender is evidence of Mr. Nordlicht's motive and intent.  Platinum was the only actor

in the consent solicitation that held substantial amounts of Black Elk's preferred equity and stood

to make even more money if the stock was paid before the bonds.

### C.  Motion Concerning Government Misconduct

Separately, Mr. Levy argues that the government engaged in prosecutorial misconduct by

knowingly eliciting false testimony at trial, presenting arguments to the jury that were not made

in good faith, and making factual misrepresentations to the Court prior to trial.  For his

conviction to be vacated for prosecutorial misconduct, Mr. Levy must show that "the misconduct

caused substantial prejudice implicating the right to due process."  United States v. Fell, 531

F.3d 197, 209 (2d Cir. 2008).

The government has a fundamental obligation to ensure that the testimony a witness

elicits is true.  Shih Wei Su v. Filion, 335 F.3d 119, 126-27 (2d Cir. 2003).  Further, a

"prosecutor should not use arguments calculated to inflame the passions or prejudices of the

jury," and where "the only conceivable purpose of the prosecutor's [remarks is] to prejudice the

jury," those statements are improper.  United States v. Modica, 663 F.2d 1173, 1180-81 (2d Cir.

1981).  To warrant reversal, however, the prosecutorial misconduct must "so infect[] the trial

with unfairness as to make the resulting conviction a denial of due process."  United States v.

Elias, 285 F.3d 183, 190 (2d Cir. 2002).  In assessing whether prosecutorial misconduct caused

"substantial prejudice," a court looks at "the severity of the misconduct, the measures adopted to

cure it, and the certainty of conviction in the absence of the misconduct."  United States v.

Melendez, 57 F.3d 238, 241 (2d Cir. 1995).

First, Mr. Levy points to five statements made by three government witnesses, Dixon

Yee, Todd Pulvino, and Joe Bruno, which he believes the government knew were false and did

not correct.  Starting with the statements from Yee and Pulvino, it is evident that these witnesses were only providing their perspective of what happened.  Specifically, Yee claimed that he believed the consent solicitation was rigged because $110 million in bonds voted to give up their rights for nothing, and Pulvino also testified that he understood that $110 million in bonds voted for the amendment without tendering.  This is essentially what the press release following the consent solicitation said, so these witnesses' understanding was not manufactured from thin air.  Additionally, $110 million bonds did ultimately agree with the proposed amendment, even if Shearer only counted a subset of those when determining if the indenture passed.

Turning to Bruno's statements, Mr. Levy contends that three of his claims are false: (1) after the West Delta 32 incident the company had no production or revenue; (2) the assets sold following the consent solicitation were responsible for 80% to 85% of the company's cash flow; (3) Bruno recalled telling an FBI agent that the 2013 "shut in" following the West Delta Incident cut revenue in half.  As the government points out, these misstatements had a basis in fact.  Specifically, although not all of Black Elk's assets were shut after the West Delta incident, all of the firm's Gulf of Mexico assets were.  Similarly, revenue did not fall by half, but oil revenue was down more than 15% in 2013, and the assets that were sold following the consent solicitation were generally recognized as Black Elk's "best."

Additionally, Yee, Pulvino, and Bruno's statements were all subject to defendants' full and fair cross-examination.  During this cross, any misunderstandings these witnesses had about the facts were challenged before the jury.  Moreover, defendants present no evidence demonstrating that the government knew these witnesses made any false or misleading statements during its direct examination.  Finally, the statements which Mr. Levy presents as problematic bear on tangential issues in this case.  As described above, the exact number of

affiliated bonds which voted in favor of the amendment is immaterial to the charges and any misunderstanding of the importance of the asset sale did not speak to the issue of defendants' attempt to keep the proceeds of that sale.  Thus, the supposedly problematic witness testimony raised by Mr. Levy did not prejudice him.

Mr. Levy points to four arguments the government presented to the jury and claims they were made in bad faith because there is insufficient evidence to support them.  These arguments were: (1) Mr. Levy was "installed" at Beechwood in order to control that entity; (2) Mr. Levy knew Beechwood was an affiliate because he knew about the firms' purchase of Black Elk bonds from Platinum; (3) Mr. Levy's knowledge of the consent solicitation supports an inference that he controlled how Beechwood voted its bonds; and (4) Mr. Levy supported the consent solicitation because he wanted to put as much cash as possible into Black Elk's hands.  However, Mr. Levy had an opportunity to rebut these theories at trial and the government correctly notes that it had evidence supporting each of its positions.  In addition to all the evidence reviewed by the Second Circuit, the government points to a statement from Mr. Nordlicht saying Beechwood was "controlled by us" just two months after Mr. Levy joined Beechwood and the first set of Black Elk bonds was transferred there.  The government also notes that Mr. Levy continued to lead Platinum investments during his time at Beechwood, and returned to Platinum just months after the consent solicitation.

Lastly, Mr. Levy accuses the government of improperly delaying the disclosure of material as required under 18 U.S.C. § 3500 due to specious concerns about the potential "ostracism and harassment" of cooperating witnesses.  He also contends that the government falsely represented that all *Brady* material was provided when some was actually withheld for a longer period of time; improperly stated that Rule 16 discovery was largely complete when the

government knew that there were hundreds more pages and dozens more hours of recordings; and failed to identify and disclose Bruno's bias against Jews prior to his testimony.  Assuming this view of the facts is true, which is an exceptionally generous reading of the record, Mr. Levy cannot show that any of these incident's prejudiced him at trial.  Mr. Levy's legal team had an extensive amount of time to review the material they claim was not provided on time and Bruno's previously unidentified bias was thoroughly explored at cross-examination.

IV.   <u>**Rule 29**</u>

A.  **Motion Concerning the Proceeds of the Asset Sale**

For his part, Mr. Levy observes that both the amended and original indentures permitted Black Elk to use the proceeds of an asset sale for something other than repurchasing its debt. Consequently, he reasons, no fraud was committed against the other bondholders because they were not automatically entitled to the proceeds of any asset sale.  This analysis is too clever by half.  First, the Second Circuit has already found that a reasonable jury could conclude Mr. Levy knew that his actions removed the bondholders' right to be paid first and facilitated an asset sale that effectively cut out those bondholders.  <u>See</u> <u>Landesman</u>, 17 F.4th at 321-33.  Second, Mr. Levy's position conveniently overlooks the fact that defendants amended the indenture and arranged the sale of Black Elk's assets with the intention of the sale's proceeds paying the preferred equity first.

Without the successful consent solicitation, if defendants wanted to use the proceeds of a Black Elk asset sale to buy back preferred equity, they would have needed to pay approximately $52 million worth of unaffiliated bonds.  Thus, although Black Elk had the right to use the proceeds of its asset sale for other initiatives, once it decided to use the money to pay holders of its preferred equity and bonds, the bondholders originally had a right to be paid in full before the

preferred equity saw any of that money.  The indenture amendment, obtained via the impermissible voting of affiliate entities, removed that right and deprived the bondholders of money they would have otherwise been entitled to.

## CONCLUSION

Defendants' Rule 29 and 33 motions are denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      May 9, 2022