

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683  Direct
+1 212 698 3599  Fax

October 14, 2022

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC (E.D.N.Y.)

Dear Judge Cogan:

We represent defendant Mark Nordlicht.  As you know, the Court previously ordered a new trial on the ground that Mr. Nordlicht's initial conviction was a manifest injustice.  Although the Second Circuit set aside that decision, the government recently completed a second trial for defendant Daniel Small.  That trial was different in part because it focused exclusively on the Black Elk allegations, and the record developed there demonstrated that the government had misled the jury during Mr. Nordlicht's trial, won a conviction based on false evidence, and made material representations to the Second Circuit about the key evidence in the case.

At Mr. Nordlicht's trial, the jury was repeatedly told that (i) he hid his relationship with Beechwood from Black Elk Energy Offshore Operations, LLC ("Black Elk") and its law firm, BakerHostetler, and that (ii) Defendants allegedly sought to amend the Indenture to pay the preferred shareholders instead of the bondholders.  Yet the evidence confirms that this was false: Mr. Nordlicht told Black Elk about the "friendly" bondholders who would vote to amend the Indenture, and Defendants specifically reserved the proceeds of the Renaissance sale to ensure that $60 million would go to the unaffiliated bondholders.  Because Mr. Nordlicht may not be convicted based on a demonstrably false theory, we respectfully submit a renewed motion for a new trial under Federal Rule of Criminal Procedure 33 and ask for a hearing to present this evidence to the Court.

In 2019, after a nine-week trial, a jury acquitted Mr. Nordlicht on the first five charges and convicted him of the last three, which concerned the amendment of the Black Elk Indenture.  Dkt. 773.  This Court saw that the government had failed to prove the Black Elk case and granted Mr. Nordlicht a new trial, Dkt. 799, but the Second Circuit overturned that decision, *see United States v. Landesman*, 17 F.4th 298, 342 (2d Cir. 2021).  In August, Mr. Small was tried exclusively on Black-Elk related charges, and this more focused trial considered additional documents that directly contradicted the government's case against Mr. Nordlicht.  Midway through trial, after reviewing one of those documents, the Court asked the government's attorneys to "take a fresh



look" at the case and "talk amongst yourselves and see if maybe you think this is not what it was thought of at the beginning." Ex. 1, Small Tr. at 557:16-22. Yet the government insisted on plowing forward and arguing to the jury that Mr. Small participated in deceiving Black Elk and BakerHostetler.

Had the government taken seriously its duty to "present a forceful *and truthful* case to the jury, not to win at any cost," it would have sought to vacate its conviction of Mr. Nordlicht. *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009) (emphasis added); *see also United States v. Marinello*, 855 F.3d 455, 457 (2d Cir. 2017) (Jacobs, J., dissenting from denial of rehearing *en banc*) (warning that "[p]rosecutorial power is not just the power to convict those we are sure have guilty minds; it is also the power to destroy people."). At both Mr. Nordlicht and Mr. Small's trials, the government's case was based on the premise that Mr. Nordlicht and his co-defendants intentionally deceived Black Elk and its law firm, BakerHostetler, about bonds owned by Mr. Nordlicht's hedge fund, Platinum Partners L.P. ("Platinum"), and entities friendly to it. According to the government, Platinum hid the fact that Platinum and "friendlies" owned about $90 million of the $150 million in outstanding bonds, orchestrated a bondholder vote to amend the bond indenture and allow Black Elk to pay the preferred equity holders before bondholders, and then secretly voted their bonds to ensure the amendment passed.

But, as Mr. Small's trial made clear, that theory was demonstrably false, as the government knew or should have known. Mr. Nordlicht fully disclosed his plans to Black Elk and therefore he did not knowingly deceive BakerHostetler or the bondholders. A memo from Paul Francis, a BakerHostetler partner, to John Hoffman, the CEO of Black Elk, and Marizza Piché, Black Elk's general counsel, irrefutably establishes that both Black Elk and BakerHostetler knew Platinum's plan—including the fact that Platinum and "friendlies" owned about $90 million in Black Elk bonds—before the consent solicitation even began. And other evidence in the government's possession, including notes from the government's interview with Mr. Hoffman, confirms that *Mr. Nordlicht himself* told Black Elk that Platinum and friendly entities owned Black Elk bonds and planned to vote them in the consent solicitation. The documents further demonstrate that Mr. Nordlicht intended for the Renaissance proceeds to be used to retire the debt owed to the unaffiliated bondholders.

