

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DCP/LHE/NMA
F. #2016R00505

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 6, 2023

By Hand and ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Mark Nordlicht, et al.
Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in opposition to the defendant Mark Nordlicht's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, see ECF Dkt. No. 971 (the "Motion" or "Ltr."). Nordlicht's motion, which is his third bite at the apple, should be denied. The motion's primary argument relies upon a memorandum of an interview with John Hoffman (the "Hoffman 302"),[1] Black Elk's former CEO, reflecting Hoffman's statement that Nordlicht had provided him with certain information about Platinum's scheme. Similar information was evidently later provided by Hoffman and/or Marizza Piche, then Black Elk's General Counsel, to litigation attorneys for Black Elk. Nordlicht argues that his purported "disclosure" to Hoffman defeats an inference of fraudulent intent. Nordlicht provides no explanation for why he has not raised Hoffman's potential testimony before—at trial when he could have called Hoffman as a witness, in connection with his earlier Rule 33 motion, or on appeal. There is no good cause for his delay and his motion is not timely under Rule 33.

      Furthermore, on the merits, Nordlicht's motion relies on mischaracterizations of the evidence. As the Second Circuit found, there is no evidence Nordlicht intended for information about Platinum's scheme to be disclosed to BakerHostetler, much less to the BakerHostetler lawyers managing the Black Elk consent solicitation, and certainly not to the independent Black Elk investors who were defrauded. The Hoffman 302 does not change those facts, and this Court is not a proper venue to seek reconsideration of the Second Circuit's decision.

---

[1] This memorandum was disclosed to Nordlicht in October 2018—months in advance of trial.

Likewise, Nordlicht argues that two documents admitted at the trial of his co-defendant, Daniel Small, disprove the government's allegations of Nordlicht's fraudulent intent, because, he contends, they show that he intended to pay the bondholders and not defraud them. These arguments are also untimely because these documents were produced to Nordlicht in discovery in January 2017 and there is no cause for his delay in raising this argument either. And even if this argument could be considered on the merits, the documents do not in fact negate Nordlicht's fraudulent intent.

In sum, the government respectfully submits that the motion should be denied.

I.    Background

Nordlicht's motion relies on documents that were produced to him by the government and have been in his possession since January 2017 and October 2018, and largely reiterates arguments that have already been heard by this Court and the Second Circuit. Nordlicht's primary argument relies on a July 1, 2014 memo from BakerHostetler litigator Paul Francis to Black Elk's then-CEO John Hoffman and then-General Counsel Marizza Piche (the "Francis Memo"). The memo appears to have been produced for Hoffman and Piche as they considered whether Black Elk could sue Platinum, in other words, for purposes adverse to Platinum, and it was not shared at the time with anyone at Platinum or with the BakerHostetler lawyers working on the Black Elk consent solicitation. This document has been well-known to defense counsel, and the Court, for years. At trial in 2019, counsel for David Levy, Nordlicht's co-defendant, attempted to introduce the Francis Memo into evidence, see Tr. at 5074–75, and cross-examined Robert Shearer about its contents: "Can we agree Attorney Shearer, that Platinum and friendly companies' ownership of $90 million or more of Black Elk bonds was not concealed from your law firm in July 2014." Tr. at 5079; see also id. at 5080. The Francis Memo came up again in Levy's summation. See Tr. at 6978–79.

Following his conviction, Nordlicht (and Levy) raised the Francis Memo in his initial Rule 29 and 33 motions to argue—as he does again here—that the defendants could not have intended to defraud Black Elk's bondholders because "Platinum" fully disclosed its plan to vote "friendly" bonds to BakerHostetler in July 2014. See ECF Dkt. No. 786-1 at 9, 22–23, 27, 35. This Court agreed, finding that the disclosure implied by the Francis Memo was evidence Nordlicht did not intend to conceal the co-conspirators' plan from BakerHostetler, even though there is no evidence Nordlicht intended Hoffman and Piche to share this information with BakerHostetler or was aware that they had. See ECF Dkt. No. 799 at 36–37.

