

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683 Direct
+1 212 698 3599 Fax

April 4, 2023

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC (E.D.N.Y.)

Dear Judge Cogan:

We represent defendant Mark Nordlicht. As we have explained in our prior motions, we believe that Mr. Nordlicht is innocent of the charges for which he has been convicted: The record is now undisputed that he told Black Elk's CEO that $90 million of its bonds were held by Platinum and friendly investors, and that the bond offering would redeem $60 million in bonds held by independent investors. Dkt. 971. Mr. Nordlicht's disclosures were inconsistent with any conceivable plan to trick Black Elk into duping its bond holders about the offering. In addition, the civil depositions of the previously unavailable Beechwood executives have now confirmed that Mr. Nordlicht did not control Beechwood, a fact necessary to his conviction. Dkt. 894.

Accordingly, we have renewed our Rule 33 motion before this Court and we have asked the U.S. Attorney to consider carefully whether this prosecution should continue to go forward. In advance of the joint hearing on loss scheduled for April 18, 2023, we respectfully submit this letter to explain that Mr. Nordlicht is not only innocent of the charged offenses, but there were in fact no victims. Under well-established principles of loss causation, the amendment to the bond indenture did not cause bond investors any economic injury, even if the government had a good faith basis to argue that Mr. Nordlicht had set about to "rig the vote" to ensure the passage of the amendment to the bond indenture. We therefore respectfully request that, if the Court proceeds to sentencing, it find no economic loss caused by the offenses of conviction.

## I. <u>Introduction</u>

Under the Sentencing Guidelines, the issue of loss is a critical factor bearing on Mr. Nordlicht's sentence. The Probation Department's loss determination added 18 levels to the offense to reach a total of 29. *See* Presentence Investigation Report of Mark Nordlicht ("PSR") ¶ 72 (May 27, 2022). The Probation Department concluded that loss would be difficult to prove and so it skipped over that issue and sought to calculate the gain from the conduct. Because the factual record and controlling caselaw demonstrate that the offense did not cause any loss, the Probation Department

could not consider gain, and the Probation Department compounded the error by including gains that were not received by Mr. Nordlicht or any co-conspirator.

At trial, the government argued that the Defendants had caused Black Elk to represent falsely to its bondholders that only unaffiliated bondholders would vote in the bond offering, and so the independent bondholders reasonably expected the indenture amendment to fail. Black Elk's bond offering gave bondholders the choice to tender their bonds and receive 100 cents on the dollar, or to retain their bonds and vote on the proposed amendment, which would allow the company to use the Renaissance sale proceeds to retire Black Elk's higher-interest obligation to the preferred shareholders. Ex. 1, Nordlicht Tr. 3831:2-18 (D. Yee). Two bondholders testified that they chose not to tender because they had believed the amendment vote would fail. *Id*. at 3833:4-8 (D. Yee); 5223:2-17 (T. Pulvino). The government argued that the amendment only passed because Beechwood, an allegedly affiliated company, was permitted to vote its bonds.

Even accepting the government's theory of the fraud for purposes of this motion, the "rigged vote" did not cause the bondholders any harm. We know this because Black Elk's bonds were publicly traded in the market and so the value of each bond was readily ascertainable, and the impact, if any, of the change in the bond indenture could be measured. The Second Circuit has held that the same principles of loss causation that govern civil securities litigation apply to calculating loss in criminal securities fraud cases under the Sentencing Guidelines. *See United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007). In evaluating a claimed loss on a publicly traded security, such as the Black Elk bonds, the Court thus considers whether the government can show a decline in the price of the bonds when the market learned of the results of the supposed fraud.

On August 14, 2014, Black Elk announced in its SEC filing that the indenture amendment had passed. If the adoption of the amendment truly impaired the value of Black Elk's bonds, then the publicly traded share price of the bonds would have dropped. Ex. 2, Expert Report of Dr. James Overdahl ("Overdahl Rep.") ¶¶ 26-27. Yet as reflected in the market data, and confirmed by the expert report of Dr. James Overdahl, the former chief economist of the U.S. Securities and Exchange Commission, the Black Elk bonds kept their value after the disclosure of the news. *Id.* ¶ 34. In fact, one of the government's "victim" witnesses testified that after the vote, he purchased ***more*** bonds at full price. *See* Ex. 1, Nordlicht Tr. 3956:4-9 (D. Yee). Any bondholder who chose not to tender in reliance on the belief that the indenture vote would fail could then have reconsidered the choice, sold the bonds at par value, and suffered no loss. Ex. 2, Overdahl Rep. ¶ 39.

