

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683  Direct
+1 212 698 3599  Fax

May 30, 2023

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC (E.D.N.Y.)

Dear Judge Cogan:

We represent defendant Mark Nordlicht. Pursuant to the Court's May 16, 2023 direction, we submit this letter on behalf of Mr. Nordlicht and his co-defendant, David Levy, to address the impact of *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), on the convictions in this matter. We respectfully submit that the Supreme Court's decision requires that the convictions be vacated.

Mr. Nordlicht has previously explained why his conviction should be vacated: The record is now undisputed that he told Black Elk's CEO that $90 million of its bonds were held by Platinum and friendly investors, and that the bond offering would redeem $60 million in bonds held by independent investors. Dkt. 971 at 6-10. These disclosures were inconsistent with any conceivable plan to trick Black Elk into duping its bondholders, and they were conveyed to and memorialized by Black Elk's lawyers at BakerHostetler in the Francis Memo. In addition, the civil depositions of the previously unavailable Beechwood executives have confirmed that the defendants did not control Beechwood, a fact necessary to their conviction. Dkt. 894. Accordingly, we have renewed our Rule 33 motion and requested that the U.S. Attorney reconsider this case. Although the government opposed our renewed motion largely on procedural grounds, such grounds do not permit the government to convict an innocent man contrary to the evidence. Dkt. 988 at 1-2.

In any event, there cannot even be an arguable procedural objection to the Court's consideration of *Ciminelli*. *See, e.g.*, *United States v. Parasmo*, No. 19-CR-1 (JMA), 2023 WL 1109649, at *15 n.5 (E.D.N.Y. Jan. 30, 2023) (explaining that although the defendant "filed his Rule 33 motion approximately nine months after he was convicted at trial, the Court will consider the motion because it was filed shortly after the Supreme Court's decision in *Ruan*"); *United States v. Mangano*, No. 16-CR-540 (JMA), 2022 WL 65775, at *23 (E.D.N.Y. Jan. 6, 2022) ("A significant intervening change in law constitutes a valid basis to extend time under Rule 45(b)(1)(B)."). The Supreme Court's rejection of the government's very theory of prosecution here warrants the vacatur of the convictions.



*Ciminelli* rejected the "right to control" theory of fraud, which the Court of Appeals had previously permitted the government to pursue in this Circuit. In *Ciminelli*, the government had charged the defendants with conspiracy to commit wire fraud based on their paying an associate of New York's governor to choose qualifications for state-funded contracts that would ensure the selection of Ciminelli's company. 143 S. Ct. at 1125. The government argued that the defendants defrauded Fort Schuyler, the contracting party, by depriving it of the "economically valuable information" necessary to make a discretionary economic decision, i.e., the awarding of the contracts. *Id.* at 1126. The Second Circuit affirmed the conviction on the ground that by "rigging the RFPs to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information." *Id.* (quoting *United States v. Percoco*, 13 F.4th 158, 171 (2d Cir. 2021)).

By a unanimous vote, the Supreme Court reversed, holding that the government's "right to control" theory impermissibly expanded the scope of the federal fraud statutes. The Court explained that "[t]he federal fraud statutes criminalize only schemes to deprive people of traditional property interests," and because "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest," the fraud statutes did not criminalize Ciminelli's conduct. *Id.* 1124, 1128. The Court criticized the atextual expansion of the fraud statutes "to protect an ever-growing swath of intangible interests unconnected to property," which threatened to "make[] a federal crime of an almost limitless variety of deceptive actions." *Id.* at 1128. In short, the Court held that, to convict for fraud, the government must prove that the defendants sought to deprive the victims of money or another tangible property interest. The deprivation of an intangible right to more accurate information, even where such information bore on an important financial decision, was not sufficient.

