

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683 Direct
+1 212 698 3599 Fax

June 20, 2023

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC (E.D.N.Y.)

Dear Judge Cogan:

We represent defendant Mark Nordlicht. We respectfully submit this reply on behalf of Mr. Nordlicht and his co-defendant David Levy in further support of the May 30, 2023 letter explaining why the Supreme Court's recent decision in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), requires that the convictions be vacated.

*Ciminelli* presents yet another reason why the convictions should be overturned. *See* Dkt. 971; Dkt. 988. As discussed previously, the government's entire theory of fraud rested on the claim that Mr. Nordlicht duped Black Elk into making false disclosures to its bondholders, yet Mr. Nordlicht told Black Elk's CEO that $90 million of its bonds were held by Platinum and friendly investors and that the bond offering would redeem $60 million in bonds held by independent investors. Dkt. 971 at 6-10. This indisputable evidence comes on top of new evidence that Mr. Nordlicht and his co-defendants did not control Beechwood, a fact necessary to their conviction. Dkt. 894. Despite this exculpatory evidence, the government doggedly pursues the conviction of innocent men.[1]

Regardless, *Ciminelli* too requires vacatur. The government convicted Mr. Nordlicht and his co-defendant, Mr. Levy, based upon the "right to control" theory. The government could not argue to the jury that Black Elk's bondholders had any property interest in the proceeds of the Renaissance sale, because they never had a right to the proceeds, and the proceeds were used in a

[1] The government's *Ciminelli* response argues that Mr. Nordlicht's renewed Rule 33 motion is premised on "false and misleading factual claims." Dkt. 1001 at 1 n.1. Yet despite making such a serious charge, the government does not identify anything "false and misleading" in Mr. Nordlicht's motion. The Francis Memo was indisputably authentic and Black Elk's CEO told the government (as reflected in the FD-302) that Mr. Nordlicht disclosed the "scheme" prior to the consent solicitation. Far from charging Defendants with "false and misleading factual claims," the government's earlier briefing largely refused to engage with the substance of Mr. Nordlicht's arguments, relying instead on perceived procedural defects. *See* Dkt. 987.

way that benefitted Black Elk (i.e., they were used to retire expensive preferred equity). *See* Dkt. 994 at 4-5. So the government argued that if the bondholders "had known the truth about what was happening here . . . they would have made a different decision about what to do with their bond[s] or they would have tried to somehow undo this illegal vote." *See* Dkt. 999, Ex. 1, Nordlicht Tr. 6682:23-6683:3. That argument epitomizes the "right to control" pure and simple, and it is the theory that the Supreme Court disavowed in *Ciminelli*.

Unable to avoid its closing argument, the government seeks to distinguish *Ciminelli* on the ground that the jury instruction here did not specifically state that defendants may be convicted based on a "right to control" theory. *See* Dkt. 1001 at 2-5. But *Ciminelli* was not just a case about a jury instruction; it was a case about what kind of "property" counts under the federal fraud statutes. The Supreme Court held that "property" does ***not*** include "[t]he right to valuable economic information needed to make discretionary economic decisions" because that right "is not a traditional property interest." *Ciminelli*, 143 S. Ct. at 1128. Thus, the government could not convict someone for seeking to deprive victims of "property" based on the intangible "right to control."

Although the Court in this case did not instruct the jury that "property" affirmatively included the right to control, the Court did not instruct (and could not have instructed) the jury to the contrary.[2] Thus, the government remained free to argue that Mr. Nordlicht and his co-defendants had sought to deprive the bondholders of valuable economic information bearing on what they should do with their bonds. Indeed, given the bondholders' lack of entitlement to the Renaissance sales proceeds, that theory of fraud was the only one available to the government.[3] The jury thus impermissibly concluded that the "right to control" was encompassed in the meaning of "property," making *Ciminelli* directly on point.

To distance itself from the "right to control" theory, the government now argues that defendants sought to deprive the bondholders of their "contractual protections, priority claim to Black Elk's assets, and their security interest in Black Elk's assets" or "money." Dkt. 1001 at 5. But nothing defendants did could deprive the bondholders of any rights they enjoyed by contract. The charged crime was that defendants tricked the bondholders into keeping their bonds by depriving them of

[2] Nor could Defendants have requested such an instruction, since the Second Circuit had previously held that "property" included a deprivation of an individual's "right to control" its assets. *See, e.g.*, *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (holding that a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions").