The government's fraud theory thus conflicts with documents known to the government. Mr. Nordlicht disclosed Platinum's plan to the very people whom the government claims he needed to deceive to induce Black Elk to make false statements to the bondholders, and Mr. Nordlicht sought to pay the very bondholders whom the government claimed to be the victims of this deception. Yet the government repeatedly misrepresented these facts to the jury, and it compounded its misconduct by mischaracterizing the Francis Memo to the Second Circuit. Feeding false information to the Second Circuit led that court to overturn this Court's grant of Mr. Nordlicht's original Rule 33 motion. Such misconduct is a manifest injustice, and it warrants a new trial, even at this stage.



The Honorable Brian M. Cogan
October 14, 2022
Page 3

## RELEVANT TRIAL FACTS

In December 2016, in an eight-count indictment, Mr. Nordlicht was charged with two independent fraudulent schemes. The first five counts charged Mr. Nordlicht with a scheme to defraud investors in funds managed by Platinum, and the remaining three counts charged a scheme to defraud Black Elk's bondholders. Most of the nine-week trial focused on the Platinum scheme. Mr. Nordlicht was acquitted of those charges but convicted of the three counts relating to Black Elk. Dkt. 773.

According to the government, the Black Elk scheme sought to "misappropriate proceeds of Black Elk's asset sales" by amending the Black Elk bond indenture to benefit the preferred shareholders. Indictment ¶ 75. Black Elk initiated a public consent solicitation in July 2014.[1] It gave bondholders three options. They could (1) tender their bonds for par value, thereby consenting to the amendment, (2) consent to the amendment without tendering their bonds, or (3) keep their bonds and not consent to the amendment. *See, e.g.*, Ex. 2, Nordlicht Tr. 4084:1-4085:12. Because any bondholder who tendered their bonds would receive par value, they would have been paid in full.

    A.   **The Government's Theory of Wrongdoing Rested on the False Premise That Mr. Nordlicht Intentionally Concealed Ownership of Black Elk Bonds**

In Mr. Nordlicht's indictment, the government's central theory was that Mr. Nordlicht and the other defendants controlled approximately $90 million of the $150 million in outstanding Black Elk bonds, intentionally "conceal[ed] Platinum's ownership of and control" over the bonds from everyone, then voted the bonds they controlled in the consent solicitation to ensure that the bond amendment passed. Indictment ¶ 81. At the trial's outset, the government told the jury that Mr. Nordlicht intended to defraud the bondholders, and that this intent to defraud could be inferred from the fact that Mr. Nordlicht and his co-conspirators concealed Platinum's interest in Black Elk bonds from Black Elk and BakerHostetler. Specifically, in its opening statement, the government said that the defendants "rigged the vote behind the scenes by hiding over half of the voting bonds in companies they secretly controlled." Ex. 2, Nordlicht Tr. 21:19-20. They "made it look like they weren't participating in the vote, like the rules were being followed," but this was a "complete sham." *Id.* at 21:21-25. The government articulated a different, but related theory, during its closing argument, again telling the jury that "the defendants hid the fact that there were other Platinum funds controlled by Mark Nordlicht that held bonds," *id.* at 6649:19-21, meaning that

---

[1] Black Elk first tried to amend the Black Elk bond by a private vote of a majority of the bondholders, but this effort did not succeed. Indictment ¶ 83.