On appeal, this issue was litigated yet again and the Second Circuit reversed this Court's finding. On appeal, Nordlicht presented his argument in essentially the terms he has presented it here, and as he did in his first Rule 33 motion. He argued in the Second Circuit that "Platinum repeatedly disclosed its bonds to BakerHostetler. . . . It disclosed them in July 2014, which BakerHostetler memorialized in a legal memorandum." See United States v. Landesman, et al., Case No. 19-3209, ECF Dkt. No. 67 at 45 (2d Cir. April 28, 2020) (emphasis added). The government explained, as it did at trial, that, in fact, the disclosure was made by Black Elk executives, Hoffman and Piche, not Platinum, and was communicated to litigators at BakerHostetler who were not working on the consent solicitation, but were evaluating whether

2

Black Elk could or should sue Platinum. See United States v. Landesman, et al., Case No. 19-3209, ECF Dkt. No. 37 at 106 (2d Cir. Jan. 7, 2020). The Second Circuit agreed:

> The memo was not admitted into evidence and is therefore not a part of the record; the district court excluded it as hearsay. On cross-examination, Shearer testified that after the public consent solicitation process terminated, he later learned of an internal BakerHostetler memo (dated July 1, 2014) that disclosed that Platinum, along with companies friendly to it, owned $90 million of Black Elk bonds. That information, however, was not disclosed to Shearer at the time of the public consent solicitation process. Moreover, there is no evidence in the record that Nordlicht provided the information that formed the basis for this memo, that this memo was completed at Nordlicht's request, or that the memo opined on the affiliate status of any of the Platinum-related entities. Nor is there any evidence that Nordlicht received or relied on any such memo in formulating his views about the Affiliate Rule. It is unclear how a memo unrelated to Nordlicht, undisclosed (at the time) to Shearer and sent to lawyers who were not working on the public consent solicitation process negates Nordlicht's intent to conceal the PPCO- and PPLO-owned bonds, particularly where, as here, Nordlicht affirmatively concealed information related to PPCO, PPLO, and Beechwood in response to Shearer's inquiries related to the Affiliate Rule.

United States v. Landesman, 17 F.4th 298, 338–39 (2d Cir. 2021).

In raising this argument here for a fourth time, Nordlicht relies on the Hoffman 302, an FBI FD-302 report of a July 14, 2016 interview with Hoffman. The Hoffman 302 states that "a week or two prior to the solicitation offer going out Nordlicht said to Hoffman not to worry about the vote and the bond holders tending. Nordlicht stated that the bonds are in friendly hands and PP [Platinum Partners] has it under control." ECF Dkt. No. 971-6 at 1. The Hoffman 302 further makes clear that Hoffman learned this information from Nordlicht sometime during the first few weeks of July 2014. Id. Now, even though the timeline does not add up—the Francis Memo was drafted on July 1, 2014—Nordlicht seeks to infer from the Hoffman 302 that he (Nordlicht) must have been the original source of the information that Hoffman and Piche provided to BakerHostetler.

The Hoffman 302 was indisputably produced by the government to defense counsel before the 2019 trial, in October 2018, meaning Nordlicht has had the information contained in the Hoffman 302 for well over four years. Nordlicht was aware of the information in the Hoffman 302 at the time of trial, when he filed his first Rule 33 motion, throughout the litigation on appeal before the Second Circuit, and when he filed his supplemental Rule 33 motion on remand. Moreover, Nordlicht and his co-defendants could have called Hoffman as a witness at either the 2019 or 2022 trial, but chose not to.

In addition to the Hoffman 302, Nordlicht relies on two emails (Small DX-6405, and Small DX-6793) that he has also had for years, since the government produced them to him in January 2017. See Nordlicht Br. at 6. As Nordlicht admits, albeit in a footnote, he tried to move these documents into evidence at the 2019 trial. See Nordlicht Br. at 6 n.3. Small moved these documents into evidence at the 2022 trial. Like the Francis Memo, which also wasn't introduced in evidence, these documents are not a part of the record as to Nordlicht. But they were produced to Nordlicht, and he raised both of them at trial. See Trial Tr. 5794:5–12 (questioning a witness regarding Small DX-6793), Trial Tr. 6183:10 – 6184:3 (questioning a witness regarding Small DX-6405).