If the bondholders chose not to sell the bonds, but instead remained invested in Black Elk, they did so knowing that Black Elk had distributed $70 million to its preferred shareholders, and thus, that the future returns on their investment would depend on market forces without any connection to the bondholder vote. That the price of the bonds did not change, and bondholders did not raise any complaint at the time, indicates that the indenture amendment did not cause any loss to the





bondholders. Thus, as a matter of fact and of law, the bondholders did not and could not have suffered any cognizable loss attributable to the claimed fraud.

In the PSR, the Probation Department does not identify any cognizable loss suffered by the bondholders. It admits that the bond prices were subject to the vagaries of the market, opines that the non-existent loss is "difficult to calculate," and then impermissibly jumps from the non-proven loss to calculating $7 million in "gain" from the offense based on distributions paid to certain Platinum investors who are neither defendants nor co-conspirators. PSR ¶ 62. Absent evidence of any loss, however, the Guidelines do not permit Mr. Nordlicht to be sentenced based on a gain, much less a "gain" received by others.

The government similarly makes no effort to show a loss, but instead articulates a theory of "gain" based on Black Elk's distributing $70 million to the preferred shareholders following the adoption of the amendment. Yet Black Elk's payments to retire bona fide obligations did not directly harm the bond investors, who retained the same economic rights in Black Elk to receive the payment of interest and principal. In its opposition to Mr. Levy's sentencing memorandum, the government offers the facile argument that, had Black Elk not distributed the $70 million, then perhaps it would have kept those funds in its bank account, and they may have been available to the bondholders when Black Elk ultimately declared bankruptcy a year later due to a precipitous decline in oil prices. Dkt. 922 at 8. But the Second Circuit's decision in *Rutkoske* does not permit a finding of proximate cause based, not on the market impact of the Defendants' conduct, but upon what happened to Black Elk when oil prices dropped a year after Black Elk amended the Indenture.

Under *Rutkoske*, the district court at sentencing must disaggregate the "loss caused by the fraud" from "other factors relevant to a decline in [the asset's] price" to ensure that defendants are only punished for harm legally attributable to their actions. 506 F.3d at 179-80. Here, the evidence demonstrates that Defendants' conduct did not harm the value of Black Elk's bonds. If the Defendants' actions had impaired the bonds, then their price would have plummeted on the public markets after the bondholders learned that the Indenture had been amended. That is not what happened. The price of Black Elk bonds remained essentially unchanged and even ***increased*** slightly. To the extent that the bond prices declined many months later, they declined because of market-wide factors impacting the entire oil and gas industry, not anything the Defendants did in the bond offering. Ex. 2, Overdahl Rep. ¶¶ 44-49. Given that the bondholder vote had no proximate impact on the Black Elk bonds, the government may not hold Mr. Nordlicht responsible for a loss caused by global market forces.

Because there was no loss, the Court cannot rely on "gain" as "an alternative measure of loss." *United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015) (explaining that a sentencing court is "authoriz[ed]" to use a gain calculation instead of a loss calculation "only if *there is a loss*." (quoting U.S.S.G. § 2B1.1 Application Note 3(B))). Further, because "loss" means "actual loss" and the word "gain" appears nowhere in the relevant Sentencing Guidelines, using gain as an alternative to loss is impermissible. *Cf. United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022)

(holding that "the ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss'" and cannot be expanded by § 2B1.1's Application Notes). But even if the Court did seek to measure the gain, the Probation Department errs by counting payments made to other parties, who were neither Mr. Nordlicht nor alleged co-conspirators. Mr. Nordlicht did not himself receive any proceeds at all from the Black Elk offering. So the true gain should be zero.

For these reasons, we respectfully ask the Court to determine that there is no loss and, if Mr. Nordlicht is to be sentenced, to reject the government's request to increase his offense level under U.S.S.G. § 2B1.1(b)(1)(J).