*Ciminelli* applies with full force here. At trial, the government relied on the "right to control" theory to win its convictions against Mr. Nordlicht and Mr. Levy. The government argued that the defendants deprived the Black Elk bondholders of valuable economic information (the fact that entities affiliated with Platinum would vote Black Elk bonds) that was necessary for the bondholders to make a discretionary economic decision (whether to tender their bonds in the consent solicitation). Indeed, in its closing argument, the government told the jury that the defendants' actions were fraudulent because (1) they deprived bondholders of information and (2) the bondholders would have done something different if they had this information:

> ***The bondholders would have wanted to know if this vote was rigged, that it was corrupt.*** They would have wanted to know that, that the people who were supposed to be not influencing the vote were the very people who had their hands in it making sure it went their way. Dixon Yee and Todd Pulvino told you how important this would have been to them. ***They said if they had known the truth about what was happening here, that Platinum controlled 98 million in bonds and the vote was fixed from the start, they would***



> ***have made a different decision about what to do with their bond[s]***
> or they would have tried to somehow undo this illegal vote.

Ex. 1, Nordlicht Tr. 6682:17-6683:3; *see also id.* 5208:17-5210:22 (T. Pulvino testifying that the number of friendly bondholders was important in deciding whether to tender); *id.* 3832:5-3833:8 (D. Yee explaining why Phoenix did not tender).

This "right to control" theory was the only one the government ***could*** advance at trial, since the allegedly rigged vote did not deprive the Black Elk bondholders of any tangible property interest.[1] Both before and after the consent solicitation, the bondholders had all of the bonds that they chose not to tender, with the same rights to payment that they had before. And the price of Black Elk bonds did not react ***at all*** to the passage of the consent solicitation, confirming that it had no effect on the bondholders' property rights. *See* Dkt. 994 at 4-6 (explaining why there was no loss to the bondholders); *id.* Ex. 2 at ¶ 50 (report of Dr. James Overdahl confirming that "the Indenture Amendment had no impact on Black Elk bond prices").

Even if some bondholders were upset that the Renaissance sale proceeds were used to pay off Black Elk's preferred shareholders, the bondholders were not themselves deprived of any money or property when Black Elk amended its indenture. The bondholders never had a contractual right to the Renaissance sale proceeds and so could not have lost any property rights when the consent solicitation passed. *See* Ex. 1, Nordlicht Tr. 3920:25-3921:22; 3936:9-14 (D. Yee testifying that the bondholders were not entitled to the asset sale proceeds); *id.* 4978:15-25 (R. Shearer testifying to the same effect); *see also* Dkt. 994 at 12. Even before the consent solicitation, the Renaissance sale proceeds could have been used for purposes other than paying the bondholders, like paying down Black Elk's accounts payable or buying long-term assets. *See* Dkt. 907-6, GX-9507 at BH-

---

[1] Thus, the "right to control" theory here differs materially from a typical securities fraud case where, for instance, the government charges the defendant with disseminating false information in the market to dupe investors into buying a security at an artificially inflated price. In such a case, the defendant seeks to deprive the purchasers of money by getting them to pay more for the security than it is truly worth. By contrast, here, the government's theory was that, had the defendants disclosed that the affiliated bonds would vote, then the bondholders "would have made a different decision about what to do with their bond[s]," namely tender them at par. Ex. 1, Nordlicht Tr. 6683:1-6683:2. The government argued that bondholders were deprived of their right to make an informed decision by the alleged fraud, but it could not argue that the bondholders actually lost money in the consent solicitation because, once the results of the vote were announced, the price of Black Elk bonds did not drop, and in fact, increased in the following weeks. *See* Dkt. 994 at 4-6.

Furthermore, there is no factual dispute that the tender offer was a bona fide, genuine offer that the bondholders could have accepted or declined. In fact, holders of approximately $11 million in bonds, a substantial amount, chose to tender and were paid 100 cents on the dollar. *See id.* at 11. Other bondholders chose not to tender. The only impact of the alleged scheme related to the independent bondholders' discretionary tender decision.