[3] The government argues that applying *Ciminelli* here would somehow "invalidate" the standard wire fraud instructions used in this Circuit. Dkt. 1001 at 4. Not so. The problem was with the theory of fraud that the government argued to the jury, not the jury instructions. The standard wire fraud instructions only present a *Ciminelli* problem when—as here—the government's bases its theory of fraud on the "right to control." It is the government's theory of the case, not the standard jury instruction, that contravenes *Ciminelli*.

the information necessary to make a discretionary economic decision. *Cf. Ciminelli*, 143 S. Ct. at 1128; *see* Dkt. 999, Ex. 1, Nordlicht Tr. 6682:17-6683:3 (if the bondholders "had known the truth about what was happening here . . . they would have made a different decision about what to do with their bond[s]"); *id.* at 5208:17-5210:22 (T. Pulvino testifying about his decision-making process); *id.* 3832:5-3833:8 (D. Yee explaining why Phoenix did not tender).

The government's theory was not—and could not have been—that the fraud sought to deprive the bondholders of their contractual rights, because the victims themselves testified that, absent the fraud, they would have willingly tendered the bonds and forfeited those rights. Pulvino and Yee testified that, had the alleged fraud been disclosed—*i.e.*, had they known that Black Elk would count the affiliated bonds—then they would tendered their bonds (and received 100 cents on the dollar). Had they done so, then those bondholders would have ceded their contractual rights. Therefore, those rights could not themselves have been the object of the fraud. Rather, as the government argued at trial, the alleged scheme sought to deprive the bondholders of valuable economic information—the fact that affiliated votes would be counted—and, had they known, the bondholders "would have made a different decision" about tendering their bonds. Dkt. 999, Ex. 1, Nordlicht Tr. 6683:1.

The government also argues that, at a minimum, the securities fraud convictions should stand because, in contrast to the wire fraud statute, the securities fraud statute does not require an effort to deprive the victims of "money or property." *See* Dkt. 1001 at 7-8. But even so, the securities fraud charges permitted conviction upon the jury's finding that defendants had employed a "scheme or artifice to defraud," Dkt. 999, Ex. 1, Nordlicht Tr. 6595:14; *id.* at 7142:22-23, and the Court has consistently interpreted the federal fraud statutes based on "the 'common understanding' of the words 'to defraud,'" which referred "to wronging one in his property rights." *Ciminelli*, 143 S. Ct. at 1126 (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)). *Ciminelli* confirms that: (1) to "defraud" someone means to deprive them of money or property; and, consequently, that (2) to "defraud" cannot mean depriving someone of the information necessary to make a discretionary economic decision. *See* 143 S. Ct. at 1126; Dkt. 999 at 4-5.

The Supreme Court has rejected the argument that these principles turn upon a particular gloss on "money or property" in certain federal fraud statutes. *See Cleveland*, 531 U.S. at 25-26 (holding that the phrase "money or property" in the mail fraud statute should not be construed separately from the phrase "any scheme or artifice to defraud"). In other words, both securities fraud and wire fraud require ***fraud***. Since at least 1909, fraud has required an effort to deprive a person of money or property, not to deprive someone of the information necessary to make a discretionary economic decision. *See Ciminelli*, 143 S. Ct. at 1126. Accordingly, even if securities fraud may be broader than wire fraud in some contexts, a defendant still may not be convicted of securities fraud based on the intangible "right to control."

And it is clear that, just like the wire fraud count, the securities fraud counts turned on the theory that the fraud deprived the bondholders of valuable economic information. This case was not like







a typical securities fraud case where the defendants are charged with disseminating false information to dupe investors into buying a security at an artificially inflated price. Here, the allegedly misleading consent solicitation included a bona fide, genuine offer to buy the bonds back for 100 cents on the dollar, and approximately $11 million of the independent bondholders chose to tender their bonds. The government's theory was that, had the defendants disclosed that the affiliated bonds would vote, then many other bondholders "would have made a different decision about what to do with their bond[s]" and tendered. Dkt. 999, Ex. 1, Nordlicht Tr. 6683:1-6683:2. In other words, the government argued that bondholders were deprived of their right to control their assets by making an informed decision by the alleged fraud. Under *Ciminelli*, that can no more constitute a violation of the securities fraud statue than it could under the wire fraud statute.

For the foregoing reasons, and for the reasons articulated in defendants' May 30, 2023 letter, the Court should vacate Mr. Nordlicht and Mr. Levy's convictions in light of *Ciminelli*.

Respectfully submitted,

/s/ *Andrew J. Levander*
Andrew J. Levander
Steven A. Engel
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3683
andrew.levander@dechert.com
steven.engel@dechert.com

*Counsel for Mark Nordlicht*

cc: All Counsel (via ECF)