The Honorable Brian M. Cogan
October 14, 2022
Page 4

Mr. Nordlicht knew "the fraudulent nature of the scheme" and acted "with the intent to defraud," *id.* at 6685:19-20.[2]

### B. The Government Misconstrued the Evidence and Doubled Down on its Theory in Response to Mr. Nordlicht's Post-Trial Motion and Before the Second Circuit

The government's theory, however, was not true. On July 30, 2019, Mr. Nordlicht submitted a motion for an acquittal or, in the alternative, a new trial under Federal Rules of Criminal Procedure 29 and 33. Dkt. 786. Relying on the trial evidence, the motion argued that Mr. Nordlicht had not concealed the Platinum entities' ownership of Black Elk bonds. *See* Dkt. 768-1 at 6; 9-10. In fact, Platinum had repeatedly disclosed its ownership of Black Elk bonds to BakerHostetler. Robert Shearer, an attorney at BakerHostetler, testified that he had learned about Platinum's ownership of Black Elk bonds two months before the consent solicitation. *See id.* at 9; Ex. 2, Nordlicht Tr. 5025-26 (R. Shearer) (testifying that he was told sometime between April and May 2014 that Platinum owned 70% of the Black Elk bonds). And, on July 1, 2014, Paul Francis, another partner at BakerHostetler, sent a memorandum to Black Elk's CEO and general counsel, confirming that BakerHostetler knew that Platinum and companies friendly to it owned $90 million in Black Elk bonds. *See* Dkt. 786-1 at 9; Ex. 2, Nordlicht Tr. 5079-80 (R. Shearer) (confirming that he had seen a memo saying "that Platinum owned $90 million of Black Elk bonds along with companies friendly to it"). The Francis Memo was shown to Rob Shearer at trial, but he testified that he had not seen the memo during the consent solicitation process, and the memo was not admitted into evidence.

BakerHostetler prepared the Francis Memo on July 1, 2014 "based upon information received from or through" Mr. Hoffman and Ms. Piché. The Francis Memo revealed that before the consent solicitation began, BakerHostetler knew that "Platinum . . . *intends* to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, ***which will leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself.***" Ex. 3, Francis Memo. Before the consent solicitation had even begun, Mr. Nordlicht and Platinum had explained everything to BakerHostetler. Indeed, it knew Platinum's entire plan.

In response to Mr. Nordlicht's first Rule 33 motion, the government downplayed the Francis Memo's importance. Even though the Francis Memo confirmed that Platinum had disclosed the friendly bonds to BakerHostetler on the eve of the consent solicitation, the government misconstrued the memo in its briefing to the Court. It said that "any information in the July 1

---

[2] The bulk of Mr. Nordlicht's trial, and trial counsel's energy, was devoted to successfully defending the charges related to the first scheme. When it came to defending the Black Elk-related charges, the government's theory continued to evolve and shift mid-trial—at first, the government argued that Mr. Nordlicht controlled a majority of the bonds that voted, but after Mr. Shearer testified that the Platinum bonds were not counted, the government focused on the Beechwood bonds. *See* Dkt. 888 at 13. This mid-trial shift forced Mr. Nordlicht to play whack-a-mole and left his defense team uncertain about what evidence—like the Francis Memo—would be dispositive.



Memo reflecting Platinum's [Black Elk] Bond holdings came <u>not</u> from Platinum, the Defendants or their co-conspirators, but from John Hoffman and Marizza Piché at Black Elk." Dkt. 787 at 58. That was simply false. The Francis Memo explicitly said that "*Platinum* [h]as stated" that it will "leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders," Ex. 3, Francis Memo—confirming that the information in the memo came from *Platinum*. In fact, as discussed below, Mr. Hoffman too had told the government the information came from Mr. Nordlicht.

The Court granted Mr. Nordlicht a new trial and mentioned the Francis Memo when explaining that there was "insufficient evidence that the affiliate status . . . was even concealed from BakerHostetler, which was responsible for communication with bondholders and which distributed the July 16, 2014 consent solicitation statement." Dkt. 799 at 35.

After the government appealed the Court's decision, it went even further in its mischaracterization of the origins of the information in the Francis Memo. In its opening brief to the Second Circuit, the government argued that Mr. Nordlicht and Platinum "had no involvement in [the Francis Memo]," 2d Cir. No. 19-3207, ECF 52 ("Gov't App. Br.") at 106. And even though the Francis Memo speaks of what Platinum "intends" when discussing Platinum's plan to buy out non-friendly bondholders in the consent solicitation, the Government argued that the memorandum "has no bearing on Nordlicht's intent." *Id.*

Because the Francis Memo had not been admitted at Mr. Nordlicht's trial, it was not part of the record before the Second Circuit. As such, the court did not have the memo itself before it, but saw only the government's misleading characterization of it. Understandably, the court believed the government was acting in good faith, and it relied on the government's misrepresentations in its decision. It held that Mr. Nordlicht's conviction was not a manifest injustice, in part, because he did not "provide[] the information that formed the basis for this memo" and because the memo was "unrelated to Nordlicht." *Landesman*, 17 F.4th at 338. As is now clear, the Second Circuit's reliance on the government's inaccurate statements was plainly an error.