II.  Nordlicht's Motion Is Not Timely and There Are No Grounds to Excuse his Failure to Present his Claim Before

Rule 33 requires that "any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2) (emphasis added). Nordlicht does not claim any of the four documents he relies on are "newly discovered evidence," nor could he. As explained above, Nordlicht has had the Hoffman 302, the Francis Memo, and Small DX-6405 and -6793 for years. Accordingly, the 14-day period set out in Rule 33(b)(2) applies to Nordlicht's motion, and he has plainly failed to comply.[2] Rule 33 does not provide for successive motions not based on new evidence—the 14-day rule expressly applies to "any" other motion—and Nordlicht cites no case permitting such a successive motion. See United States v. Williams, No. 10-CR-622 (ADS), 2017 WL 5483744, at *2 (E.D.N.Y. Nov. 15, 2017) ("After the 14 day limit, the only ground on which [Defendant] may pursue a new trial under Rule 33 is the existence of newly discovered evidence."); United States v. Moreno, 181 F.3d 206, 212 (2d Cir. 1999) (prosecutorial misconduct claim time-barred under Rule 33); United States v. Jones, 858 F. App'x 420, 424 (2d Cir. 2021) (summary order) (affirming denial of successive Rule 33 motion based on prosecutorial misconduct because the claim was not based on newly discovered evidence); United States v. Klein, No. 03-CR-813 (LBS), 2007 WL 22744254, at *3 (S.D.N.Y. Aug. 7, 2007) (finding prosecutorial misconduct claims time-barred pursuant to Rule 33 because the claims were not based on new evidence).

---

[2]  To the extent Nordlicht claims his motion instead seeks reconsideration of the Court's most recent denial of his Rule 33 motion, ECF Dkt. No. 894, it would fare no better. "A motion for reconsideration . . . shall be filed and served within fourteen (14) days after the Court's determination of the original motion." Local Criminal Rule 49.1(d). "[U]ntimeliness is itself a sufficient basis for denial" of a motion for reconsideration. See United States v. Lisi, No. 15-CR-457 (KBF), 2020 WL 1331955, at *1 (S.D.N.Y. Mar. 23, 2020). Moreover, "[t]he standard for granting motions for reconsideration is strict, and a court may grant reconsideration only where the moving party demonstrates an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." United States v. Alvarez-Estevez, No. 13-CR-380 (JFK), 2014 WL 12681364, at *1 (S.D.N.Y. Nov. 6, 2014) (internal quotation marks omitted). None of those bases can be asserted here.

Nordlicht does not even attempt to argue he has complied with Rule 33's time limits, but contends instead that he can raise his claim "at any time under Rule 33" because his claim is a "due process challenge to the government's use of false testimony." ECF Dkt. No. 971 at 8. Most fundamentally, Nordlicht's claim fails because there was no perjurious testimony in this case and the government did not misrepresent the facts; issues we address in depth below. In addition, Nordlicht misstates the law. The Due Process clause does not create a freestanding exception to the Federal Rules of Criminal Procedure for misconduct claims. As cases like Moreno, Jones, and Klein demonstrate, a new trial motion based on a claim of prosecutorial misconduct must be filed within 14 days of the verdict or be based on "newly discovered" evidence, just like any other Rule 33 motion. See Moreno, 181 F.3d at 212 (misconduct claim time barred under Rule 33); Jones, 858 F. App'x at 424 (same); Klein, 2007 WL 22744254, at *3.

United States v. Helmsley, the sole case Nordlicht cites in support of his argument, does not create an exception to the rule that a Rule 33 motion based on misconduct must be based on new evidence if not filed within 14 days. Rather, Helmsley creates a narrow exception involving perjurious testimony and even then only to the separate requirement that the defendant also allege facts "from which the court can infer due diligence on the part of the movant to obtain the evidence." United States v. Forbes, 790 F.3d 403, 408 (2d Cir. 2015) (internal citations omitted); see also United States v. Dukes, 727 F.2d 34, 38 (2d Cir. 1984) ("For evidence to be considered newly discovered for purposes of Rule 33, a defendant must show that the evidence was discovered after trial and that it could not have been discovered sooner with the exercise of due diligence.") (emphasis added).[3] Helmsley says nothing about an exception to the plain-text requirement of Rule 33 that there be "newly-discovered" evidence.