## II. <u>The Offense of Conviction Caused No "Loss."</u>

### A. <u>The Amendment to the Indenture Had No Impact on the Value of the Bonds.</u>

The amendment to the Black Elk Indenture did not cause a loss to any of the bondholders who chose not to tender. The consent solicitation and tender offer process began on July 16, 2014, and it ended on August 14, 2014. As part of the consent solicitation, Black Elk offered tendering bondholders a payment of $100 on their bonds, which was a premium to the then-prevailing market price of $97.835. *See* Dkt. 907-3 (Bloomberg list of historical Black Elk bond prices). Any bondholder who wanted to tender could have received $100 in exchange for each bond. Alternatively, the bondholder could have declined to tender; held on to the investment; and then granted or withheld consent to the proposed amendment.

At trial, the government presented two witnesses to help explain its theory of harm: Dixon Yee of Phoenix Investment Adviser LLC ("Phoenix") and Todd Pulvino of CNH Partners, LLC ("CNH"). Each owned approximately $7 million in Black Elk bonds through their respective hedge-fund employers. They both testified that in their view, the non-tendering, unaffiliated bondholders would vote against the indenture amendment, because the amendment allowed Black Elk to use the proceeds of the Renaissance sale to retire the preferred equity (which paid far higher interest rates than the bonds), rather than to retain the money or use it for some other purpose. *See* Ex. 1, Nordlicht Tr. 3832:21-3833:8 (D. Yee); 5211:8-14; 5214:12-17 (T. Pulvino). As Mr. Pulvino explained, if he knew the amendment would pass, then he "would have thought more about tendering [the] notes" because he "wouldn't have wanted to hold th[ose] notes without the protective covenants that were in place." *Id.* at 5223:8-11. The two witnesses claimed to have been deceived into declining to tender because they believed the amendment vote would fail.

If the government's theory were correct, then the market price for the bonds would have dropped on the date that Black Elk publicly announced that the amendment had been approved. This is black-letter securities law, which fully applies here. As the Second Circuit made clear in *Rutkoske*, there is "no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *Rutkoske,* 506 F.3d at 179. To that end, "'[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id.*





(quoting *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)); *see also United States v. Zolp*, 479 F.3d 715, 719 (9th Cir.2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines."). Upon Black Elk's disclosure that the amendment vote had passed, Yee, Pulvino, and other bondholders who supposedly believed that it would fail would have learned they were mistaken, and, according to the government's theory, the market price of the publicly traded bonds would have inevitably declined after Black Elk paid the $70 million to the preferred shareholders.

But that did not happen. On August 14, 2014, Black Elk issued a press release publicly announcing that the consent solicitation had passed and that the indenture had been amended. The bondholders learned on that date that the "protective covenants" were no longer in place, and that Black Elk had redeemed the preferred shares with the proceeds of the Renaissance sale. Yet the price of Black Elk bonds did not decrease. The bond price barely moved at all. It even *increased* shortly thereafter:




In his expert report, Dr. Overdahl, the former Chief Economist for the U.S. Securities and Exchange Commission, confirms the absence of any price impact. He runs a statistical analysis to determine what effect, if any, the consent solicitation had on Black Elk's bond price. Dr. Overdahl conducted that event study by comparing the daily movements of Black Elk's bond price against the S&P 500 index and the industry-specific S&P index for oil and gas companies. Ex. 2, Overdahl





Rep. ¶ 28. By comparing the movement of the price of Black Elk bonds with other indexes that correlate with the public market, Dr. Overdahl concluded that the bond price's reaction—or lack of reaction—means that "there is no loss associated with the bond covenant change and therefore no harm to Black Elk bondholders." *Id.* ¶ 34.

Specifically, on July 10, 2014, with the consent solicitation pending, the bonds were trading at $97.84. *See id.* ¶ 31. On August 19, right ***after*** the press release, the bonds were trading at $99.94. *See id.* ¶ 33. And on August 22, 2014, the following week, the bonds increased to $100.27. *See id.* ¶ 39. Therefore, with the market fully aware of the indenture amendment, Black Elk bonds, after the change to the indenture, were trading higher and even ***above par***.[1]

Pulvino and Yee both testified that they saw Black Elk's press release announcing that the indenture amendment had passed shortly after it was issued. *See* Ex. 1, Nordlicht Tr. 3833:9-17 (D. Yee); 5211:20-5212:1 (T. Pulvino). At this point, the indenture had already been amended. The protective covenants Pulvino feared losing were gone. Both Pulvino and Yee, if they were unhappy with the outcome, could have sold their bonds at the prevailing market price. They could have even done better than if they had tendered their bonds during the consent solicitation, since Black Elk bonds were trading at $100.27—above par—on August 22, 2014. Therefore, even accepting Yee and Pulvino's testimony that they might have tendered had they known that the votes of affiliated bondholders would be counted, those bondholders could have still sold their bonds ***after*** they knew all the relevant facts and received $100 or even more. *See* Ex. 2, Overdahl Rep. ¶ 39.