BEFILE0013935 (explaining, pre-amendment, that Black Elk could have used the proceeds to "repay . . . Obligations under a Credit Facility" or "make one or more capital expenditures"). And any bondholders upset by the alleged fraud could have sold their bonds at a price ***above par*** after the consent solicitation passed. The fact that the two bondholders who testified at trial did not—and in fact either held onto their bonds or bought more—confirms that they were not deprived of any money or property. *See* Ex. 1, Nordlicht Tr. 5214:7-5215:2 (T. Pulvino testifying that he held bonds after the consent solicitation); *id.* 3956:4-14 (D. Yee testifying that he bought more bonds after the consent solicitation). The only interest of which the bondholders were allegedly deprived by the consent solicitation was the opportunity to decide, with full information, how they would exercise their discretion in the consent solicitation vote. This is precisely the sort of interest that the Supreme Court held to be insufficient to support the fraud conviction in *Ciminelli.*

It is also clear that the jury convicted on the "right to control" theory advanced by the government. Consistent with the then-prevailing law in the Second Circuit, the Court's instructions to the jury on what it meant "to defraud" the Black Elk bondholders permitted the jury to convict under a "right to control" theory. *Cf. Ciminelli,* 143 S. Ct. at 1125 (noting that the jury was instructed "consistent with the right to control theory"). The Court made clear that "fraud" is simply "a general term" that "encompasses all efforts and means that individuals devise to unlawfully, willfully, and intentionally take advantage of others." Ex. 1, Nordlicht Tr. 7142:23-7143:1; *see also id.* 7142:22-23 ("A device, scheme or artifice to defraud is a plan for the accomplishment of an unlawful objective."). This instruction, coupled with the government's closing argument explaining that if they had the relevant information then the bondholders would have "made a different decision about what to do with their bond[s]," leaves no doubt that the jury could have—and indeed, likely—convicted Mr. Nordlicht and Mr. Levy based on the government's "right to control" theory. Ex. 1, Nordlicht Tr. 6683:1-6683:2.

*Ciminelli* requires that all of the convictions be vacated. The jury convicted Mr. Nordlicht and Mr. Levy of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud. *See* Dkt. 773 at 2. The wire fraud conspiracy count is the same as in *Ciminelli*. *See* 143 S. Ct. at 1126 ("The jury found Ciminelli guilty of . . . conspiracy to commit wire fraud."). To convict on the securities fraud charges, the jury was similarly instructed that it could convict upon finding that the defendants had employed a "scheme or artifice to defraud." Ex. 1, Nordlicht Tr. 6595:14; *id.* at 7142:22-23; *compare also* 17 C.F.R. § 240.10b-5 *with* 18 U.S.C. § 1343. As *Ciminelli* explained, the Court has consistently interpreted the federal fraud statutes based on "the 'common understanding' of the words 'to defraud', which referred 'to wronging one in his property rights.'" 143 S. Ct. at 1126 (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)).

In concluding that fraud requires the deprivation of a tangible property right, *Ciminelli* relied upon that "common understanding" in 1952, "when the [wire fraud] statute was enacted." *Id.* The Court had previously reached the same conclusion with respect to the mail fraud statute, which was adopted in 1862. *See Cleveland*, 531 U.S. at 19 (explaining that the addition of the words "for obtaining money or property" to the mail fraud statute in 1909 "signaled no intent by Congress to



'depar[t] from [the] common understanding' that 'the words 'to defraud' commonly refer 'to wronging one in his property rights'" (quoting *McNally v. United States*, 483 U.S. 350, 351 (1987))). It follows that Congress adopted the same "common understanding" tying fraud to the deprivation of tangible property rights in 1934 when it enacted the federal securities laws and the SEC adopted its implementing rules. Because the federal definition of a "scheme or artifice to defraud" requires an effort to deprive the victims of tangible money or property, all three of the "right to control" convictions must be vacated.

For these reasons, and for the reasons previously articulated in the pending Rule 33 motion, Mr. Nordlicht and Mr. Levy respectfully request that their convictions be vacated.

Respectfully submitted,

/s/ *Andrew J. Levander*
Andrew J. Levander
Steven A. Engel
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3683
andrew.levander@dechert.com
steven.engel@dechert.com

*Counsel for Mark Nordlicht*

cc: All Counsel (via ECF)