### C. <u>Additional Evidence Presented at Mr. Small's Recent Trial Confirms That the Government's Theory Was Wrong</u>

After Mr. Nordlicht's conviction, the government tried its case against Mr. Small based on his participation in the Black Elk scheme. Mr. Small was tried in August, and during his trial the importance of the Francis Memo became abundantly clear. It clearly established that Black Elk and BakerHostetler knew that Platinum and "friendlies" owned $90 million in Black Elk bonds before the consent solicitation and that the defendants had no intent to deceive anyone. Indeed, after seeing the Francis Memo and focusing upon it for the first time, the Court, on a sidebar, "question[ed] the government's judgment" in pursuing charges against Mr. Small and urged the U.S. Attorney's Office to "take a fresh look" at whether to proceed with the trial. Ex. 1, Small Tr. at 557:16-19; 558:18-20.

Case 1:16-cr-00640-BMC   Document 971   Filed 10/14/22   Page 6 of 12 PageID #: 22355



In addition to the Francis Memo, two other documents introduced into evidence during Mr. Small's trial confirmed that Mr. Nordlicht did not act with criminal intent. One of those documents, Small DX 6793, shows Black Elk's intended "sources and uses" of the Renaissance sale proceeds and confirms that Mr. Nordlicht wanted all non-friendly bondholders to tender their bonds and be paid in full during the consent solicitation—the opposite of what he would have wanted if the entire plan was to steal money from the non-friendly bondholders. *See* Ex. 4, Small DX 6793. The other, Small DX 6405, provides additional evidence that Mr. Nordlicht's "desired result" was for all non-friendly bondholders to be paid in full. *See* Ex. 5, Small DX 6405.[3] Even the government acknowledged that this document was relevant to Mr. Nordlicht's state of mind during a sidebar at Mr. Small's trial. *See* Ex. 1, Small Tr. 1293:8-9. These documents, coupled with the Francis Memo, reinforce the fact that Mr. Nordlicht has been convicted based on a demonstrably false story by the government.

## ARGUMENT

### 1. Mr. Nordlicht Is Entitled to a New Trial Because the Government Obtained His Conviction Based on a False Premise

The government is duty bound to present a truthful case to the jury. But its entire case against Mr. Nordlicht and his co-defendants was based on a premise the government knew or should have known was false: that Mr. Nordlicht intentionally concealed the fact that Platinum and "friendlies" owned Black Elk bonds from Black Elk and BakerHostetler. As the Francis Memo and other evidence shows, this is simply not true. Before the consent solicitation, Mr. Nordlicht disclosed that Platinum and friendlies owned $90 million in Black Elk bonds to Mr. Hoffman, Mr. Hoffman told BakerHostetler, and BakerHostetler memorialized it in the Francis Memo. Mr. Nordlicht hid nothing, and it was always his intent that non-friendly bondholders would tender their bonds and be paid in full.

Nevertheless, despite knowing Mr. Nordlicht's intent and that the bond holdings had been disclosed before the consent solicitation, the government pressed forward. It wanted the jury to believe that Mr. Nordlicht hid information from Black Elk and BakerHostetler so that the jury could infer that Mr. Nordlicht acted with criminal intent. *See, e.g.*, Ex. 2, Nordlicht Tr. 6649:18-21 ("[T]he defendants hid the fact that there were other Platinum funds controlled by Mark Nordlicht that held bonds."). The jury believed the government's misrepresentations. Although this Court was not persuaded that there was enough for a conviction, the government persisted, misrepresenting the Francis Memo to the Second Circuit and convincing that court to overturn this Court's decision.

---

[3] Mr. Nordlicht's trial counsel did not succeed in admitting either document into evidence during Mr. Nordlicht's trial. *See* Ex. 2, Nordlicht Tr. 5794:5-5794:12 (noting that Mr. Nordlicht's trial counsel could not move Small DX 6793 into evidence); 6183:10-6184:3 (excluding the "not really our desired result" email).