In fact, Helmsley expressly rejected a collateral attack based entirely on evidence that was known to the defendant at the time of the alleged misconduct—just as it was here—because the evidence was not "newly discovered." The Helmsley Court explained that:

> We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial, and we have permitted such an attack to succeed, despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity.

Id. at 1208. Helmsley teaches that there must be something that is somehow new, and in Helmsley, just like this case, there was not: "Whether the collateral attack is aimed at Marsden's knowledge

---

[3] A five-part test applies to Rule 33 claims based on new evidence. "Diligence" and newly-discovered evidence are separate prongs: "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." Forbes, 790 F.3d at 407–08 (quoting United States v. Owen, 500 F.3d 83, 88 (2d Cir. 2007)).

5

or Nowak's knowledge, it fails because it rests entirely on inferences from circumstances all of which were known to the defense prior to the trial." Id.

The two examples of misconduct identified in Helmsley—Valentine and Washington—are not analogous. Valentine involved a prosecutor's flat-out misrepresentations about secret grand jury testimony that the prosecutor had himself procured, while Washington involved a prosecutor's failure to correct a witness who claimed he had not reached a deal to cooperate with the government. Id. at 1206–07. Both cases involved "at least some evidence of the prosecutor's knowledge of the perjury that was not available at trial." Helmsley at 1208. The defense in Valentine was not in a position to know all of what was said by each witness to the grand jury. In Washington, defense counsel had only second-hand reports of the promises to the witness, which he doubted. See United States ex rel. Washington v. Vincent, 525 F.2d 262, 265 n.4 (2d Cir. 1975).

The circumstances here are not analogous. There is no purportedly false testimony presented to the jury, as in Washington. The Hoffman 302 was well known to Nordlicht far in advance of his 2019 trial. Nordlicht does not even claim the government's statements were actually false, only that the government's briefing omits the inference that Hoffman learned the information in the Francis Memo from Nordlicht, which itself is not a significant fact because there is no evidence Nordlicht knew or intended this information would be communicated to BakerHostetler or the independent bondholders. Otherwise, Nordlicht relies on the government's opening and closing jury addresses, which argued that the co-conspirators concealed their ownership of the Beechwood bonds from the independent Black Elk investors who were defrauded and from the BakerHostetler lawyers actually involved in the transaction. "Remarks of the prosecutor in summation do not amount to denial of due process unless they constitute 'egregious misconduct,'" United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quoting United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal citation omitted)), and here the government's remarks were well supported by the evidence, including testimony from Robert Shearer, the lead BakerHostetler lawyer on the transaction, and victim-investors who also testified that they were lied to about Platinum's holdings in Black Elk bonds. These arguments were not improper just because Nordlicht believes the Hoffman 302 gives rise to the not-inconsistent inference that Nordlicht did not conceal all aspects of his scheme from a single Black Elk executive.

Moreover, in terms that are fully applicable to this case, the Helmsley court went on to explain that there were no good grounds to excuse the defendant's default because "it appears that her choice not to [raise the issue at trial] may have been deliberate." Id. at 1209; see also id. at 1208 ("Whether the collateral attack is aimed at Marsden's knowledge or Nowak's knowledge, it fails because it rests entirely on inferences from circumstances all of which were known to the defense prior to the trial."). The defendant in Helmsley could have called witnesses to expose the supposedly perjurious testimony, but chose not to because of the risk those same witnesses would have provided incriminating testimony. Likewise, Nordlicht could have called Hoffman or Piche to testify to how they learned the information they then communicated to Francis, but he did not because of the likelihood Hoffman and Piche would have provided incriminating testimony. "A defendant is not entitled to remain silent while having knowledge of facts of an impropriety that would entitle him to relief and to invoke that impropriety only later if the result of the proceeding is unsatisfactory to him." United States v. Parse, 789 F.3d 83, 109–10 (2d Cir. 2015).

6

Nordlicht's motion must therefore be denied as untimely and procedurally improper.