Put simply, if Defendants' conduct had harmed the bondholders, then the market would have reacted accordingly. *See e.g., United States v. Kaleil Isaza Tuzman*, No. 15 CR. 536 (PGG), 2021 WL 3284231, at *19 (S.D.N.Y. July 29, 2021) (finding no loss when "assuming . . . the market manipulation scheme charged . . . was successful," the government did not establish "a decline in [the relevant] stock price."). But the market did not react negatively at all. As a result, the government cannot establish that the bondholders suffered any loss whatsoever based on the alleged misrepresentation concerning affiliated votes.

B. Extrinsic Market Factors Caused the Subsequent Decline in Black Elk Bond Prices.

Instead of tendering, Pulvino, Yee, and other bondholders made the investment decision to keep their bonds and to hold onto that investment after the indenture amendment had been adopted. Not only that, but Yee's firm, Phoenix, increased its investment in Black Elk by purchasing over $500,000 ***more*** in bonds, ***for greater than par value***, just days later, and Phoenix then bought

[1] This means that some number of Black Elk bondholders sold their bonds after the indenture was changed and received above par for those bonds. These bondholders clearly did not suffer any loss and would certainly need to be excluded from any "loss" calculation. So, too, would any bondholders who purchased bonds after the indenture was changed.

another $11 million in bonds in the following months. *See* Ex. 3, Small Tr. 984:12-985:12 (D. Yee). Pulvino's firm decided ***not*** to sell bonds after the consent solicitation. *Id.* at 760:19-761:3 (T. Pulvino). After Black Elk's bankruptcy, it made an additional investment in Black Elk and ***gained*** about $4.5 million overall. *See id.* at 723:18-725:11 (T. Pulvino).[2] Even the purported victims of the fraud, then, behaved in a way that is inconsistent with the idea that the consent solicitation harmed them. They did not divest their bonds—as they could have done, without any loss, after the amendment passed.[3] They chose to remain invested—in fact, increasingly invested—in Black Elk.

These sophisticated investors had sound economic reasons for not selling their bonds either in the tender or after the indenture was changed. The bonds were paying a high interest rate of 13.75%, and Black Elk had not missed a single interest payment. Moreover, independent third-party valuation firms had confirmed both before and after the consent solicitation that Black Elk had more than sufficient assets to meet its obligations to each of its bondholders, its preferred equity holders, and its common equity holders:

- The third-party valuation for June 30, 2014—the quarter immediately before the consent solicitation—concluded that Black Elk had equity value in the range of $168-201 million, ***after deducting*** the value of the $150 million in bonds and the $104 million in preferred equity. *See* Dkt. 907-4, 1-DX-5214 at Sterling 000004125 (Sterling valuation for the quarter ending June 30, 2014).

- The third-party valuation for September 30, 2014—the quarter immediately after the change to the indenture (and after oil prices had started their precipitous decline)—concluded that Black Elk had equity value in the range of $49-$74 million ***after deducting*** the value of the remaining $138 million in bonds and the remaining $8 million in preferred equity. *See* Dkt. 907-5, 1-DX-5215 at EDNY-PP-SW1-002398880 (Sterling valuation for the quarter ending September 30, 2014).

---

[2] As Mr. Pulvino explained at Mr. Small's trial, CNH provided $2 million in debtor-in-possession ("DIP") financing to Black Elk during its bankruptcy. In exchange, its bonds "jumped to the front of the line" in the bankruptcy proceedings. All told, CNH "got 100 percent of [its] money back for [its] bonds," and it also "got [its] money back for the $2 million [it] put in for the [DIP] loan at 7 and a half percent." Ex. 3, Small Tr. 725:1-726:13 (T. Pulvino).

[3] This observation is not unique to CNH and Phoenix. Any of the investors owning the remaining $24 million in Black Elk bonds learned of the supposed fraud on August 14, 2014 and could have exited their positions, without suffering a loss, after the vote was disclosed. Some may have even done so, further limiting the potential losses the alleged fraud could have possibly caused.