The Honorable Brian M. Cogan
October 14, 2022
Page 7

A conviction obtained based on false evidence cannot stand. In light of the Francis Memo and other evidence presented at Mr. Small's trial, it is clear that the central premise underlying the government's case was false. Moreover, as the Court is aware, evidence at Mr. Small's trial further established that Mark Feuer and Scott Taylor, not Mr. Nordlicht, controlled Beechwood and that Beechwood was not a legal affiliate of PPVA. *See* Ex. 1, Small Tr. 888:11-889:12. Indeed, there is a wealth of new evidence establishing that Mr. Nordlicht did not in fact control Beechwood.[4] This Court has previously ruled that this new evidence "would certainly have strengthened [Mr. Nordlicht's] case," but it "would not have likely prompted the jury to acquit him." Dkt. 894 at 15. When Mr. Nordlicht's lack of control over Beechwood is combined with the fact that he disclosed Beechwood's bonds to Black Elk's CEO, the weight of the evidence preponderates heavily against the verdict. To prevent a manifest injustice, this Court should grant Mr. Nordlicht a new trial.

### A. Due Process Bars the Government From Misrepresenting Facts to the Jury, and a Defendant May Raise Such a Violation at Any Time

The United States Attorney represents the United States, not an "ordinary party." *Berger v. United States*, 295 U.S. 78, 88 (1935). Its interest in a criminal case "is not that it shall win . . . but that justice shall be done." *Id.* As a "servant of the law," "he may strike hard blows, [but] he is not at liberty to strike foul ones." *Id.* And "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* In fact, "the average jury" relies on the U.S. Attorney's office to carry out this duty, and it "has confidence that these obligations . . . will be faithfully observed." *Id.*; *see also Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009) (noting that the U.S. Attorney is "an officer of the court whose duty is to present a forceful *and truthful* case to the jury, not to win at any cost") (emphasis added); *Jenkins v. Artuz*, 294 F.3d 284, 296 n.2 (2d Cir. 2002) (explaining that prosecutors have a duty to "seek justice, not merely to convict"); *Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) (similar).

It is "implicit in any concept of ordered liberty" that the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" because doing so violates the Constitution's guarantee of due process. *Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959). If the prosecution misrepresents the facts to the jury to induce a criminal conviction, then the verdict cannot stand. *See United States v. Helmsley*, 985 F.2d 1202, 1207 (2d Cir. 1993) (explaining that in *United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987), the Court of Appeals reversed a conviction after the "prosecutor misrepresented [facts] to the jury" even when "the defendant had 'some knowledge' of the misrepresentation" because "the defendant's 'failure does

---

[4] The new evidence consisted of deposition testimony from Mr. Taylor, Mr. Feuer, and Beechwood's 30(b)(6) witness, Christian Thomas. Each witness stated that "Mr. Nordlicht merely acted as an advisor to Beechwood and exercised no formal control over the firm." Dkt. 894 at 15. These witnesses were not available at Mr. Nordlicht's trial because they had originally told Mr. Nordlicht's counsel "that they would assert their Fifth Amendment right against self-incrimination if called." *Id.*



The Honorable Brian M. Cogan
October 14, 2022
Page 8

not allow the prosecutor to make misrepresentations.'"). If the government makes a representation it "knew or should have known" to be false, and there is "any reasonable likelihood" that it "could have affected the judgment of the jury," then the conviction must be overturned. *Helmsley*, 985 F.2d at 1205-06. Notably, a due process challenge to the government's use of false testimony may be made at any time under Rule 33. *See id.* at 1206-07. Even where the defense counsel knew or could have known of the misrepresentation, there may still be a deprivation of due process where "the prosecutor reinforces the deception by capitalizing on it in closing argument," or by "posing misleading questions to [a] witness." *Mills v. Scully*, 826 F.2d 1192, 1995 (2d Cir. 1987); *see also United States v. Valentine*, 820 F.2d 565, 571 (2d Cir. 1987).