III. Even If Nordlicht's Motion Was Timely, it Fails on the Merits

Even if the motion were not untimely, it should still be denied because it rests upon incorrect and strained interpretations of the relevant facts and fails on the merits.

A. Nordlicht and his Co-Conspirators Deceived the Bondholders, and the Francis Memo Does Nothing to Disprove the Government's Evidence

Nordlicht first contends that he "fully disclosed his plans to Black Elk and therefore he did not knowingly deceive BakerHostetler or the bondholders." Ltr. at 2. Specifically, he argues Nordlicht (who controlled the entity that was the majority owner of Black Elk) informed Hoffman that "Platinum and friendly entities owned Black Elk bonds and planned to vote them in the consent solicitation," id., and so there can be no "inference that Mr. Nordlicht and Platinum sought to pass the consent solicitation by hiding their relationship with friendly bondholders from BakerHostetler." Ltr. at 9. This argument misapprehends the charged offense, misstates the facts, and has no merit.

First, the Indictment does not charge that Nordlicht deceived Black Elk as to his control of Black Elk bonds, it charges that Nordlicht, together with his co-conspirators, deceived the independent bondholders. Indictment ¶¶ 73 (alleging that Nordlicht and his co-conspirators "engaged in a scheme to defraud the third-party holders of the [Black Elk Bonds]"); 100 (charging securities fraud in connection with a "fraud and deceit upon" the third party bondholders); 103 (charging wire fraud conspiracy as to the third party bondholders); 105 (securities fraud as to the third party bondholders). Indeed, the Indictment charged Small, a member of the Board of Directors of Black Elk, and Jeffrey Shulse, an Officer of Black Elk, with participating in this very fraud. The Motion cites no instance in which the government has asserted that that Nordlicht deceived Black Elk, or that Small and Shulse, who were Black Elk's own agents, somehow deceived the company. On the contrary, the Indictment charges and the government has consistently argued that Nordlicht and his co-conspirators deceived the independent bondholders—not Black Elk's directors or employees—by causing the consent solicitation statement to misstate the number of Black Elk bonds held by affiliates of PPVA and thereby rigging the vote. Consequently, the argument that, because Nordlicht provided relevant information to Hoffman (not an independent bondholder), he had no intent to participate in the charged scheme to defraud the independent bondholders is nonsensical.

Second, the Francis Memo has no bearing on Nordlicht's fraudulent intent. The Francis Memo includes statements that (1) $90 million in Black Elk bonds were in the hands of "friendly" bondholders, most of which was held by Platinum itself, and (2) that Platinum would cause $100 million of the Renaissance proceeds to be paid to Platinum. Ltr. Ex. 3 at 1. As an initial matter, the Francis Memo is inaccurate and incomplete, because it does not explain that the $90 million in Black Elk bonds were not merely held by Platinum and friendly bondholders, but rather held by Platinum and other entities controlled by Platinum and Nordlicht, namely Beechwood and the Platinum funds, and therefore held by affiliates. Thus, even if one were to adopt Nordlicht's strained argument that the information set forth in this memo amounted to some

7

form of exculpatory disclosure, it would still fail, because this information does not include the most relevant fact—that Nordlicht and his co-conspirators planned to stuff the ballot box through affiliate votes they controlled.

Moreover, the Francis Memo was evidently prepared in response to a request from Hoffman and Piche, see Ltr. Ex. 3 at 1 (addressing the memo to Hoffman and Piche and stating that the information it set forth was provided "by or through" Hoffman and Piche), not Nordlicht, and there is no evidence to suggest that the facts laid out in the memo were conveyed to BakerHostetler by Nordlicht, Small, Levy or anyone else at Platinum. Indeed, the evidence reflects, and Nordlicht tacitly concedes, that this information was provided to BakerHostetler by Hoffman and Piche, who were confidentially seeking advice on whether to sue Platinum. There is no evidence to suggest that the memo was shared by Francis or anyone else with the BakerHostetler attorneys actually working on the consent solicitation materials, who dealt with Platinum, and the lead attorney working on that deal, Rob Shearer, has testified that he did not receive the memo during the relevant time period. Tr. at 5077:3–10, 5079:16, 22–23. The fact that someone, other than the charged defendants, told some lawyer, other than the lawyer working on the transaction, that Platinum and friendly bondholders controlled $90 million in bonds, without any evidence that Nordlicht ever knew, much less intended, that (incomplete) information to be conveyed to anyone, let alone a lawyer at BakerHostetler, let alone the independent bondholders, cannot have any bearing on Nordlicht's knowledge and intent in connection with the charged offenses. There is zero factual basis for defense counsel's assertion that "Mr. Nordlicht and Platinum had explained everything to BakerHostetler," Ltr. at 4, and no merit to this argument.