In light of these undisputed facts, the Court instructed the jury that Platinum's valuations were proper and correct.[4] And Dr. Overdahl similarly opines that these valuation reports "provide further confirmation that the Indenture Amendment did not affect market participants' assessment of the value of Black Elk bonds." *See* Ex. 2, Overdahl Rep. ¶ 38. The public bond markets expected that Black Elk could meet its obligations on the bonds as they became due because they valued the Black Elk bonds after the indenture amendment at par or above.

Although the Black Elk bonds traded at or above par in the weeks after the indenture amendment was publicly disclosed, the price of the bonds ultimately did decline, but not because of anything done by the Defendants. Black Elk was an oil and gas company. The value of its assets and therefore, its cash flow, depended heavily on the market price of oil. *See* Ex. 2, Overdahl Rep. ¶¶ 44-45. Sophisticated investors like CNH and Phoenix recognize these risks when they purchase assets like Black Elk bonds. Sometimes investors are compensated handsomely for assuming such risk. Sometimes, like here, the market turns against them, and they may lose their investment. Indeed, the Probation Department admitted in the PSR that these "external, market-related forces are out of the defendants' control or ability to foresee." PSR ¶ 62.

There can be no dispute that the decline in oil prices, not the indenture amendment, caused the decline in the value of Black Elk's bonds in the following months. In the 90 days following the mid-August 2014 disclosure of the indenture amendment, the price of oil dropped by more than 20%.[5] That decline led to a significant drop in bond prices for firms across the oil and gas sector. As Dr. Overdahl explains, because of this decline, multiple credit rating agency reports "tracked an increase in default risk among oil and gas companies coinciding with sustained low commodity prices." Ex. 2, Overdahl Rep. ¶ 46 (internal quotation omitted). Thus, "Standard & Poor's also downgraded ratings for Black Elk along with 7 other peers in 2015, and lowered the outlook of 12 additional companies, showing that subsequent declines in Black Elk bond prices are correlated with the decline in oil and gas prices." *Id.* ¶ 47. "[T]he decline in Black Elk bond prices coincided with the decline in prices of Black Elk's peers." *Id.* ¶¶ 48-49 & Overdahl Exs. 5-6.

For example, according to Bloomberg data, the price of one of Energy XXI LTD's bonds (EJ945881 Corp) decreased by over 25% over the same period. Bonds issued by W&T Offshore

---

[4] Ex. 1, Nordlicht Tr. 7101:9-14 ("Ladies and Gentlemen of the Jury, you have heard testimony and seen exhibits about Platinum's valuation of its assets. Judge Cogan has found that the valuation of Platinum's assets was proper and you must accept that as a fact. Therefore, fraudulent valuations cannot serve as a basis to convict any defendant.").

[5] The 90-day period is particularly relevant because Application Note 3(F)(ix)(I) to U.S.S.G. § 2B.1.1 says that one way in which a court may measure loss is by "calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market." That measurement, though, is only relevant when the disclosure of the fraud causes an actual drop in the stock price. *Rutkoske,* 506 F.3d at 179.

Inc. (EI9072295 Corp) and Midstates Petroleum (EJ8621850 Corp) experienced declines of 13% and 21%, respectively. The list price of Black Elk bonds decreased by about 11%, which was notably less than these peer firms.[6] What is clear, though, was that the cause of this decline was not Defendants' conduct, but the global drop in oil prices.

The below chart further demonstrates the impact that the historic drop in the price of oil imposed on Black Elk and peer firms:

[6] In fact, the 11% drop in list price overstates the decrease in value, since the bond's list price does not include the accrued interest. Because Black Elk bonds paid 13.75% in annual interest, a person holding the bonds from August 2014 to November 2014 would be entitled to receive $3.4375 in accrued interest. In a sale transaction, the bond holder would thus be entitled to receive, not just the list price, but also payment for that accrued interest, which means the value of the bond would have decreased only around 7% over this period.