### B. A New Trial Is Warranted Because the Government Misled the Jury and the Courts

Here, the government did not "faithfully observe" its obligation to present a truthful case. Mr. Nordlicht's conviction was based on the premise that he concealed the fact that entities friendly to Platinum owned Black Elk bonds from everyone, including Black Elk and BakerHostetler. But the Francis Memo confirms that Mr. Nordlicht disclosed the friendly bond holdings to Black Elk's CEO and general counsel, and that BakerHostetler received the same information more than two weeks *before* Black Elk sent the consent solicitation to bondholders. Mr. Nordlicht was the source of the information in the Francis Memo, rendering false the government's representation to this Court and the Second Circuit about the Francis Memo. And evidence admitted at Mr. Small's trial further confirms that Mr. Nordlicht did not intend to deceive anyone, highlighting the manifest injustice of his conviction.

1. The Francis Memo Establishes That Platinum's Plans Were Never Concealed from BakerHostetler or Black Elk

Before the consent solicitation began, Mr. Nordlicht told Black Elk and BakerHostetler that Platinum and "friendlies" owned $90 million in Black Elk bonds. This fact, documented in the Francis Memo, is fatal to the government's theory of the case.

On July 1, 2014, Mr. Francis wrote a memo to Mr. Hoffman and Ms. Piché that included a summary of the "information provided [to BakerHostetler] thus far." The first five points in BakerHostetler's summary cleanly lay out the entire "scheme" the government accused Mr. Nordlicht of hiding from Black Elk and BakerHostetler:

1. Black Elk has agreed to sell assets to Renaissance for a sale price of $170 Million, which is to close on July 15, 2014.
2. As a result of the disposition of those assets, BEE will be relieved of $60 Million in bond/security obligations on the properties sold.
3. As a result of items 1 and 2, BEE will have $230 Million in relatively free funds.
4. Platinum [h]as stated that it intends to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, which will leave $90 Million in bond debt in the hands of so-called "friendly" bond holders, most of which is held by Platinum itself.



The Honorable Brian M. Cogan
October 14, 2022
Page 9

> 5. Platinum will cause $100 Million of the funds to be paid to Platinum as a dividend/distribution on its preferred equity interest in BEE.

Ex. 3, Francis Memo. Before the consent solicitation, then, BakerHostetler and Black Elk knew exactly what Mr. Nordlicht wanted to do: buy out the tendering, non-friendly bondholders and retire the high-interest obligations held by the preferred equity holders, leaving only the lower-interest obligations held by friendly bondholders. This plan, and Platinum's ownership of Black Elk bonds, was never hidden. The Francis Memo confirms and removes any doubt about the trial evidence establishing the absence of Mr. Nordlicht's criminal intent.[5] It destroys any inference that Mr. Nordlicht and Platinum sought to pass the consent solicitation by hiding their relationship with friendly bondholders from BakerHostetler and Black Elk or by depriving the independent bondholders of any money owed to them.

> 2. Contrary to the Government's Representations, Mr. Nordlicht Was the Source of Information in the Francis Memo

The government has represented to this Court and the Second Circuit that the Francis Memo does not speak to Mr. Nordlicht's intent because the information came from Black Elk. In its Rule 29 and Rule 33 briefing, it told the Court that any "information in the July 1 Memo reflecting Platinum's [Black Elk] Bond holdings" did not come "from Platinum, the Defendants or their co-conspirators." Dkt. 787 at 58. And it told the Second Circuit that Mr. Nordlicht "had no involvement in [the Francis Memo]" and that the memo "has no bearing on Mr. Nordlicht's intent." *See* Gov't App. Br. at 106. Relying on the government's representations, the Second Circuit wrote that the memo was "unrelated to Nordlicht" and that Mr. Nordlicht did not "provide[] the information that formed the basis for this memo." *Landesman*, 17 F.4th at 338.