The Hoffman 302 does nothing to change these facts. It merely shows that Nordlicht told Hoffman that there were bonds in hands that were "friendly" to Platinum. There is no evidence to suggest that Nordlicht desired that Hoffman share this information with attorneys, independent bondholders, or anyone else. Indeed, if anything, the opposite inference is supported by the fact that Hoffman then sought advice from litigation counsel to Black Elk about suing Platinum.

The trial record is replete with contrary evidence showing that Nordlicht and his co-conspirators repeatedly took great pains to conceal the truth about Platinum's bondholdings from the BakerHostetler deal team, efforts that would have been unnecessary had Nordlicht believed that everyone at BakerHostetler knew the truth about Platinum's control over affiliated bondholders. Nordlicht's co-conspirator, Dan Small, repeatedly told Shearer that $18.3 million was the relevant number of bonds held by PPVA and its affiliates. See GX-695, -699. Notably, on July 7, 2014—after the date of the Francis Memo—Small emailed Nordlicht and Levy and wrote "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. . . . Let's discuss asap." GX-692. Had Nordlicht believed that the relevant information about Platinum's bondholdings had already been conveyed to BakerHostetler's deal team, there would have been no need to discuss what number to provide. Moreover, the first (and only) time the co-conspirators disclosed to the lead deal attorney, Robert Shearer, that there were any Black Elk bonds held by any Platinum-related entities other than PPVA was after the consent solicitation vote was closed and they were assured of its success. See GX-761. And even then, the co-conspirators only disclosed, in an opaque way, that approximately $43 million bonds were held by sister-funds of PPVA (which they termed parties "not deemed affiliates"), and never revealed the fact that an additional $37 million in bonds that voted to consent

8

to the indenture amendments were held by a Platinum affiliate—Beechwood. If Nordlicht "had explained everything to BakerHostetler . . . [b]efore the consent solicitation had even begun," Ltr. at 4, why was it necessary to divulge any information about Platinum's affiliated bondholdings after the vote closed, on July 29, 2014? Why was it necessary for Small to send BakerHostetler the Officer's certificate detailing which entities held which bonds, or the chart showing which bonds could be included in the count yielding which outcome? The only explanation is that the co-conspirators were intentionally keeping the deal team lawyers, and the bondholders, in the dark. The idea that Nordlicht had "explained everything" to BakerHostetler is proven false by his own deceptive conduct and that of his co-conspirators.

      B. <u>Evidence From the Small Trial Does Not Negate Nordlicht's Fraudulent Intent</u>

Nordlicht also argues that evidence from the Small trial, particularly two exhibits relating to the consent solicitation and tender offer, show Nordlicht's lack of intent.[4] Both of these documents were admitted, and argued about at length, at the Small trial, where the jury nevertheless found Small guilty. Likewise, they do nothing to negate the proof of Nordlicht's fraudulent intent. Nordlicht argues that these documents show that rather than intending to defraud the bondholders, the co-conspirators wished to "pay the bondholders in full." Ltr. at 11. As the government argued at the Small trial, had the co-conspirators' desire been to pay the bondholders everything to which they were contractually entitled, they could have paid them the entire amount they were due under the contract, which was $106.876 per bond (par plus a 6.876% call premium). Small Tr. at 1670. That is not what they chose to do—instead, they chose to force through their proposed amendments to the indenture through fraud.