AGGREGATE PERFORMANCE
Price change of all securities and Price change of Black Elk
Date Range: Aug 15, 2014 - Nov 15, 2014
Chg % by Date and Company Name
Company Name
Black Elk Energy Offshore Operations LLC
Clayton Williams Energy Inc
Concho Resources Inc
Energy XXI Gulf Coast LLC
Energy XXI Ltd
Gulfport Energy Operating Corp
Linn Energy LLC / Linn Energy Finance Corp
Midstates Petroleum Co Inc / Midstates Petroleum Co LLC
Oasis Petroleum Inc
PetroQuest Energy Inc
Swift Energy Co/Texas
W&T Offshore Inc
Whiting Petroleum Corp
5%
0%
-5%
-10%
-15%
-20%
-25%
-30%
Chg %
Sep 2014
Oct 2014
Nov 2014
Date

Looking even further after August 2014, the price of oil had a devastating impact on Black Elk's finances, and therefore, its bond prices. Right before the indenture was amended, the price of oil per barrel was $103.59. A year later, when Black Elk declared bankruptcy in August 2015, oil was trading at $42.87—a decline of nearly 60%. This historic decline in oil prices made Black Elk unable to service its debt and is entirely responsible for the losses incurred by the bondholders who continued to hold Black Elk bonds in the year following August 14, 2014.[7]

In short, there is no reasonable argument that Defendants' effort to "rig" the amendment vote caused any loss to the unaffiliated bondholders who declined to tender. Once the market learned of the adoption of the amendment, the market did not react because Black Elk remained solvent, and the amendment did not have any material impact on Black Elk's ability to service its debt. In the days after that disclosure, the bondholders could have sold their bonds at a profit. The price of the bonds only began to decrease in the weeks following disclosure because of a historic decline in oil prices, which similarly impacted the value of Black Elk's peer firms and independently caused Black Elk's bankruptcy. Under well-established sentencing principles, Mr. Nordlicht may not be held accountable for any losses caused by external market events.

C. <u>Only a Minority of Bondholders Could Even Be Considered as Potential Victims.</u>

In addition to the fact that there was no loss, the government's claim that $70 million is an appropriate measure of harm fails to consider that only a fraction of the bondholders could possibly have been the victims of the offense. As of July 2014, Black Elk had $150 million in bonds outstanding. Simple math establishes that only $38.735 million of Black Elk bonds—those owned by bondholders who chose not to tender and voted against the amendment—could have suffered a potential injury from Defendants' conduct. Roughly two-thirds of the outstanding bonds were owned by PPVA, other Platinum entities, or Beechwood—these entities cannot simultaneously be considered victims and instruments of the fraud, as the PSR recognizes. *See* PSR ¶ 62. Another significant group of bondholders, who held roughly $11.433 million in bonds, voted to tender their bonds. They were paid in full, experienced no loss, and are not victims. Finally, an additional group of bondholders holding $600,000 in bonds voted not to tender, but to amend the indenture, *i.e.*, they independently agreed that Black Elk should retire the company's higher-interest obligation to the preferred shareholders—the same outcome that the government claimed to be the object of the conspiracy. Those bondholders were not victims, because they supported the indenture amendment.

Accordingly, even if one assumed that the Defendants' conduct had proximately caused an injury to any of the bondholders, the bondholders who could have experienced a loss held only $38.735 million of Black Elk bonds. Thus, the independent bondholders who declined to tender and voted

---

[7] The fall in the price of oil affected Black Elk's finances so severely that, even if the Renaissance Sale proceeds had not been used to pay the preferred equity holders, Black Elk bondholders still would have suffered losses in the bankruptcy.





against the amendment represented less than $40 million in outstanding bonds, which rebuts the government's argument that Defendants' conduct caused, "conservatively," $70 million in losses. *See* PSR ¶ 60. And the number in fact is even lower, because the Black Elk bonds were publicly traded, and as discussed above, bondholders could have sold their bonds at a profit ***after*** the results of the indenture vote had been disclosed. Those bondholders, who later made money off their investment, could not be victims of any fraud.