But the government knew or should have known that these representations were false. Not only does the Francis Memo itself describe the plan as reflecting *Platinum's* intentions, but the government learned from Mr. Hoffman, Black Elk's CEO, that this information came from Mr. Nordlicht. Before trial, the government interviewed Mr. Hoffman. The FD-302 of that interview reveals that "[a]pproximately a week or two prior to the solicitation offer going out Nordlicht said to Hoffman . . . . that the bonds are in friendly hands and [Platinum] has it under control." *See* Ex. 6, Hoffman 302 at 1. Mr. Nordlicht told Mr. Hoffman this information at Mr. Hoffman's office in Texas, and the "conversation was documented by a meeting in Hoffman's Microsoft Outlook

---

[5] *See* Ex. 2, Nordlicht Tr. 5025-26 (Mr. Shearer testifying that, as of April and May 2014, he knew that Platinum owned 70% of the Black Elk bonds); Nordlicht Tr. 5079-5080 (R. Shearer testifying that BakerHostetler was informed of Platinum's stake in Black Elk in July 2014); Ex. 10, GX 4504 at 11 (Mr. Nordlicht stating in an investor call that "we are in the midst of taking down debt" at Black Elk); Ex. 2, Nordlicht Tr. 5236-37 (T. Pulvino testifying that he thought Black Elk wanted bondholders to tender); Nordlicht Tr. 3880 (D. Yee testifying that he thought Black Elk wanted bondholders to tender); Nordlicht Tr. 5096 (R. Shearer testifying that he expected bondholders to tender); Nordlicht Tr. 5054-57; 4832, 4851, 4864-66 (R. Shearer testifying that he forgot about the Indenture's affiliate rule and only advised Mr. Nordlicht about the applicability of the Trust Indenture Act).



The Honorable Brian M. Cogan
October 14, 2022
Page 10

calendar." *Id.* An email between Mr. Nordlicht and Mr. Hoffman confirms that they met at Mr. Hoffman's office on June 12, 2014, well before the consent solicitation, *see* Ex. 7, M. Nordlicht Email to J. Hoffman, and the Hoffman 302 confirms that "Hoffman had no knowledge of [Platinum] owning these bonds prior to his meeting with Nordlicht," *see* Ex. 6, Hoffman 302 at 1.

As the Hoffman 302 makes clear, Mr. Nordlicht disclosed Platinum and the friendly bondholders' stake in the Black Elk bonds to Black Elk's CEO before the consent solicitation. Because Mr. Hoffman "had no knowledge" of these facts before speaking with Mr. Nordlicht, the information in the Francis Memo plainly came from Mr. Nordlicht. After learning Platinum's plans from Mr. Nordlicht, Mr. Hoffman and Ms. Piché contacted Paul Francis at BakerHostetler on June 26, 2014 and told him that Platinum intended to use the proceeds from the Renaissance sale to pay preferred equity holders "ahead of so called friendly bond holders."[6] *See* Ex. 8, Small DX 6291 (email from M. Piché to P. Francis forwarding an email from J. Hoffman). Mr. Francis and Eric Kristiansen, another partner at BakerHostetler, spoke with Mr. Hoffman and Ms. Piché later that day to "gather[] some general facts and the timeline of transactions on the horizon that would effectuate Platinum's scheme." *See* Ex. 9, Small DX 6298 at 2. Mr. Francis then wrote what he learned from Mr. Hoffman and Ms. Piché about Platinum's intent in his July 1, 2014 memo. *See* Ex. 3, Francis Memo (stating that the Francis Memo was based on information provided "by or through" Mr. Hoffman and Ms. Piché).

These documents make clear that Black Elk and BakerHostetler knew about Platinum's intent *because of Mr. Nordlicht*. If Mr. Nordlicht had intended to deceive Black Elk and BakerHostetler by concealing Platinum's interest in the Black Elk bonds—as the government argued to the jury—he never would have told Mr. Hoffman that Platinum and friendly entities owned the vast majority of Black Elk bonds, and he never would have told Mr. Hoffman exactly what Platinum was planning to do through the consent solicitation. To the extent that Black Elk made inaccurate statements in the public bond solicitation, it decidedly was not because Mr. Nordlicht kept any information from the company.