Nordlicht first points to a spreadsheet prepared by Jeff Shulse—not Nordlicht—with a line item reflecting $65 million paid to "Bond Tender," Ltr. Ex. 4 (citing Small DX-6793), arguing that it showed that Nordlicht "intended" to pay the bondholders in full. Ltr. at 11. Setting aside the obvious impossibility of a spreadsheet written by Jeff Shulse representing a statement of Nordlicht's contemporaneous intent, the spreadsheet itself does not reflect the reality of how the transaction in fact occurred, or do anything to explain why, in the consent solicitation, the

---

[4] Nordlicht also makes a passing assertion that evidence at the Small trial "further established" that Mark Feuer and Scott Taylor controlled Beechwood and Beechwood was not a legal affiliate of PPVA. Ltr. at 7. This claim should (again) be rejected. Nordlicht's arguments regarding Feuer and Taylor been presented, and rejected, in both the Second Circuit, see Landesman, 17 F.4th at 329–30, 335 n.5, and twice in this Court, see United States v. Nordlicht, No. 16-CR-640 (BMC), 2019 WL 4736957, at *11 (E.D.N.Y. Sept. 27, 2019); ECF Dkt. No. 894 at 19 (May 10, 2022). Moreover, the purported "new evidence" presented at Small's trial consists of testimony from Israel Wallach that Feuer and Taylor "sort of ran" Beechwood. Id. (citing Small Tr. at 888-889). Nordlicht ignores the voluminous evidence from Wallach that Nordlicht, not Feuer or Taylor, actually had the capacity to, and did, singlehandedly direct Beechwood's trading and that Feuer and Taylor were not involved in the trades. Landesman, 17 F.4th at 335 n.5. And, of course, Nordlicht also fails to mention that Small's arguments regarding Feuer and Taylor's purported control over Beechwood were rejected by the jury in Small's trial, just as they were by the jury in Nordlicht's trial.

independent bondholders were provided with false information about the number of bonds Platinum controlled and the fact that the outcome of the vote was predetermined. The spreadsheet is irrelevant to Nordlicht's intent, and is even more irrelevant in light of the abundant other evidence that Nordlicht intended to perpetrate a scheme to defraud.

Nordlicht next points to an email from August 9, 2014, Small DX-6405, presented at the Small trial, in which Nordlicht described the fact that, as of August 8, 2014, only $2.8 million had opted to tender as not his "desired result." As the government argued at the Small trial, this vague statement about Nordlicht's "desired result" reflected the fact that only a tiny percentage had tendered at that point. Small Tr. at 1674. Such a small number of bondholders electing to tender revealed the process for the "sham that it was." Id. If too many bondholders held out and essentially voted "no" to the amendments, the legitimacy of the guaranteed outcome would have been cast into doubt. As the government argued at the Small trial, the contemporaneous evidence revealed Nordlicht's driving intent—paying the preferred. Small Tr. at 1675.

These two documents, one of which Nordlicht did not even write, do nothing to contradict the powerful evidence, presented to the jury at Nordlicht's own trial, showing that faced with a liquidity crisis, Nordlicht was determined to pay off the preferred equity holders and participated in a fraudulent scheme in order to do so.

## IV. There Is No Evidence of Government Misconduct

The government has accurately described the Francis Memo and its limited relevance to Nordlicht's intent throughout these proceedings. Nordlicht has not identified any government misconduct.

The government has not made any misrepresentations to this Court about the source of the information Hoffman and Piche provided to BakerHostetler. The defendant claims that the government falsely stated in its opposition to Nordlicht's first Rule 33 motion that: "any information in the [Francis Memo] reflecting Platinum's Bond holdings came not from Platinum, the Defendants or their co-conspirators, but from John Hoffman and Marizza Piche at Black Elk" is "simply false." Ltr. at 4–5 (citing ECF Dkt. No 787 at 58). But this statement is entirely true, and does not describe where Piche and Hoffman got this information. What the government (accurately) asserted was that the information provided to Paul Francis and included in the Francis Memo was provided to BakerHostetler by representatives of Black Elk Energy, who were not co-conspirators, and not by Nordlicht or any of his co-conspirators. The text of the brief is clear and the context confirms that this is the case. In that section of the government's brief, the government addressed a defense argument that Nordlicht himself had disclosed relevant information to BakerHostetler. In response, the government argued, as it has consistently argued throughout, that any "disclosure" of relevant information to BakerHostetler came not from Nordlicht, but from Black Elk, and this disclosure was not intended, foreseen, contemplated, or approved by Nordlicht. The original source of the information is not relevant to government's argument. As noted above, the information that Hoffman and Piche provided to Francis had to have come from someone with first-hand knowledge, a fact that the Francis Memo itself makes plain. See Francis Memo ("Platinum [h]as stated . . . ."). The notion that the government mispresented to anyone the original provenance of the information in the Francis Memo, which is clearly noted in the Francis Memo itself, is absurd and should be rejected.