Whether the number is $70 million, $38.735 million, or something less, the government's analysis assumes that the "fraud" involved paying the preferred equity holders with the proceeds from the Renaissance sale, and that Defendants' actions took money that would otherwise have gone to the bondholders. But this assumption too is flawed because the bondholders did not have any contractual right to receive payment from the Renaissance sale. Even prior to the amendment, the indenture granted Black Elk the discretion to use the proceeds in several different ways. *See* Dkt. 907-6, GX-9507 at BH-BEFILE0013935 (explaining, pre-amendment, that Black Elk could have used the asset sale proceeds to, for example, "make capital expenditures or purchase long-term assets" instead of paying the bondholders); *see also* Ex. 1, Nordlicht Tr. 3920:25-3921:8; 3936:9-14 (D. Yee testifying that the bondholders were not entitled to the asset sale proceeds); 4978:15-25 (R. Shearer testifying to the same effect). Accordingly, as the Probation Department recognizes, the $70 million was not property taken from the bondholders. The appropriate question is whether Black Elk's decision to use the $70 million to redeem the higher interest preferred shares caused any cognizable loss to the bondholders who chose not to tender in the offering. And that answer is no.

## III. <u>The "Gain" Calculation in Mr. Nordlicht's PSR Is Improper.</u>

The PSR calculates the Guidelines loss based on an estimate of the Defendants' gain, but that avenue is not legally available. A sentencing court is "authoriz[ed]" to use a gain calculation instead of a loss calculation "only if *there is a loss*." *Romano*, 794 F.3d at 339 (quoting U.S.S.G. § 2B1.1 Application Note 3(B)). Other circuits agree. *See United States v. Miller*, 588 F.3d 560, 567 (8th Cir. 2009); *United States v. Haddock*, 12 F.3d 950, 960 (10th Cir. 1993). Because the bondholders did not proximately suffer any loss because of Defendants' conduct, then the Probation Department could not lawfully rely on gain as an alternative measure of harm.

In addition, the Court should not consider gain as an alternative to loss because it is contrary to the plain meaning of "loss" under § 2B1.1. The Sentencing Guidelines do not say that the Court should sentence a defendant based upon "gain." In fact, that word that does not appear in § 2B1.1. The concept of "gain" appears only in an Application Note to § 2B1.1, which invites the Court to use gain as an alternative to loss "if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 Application Note 3(B). But while the Sentencing Guidelines are legislative rules, the Sentencing Commission's Application Notes are interpretive rules that are not blindly followed by the courts. *See Stinson v. United States*, 508 U.S. 36, 44 (1993). As the Supreme Court recently clarified, the Court will follow an interpretive rule only after exhausting "all the 'traditional tools' of construction" and determining that the legislative rule, here the Guideline, is





"genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). There is nothing "genuinely ambiguous" about "loss" under § 2B1.1. As the Third Circuit recently held, the ordinary meaning of "loss" is "actual loss." *See Banks*, 55 F.4th at 257 (applying *Kisor* to reject the Application Notes' impermissible expansion of "loss" under § 2B1.1). And "loss" plainly cannot be interpreted to mean "gain." Indeed, "loss" is defined in opposition to "gain." *See id.* (collecting dictionary definitions of "loss" around the time the Sentencing Guidelines were adopted); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 706 (1988) (listing the third definition of "loss" as "a failure to gain, win, obtain, or utilize"). Therefore, even if the government could establish "loss" from the offense, the Court should give Application Note 3(B) no deference and follow the plain meaning of § 2B1.1. The Court would sentence based upon whatever "actual loss" the government could establish (which in fact is zero here), rather than enhancing the sentence under § 2B1.1 and treating gain as interchangeable, rather than irreconcilable, with loss.

Even if the Probation Department could rely on gain, the PSR's calculation is incorrect. It is undisputed that Mr. Nordlicht himself did not receive any gain from the fraud. Nonetheless, the PSR calculates Mr. Nordlicht's gain by including: (1) about $7.7 million paid to Jules Nordlicht and the Jules/Barbara Nordlicht Foundation; (2) $256,679 paid to Mr. Levy; (3) $102,672 paid to Mr. Small; and (4) about $1 million paid to the Huberfeld Family Foundation. PSR ¶ 59. Aggregating these values, the PSR concludes that Mr. Nordlicht should be sentenced based on a total gain of $9,059,351. PSR ¶ 62. But this analysis presupposes that the gains went to Mr. Nordlicht or his co-conspirators. Yet only two of these parties were in fact even alleged to be co-conspirators, and therefore, most of these payments could not be viewed as "gain" for sentencing purposes.