Nevertheless, despite reviewing the Francis Memo and having interviewed Mr. Hoffman, the government repeatedly argued to the contrary. To persuade the jury to convict Mr. Nordlicht, the government made arguments about Mr. Nordlicht's intent that the government knew or should have known to be false. It misrepresented Mr. Nordlicht's intent in its opening and closing statements when it told the jury that Mr. Nordlicht was "hiding" the bonds. *See* Ex. 2, Nordlicht Tr. 21:19-20; 6649:18-21. And following the conviction, the government misrepresented the exculpatory nature of the Francis Memo to this Court in an effort to sustain the conviction. When that failed, it repeated its misrepresentations to the Second Circuit, which never saw the Francis Memo, to prevent Mr. Nordlicht from receiving a new, fair trial. There is little doubt that the Government's mischaracterization of the most important piece of evidence in this case likely

---

[6] Mr. Hoffman's statement that preferred equity holders were to be paid ahead of "friendly" bondholders further confirms that Platinum always intended non-friendly bondholders to tender and receive par value for their bonds.



The Honorable Brian M. Cogan
October 14, 2022
Page 11

impacted the Second Circuit's decision. It would violate due process, and be a manifest injustice, to allow Mr. Nordlicht's conviction to stand in the face of the government's misconduct.

    3. <u>Evidence from Mr. Small's Trial Further Establishes That Mr. Nordlicht Had No Intent to Deceive</u>

The Francis Memo, coupled with documents showing that Mr. Nordlicht was the source of the exculpatory information in that document, clearly establishes Mr. Nordlicht's lack of intent. Yet the Francis Memo does not stand alone. Two other documents used at Mr. Small's trial remove any doubt.

First, Small DX 6793 confirms that, before the consent solicitation ended, Black Elk had set aside enough money from the Renaissance sale to pay *all* of the non-friendly bondholders. On July 29, 2014, a few hours after Mr. Nordlicht told Mr. Small to "get a handle on" how the money from the Renaissance sale would be used, *see* Ex. 11, Jeff Shulse, the CFO of Black Elk, sent Mr. Small an email attaching a spreadsheet showing the "sources and uses" of proceeds from the sale. Mr. Small then forwarded this email to Mr. Nordlicht and Mr. Levy. The spreadsheet highlights that "as of 8/13"—the day before the consent solicitation ended—Black Elk expected to pay $65 million to the tendering bondholders. Ex. 4, Small DX 6793. Because entities friendly to Platinum controlled the rest of the $150 million in outstanding bonds, this spreadsheet shows that Mr. Nordlicht intended for all non-friendly bondholders to be paid in full.

In addition, Small DX 6405 provides additional evidence that Mr. Nordlicht wanted all bondholders to tender. On August 9, 2014, shortly before the end of the consent solicitation period, Mr. Shulse e-mailed Mr. Nordlicht, saying, "we finished the week with the consents at 67%," that "the new indenture passed," and that, although "the tender is still open," it was "interesting that only $2.8 million of the bonds have tendered." Ex. 5, Small DX 6405. Mr. Nordlicht responded, "[t]hat's not really our desired result. I think some tenders will show up last minute." *Id.* It defies credulity that Mr. Nordlicht could simultaneously want to jump the priority line and steal money from bondholders—the government's theory of the case—while telling Mr. Shulse that his "desired result" is that the bondholders tender their bonds and receive 100 cents on the dollar.

## CONCLUSION

Several years ago, this Court recognized Mr. Nordlicht's conviction based on the Black Elk scheme to be a manifest injustice. And as it heard the weak evidence at Mr. Small's trial in August for his participation in the same scheme, it "question[ed] the government's judgment" and expressed doubts about whether the case should proceed. The government never should have brought this case, it never should have pursued it once it became clear that Mr. Nordlicht did not intend to deceive anyone, and it never should have misled the jury and the courts about Mr. Nordlicht's intent. It would be a manifest injustice to let Mr. Nordlicht's conviction stand.



The Honorable Brian M. Cogan
October 14, 2022
Page 12

For all these reasons, Mr. Nordlicht respectfully requests that his Rule 33 motion be granted.  Mr. Nordlicht also respectfully requests the opportunity for oral argument on this motion.

                                                Respectfully submitted,

                                                /s/ *Andrew J. Levander*
                                                Andrew J. Levander
                                                Steven A. Engel

cc:  All Counsel (via ECF)            Three Bryant Park
                                                1095 Avenue of the Americas
                                                New York, NY 10036
                                                (212) 698-3683
                                                andrew.levander@dechert.com

                                                *Counsel for Mark Nordlicht*