10

Before the Second Circuit, the government also accurately described Nordlicht's purported role (or lack thereof) in the creation of the Francis Memo. In its brief to the Second Circuit, the government asserted that, "[t]he Coconspirators Had No Involvement in the Black Elk Memo to BakerHostetler" and that the Francis Memo "has no bearing on Nordlicht's intent." United States v. Landesman, et al., Case No. 19-3209, ECF Dkt. No. 37 at 106 (2d Cir. Jan. 7, 2020). Both of those statements are entirely accurate. As noted above and as argued throughout the Nordlicht trial and all the post-trial proceedings, there is no evidence indicating that the defendant nor any of his co-conspirators, had any involvement in providing information to Francis or knew that information had been provided to BakerHostetler litigators. The government's submission to the Second Circuit accurately noted this fact, which is critical because the question is what Nordlicht intended and not whether he was the underlying source for the information ultimately conveyed to the BakerHostetler litigators.[5]

The Hoffman 302, which the defendant has had since October 2018, does not change this conclusion or render the government's statements false. Even assuming that Nordlicht was the source of the information that Hoffman and Piche provided to BakerHostetler, it is a non sequitur to conclude that Nordlicht had anything to do with disclosing the information to Francis or drafting the Francis Memo. The Francis Memo itself makes plain that the information underlying the analysis came from someone else, likely Platinum. But whether or not Nordlicht was the source of the information in the Francis Memo is utterly irrelevant because there is no evidence in the record from either trial that Nordlicht, Levy, Small or any of the co-conspirators knew of or sanctioned providing that information to Francis. Indeed, the evidence, including the Francis Memo itself, indicates that Piche and Hoffman took those facts to Francis in an attempt to try and take actions to prevent Platinum from harming Black Elk. See Ex. 3 ("provide you with an outline of suggested actions to be taken on behalf of BEE in response to anticipated or suspected actions concerning BE's business being taken and which may be taken by Platinum and persons operating under its direction.").

Nordlicht also objects to generic statements in the government's opening and closing arguments that the defendant hid information about the bonds, thereby committing the charged fraud offenses. Ltr. at 10. As the jury at his trial, and later the Court of Appeals found, the evidence did establish that Nordlicht hid information about the bonds he controlled from the third party bondholders, and the Motion does not make any showing to the contrary.

Finally, as the government argued at trial and as Second Circuit found, the Francis Memo did not include the ultimate misrepresentation to investors—that the bonds held by Platinum had been transferred to Beechwood, Platinum's affiliate that was controlled by Nordlicht. To the extent Nordlicht made any statements to Hoffman, which Hoffman then went around Nordlicht to

---

[5] Similarly, the Second Circuit's conclusion that "there is no evidence in the record that Nordlicht provided the information that formed the basis for this memo" is also accurate, as the information communicated to the drafters of the memo came from Hoffman and Piche. See Ltr. at 9 n.5. Nordlicht's incomplete excerpt of the Second Circuit opinion aside, there was and is no evidence in his trial record that Nordlicht provided the information that formed the basis of the memo—indeed the memo itself was not part of the trial record—and the Second Circuit's finding is accurate.

share with Francis, Nordlicht did not tell Hoffman (or anyone else) that he had transferred bonds to Beechwood.

* * *

For the reasons set forth above, and in the government's prior submission in opposition to the defendants' motions under Rules 29 and 33, the government respectfully submits that the motion should be denied and this matter should proceed to sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:      /s/
David C. Pitluck
Lauren Howard Elbert
Nick M. Axelrod
Assistant U.S. Attorneys
(718) 254-7000