Although the gains of co-conspirators may be included, *see United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011) (collecting cases), the government did not present ***any*** evidence that Jules Nordlicht (Mr. Nordlicht's father), the Jules/Barbara Nordlicht Foundation, or the Huberfeld Family Foundation were co-conspirators in the Black Elk "scheme." Indeed, there was no evidence presented of any kind that Jules Nordlicht or either Foundation played the slightest role in the conspiracy. Accordingly, the amounts received by Jules Nordlicht and the Foundations may not be included as part of "gain." The PSR thus improperly attributes $8,700,000 million in gain to Mr. Nordlicht and his co-conspirators.

The PSR's alternative basis for including these amounts appears to be that Jules Nordlicht and Murray Huberfeld were family members of Mr. Nordlicht and Mr. Levy. But we are not aware of any legal authority that exists—either in the Guidelines or in the caselaw—that money received by investors who are part of a defendant's extended family may properly be included as a "gain" under the Guidelines. Moreover, neither the Jules/Barbara Nordlicht Foundation nor the Huberfeld Family Foundation are relatives of Defendants. Those parties are charitable foundations for which no family member of a defendant did or could receive ***any*** of the proceeds. Accordingly, the factual premise underlying the inclusion of those amounts is simply wrong.

The remaining $359,351 attributed to Mr. Levy and Mr. Small is also improperly included in the calculation. Black Elk transferred proceeds from the Renaissance Sale to PPVA's "Black Elk" account, PPVA's "Sterling" account, PPCO, and PPLO. PSR ¶ 59. Black Elk did ***not*** transfer proceeds from the Renaissance Sale to any Defendant or any co-conspirator, as the PSR incorrectly suggests. *See* PSR ¶ 52 (stating that Defendants were able to "extract the proceeds of the Renaissance Sale from Black Elk"); PSR ¶ 59 (stating that "Black Elk transferred proceeds from the Renaissance Sale to the defendants [and] their co-conspirators"). That is because Black Elk used the proceeds from the Renaissance Sale to pay its preferred equity holders. No Defendant or co-conspirator held any preferred equity in Black Elk and, therefore, no Defendant or co-conspirator directly benefited from this distribution.

Defendants and co-conspirators invested in Platinum Partners Black Elk ("PPBE"), but that fund held Black Elk *bonds*, not preferred equity. PPCO—which received some of the Renaissance Sale distribution—did eventually use some of its assets to wind down the PPBE fund and repay its investors, including some of the Defendants and co-conspirators, but this money was used to purchase the interests owned by the fund (including Black Elk bonds), not to transfer Renaissance Sale proceeds to Defendants.

Further, even if $359,351 could be viewed as going to Mr. Nordlicht's co-conspirators because of their indirect ownership in preferred equity, the distribution cannot be treated as "gain" as though the entire proceeds were the result of the offense. Preferred equity holders had a legal claim to Black Elk's assets. By using the Renaissance sale proceeds to pay the preferred equity holders, Black Elk effectively reduced a high-interest obligation on its balance sheet. The preferred shareholders did not receive anything they were not legally owed. Stated differently, shares of preferred equity had a market value ***before*** the consent solicitation passed, precisely because they entitled their owners to a share of Black Elk's assets. The preferred equity payment therefore was given to retire the preferred equity's claim on the company, and the true gain from this payment would be limited to the difference in value between the preferred equity before the payment and the cash received after. It is simply improper to ignore the benefit to the company of retiring an expensive obligation while assuming, as the PSR's gain calculation implicitly does, that the proceeds paid to these shareholders was a windfall to them, as though the preferred shares had otherwise been without value.

In sum, because the fraud did not result in a loss, Mr. Nordlicht should receive no enhancement for the specific characteristics of his offense under the Sentencing Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(J). Even if there were some loss and a gain calculation were permissible, which it is not, Paragraph 72 of the PSR incorrectly calculates the gain from Mr. Nordlicht's fraud. The gain from the fraud is zero, which again would result in no enhancement.

## IV. <u>Conclusion</u>

Mr. Nordlicht's conduct caused no harm at all to Black Elk bondholders, and he did not receive any payments from it. He should not be punished simply because an unprecedented decline in oil

prices caused Black Elk to go bankrupt a year after the consent solicitation passed. The Court should decline to increase Mr. Nordlicht's offense level under U.S.S.G. § 2B1.1(b)(1)(J).

Respectfully submitted,

/s/ *Andrew J. Levander*

Andrew J. Levander
Steven A. Engel
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3683
andrew.levander@dechert.com
steven.engel@dechert.com

*Counsel for Mark Nordlicht*

cc: All Counsel (via ECF)