**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA, |
| -against- |
| MARK NORDLICHT, et al., |
| Defendants. |

Case No. 1:16-cr-00640-BMC

## SENTENCING MEMORANDUM
## SUBMITTED ON BEHALF OF DEFENDANT MARK NORDLICHT

Andrew J. Levander
Steven A. Engel
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
andrew.levander@dechert.com
steven.engel@dechert.com

*Attorneys for Defendant Mark Nordlicht*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................ 1

II.  RELEVANT SENTENCING CONSIDERATIONS ........................................ 6

III.  CORRECTIONS AND OBJECTIONS TO MR. NORDLICHT'S PSR AND OFFENSE LEVEL COMPUTATION ........................................................... 8

    A.  THE TWO-LEVEL ENHANCEMENT FOR TEN OR MORE VICTIMS DOES NOT APPLY ................................................................ 8

    B.  THE TWO-LEVEL ENHANCEMENT FOR MR. NORDLICHT'S ROLE DOES NOT APPLY ............................................................... 9

        1.  THE PSR'S FINDING OF A LEADERSHIP ROLE RESTS ON AN ERRONEOUS PREMISE .............................................. 10

        2.  MR. NORDLICHT DID NOT LEAD ANY CRIMINAL ACTIVITY ........................................................................... 11

    C.  MR. NORDLICHT IS ELIGIBLE FOR A TWO-LEVEL "MITIGATING ROLE" REDUCTION ........................................... 12

    D.  MR. NORDLICHT IS ELIGIBLE FOR A TWO-LEVEL "ZERO-POINT OFFENDER" REDUCTION ......................................... 13

    E.  NO UPWARD DEPARTURE IS APPROPRIATE ........................... 14

    F.  MR. NORDLICHT'S TOTAL OFFENSE LEVEL IS 3 .................... 14

IV.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WARRANT LENIENCY ............................................................................................. 15

    A.  MR. NORDLICHT HAD NO INTENT TO HARM OR DEFRAUD ANYONE ............................................................................... 16

    B.  DEFENDANTS DID NOT SEEK TO "PARK" BONDS AT BEECHWOOD TO INFLUENCE THE BLACK ELK VOTE ......................... 18

    C.  DEFENDANTS' ACTIONS CAUSED NO HARM TO ANYONE .................. 21

    D.  THERE REMAINS SIGNIFICANT UNCERTAINTY OVER WHETHER BEECHWOOD WAS AN AFFILIATE OF BLACK ELK ................................ 22

    E.  MR. NORDLICHT WAS UNAWARE OF THE INDENTURE'S AFFILIATE RULE ................................................................... 23

V.  A SENTENCE OF TIME SERVED IS APPROPRIATE GIVEN THE OTHER SENTENCING FACTORS ........................................................................ 25

    A.  MR. NORDLICHT IS A GOOD AND HONORABLE MAN ........................... 26

        1.  MR. NORDLICHT CARES DEEPLY ABOUT HIS FAMILY ............. 26

# TABLE OF CONTENTS

(continued)

**Page**

2.    MR. NORDLICHT HUMBLY, GENEROUSLY, AND SELFLESSLY HELPS THOSE IN NEED ............................................... 29

3.    MR. NORDLICHT HAS DEDICATED HIS LIFE TO HIS FAITH AND COMMUNITY .................................................................................. 42

B.    THERE IS NO NEED FOR A CUSTODIAL SENTENCE ............................... 48

1.    MR. NORDLICHT HAS ALREADY BEEN SEVERELY PUNISHED ............................................................................................ 48

2.    THE PURPOSES OF DETERRENCE HAVE BEEN SERVED ............ 50

3.    THERE IS NO NEED TO PROTECT THE PUBLIC FROM MR. NORDLICHT ............................................................................... 51

4.    MR. NORDLICHT DOES NOT NEED TREATMENT ........................ 51

C.    SUITABLE ALTERNATIVES TO A CUSTODIAL SENTENCE ARE AVAILABLE ........................................................................................ 52

D.    A SENTENCE OF TIME SERVED AVOIDS UNWARRANTED SENTENCING DISPARITIES ............................................................ 52

E.    THERE IS NO NEED FOR RESTITUTION OR FORFEITURE ..................... 53

CONCLUSION .............................................................................................................. 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ciminelli v. United States*,
  143 S. Ct. 1121 (2023)..............................................................................4

*Kimbrough v. United States*,
  552 U.S. 85 (2007)....................................................................................7

*Koon v. United States*,
  518 U.S. 81 (1996)..............................................................................15, 25

*Pepper v. United States*,
  562 U.S. 476 (2011)................................................................................25

*United States v. Booker*,
  543 U.S. 220 (2005)..................................................................................6

*United States v. Broderson*,
  67 F.3d 452 (2d Cir. 1995)......................................................................15

*United States v. Carson*,
  560 F.3d 566 (6th Cir. 2009) ...................................................................47

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)......................................................................6

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010)...................................................................6, 7

*United States v. Forchette*,
  220 F. Supp. 2d 914 (E.D. Wis. 2002)...................................................16

*United States v. Hadash*,
  408 F.3d 1080 (8th Cir. 2005).................................................................47

*United States v. Howe*,
  543 F.3d 128 (3d Cir. 2008)....................................................................47

*United States v. Keitt*,
  21 F.4th 67 (2d Cir. 2021) .......................................................................6

*United States v. Landesman*,
  17 F.4th 298 (2d Cir. 2021) .........................................................19, 20, 52

*United States v. Musgrave,*
  647 F. App'x 529 (6th Cir. 2016) ..........................................................53

*United States v. Nachamie,*
  121 F. Supp. 2d 285 (S.D.N.Y. 2000)...................................................16

*United States v. Prosperi,*
  686 F.3d 32 (1st Cir. 2012)...................................................................53

*United States v. Skys,*
  637 F.3d 146 (2d Cir. 2011)....................................................................9

*United States v. Thurston,*
  544 F.3d 22 (1st Cir. 2008)...................................................................47

*Williams v. New York,*
  337 U.S. 241 (1949).............................................................................25

**Statutes**

18 U.S.C. § 3553...............................................................................6, 7, 15

28 U.S.C. § 994(j)....................................................................................13

**Other Authorities**

2023 Amendments in Brief, U.S. Sentencing Commission,
  https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-
  in-brief/AIB_821R.pdf...........................................................................13

Press Release, United States Attorney's Office, Eastern District of New York,
  *Platinum Partners' Founder and Chief Investment Officer Among Five
  Indicted in a $1 Billion Investment Fraud* (Dec. 19, 2016),
  https://www.justice.gov/usao-edny/pr/platinum-partners-founder-and-chief-
  investment-officer-among-five-indicted-1-billion...................................1

United States Sentencing Guidelines Manual................................... *passim*

Mark Nordlicht respectfully submits this memorandum and accompanying exhibits to assist the Court in determining a fair and just sentence to impose at the March 20, 2024 sentencing hearing. For the following reasons, a non-custodial sentence of time served is appropriate to serve the purposes of sentencing and is consistent with the applicable Sentencing Guidelines.[1]

## I.     INTRODUCTION

For over seven years, Mr. Nordlicht has consistently maintained his innocence and vigorously fought the charges brought against him. Those seven years have imposed a crushing personal cost on him, his wife, and his six children who have grown up with their father as a criminal defendant.[2] The prosecution has cost him his reputation, his livelihood, and his fortune, even while the case has proven to be something very different from what the government once publicly charged.

In November 2016, the government raided Platinum Partners and publicly declared at a press conference that the business was a $1 billion "investment fraud" operated "like a Ponzi-scheme."[3] The jury would squarely reject those charges years later, yet the government's actions predictably and assuredly destroyed Mr. Nordlicht's standing in his community and in the business world; eradicated the entirety of Mr. Nordlicht's life savings, which totaled tens of millions of dollars and had been invested in those same Platinum funds; and forced him into bankruptcy. Mr.

---

[1]     Mr. Nordlicht's sentencing date has been adjourned several times over the past year and a half. The Probation Department submitted a revised PSR on January 19, 2024, and Mr. Nordlicht submitted corrections and objections to the Probation Department on February 5, 2024.

[2]     Mr. Nordlicht has four daughters and two sons. At the time of his indictment, the children were aged 6, 8, 12, 14, 17, and 19.

[3]     Press Release, United States Attorney's Office, Eastern District of New York, *Platinum Partners' Founder and Chief Investment Officer Among Five Indicted in a $1 Billion Investment Fraud* (Dec. 19, 2016), https://www.justice.gov/usao-edny/pr/platinum-partners-founder-and-chief-investment-officer-among-five-indicted-1-billion.

Nordlicht has already served seven-plus years of punishment, even before he reaches his sentencing date.

There also can be no risk of overstatement in recognizing that there are few cases where the specter of convicting an innocent man looms as prominently as it does in this case.  And it is entirely appropriate for the Court to consider the extraordinary evidentiary and legal issues in this seven-year-long criminal prosecution when determining what would constitute a just and reasonable sentence.

At trial, the bulk of the government's case focused on the five charges for which Mr. Nordlicht was acquitted.  Having sat through the six-week trial, this Court's initial view was that it would be a "manifest injustice" to permit the three remaining charges to stand.  *See* Dkt. 799. Although the Second Circuit disagreed, since then, the evidentiary and legal ground has shifted only further in Mr. Nordlicht's direction.  In contrast with Mr. Nordlicht's trial, the trial of his co-defendant, Daniel Small, focused entirely upon the alleged conspiracy to rig the vote on the Black Elk Indenture, and the Court had the benefit of reviewing new evidence from that trial related to the supposed scheme.

In addition, since remand from the Second Circuit, the Court has made several rulings on post-trial motions in Mr. Nordlicht's case that weigh against the proposition that Mr. Nordlicht intentionally defrauded or sought to defraud anyone.  For instance:

- ***Mr. Nordlicht fully disclosed his plans to buy out Black Elk's outside bondholders with the support of votes from "friendly" bondholders.***  At Mr. Small's trial, evidence resurfaced confirming that, before the consent solicitation, Mr. Nordlicht told Black Elk's CEO that Platinum planned to "redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million," leaving "$90 Million in bond debt in the

2

hands of so-called 'friendly' bond holders, most of which is held by Platinum itself."
Dkt. 971-3.  This Court recognized that Black Elk and its counsel, BakerHostetler,
learned this information **only because Nordlicht told them so**.  *See* Dkt. 971-6; Dkt.
1004 at 5.  His frank disclosures are flatly inconsistent with the idea that he planned to
defraud anyone.

- **Far from intending to steal, Mr. Nordlicht sought to pay the bondholders in full.**  In
ruling on renewed post-trial motions, this Court found that Mr. Nordlicht "wanted all
non-affiliated bondholders to tender their bonds and be paid in full," and that
"defendants intended to use the proceeds of the Renaissance sale to pay out all
non-affiliated bondholders before using the remaining proceeds to pay off the
high[er]-interest preferred equity."  Dkt. 1004 at 7-8.  Mr. Nordlicht had no plan for
Platinum to profit ahead of the unaffiliated bondholders.

- **Mr. Nordlicht in fact did not harm anyone.**  This Court has also found that Mr.
Nordlicht's actions caused no loss to the bondholders: "The Government has not shown
that any loss to bondholders was the result of defendants' misrepresentation, the
amendments to the Black Elk bond indenture, or the subsequent payout of preferred
equity."  Dkt. 1005 at 6.  The bondholders who lost money did so only because they
deliberately chose to remain invested with Black Elk (in some cases increasing the size
of their investment) until an unforeseen and unprecedented drop in the price of oil
caused the value of the company to crater.  Therefore, "the amount of loss" caused by
the criminal offense is "zero."  *Id.* at 7.  This case thus involves not just a crime without
a scheme, but a crime without any loss to any possible victims.

3

- ***The Court threw out one of the three remaining convictions.***  In light of *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), the Court held that the evidence cannot sustain a conviction for wire fraud because "no reasonable jury could find beyond a reasonable doubt that Nordlicht . . . intended to defraud bondholders of the proceeds of the Renaissance sale except under a[n] [impermissible] 'right-to-control' theory."  Dkt. 1004 at 10.  Just two of eight original charges now remain.

- ***The evidence demonstrates the absence of any plan to rig the bondholder vote by "parking" bonds at Beechwood.***  The Probation Department has premised a leadership enhancement based on Mr. Nordlicht's role in proposing that Platinum sell bonds to Beechwood.  The Probation Department indicates a belief that Defendants moved Black Elk bonds to Beechwood so that they could be counted as unaffiliated votes in the consent solicitation.  But a careful review of the contemporaneous communications belies that concern.  As discussed in detail below, the evidence demonstrates that each time Platinum sold bonds to Beechwood, it did so because Platinum needed liquidity for particular, short-term obligations, not for any reason related to the consent solicitation.  This evidence further demonstrates the absence of any criminal plan.

- ***New witnesses further weaken the conclusion that Beechwood was an affiliate of Platinum.***  Numerous Beechwood witnesses who were not available at trial have since testified in civil litigation that Mr. Nordlicht did not control Beechwood.  Although the Court found these new witnesses to be insufficient to vacate the jury verdict, Dkt. 894 at 19, this new evidence further weakens the argument that Defendants knew Beechwood was a legal affiliate (through Platinum) of Black Elk.

- ***The Court has held that the affiliate rule of the Trust Indenture Act of 1939 ("TIA"), which formed the basis of the government's original case, did not apply to the consent solicitation.*** At trial, the government argued, based on Mr. Shearer's testimony, that defendants sought to evade the TIA's affiliate rule, yet this Court has since held that the provision does not apply as a matter of law. Dkt. 921 at 2. Mr. Nordlicht was thus convicted for "rigging a vote" based on demonstrably erroneous legal advice involving a complex and arcane area of the law.

Plainly, the Second Circuit's decision on the Rule 33 motion remains the law of this case, and Mr. Nordlicht understands that the Court must enter a sentence. Yet the absence of any typical criminal scheme, the absence of any loss or victims, and the closeness of these unique factual and legal questions unquestionably bears on what would be an appropriate sentence in this wholly atypical case that has been pending for the better part of a decade.

All of these factors weigh strongly in favor of a sentence of time served even before the Court takes into account Mr. Nordlicht's individual circumstances. Yet Mr. Nordlicht's history, family, and character all weigh strongly against any additional punishment. Mr. Nordlicht has no prior offenses, and there were no victims. The charges stand in marked conflict with the life that Mr. Nordlicht has led. He is a good and honorable man—a caring son to his 85-year-old mother, a model husband to his wife of 27 years, a devoted father to his six children, some of whom are still minors. Mr. Nordlicht's family and supporters have submitted 150 letters on his behalf, and those letters powerfully attest that he has devoted his life to caring for others and to making his community a better place. Indeed, the letters reflect Mr. Nordlicht's remarkable history of helping strangers from different communities as well as friends, neighbors, and family members. Even

the government cannot deny that he lived an exemplary life prior to the aberrational conduct at issue in this case.

The government's prosecution of Mr. Nordlicht has taken a severe toll on his life, his family, and his personal finances. The reputational damage and the personal and financial toll of seven years of criminal litigation have more than served any legitimate governmental purpose of deterrence. There is no warrant and no good that would come from an additional sentence. For these reasons, we ask that the Court follow the same path that it has established with respect to Mr. Nordlicht's co-defendants, Mr. Levy and Mr. Small, and impose a non-custodial sentence that is fair, reasonable, appropriate, and just based on the record of this unique case.

## II.     RELEVANT SENTENCING CONSIDERATIONS

In determining the appropriate sentence, the Court considers the nature and circumstance of the offense, the history and characteristics of the defendant, whether the sentence imposed promotes respect for the law, whether it deters future crime, whether it provides just punishment for the offense, whether it promotes public safety and rehabilitation, whether it avoids sentencing disparities and is appropriate given other kinds of sentences, and whether it reflects the seriousness of the offense. *See* 18 U.S.C. § 3553(a); *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021). The Court must also consider the range of possible sentences under the relevant Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(4). But the applicable Guidelines-range sentence is advisory, not mandatory, and the Court may "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008); *see United States v. Booker*, 543 U.S. 220, 227 (2005).

The Court "must conduct its own independent review of the § 3553(a) sentencing factors" and "may not presume that a Guidelines sentence is reasonable." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). After conducting its review and weighing the relevant factors, the

Court must apply Section 3553(a)'s parsimony clause and "'impose a sentence sufficient, but not greater than necessary,' to accomplish the sentencing goals." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (quoting 18 U.S.C. § 3553(a)); *Dorvee*, 616 F.3d at 182 ("Under § 3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. § 3553(a)(2)." (quoting *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009))).

Under these principles, the appropriate Guidelines sentencing range is zero to six months, and there are strong reasons for a sentence of time served. *First,* the Probation Department's PSR contains factual errors that overstate Mr. Nordlicht's role and miscalculate the offense level. Properly calculated, Mr. Nordlicht's total offense level is 3. Combined with his criminal history category of I, *see* PSR ¶ 74, a total offense level of 3 means that the applicable Guidelines Range sentence is zero to six months. A non-custodial sentence would be "generally appropriate" for a non-violent, first-time offender like Mr. Nordlicht. *See* United States Sentencing Guidelines Manual ("U.S.S.G.") § 5C1.1 Application Note 10(A). Mr. Nordlicht has been under supervision for over seven years. As in the case of Mr. Levy, a sentence of time served is therefore appropriate under the facts and circumstances of this case.

*Second*, as this Court knows, this was an extremely close case. Mr. Nordlicht had no intent to steal from anyone, and no one in fact was harmed. The Court can respect the Second Circuit's decision that the conviction was not a "manifest injustice" while taking the closeness of the facts into account for purposes of sentencing. Indeed, the case was at best a marginal criminal case at the time of conviction, and the record since then has only further underscored the debatable nature of the case. The thin case against Mr. Nordlicht and the attendant potential for a miscarriage of

7

justice are relevant to "the nature and circumstances of the offense," *see* 18 U.S.C. § 3553(a)(1), and weigh in favor of leniency.

*Third*, the other sentencing factors also support a non-custodial sentence like time served. As the many, many letters submitted on behalf of Mr. Nordlicht establish, he is a fundamentally good and honorable man.  He cares deeply about his family, is extremely humble and generous, and has dedicated his life to supporting his faith and helping not only his community, but anyone in need.  In fact, a plethora of letters before this Court highlight Mr. Nordlicht's remarkable humanity towards strangers as well as towards those he knows.  A non-custodial sentence is therefore fair, reasonable, appropriate, and just in Mr. Nordlicht's case, as it was in the cases of Mr. Levy and Mr. Small.

## III.   CORRECTIONS AND OBJECTIONS TO MR. NORDLICHT'S PSR AND OFFENSE LEVEL COMPUTATION

The Probation Department released the initial PSR for Mark Nordlicht on May 27, 2022. Mr. Nordlicht submitted corrections and objections, and Probation issued an addendum on August 12, 2022 that addressed some of Mr. Nordlicht's corrections and objections ("PSR Addendum"). On January 19, 2024, Probation issued a revised PSR.  Mr. Nordlicht again submitted corrections and objections.  As of this date, Probation has not responded to Mr. Nordlicht's submission.  The revised PSR still contains many factual errors, which are specifically addressed in Appendix A to this memorandum.  Additionally, as explained in this part, the revised PSR contains several legal errors that overstate Mr. Nordlicht's Guidelines offense level.

### A.   The Two-Level Enhancement For Ten Or More Victims Does Not Apply

The PSR incorrectly includes a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) because "the offense involved 10 or more victims."  PSR ¶¶ 56; 64.  The Application Notes of the Guidelines, however, explain that a victim is "any person who sustained any part of the actual loss

determined under subsection (b)(1)." *See* U.S.S.G. § 2B1.1 Application Note 1.  In the absence of any loss, the offense did not involve any victims, much less ten or more.

As the Court held, and as the PSR recognizes elsewhere, there was no actual loss under § 2B1.1(b)(1).  *See* Dkt. 1005 at 7; PSR ¶ 54.[4]  Because there was no actual loss, there can be no victims.  *See United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011) (remanding to the district court when it erred by "inappropriately includ[ing]" entities "as victims under § 2B1.1(b)(2)" "[w]ithout any determined amount of financial loss to [them]").  Indeed, at Mr. Levy's sentencing, the government conceded that the Court's earlier rulings preclude any victim enhancement under § 2B1.1(b)(2)(A)(i).  *See* Ex. 1, Levy Tr. 12:23-13:1 (stating that the government cannot argue for a substantial term of imprisonment because of "the Court's rulings on loss and victim status").  Therefore, this enhancement for the number of victims is not warranted.

**B.     The Two-Level Enhancement For Mr. Nordlicht's Role Does Not Apply**

The PSR erroneously applies a two-level enhancement under U.S.S.G. § 3B1.1(c) on the ground that Mr. Nordlicht was "an organizer, leader, manager, or supervisor in criminal activity."  PSR ¶¶ 56, 66.  As the Application Notes explain, relevant factors in determining this enhancement are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  *See* U.S.S.G.

---

[4]     Additionally, the Court recognized "the lack of any victims" when denying Mr. Small's Rule 29 and Rule 33 motions.  *See* Dkt. 1003 at 52 n.14.

§ 3B1.1, Application Note 4.  In finding Mr. Nordlicht to have exercised a leadership role, the PSR relies on incorrect allegations and there is no other basis for such a finding.

### 1.   The PSR's Finding Of A Leadership Role Rests On An Erroneous Premise

Although Mr. Nordlicht had a senior role at Platinum, his position at the company does not establish that he led or supervised any "criminal activity."  The PSR states that Mr. Nordlicht was an "organizer and leader of the criminal activity" because he was "CIO of both Platinum and Beechwood" and because he "directed other individuals to transfer funds from Platinum to Beechwood."  PSR ¶ 56.  Yet these allegations are erroneous and do not support a finding that Mr. Nordlicht was a leader in any criminal activity.

First, Mr. Nordlicht was not the CIO of Beechwood.  That is simply incorrect.  And there is nothing criminal or suspicious about Mr. Nordlicht's role as CIO of Platinum.  Standing alone, that does not mean that he led or supervised any "criminal activity."

Second, the PSR incorrectly states that Mr. Nordlicht "directed other individuals to transfer funds from Platinum to Beechwood."  PSR ¶ 56.  Platinum did not transfer any funds to Beechwood.  As the PSR recognizes, Beechwood transferred $32 million in funds to Platinum in exchange for Black Elk bonds.  PSR ¶¶ 31-32.  Although Mr. Nordlicht proposed the fair-value trades to Beechwood, the government did not present any evidence at trial that Platinum sold those bonds to Beechwood with the intent to influence the consent solicitation.  And in fact, any such inference is demonstrably incorrect.

As discussed in more detail below, *see infra* Section IV.B, in the run-up to the bond vote, Beechwood purchased Black Elk bonds on five different occasions—once from activist bondholders and the rest from the Platinum funds.  These purchases began well before Mr. Nordlicht and Platinum expected to rely on a public consent solicitation, and the evidence cited

10

below demonstrates that every one of the purchases was for a reason unrelated to the consent solicitation.  The first transaction was occasioned by the bondholders' interest in selling their position and the others arose because Platinum had particular reasons to sell the Black Elk bonds in exchange for cash to generate the short-term liquidity necessary to make other investments or to meet margin calls.  The Black Elk consent solicitation played no role in any of these transactions, contradicting the idea that Mr. Nordlicht proposed these trades to Beechwood with an interest in influencing the consent solicitation, much less as part of an effort to lead or supervise any criminal activity.

### 2.    Mr. Nordlicht Did Not Lead Any Criminal Activity

Stripped of its erroneous premise, the PSR provides no other reason to find that Mr. Nordlicht was a leader of any criminal activity.  Mr. Nordlicht was not an architect of the consent solicitation process, much less of any fraud.  He played a minor role in organizing the public consent process, and his strong preference was to buy out the bondholders in a private solicitation process that Black Elk's counsel (erroneously) thought would have avoided the affiliate restriction. Ex. 2, Nordlicht Tr. 5055-59.  In his only substantive conversation with Black Elk about the public solicitation process, he disclosed to Black Elk's CEO that the independent Black Elk bondholders would be paid in full and that the remaining bonds would be left in the hands of "friendly" bondholders.  Black Elk's CEO promptly conveyed those plans and Mr. Nordlicht's statements to counsel.  Dkt. 971-3.

With respect to the public consent solicitation process, other defendants carried out the vote and provided the needed submissions to Black Elk and its counsel.  Mr. Nordlicht never met with or spoke with Black Elk's counsel or directed them to take any action on the consent solicitation; Mr. Nordlicht did not cast votes for Beechwood; and he believed that *all* independent bondholders would be bought out in the consent solicitation.  *See, e.g.*, Dkt. 971-3; Dkt. 971-5;

Dkt. 971-6 at 1; Dkt. 971-11.  To the extent that independent bondholders were misled, there is no evidence that Mr. Nordlicht directed any such misrepresentations or was an "organizer, leader, or manager" of any plan to hide Beechwood's affiliation.

As an officer at Platinum, Mr. Nordlicht signed a disclosure certifying PPCO and PPLO's ownership of Black Elk bonds on August 8, 2014.  Mr. Nordlicht did not prepare the certificate or pass it on to Black Elk's counsel.  He signed the certificate presented to him, at a time when few bonds had voted.  *See* Dkt. 888 at 5 n.3; Dkt. 888-1.  Mr. Nordlicht did not otherwise communicate or direct Black Elk's counsel concerning which votes should be counted in the consent solicitation.

In addition, Mr. Nordlicht cannot be deemed a leader because of a "claimed right to a larger share of the fruits of the crime" because he had no personal stake in Black Elk or any of its bonds. His compensation at Platinum was not tied to Black Elk, and in contrast with others, he did not receive any money from PPCO as a result of the bond offering.  *See* PSR ¶ 53.  Absent evidence that Mr. Nordlicht exercised any control over the consent solicitation or Black Elk's disclosures to the bondholders or was the primary beneficiary of the vote, there is no basis for concluding that his sentence should be enhanced because of any leadership role in criminal activity.

### C.    Mr. Nordlicht Is Eligible For A Two-Level "Mitigating Role" Reduction

All of the same evidence showing that Mr. Nordlicht was not an "organizer, leader, manager, or supervisor" also demonstrates that he was a "minor participant in any criminal activity" and thus should receive a two-level "mitigating role" reduction under U.S. Sentencing Commission Guidelines ("U.S.S.G.") § 3B1.2(b).  The relevant factors when determining whether a "mitigating role" reduction is appropriate include "the degree to which the defendant understood the scope and structure of the criminal activity; the degree to which the defendant participated in planning or organizing the criminal activity; the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; the nature and extent of

the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and the degree to which the defendant stood to benefit from the criminal activity." *See* U.S.S.G. § 3B1.2, Application Note 3(C).  Mr. Nordlicht's understanding was that all non-friendly bondholders would be paid in full, he had a small role in organizing the public consent solicitation, and he never directed any misrepresentations to Black Elk bondholders.  He also did not receive any money in connection with the alleged fraud. Like his co-defendant Mr. Levy, Mr. Nordlicht should receive a two-level mitigating role reduction.  *See* Ex. 1, Levy Tr. 7:4-7.

### D.      Mr. Nordlicht Is Eligible For A Two-Level "Zero-Point Offender" Reduction

As the PSR correctly recognizes, Mr. Nordlicht is eligible for a two-level reduction in his offense level under U.S.S.G. § 4C1.1, which went into effect in November 2023 and from which Mr. Small and Mr. Levy both benefitted at their sentencings.  *See* PSR ¶ 69.  The Commission added this section following "extensive recidivism research," which "found that offenders with zero criminal history points were less likely to be rearrested following their release than other federal offenders."[5]  Additionally, when a  defendant "receive[s] an adjustment under § 4C1.1" and, as here, "the defendant's applicable guideline range is in Zone A or B of the Sentencing Table," then "a sentence other than a sentence of imprisonment . . . is generally appropriate." U.S.S.G. § 5C1.1 Application Note 10(A); *see* PSR ¶ 103; *see also* 28 U.S.C. § 994(j) (directing the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.").

---

[5]      *See* 2023 Amendments in Brief, U.S. Sentencing Commission, https://www.ussc.gov/ sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf.

### E.   No Upward Departure Is Appropriate

The PSR also includes information about an unfortunate incident when, during a break at trial, Mr. Nordlicht lost his temper and raised his voice to an Assistant United States Attorney in the courthouse hallway.  *See* PSR ¶¶ 6, 75, 87.  Mr. Nordlicht promptly apologized for the incident and deeply regrets it, as some of the letters submitted in his support discuss.  *See, e.g.*, Ex. 66, R. Fink (letter from Mr. Nordlicht's rabbi explaining that Mr. Nordlicht "so very much regrets" his outburst, that Mr. Nordlicht "agreed . . . that there is no excuse" for it, and that he "apologized to all those affected for his lack of self-control"); *see also* Ex. 134, A. Raskin.

The PSR does not recommend a particular sentencing enhancement based on this incident, and we do not believe that one would be warranted.  Mr. Nordlicht admittedly lost his temper during a particularly difficult portion of his long, onerous trial, following testimony that he believed to be false.  Mr. Nordlicht personally apologized to the Assistant United States Attorneys involved, and, despite the fact that a video of the entire incident exists, the government declined to bring any charges against Mr. Nordlicht based on the incident.  In addition, Mr. Nordlicht received effective punishment for this incident because the Court temporarily revoked his bail and remanded him into custody at that time.  We do not believe that this unadjudicated and uncharged incident, which caused only a momentary disruption in the proceedings, warrants an upward departure on his sentence.

### F.   Mr. Nordlicht's Total Offense Level Is 3

Based on the above, Mr. Nordlicht's Total Offense Level is 3.[6]  Mr. Nordlicht has no prior convictions and his criminal history is category I.  PSR ¶ 74.  Therefore, the applicable Guidelines

---

[6]     As the PSR correctly recognizes, Mr. Nordlicht's Base Offense Level is 7.  PSR ¶ 63.  His Base Offense Level is reduced to a Total Offense Level of 3 by applying the two-level "mitigating role" reduction and the two-level "zero-point offender" reduction.

Range is zero to six months.[7]  This range is in Zone A of the Sentencing Table, making a non-custodial sentence appropriate under U.S.S.G. § 5B1.1(a)(1).   As the PSR recognizes, a punishment "other than a sentence of imprisonment" is also "generally appropriate" because Mr. Nordlicht is a nonviolent, "zero-point" first offender.  *See* PSR ¶ 103; U.S.S.G. § 5C1.1 Application Note 10(A).

## IV.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WARRANT LENIENCY

The Sentencing Guidelines are meant to capture appropriate sentences for the "heartland" of cases.  *See Koon v. United States*, 518 U.S. 81, 93 (1996).  Yet as this Court recognized at Mr. Small's sentencing, this was "a somewhat atypical kind of fraud in that it wasn't stealing money from people.  You don't see that often."  Ex. 3, Small Tr. at 47:23-25.  This case is far from the heartland of securities fraud—involving no loss, no victims, and no intent to deprive anyone of property.  In other words, "[the convicted] conduct significantly differs from the norm."  *See* U.S.S.G. § 1A, intro. cmt. 4(b).  Consistent with this approach, 18 U.S.C. § 3553(a)(1) directs the Court to consider the specific "nature and circumstances" of the crime.

Mr. Nordlicht respectively submits that the fact that this was an extremely close case—as the Court repeatedly acknowledged, *see* Dkt. 799; Dkt. 971-1 at 557:16-22—bears in favor of leniency.   Even if the Second Circuit were correct that the conviction was not a "manifest injustice," the Court should plainly account at sentencing for the fact that the circumstances do not reflect a compelling case of criminal fraud or intentional misconduct.

---

[7]      Even if Mr. Nordlicht does not receive a "mitigating role" reduction, the applicable Guidelines Range for a total offense level of 5 would still be zero to six months.

### A.     Mr. Nordlicht Had No Intent To Harm Or Defraud Anyone

At trial, the government presented no evidence that Mr. Nordlicht intended to harm or defraud anyone. That fact merits leniency. *See United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (affirming a downward departure when the defendant's "criminal intent was significantly different from that of the typical fraud defendant" and "unlike the typical fraud [case], [there was] no loss."); *United States v. Nachamie*, 121 F. Supp. 2d 285, 297 & n.11 (S.D.N.Y. 2000), *aff'd*, 5 F. App'x 95 (2d Cir. 2001) (holding that the defendant's "diminished intent" warrants a downward departure); *United States v. Forchette*, 220 F. Supp. 2d 914, 925 (E.D. Wis. 2002) (collecting cases throughout the country where "the unusual nature of the fraudulent conduct or of the defendant's role in it may provide a basis for a departure"). If Mr. Nordlicht crossed the line into criminal conduct, it was not because he was seeking to take money from anyone else.

Indeed, earlier this year, the Court "agree[d]" that "defendants wanted all non-affiliated bondholders to tender their bonds and be paid in full" noting the "mountain of evidence that defendants were trying to get rid of debt to save the company." Dkt. 1004 at 7. The Court similarly vacated Mr. Nordlicht's wire fraud conviction because "no reasonable jury could find beyond a reasonable doubt that Nordlicht . . . intended to defraud bondholders of the proceeds of the Renaissance sale except under a[n] [impermissible] 'right-to-control' theory." *Id.* at 10. The government could "not point[] to a single exhibit or portion of witness testimony in support of its argument that Nordlicht . . . misled bondholders with the intent to deprive them of the Renaissance proceeds." *Id.* at 10-11.

Because these facts powerfully counsel in favor of leniency at sentencing, the overwhelming evidence of Mr. Nordlicht's lack of intent to defraud bears repeating:

- **Francis Memo**: The Francis memo confirms that both Black Elk and BakerHostetler were told of the supposed scheme to "rig" the Black Elk consent solicitation before the consent solicitation began on July 16, 2014. Indeed, before

16

July 1, 2014, Mr. Nordlicht told Black Elk's CEO, Mr. Hoffman, that "Platinum . . . *intends* to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, *which will leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself.*" Dkt. 971-3 (emphasis added).

- **Mr. Hoffman's FD-302**: A government interview with Mr. Hoffman confirms that this information came from Mr. Nordlicht. Dkt. 971-6 at 1. Mr. Hoffman "had no knowledge of [Platinum] owning [Black Elk] bonds" until he met with Mr. Nordlicht before the consent solicitation. *Id.*; Dkt. 971-7 (email documenting a meeting between Mr. Nordlicht and Mr. Hoffman on June 12, 2014). During that meeting, "Nordlicht said to Hoffman . . . . that the bonds are in friendly hands and [Platinum] has it under control." Dkt. 971-6 at 1. Various emails after Mr. Nordlicht met with Mr. Hoffman demonstrate that Mr. Hoffman told BakerHostetler what Mr. Nordlicht told him. *See* Dkt. 971-8; Dkt. 971-9.[8]

- **"Sources and Uses" Spreadsheet**: On July 29, 2014, Mr. Nordlicht asked Mr. Small to explain how the money from the Renaissance sale would be used. Dkt. 971-11. A few hours later, Black Elk's CFO sent Mr. Small an email (which he then forwarded to Mr. Nordlicht) attaching a spreadsheet detailing how Black Elk expected to pay $65 million of the proceeds from the Renaissance sale to tendering bondholders. Dkt. 971-4. Entities friendly to Platinum held the rest of the $150 million in outstanding bonds, so this spreadsheet confirms that the plan all along was for the independent bondholders to be paid in full.

- **"Not Our Desired Result" Email**: On August 9, 2014, shortly before the consent solicitation period ended, Black Elk's CFO emailed Mr. Nordlicht to inform him that "only $2.8 million of the bonds have tendered." Dkt. 971-5. Mr. Nordlicht was puzzled and replied "[t]hat's not really our desired result. I think some tenders will show up last minute." *Id.* It does not make sense that Mr. Nordlicht intended to jump the priority line and steal money from bondholders if his "desired result" was for the bondholders to tender and be paid in full.

- **Trial Witness Testimony**: The bondholder witnesses at trial (and Black Elk's counsel at BakerHostetler) testified that they believed the consent solicitation process was designed so that the bondholders would tender. *See* Ex. 2, Nordlicht Tr. 5236-37 (T. Pulvino testifying that he thought Black Elk wanted bondholders to tender), 3880 (D. Yee testifying that he thought Black Elk wanted bondholders to tender), 5096 (R. Shearer testifying that he expected bondholders to tender).

- **Legitimate Reasons for Consent Solicitation**: As the Court has recognized, the defendants did not pursue the consent solicitation in order to pay the preferred

---

[8]     Because of this evidence, the Court recognized that "the information in the BakerHostetler memo must have come from Nordlicht" and "[t]he Government's prior presentation" to the Court and the Second Circuit—where it stated that Mr. Nordlicht was not the source of the information— "was certainly misleading, if not outright false." Dkt. 1004 at 6.

shareholders instead of the bondholders. Black Elk was solvent both before and after the consent solicitation and could satisfy the obligations to the bondholders and the preferred shareholders alike. *See* Dkt. 907-4, 1-DX-5214 at Sterling 000004125 (Sterling valuation for the quarter ending June 30, 2014); Dkt. 907-5, 1-DX-5215 at EDNY-PP-SW1-002398880 (Sterling valuation for the quarter ending September 30, 2014). In the Court's words, the aim of the vote was "to retire some of [Black Elk's] most burdensome debt," Dkt. 1005 at 5, and it was only the "massive and unforeseen collapse in the price of oil," not any scheme by the defendants, that later caused bondholder losses. *Id.* at 6.

**B.    Defendants Did Not Seek To "Park" Bonds At Beechwood To Influence The Black Elk Vote**

Relatedly, it is important to address the suggestion that Mr. Nordlicht and other defendants had planned for months to "park" bonds at Beechwood to vote them as unaffiliated bonds in support of amending the Indenture. As discussed above, the government presented no evidence at trial that Platinum had sold Black Elk bonds to Beechwood for the purpose of gaming the consent solicitation. Yet this mistaken idea has persisted and given rise to a suggestion that Mr. Nordlicht and his co-defendants had a premeditated plan to rig the bondholder vote by selling bonds to Beechwood. *See, e.g.*, Dkt. 799 at 31; Ex. 3, Small Tr. 15:21-23.

That view is not only unsupported but demonstrably unfair. In the run-up to the bond vote, Beechwood purchased Black Elk bonds on five different occasions—once from activist bondholders and the rest from the Platinum funds. These purchases began well before Mr. Nordlicht and Platinum expected to rely on a public consent solicitation, and every one of the purchases was for a reason unrelated to the consent solicitation. The first transaction was occasioned by the bondholders' interest in selling their position and the others arose because Platinum had particular reasons to sell the Black Elk bonds in exchange for cash to generate the liquidity necessary to make other investments or to meet margin calls. The documents reflecting these transactions confirm as much:

- **March 17, 2014**: Beechwood purchased about $11 million in Black Elk bonds directly from independent bondholders (not from Platinum) at par value.[9] Beechwood's position later decreased to $5.36 million in Black Elk bonds.[10]

- **May 13, 2014**: Platinum sold about $8 million in bonds to Beechwood to obtain cash necessary to meet Credit Suisse's margin calls.[11]

- **June 23, 2014**: Platinum sold about $10 million in bonds to Beechwood to obtain the money needed to complete two fundings at portfolio companies.[12]

---

[9]     Ex. 4, Email from M. Nordlicht to N. Marzella (M. Nordlicht providing fund allocations for $51 million purchase of Black Elk bonds from bondholders).

[10]     *See United States v. Landesman*, 17 F.4th 298, 312 (2d Cir. 2021) (noting that Beechwood owned about $5.36 million Black Elk bonds on April 8, 2014).

[11]     *Compare United States v. Landesman*, 17 F.4th 298, 312-13 (2d Cir. 2021) (noting that "$4 million of Black Elk bonds . . . from Platinum accounts at Credit Suisse and Nomura" were transferred to Beechwood on May 13, 2014) *with* Ex. 5, Emails between J. SanFilippo to M. Nordlicht (discussing how one of Platinum's brokers is "looking for their margin call"); Ex. 6, Emails among N. Marzella, J. SanFilippo, and M. Nordlicht (noting that Credit Suisse unexpectedly "raised black elk to 47% - an extra 4.8 million in [margin] requirement"); Ex. 7, Email from J. SanFilippo to A. Alonso of Credit Suisse (J. SanFilippo responding to an email demanding a margin call of ~$4 million from Credit Suisse and expressing confusion that the margin call applies to both PPVA and PPLO); Ex. 8, Email from J. SanFilippo to M. Nordlicht (explaining that J. SanFilippo is "going to take care of the adjusted Credit Suisse calls first" and "[another broker] will have to wait until we get the additional funds in"); Ex. 9, Email from R. Katzenstein of Obex Group to J. SanFilippo and M. Nordlicht (informing them that a "margin call is urgent" and saying that "the funds must be posted today or [the broker] will look to take appropriate remedies"); Ex. 10, Emails between M. Nordlicht and I. Wallach at Beechwood (M. Nordlicht asking "[w]hat is your capacity on black elk bonds?" and Wallach responding $8.1 million).

[12]     *Compare United States v. Landesman*, 17 F.4th 298, 312-13 (2d Cir. 2021) (noting that "$10 million worth of Black Elk bonds [were sold] from PPVA Nomura to BBIL Nomura" on June 23, 2014) *with* Ex. 11, Emails among J. SanFilippo, W. Slota, and M. Nordlicht (discussing whether there is enough liquidity to close three pending deals given various margin calls from Nomura and Credit Suisse, and Mr. Nordlicht stating he "need[s] to make sure I have money for [these deals]. I am freeing up some margin between 4-8 for tomorrow….so we can go bone dry"); Ex. 12, Email from M. Nordlicht to N. Marzella (M. Nordlicht stating "I want to move/sell $10 million of black elk bonds to [Beechwood]").

- **July 1, 2014**: Platinum sold about $7 million in bonds to Beechwood to generate the cash necessary to make another payment.[13]

- **July 7, 2014**: Platinum transferred about $6.7 million to Beechwood to obtain funds to put on another trade.[14]

These contemporaneous emails demonstrate the reasons underlying each of these bond purchases and establish that the Black Elk consent solicitation played no role in any of them. None suggests that there was any contemporaneous consideration given at all to the impact of those bond purchases on the consent solicitation. Indeed, to avoid any doubt on this issue, Platinum CFO Joseph SanFilippo has submitted a declaration in support of this memorandum confirming what the contemporaneous documents reflect. Specifically, in his declaration, Mr. SanFilippo unequivocally avers that the bond transactions occurred for business reasons independent of the consent solicitation. Ex. 22, SanFilippo Decl.

---

[13]     *Compare United States v. Landesman*, 17 F.4th 298, 312-13 (2d Cir. 2021) (noting that "$7 million in Black Elk bonds [were sold] from PPVA Nomura to [Beechwood]" on July 1, 2014) *with* Ex. 13, Email from M. Nordlicht to N. Marzella (M. Nordlicht asking "How much black elk bonds still at Nomura PPVA? 7 million? Trade them over to [Beechwood] please. Thx."); Ex. 14, Email from J. SanFilippo to Mark Nordlicht and Michael Nordlicht (J. SanFilippo asking Michael Nordlicht to "pls send wire confirm [of money from Beechwood] as soon as you get it. We have to turn around another wire by 5pm").

[14]     *Compare United States v. Landesman*, 17 F.4th 298, 312-13 (2d Cir. 2021) (noting that "$6.7 million of Black Elk bonds [were transferred] from Platinum to Beechwood" on July 7, 2014) *with* Ex. 15, Emails between M. Nordlicht and E. Bensinger (discussing whether to put on a trade and how to size it); Ex. 16, Email from M. Nordlicht to J. SanFilippo (M. Nordlicht stating "I need to see a margin report tomorrow [for] ppva and pplo" and asking "[w]hat is current split of [an existing position] [in] ppva/pplo?"); Ex. 17, Email from Mark Nordlicht to Michael Nordlicht and K. Propper (asking about liquidity and if there is "[a]ny chance we [are] ready to distribute [another position] this week"); Ex. 18, Emails between M. Nordlicht and B. Hutman (M. Nordlicht asking about liquidity and whether a certain stock had come into the fund yet; B. Hutman says he will sell it as soon as it does); Ex. 19, Email from N. Manela to M. Nordlicht (stating that Beechwood's position limit is $6.7M and that "[w]e can also use the basket temporarily if you want"); Ex. 20, Email from M. Nordlicht to N. Marzella, N. Manela, and I. Wallach (M. Nordlicht asking N. Marzella to "please sell 6.7 million black elk bonds to beechwood. 3.35 from ppco and 3.35 from pplo" and to increase PPLO's exposure to an existing position).

The timeline of the consent solicitation provides still further support.  All of the trades were made before Mr. Small emailed Mr. Nordlicht late in the night on July 7, 2014 with a copy of the consent solicitation and advised him that "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority."  Ex. 21, Email from D. Small to M. Nordlicht.  Even if Mr. Nordlicht had somehow known on July 7, 2014 that Beechwood could be considered a legal affiliate—which he did not, as discussed below—the timing of the Beechwood trades and the well-documented reasons underlying each transaction eliminate any idea that Mr. Nordlicht or his co-defendants sold the bonds as part of a premediated plan to "park" them at Beechwood and then avoid disclosing such bonds in the consent solicitation.

## C.   Defendants' Actions Caused No Harm To Anyone

On top of all the evidence reflecting Mr. Nordlicht's lack of intent to steal from anyone, the Court has already recognized that the crime Mr. Nordlicht has been convicted of caused no harm.  *See* Dkt. 1005.[15]  To establish a loss, the government had to "point to a subsequent drop in bond price sufficient to demonstrate a link between defendants' fraud and the supposed loss."  *Id.* at 4.  It could not because "the opposite happened"—once "the consent solicitation passed, and with the market fully aware of the indenture amendments, the price of Black Elk bonds was stable and then rose to above par," confirming "that the company's bonds were seen as more secure after the amendments passed because Black Elk was able to retire some of its most burdensome debt."  Dkt. 1005 at 4-5.  The lack of any harm, coupled with Mr. Nordlicht's lack of intent to harm anyone, is just further evidence that this is an extremely unusual case warranting leniency.

---

[15]    Indeed, it noted that the government's earlier claim that Mr. Nordlicht's conduct caused a $70 million loss "border[ed] on frivolous."  Dkt. 1005 at 3 n.1.

**D.      There Remains Significant Uncertainty Over Whether Beechwood Was An Affiliate Of Black Elk**

Although the Second Circuit found that there was sufficient evidence that Beechwood was an affiliate to sustain the jury verdict, it is indisputable that very little trial evidence supported the conclusion that Mr. Nordlicht knew Beechwood was a legal affiliate of Platinum, and thus, of Black Elk. Both Naftali Manela and Israel Wallach testified that Mr. Nordlicht did ***not*** control Beechwood. *See* Ex. 2, Nordlicht Tr. 1333-1347 (Manela), 4074-79 (Wallach). Mark Feuer and Scott Taylor controlled it, and Mr. Nordlicht's role was merely advisory. *See id.* at 4092 (Wallach). As this Court previously recognized, Mr. Nordlicht "may have been able to direct trading in particular bonds at Beechwood without having the power to direct or cause the direction of Beechwood's management or policies." Dkt. 799 at 35. There was also little evidence that "the Black Elk bonds were sufficiently significant for Beechwood that control over these bonds entailed control over Beechwood itself." *Id.* Although the Second Circuit found that the totality of the evidence could support the conviction, the Court may still consider the uncertainty over the affiliate question as a mitigating factor at sentencing.

Notably, that uncertainty has only grown since the initial trial. Since then, numerous Beechwood officers have testified in civil litigation that Mr. Nordlicht "didn't have a role" at Beechwood. *See* Dkt. 888-15 at 766:19-767:3 (M. Feuer). Beechwood CEO Mark Feuer testified that Mr. Nordlicht "was at best an advisor," but had no control over Beechwood. *See id.* at 761:21-23, 771:5-8. Mr. Feuer further testified that, as CEO, he "was the ultimate decision-maker"—and that, although Mr. Nordlicht often sent his thoughts, Mr. Feuer either "ignored" or "threw away most of them." *See* Dkt. 888-14 at 268:4-18, 203:4-14, 279:22-280:12.

Beechwood President Scott Taylor likewise testified that he reported to Mr. Feuer, not Mr. Nordlicht. *See* Dkt. 888-17 at 532:14-23. Although Mr. Nordlicht helped get Beechwood "up and

running," Mr. Taylor was clear that Beechwood was a separate business from Platinum.  *Id.* at 535:6-11.  He explained that Mr. Nordlicht's involvement in Beechwood declined over time and that Mr. Nordlicht did not have "authority over . . . Beechwood's affairs."  *Id.* at 534:2-535:5.  And Beechwood General Counsel Christian Thomas, testifying as Beechwood's Rule 30(b)(6) witness, confirmed that Mr. Nordlicht was, at most, "somebody that ideas would be bounced off of."  Dkt. 888-18 at 76:18-77:2.  Mr. Thomas repeatedly testified that Mr. Nordlicht "had no control over Beechwood or any aspect of its operations."  *Id.* at 76:25-77:2, 120:6-7 (Mr. Nordlicht "had no authority to move anyone to Beechwood"); 146:2-5 ("Again, Mark Nordlicht had no authority with respect to making any investment decisions with respect to Beechwood.").

In addition to this evidence, in preparation for sentencing, three former Beechwood employees have submitted declarations to this Court making clear that Mr. Feuer and Mr. Taylor— not Mr. Nordlicht—ran Beechwood and were the ultimate decisionmakers.  *See* Ex. 23, Declarations of Elliot Feit, Moshe Mueller, and Alexis Northwood.  Even if such testimony comes too late to set aside the verdict, the Court may consider this evidence at sentencing in evaluating the degree to which Mr. Nordlicht did know, or should have known, that Beechwood was an affiliate, to the extent that fact bears on Mr. Nordlicht's limited culpability.

### E.   Mr. Nordlicht Was Unaware Of The Indenture's Affiliate Rule

The Court may also consider the fact that Mr. Nordlicht's conviction turned entirely upon the proposition that he was told the affiliate rule of the Trust Indenture Act of 1939 ("TIA") would govern the vote on the Indenture when that was in fact untrue.  As this Court has held, Section 316(a) of the TIA does not apply to the modification of the indenture.  *See* Dkt. 921 at 2.  At Mr. Small's trial, the Court even instructed the jury that "as a matter of law . . . the TIA was not violated in this case and Mr. Small is not charged with violating it."  *Id.* at 1.

Although the Indenture itself had its own affiliate rule that went beyond the TIA, there was no evidence in the trial record that Mr. Nordlicht was ever told about the Indenture's affiliate rule. Rather, Mr. Shearer testified that he had forgotten about the Indenture's affiliate rule and that the only email he sent that included Mr. Nordlicht addressed solely the TIA. *See* Ex. 2, Nordlicht Tr. 4832, 4851, 4864-66, 5054-57. Yet Mr. Shearer's advice there, as on other things, was simply wrong. Hence, the trial evidence underscores the confusion around the rules governing the consent solicitation and further undermines the claim that Mr. Nordlicht intentionally engaged in criminal activity.

Similarly, while Mr. Nordlicht was erroneously told that the affiliate rule of the Trust Indenture Act would govern, there was next to no evidence that he was ever told that the Beechwood bonds should have been excluded from the consent solicitation. Platinum repeatedly disclosed its ownership of Black Elk bonds to Black Elk's counsel. *See id.* at 5025-26 (R. Shearer testifying that he was told in April or May of 2014 that Platinum owned more than $18.3 million in Black Elk bonds), 5079-5080 (R. Shearer testifying that he was again informed of Platinum's stake in Black Elk in July 2014). BakerHostetler was separately informed about the Beechwood bonds. *Id.* at 5079:5-5080:6 (R. Shearer). And, as detailed above, Mr. Nordlicht disclosed Platinum and "friendly" entities' bond holdings (including Beechwood's holdings) to Black Elk's CEO, Mr. Hoffman, who told BakerHostetler. *See* Dkt. 971-3; Dkt. 971-6. But there was no evidence that anyone ever advised Mr. Nordlicht that Beechwood, as a "friendly" holder, should be viewed as an affiliate whose votes must be excluded. These facts properly bear upon the Court's determination of Mr. Nordlicht's culpability.

* * *

Even recognizing that this Court and the Second Circuit have held that the above evidence is insufficient to grant Mr. Nordlicht a new trial, we urge the Court to consider at sentencing that the question of Mr. Nordlicht's guilt was extremely close.  This was not a fraud case where the Court has found the evidence of guilt and criminal intent to be overwhelming on the record before the jury.  This was not a fraud case where the defendants caused millions of dollars in harm, nor is it a fraud case where the defendants even intended to steal from anyone.  We respectfully submit that these atypical circumstances alone warrant a sentence of time served for Mr. Nordlicht.

## V.    A SENTENCE OF TIME SERVED IS APPROPRIATE GIVEN THE OTHER SENTENCING FACTORS

In crafting a just sentence, the Court should "consider every convicted person as an individual," *Koon*, 518 U.S. at 113, and evaluate "the fullest information possible concerning the defendant's life and characteristics," *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  Such information is "highly relevant—if not essential—to [the] selection of an appropriate sentence" because "the punishment should fit the offender and not merely the crime."  *Williams*, 337 U.S. at 247.  We respectively submit that, at sentencing, the Court should balance Mr. Nordlicht's role in an atypical offense against a lifetime of good deeds.  ***One hundred and fifty people*** have submitted letters in his support outlining the positive effect Mr. Nordlicht has had on their lives and communities.  Each letter provides valuable insight into Mr. Nordlicht's "life and characteristics."[16]  *Pepper*, 562 U.S. at 488.  We would ask the Court to consider these testaments to his character in crafting an appropriate sentence.

---

[16]    Mr. Nordlicht was previously scheduled to be sentenced on August 18, 2022, and some of the letters were prepared in anticipation of that date.  The Court later adjourned Mr. Nordlicht's sentencing so that it could hold a hearing on whether his conduct caused any loss, ultimately holding that there was no loss.

### A.    Mr. Nordlicht Is A Good And Honorable Man

#### 1.    Mr. Nordlicht Cares Deeply About His Family

Mark is a son, father, husband, brother, and uncle to people who depend on him.[17]  Their letters detail Mark's impact on their lives and provide a glimpse into the caring, nurturing, and loving person Mark is.  They also explain how a custodial sentence would unduly punish them, not just Mark, and how it would make their lives demonstrably worse.

Most notably, Mark is devoted to his elderly mother, Barbara Nordlicht, and is her primary caregiver.  Barbara has had many health issues since 2018—including three major surgeries and serious back problems—and Mark has been of critical assistance to her during this time.  Ex. 119, B. Nordlicht.  As Barbara explains, "[t]o say that I rely on Mark tremendously is an understatement."  *Id.*  Barbara "depend[s] on him for much of [her] day-to-day care, as well as [Mark's] goodness, his advice, and his presence."  *Id.*  Mark's brother, Kenneth, confirms that "Mark takes care of it all" and is "the rock [Barbara] relies upon."  Ex. 122, K. Nordlicht.  Mark's sister, Ora, who lives in Israel, cannot always visit her mother (especially, but not exclusively, during the COVID-19 pandemic and ongoing war) and writes that Barbara "relies mostly on Mark" and "is most dependent on him."  Ex. 76, O. Gichtin.  Mark's entire family recognizes how vital he is to his mother's well-being.  Mark routinely visits Barbara, manages her finances, and transports her to and from medical appointments.  *E.g.,* Ex. 122, K. Nordlicht; Ex. 76, O. Gichtin; Ex. 96, D. Kalter; Ex. 74, M. Gichtin; Ex. 73, J. Gichtin; Ex. 110, M. Listhaus; Ex. 93, P. Kaganoff. Barbara "cannot imagine life with him taken away" and is "very afraid for what is ahead."  Ex. 119, B. Nordlicht.

---

[17]    We refer to Mr. Nordlicht by his first name in this section, because several of the letters have been submitted by members of Mr. Nordlicht family and that is how his friends and family members generally address him in the quoted letters.  Some of the letters also refer to Mr. Nordlicht by his Hebrew name, Meir, which means to "give off light."  *E.g.*, Ex. 49, M. Cohn.

Mark's wife, Dahlia, needs Mark too.  She writes that her entire family "rel[ies] on him for his kindness, for his morality, for his generosity of spirit, for his humor, and for how he completes our family."  Ex. 96, D. Kalter.  Mark and Dahlia's six children, aged 13 through 26, look up to Mark and depend upon him.  According to Mark's sister, Mark's children "are who they are because of the dedication, time and love he gives to each one of them."  Ex. 76, O. Gichtin.  Mark "spends a great deal of time with each of his children" and even takes up their interests and hobbies to better connect with them.  Ex. 119, B. Nordlicht.

Mark's son, Noah, writes that he is "the very fortunate second child of Mark Nordlicht . . . not because of privilege, but because of the role models that I have as parents . . . especially my father."  Mark is "the greatest father a child can have . . . [h]e is kind, he is funny, he is selfless, he is giving, [and] he is respectful."  Ex. 124, N. Nordlicht.  Rachel, his oldest child, says that she "do[es] not think I can adequately express to you the role model that my father is to each one of us children."  Ex. 125, R. Nordlicht.  One of his younger daughters describes how, when she was being bullied at school because of Mark's indictment, trial, and conviction, her father "offered me strength, a shoulder to cry on, and his witty humor, all while he himself was going through the worst ordeal of his life."  Ex. 126, S. Nordlicht.  Mark's friends, Deganit and Tomer Ronen, explain that Mark's youngest daughter's life "would be unbearable without her father at home."  Ex. 136, D. & T. Ronen.

Mark's impact extends far beyond his immediate family.  His nephews "often turn to [him] for advice," and Mark "is always there for them, whenever and however he can help."  Ex. 76, O. Gichtin.  After one of Mark's nephews, Michael, "went through a rough patch in his life and . . . became estranged from the family," Mark, "[w]ithout being asked, [] stepped in" and "looked after him with the care of a father and guided him as a true and conscientious mentor."  Ex. 122, K.

Nordlicht.  Michael writes that "Mark has always been the uncle/big brother upon whom I could rely . . . . I owe much (if not all) of my accomplishments and inner peace to my Uncle Meir [and] [w]ithout his efforts, time, wisdom and willingness to help, I am honestly not sure where I would be today."  Ex. 123, M. Nordlicht.

Another nephew, Nathan, says that Mark "has always been a role model" who exemplifies "loving kindness"—the virtue of "giving to someone for the sole purpose of helping them out, without expecting anything in return."  Ex. 124, N. Gichtin.  When Mark's father died, Mark insisted that his father's phylacteries (a set of small leather boxes holding Torah scrolls, which are important to Jewish worship and are often passed down across generations) go to Nathan "because he knew I was growing further away from G-d and he had hoped that these would help me get back on the right path."  *Id.*  Mark "gave up the most sentimental gift that he could possibly receive from his father for me to grow and improve."  *Id.*

Mark's other nephews have similar stories.  *See* Ex. 74, M. Gichtin (Mark's generosity and kindness "instilled in me a burning desire to grow up to help others like my Uncle Meir"); Ex. 73, J. Gichtin (Mark "is one of the people that I most look up to in life . . . . My uncle thinks first about others, and then about himself.  Throughout my childhood and my life in general, whenever I needed help I knew that I could turn to my Uncle Mark."); Ex. 72, G. Gichtin (when Gavriel was preparing for his bar mitzvah, Mark "volunteered and set aside time to teach me [how to read a portion of the Torah] a few times per week" and "has always been available for me in every way"); Ex. 110, M. Listhaus (describing how Mark helped Michael read the Torah when her husband could not).

## 2. Mr. Nordlicht Humbly, Generously, And Selflessly Helps Those In Need

The number of other people Mark Nordlicht has helped over many decades is astounding. Most of these letters include one or more anecdotes about Mark's concern for others, and almost all include a testament to Mark's humble generosity and kindness. *E.g.,* Ex. 110, M. Listhaus (Mark is "undoubtedly the kindest person I have ever met"); Ex. 112, S. Major ("One may ask, what defines Mark? I think that it is his burning desire to give—to give charity, to help build our synagogue, to create an affordable Jewish day school accessible to those struggling financially, to give to institutions both here in the US and abroad, to give people second chances and even third chances when they have fallen once again. To give dignity."). As the letters show, Mark helps dear friends, total strangers, and everyone in between. And he does so without expecting, or even wanting, anything in return. *See, e.g.*, Ex. 171, E. Zeidman ("Once I was with Mark when he got a gift of appreciation from someone he had helped. Mark looked physically pained. He did not want gifts, he did not want accolades. Just making a positive difference in someone's life was enough for him."). Below are just a few of examples of the impact that Mark's generosity—often done anonymously or with little fanfare—has had on his community and the world.

Whenever people experience personal tragedy, Mark is the first to offer support. As one of Mark's friends, Rochel Butman, puts it, anyone who seeks assistance "knows with confidence that Mark Nordlicht will not turn them away emptyhanded." Ex. 45, R. Butman. Shaul Seitler, another friend, describes a time when one of his relatives died, leaving the family with little financial support. After Saul mentioned this, Mark "immediately volunteered to help and was instrumental in setting up a fund to support the widow and children, even though he didn't know the deceased." Ex. 146, S. Seitler. Another time, Mark heard about a woman who was selling challah bread to support her family while her husband was very sick. Leora Lambert, one of

29

Mark's friends, happened to be staying with Mark and Dahlia and, upon opening their freezer, found it "overflowing with challah breads." Ex. 104, L. & G. Lambert.  Even though he and Dahlia did not need that much bread, Mark had insisted that they stock their freezer full of it so that they could help the woman while preserving her dignity.  *Id.*

Another time, after a student at his children's school was seriously injured and rendered quadriplegic, Mark stepped in to assist the family.  Anonymously, he contributed the cost of a special lift so that the student could continue to attend school.  Lauryn Weiser, an educator at the school, writes that "[Mark] would not allow this child and his family to suffer further, and rejoiced at the opportunity to help them overcome what seemed at the time to be an insurmountable challenge."  Ex. 163, L. Weiser.  Mark did something similar for a friend whose child could not walk.  When Mark heard that there was a device that could help lift the child, dress him, bathe him, put him to bed, and transfer him to a wheelchair, Mark secretly bought it and had it installed in his friend's home.  *See* Ex. 139, Daniel Saks.  Daniel Saks writes that, "[t]o this day, our friend is unaware of who helped his family, but he has commented to others that the device changed [the child's] life, and that of his family."  *Id.*  Yet another letter describes Mark's "wisdom and compassion" for a family whose son was born with a rare disorder causing intellectual, behavioral, and physical difficulties.  Ex. 47, A. Chill.  According to the boy's father, Mark's hospitality and kindness towards the boy and his family "ease[d] our loneliness and pain."  *Id.*  The boy's mother credits Mark with "being among the people who saved her life in a very literal and profound way." *Id.*  These stories tell who Mark really is.

Other letters expand on Mark's compassion.  Multiple people wrote about how Mark helped his elderly neighbor, Sylvia Friedman, after her husband had died.  She had no children, and, except for Mark, was all "alone in the world."  Ex. 81, J. Hartman.  Mark introduced her to

his friends and made sure she was connected to her community.  He was her emergency medical contact, and even "ran over on more than one occasion in the middle of the night" to help her.  Ex. 76, O. Gichtin.  Mark "didn't do [this] so people would think that he is a great guy. . . .  He did it out of love for his elderly neighbor and nothing else."  Ex. 81, J. Hartman.

Similarly, Mark has provided support to multiple friends diagnosed with life-threatening illnesses.  *E.g.*, Ex. 171, E. Zeidman (supporting friend with breast cancer); Ex. 152, M. Stadtmauer (helping friend with leukemia); Ex. 70, L. Garbuz (aiding friend diagnosed with COVID-19 the same week Mark's father-in-law passed away).  In one particularly striking example, Michelle Jacobs describes how, when she was in the hospital for six months with sepsis, Mark and Dahlia were "by my side night and day."  Ex. 90, M. Jacobs.  "They arranged for the smallest of details" to ease her stay and "helped in any and every way humanly possible."  *Id.* When Michelle's arms and legs had to be amputated, Mark "reach[ed] out to other amputees who had suffered [similar] losses" and "help[ed] [Michelle] navigate the new world [she] was dreading."  *Id.*  Mark and Dahlia even "arranged for amputees to come to the New York area" and hosted them in their home.  *Id.*  And "they . . . became second parents to our children."  *Id.*  Michelle writes that Mark "personally took [her youngest child] under his wing and became a father figure to him, taking care of his every need and ensuring that such a young child would not suffer any setbacks."  *Id.*

Several other letters discuss Mark's devotion to Mikey, one of his closest childhood friends.  Mikey suffered from depression and bipolar disorder in the 1990s, when "those suffering from mental illness [were] usually marginalized and dismissed."  Ex. 30, E. Benovitz.  But Mark tried desperately to help his friend.  He let Mikey stay with him in his one-bedroom apartment, rent-free, indefinitely, and "tr[ied] his best to prop him up and stabilize him—financially and

31

emotionally." *Id.*  Mark was dating Dahlia at the time, and several letter writers commented on how Mark's "main preoccupation aside from school and dating his wife-to-be Dahlia, was Mikey." Ex. 110, M. Listhaus; Ex. 131, E. Press ("Mark never made a big deal about this incredible act of kindness to Mikey, and I never heard him complain about the intrusion on his personal life."). Mark would take Mikey to appointments.  Ex. 110, M. Listhaus.  He would try to get Mikey interested in business and finance.  Ex. 30, E. Benovitz.  And when Mikey's condition worsened and he had to be hospitalized, Mark drove several hours to visit him on multiple occasions.  *Id.* Later, after Mark and Dahlia married and Mikey was still struggling, Mark even invited him to live with them and their newborn child in their apartment.  *Id.*; Ex. 139, Daniel Saks.

Tragically, despite these efforts, Mikey went missing one day.  Mark was distraught and skipped another friend's wedding as he focused on the search for Mikey.  *See* Ex. 131, E. Press. He "could not bear to travel abroad while Mikey was missing in case they found Mikey alive while Mark was away and Mark's help would be needed."  *Id.*  A few days later, Mark was called on to identify Mikey's body at the police station.  *Id.*  "His grief was enormous," and he was distraught that he had been unable to save his friend.[18]  *Id.*

As Michelle Listhaus writes, Mark and Mikey's friendship "did not end there."  Ex. 110, M. Listhaus.  Mark tried to keep the memory of Mikey alive.  He and Dahlia named one of their sons after him.  *Id.*  When Mark helped build a yeshiva in Sderot, Israel, he dedicated it in memory of Mikey.  Ex. 65, D. Fendel.  Mikey's sister, Amy, says that although she has "not been in touch with Mark Nordlicht for over 20 years, he holds a special place in my heart. . . . I am forever grateful for all that [Mark] did for [Mikey]."  Ex. 151, A. Solnica.  She ends her letter by "earnestly

---

[18]     The PSR also mentions the profound impact Mikey's death had on Mark.  PSR ¶ 87.

request[ing] that [the Court] treat Mark the way that he treated Mikey, kindly and with utmost compassion." *Id.*

Mark's generosity extends beyond just close friends. *See, e.g.*, Ex. 66, R. Fink (explaining how Mark would generously donate to his synagogue's discretionary fund and that "[o]ftentimes, Meir did not even know who the beneficiaries were. He simply gave to my discretionary fund to help widows, orphans, brides etc."); Ex. 106, D. Leff (explaining how, as a single mother, she met Mark and Dahlia on a plane by happenstance and how they helped her "without ever making me feel like I was on the receiving end of charity"); Ex. 133, M. Raskas (stating that, as president of Mark's synagogue, he was "always able to turn to Mark . . . when others were struggling.  Mark would provide financial support when needed and, always, anonymously."); Ex. 159, E. Tropper (highlighting the "quiet—secret, in fact—help and assistance [Mark] has provided to many people over the years, all done in a way to preserve their dignity and privacy during most difficult times"); Ex. 129, M. Paley ("[W]hen a community member became a widow, Mark anonymously arranged for weekly food to be delivered to her home.").

As another example, Mark once flew a little girl he had never met from Israel to the United States so that she could get life-saving medical treatment (which was ultimately successful).  *See* Ex. 50, B. Colton.  He funded fertility treatments for a couple he barely knew who could not conceive naturally, *see* Ex. 45, R. Butman; Ex. 83, H. Heber, and paid for multiple weddings for couples who could not otherwise afford them, *see* Ex. 162, S. Weber; Ex. 66, R. Fink ("On one occasion, I met Dahlia . . . at a wedding in Israel.  I told her that I was off to another wedding that had been sponsored by Mark.  She didn't even know about it.").  When Mark's daughter celebrated her bat mitzvah in Israel, guests were surprised that "there appeared to be some ten bat mitzvah girls instead of one," and "[h]alf the guests were absolute strangers."  Ex. 49, M. Cohn.  Mark had

33

invited girls from an orphanage in Netanya, Israel, and any close friends and family they had to celebrate their bat mitzvahs along with his daughter. *See id.*; Ex. 94, B. Kalb. Mark's friend, Brian Kalb, writes about the impact Mark's generosity had on him and the girls: "Each girl felt so special that day. . . . [and] it was a celebration that I have no doubt each one of them still treasures. . . . [I]t still brings tears to my eyes remembering the amazing evening. The selflessness, the thoughtfulness and the sensitivity to others who were 'without' inspired me and so many others to be *better* people." Ex. 94, B. Kalb.

Similarly, Meyer Muschel tells a story about how Mark, at a community event, overheard a friend of Meyer's telling someone that she had recently been diagnosed with a terminal illness and was there "in search of someone who might look after her children after she was gone." Ex. 116, M. Muschel. The woman died a year later, and when Meyer went to her funeral, he was surprised to find Mark and Dahlia there. He later learned that, after the event, Mark told Dahlia what he had overheard and insisted that they help. They reached out to the woman, "cooked for the family, shopped for the family, hosted the family on special occasions in their own home, took the children in when our friend needed to be hospitalized." *Id.* Meyer explained that "[t]his project . . . had all of Mark's fingerprints—quiet, no fanfare, step up, get it done, and use what [he and Dahlia] had been blessed with to help others." *Id.* Meyer adds, "[t]his theme, I came to realize, was Mark's entire life." *Id.*

It can be hard to keep track of Mark's generosity. Rabbi Reuven Fink, the Rabbi of Mark's synagogue, included an entire appendix to his letter detailing Mark's "kindnesses and outreach," but even this long list includes just the ones that "stand out in [his] mind." Ex. 66, R. Fink. Rabbi Fink's letter described one kindness involving Mark's neighbor, Aharon Greene. *Id.*; Ex. 80, A. Greene. Mark recognized that Aharon—who was unemployed, going through a divorce, and on

the verge of bankruptcy—needed to sell his house quickly, but had been unable to sell it for over a year. Ex. 80, A. Greene. Mark and Aharon were not friends, and in fact barely knew each other. But recognizing that his neighbor was struggling, Mark offered to buy the house. *Id.* Mark took all the risk and wanted none of the reward: He told Aharon that if he later sold the house for a profit, he would give all the money to Aharon. *Id.* Mark's generosity had a profound impact on Aharon. He writes, "I still have chills and am emotional thinking about Mark's kindness and will have immense gratitude till the day I die. His benevolence helped me emerge from a dark pit, generally and to get out of debt, specifically." *Id.*

Although Mark has unquestionably been a blessing and a positive force for good within his Orthodox Jewish community, Mark's generosity has not been limited to helping those who share his beliefs. *See, e.g.*, Ex. 150, K. Smith; Ex. 29, O. Azoidi. For example, Kerry Cassidy writes that she was briefly introduced to Mark by a family friend, and—although a mere acquaintance and not part of his religious community—he was there for her like he was for so many others. Ex. 46, K. Cassidy. Mark did not just offer a quick phone call. He "physically show[ed] up" and spent "countless hours on the phone" helping "counsel and support" Kerry and her family through a crisis. *Id.* He was more present "than many of our lifelong friends and relatives." *Id.* "Few others have shown as much loyalty, generosity, and kindness" as Mark. *Id.* Howard Crosby writes that Mark is a model of generosity for people of all religions and backgrounds: "Although I'm an Irish Catholic, and Mark is Jewish . . . When it came to reaching out to help others, Mark was my master." Ex. 51, H. Crosby.

Similarly, Ahmed Sheikh has known Mark for almost ten years. Ex. 147, A. Sheikh. Ahmed gives several examples of Mark's kindness and writes that even though he is Muslim and Mark is Jewish, Mark "is the older brother, and only brother, that I do not have" and that Mark

helped him "to be a better person and to do better for others." *Id.*  Adam Demhasaj, who used to work at Mark's New York City apartment building, writes that Mark was unusually kind, going out of his way to give the building staff "the opportunity to take jobs that otherwise wouldn't have been available to us" and that he and his family "were always welcome in the Nordlichts' home," even after Mark and his family moved to New Rochelle.  Ex. 55, A. Demhasaj.

Mark's legendary hospitality is a common thread in other letters.  *See, e.g.*, Ex. 53, M. David; Ex. 52, K. David; Ex. 59, C. Druckman; Ex. 70, L. Garbuz; Ex. 86, A. Himelstein; Ex. 102, R. Korn.  As Dahlia writes, Mark "cannot imagine why one would not want to have guests for extended periods of time if given the opportunity."  Ex. 96, D. Katler.  Myron Eagle, who has known Mark since childhood, says that Mark "has opened his home time and time again to those who need a place to stay," including to people with marital difficulties, people in New York for medical treatment, and children in need who had nowhere else to go.  Ex. 60, M. Eagle.  Mark has housed and fed total strangers for several days on short notice.  Ex. 88, M. Hoffman.  He has invited large, grieving families to stay with him and handled their household chores—like doing the laundry and cooking meals—so that they could mourn.  Ex. 113, C. & D. Mann.  He hosted three young Israeli teachers who volunteered at Westchester Torah Academy (WTA)—which Mark helped found—for an extended period of time.  Ex. 97, N. Kandler.  One of Mark's daughters writes that, for as long as she can remember, Mark "has welcomed random guests in need of a hot meal or a place to stay"—it is "normal" for her to "walk into [her] own house" and "find a stranger hanging out on the family sofa or sitting at the kitchen table."  Ex. 126, S. Nordlicht.

Many letters also discuss Mark's positive contributions to their professional lives.  He "developed something of a reputation for giving people jobs when they were down on their luck and had lost their jobs—especially when families were involved."  Ex. 116, M. Muschel; *see also*

S. Bernstein (when "acquaintances of acquaintances" were "laid off from their jobs and could not find meaningful employment," Mark "repeatedly created . . . position[s] that allowed these people to earn a living, maintain their dignity and ultimately advance their careers"); Ex. 42, D. Brainson (Mark "was a stranger who would tap into his own resources, financially or otherwise, and never miss an opportunity to lend a hand and provide support or help them find jobs, and would do so modestly, respectfully, and seeking nothing in return."). As Dahlia explains, Mark "has no ability to enjoy success without helping others succeed as well." Ex. 96, D. Kalter.

For example, David Steinberg—who finished business school at the height of the 2008-2009 financial crisis and "was at a loss as to how [he] would support [his] family"—said that Mark gave him "an opportunity . . . when nobody else was willing to even consider it." Ex. 153, D. Steinberg.[19] David had no prior connection to Mark. *Id.* He "was just a guy who needed an opportunity" and, "like many others fortunate to meet Mr. Nordlicht, he gave it to me." *Id.* David's story was not a "fluke accident," as "at any given time there were always 3-4 young men and women with varying backgrounds that Mr. Nordlicht employed [and] trained." *Id.*

Mark helped these people, too. *See, e.g.*, Ex. 107, A. Levine (describing how, when he needed a job after graduation, Mark offered him one and noting that "[i]f it wasn't for [Mark], I would likely not have the great job that I have today."); Ex. 89, G. Hudes (describing how, when she sought out Mark's help for her nephew, Mark "offered the boy a paid internship," mentored him, and "did all of this just to help a young boy in trouble, without asking for anything in return and without expecting any recognition."). Ex. 64, H. Feder ("[I]n 1996[,] [Mark] was kind enough to offer me a job as his clerk while I learned the business of trading on the floor. . . . After

---

[19]     Mark also helped many families more directly during the financial crisis. As Michael Turek notes, "[w]ithout fanfare, Mark unabashedly stepped forward with forgivable loans—interest free" to assist families in need. Ex. 160, M. Turek.

a year, he offered to put up his own money to finance me trading for myself . . . he told me since I was a new father he want[ed] the split to be 75/25 . . . in my favor, because he knew I needed the money more than he did."). Bruce Schanzer, a childhood friend of Mark's, writes that during the financial crisis, there were multiple occasions where he went to Mark and told him "[y]ou need to give this person a job," and Mark did. Ex. 145, B. Schanzer. In Bruce's words, the people Mark helped "simply couldn't find employment and were losing all hope," but Mark "gave them jobs, paid them a very respectable wage, covered their health insurance, and helped them get on their feet. This was charity done quietly, with humility and a sense of humanity." *Id.*

The letters submitted in Mark's support are filled with similar stories. Mark Mueller writes that "[t]wenty years ago . . . [m]y future looked bleak" and that, "if not for Mark Nordlicht, it would have been bleak indeed." Ex. 115, M. Mueller. Despite having "no prior relationship with Mark," Mark "made a place for me in his business life, gave me his time and mentored me for [a] number of years[, and] . . . taught me the basics of financial products. . . . Without any exaggeration, he gave me so many hours of his time without ever asking for anything in return. . . . [W]hat I have today in large part came from a caring stranger who decided to invest his time and energy to change a kid's direction in life for the better, expecting nothing in return." *Id.*

When Ira Burstein sought out Mark's help, he was surprised to find that Mark was "not just going through the motions," and "it genuinely bothered him to hear about another person's struggles, even though it was someone that he really did not know." Ex. 44, I. Burstein. Mark offered Ira a job and "never made me feel as if he was doing me a favor." *Id.* Mark works hard to make sure that anyone he helps retains their dignity. *See* Ex. 24, H. Abrahams ("Mark was sensitive to Ira's dignity, which is why he gave him a job" instead of "simply writ[ing] him a check as a loan or a gift"). Elliot Bertram's story is similar—Mark "is the man who, literally, saved my

sanity, restored my self-respect, self-confidence and helped put me back on my feet." Ex. 35, E. Bertram.

Again, these are neither isolated incidents nor recent events. Mark's guidance and generosity helped many people launch successful careers over many, many years. *See, e.g.*, Ex. 41, D. Boim ("I owe virtually all of my career success to Mark"); Ex. 138, J. Ryan ("Mark's particular form of mentorship and guidance went above and beyond the normal course"). And he tried to instill many of the virtues he lives by—like generosity, humility, and kindness—in everyone he mentored. *See* Ex. 168, J. Winer ("Mark was really the first person to truly believe in me. He taught me that humility and kindness are much better character traits than arrogance and haughtiness. He taught me to treat people with respect no matter their status. He taught me to treat people as if they are no greater or worse than you, just as equals, regardless of how much money they had or didn't have.").

People who have worked directly with Mark attest to his warmth, thoughtfulness, and concern. When Joseph SanFilippo's youngest son had health problems, Mark "suggested that I take as much time off as I need to help get things . . . under control." Ex. 144, J. SanFilippo. Mark paid Joseph in full during this leave. *Id.* When a young woman who worked in Joseph's department was diagnosed with multiple sclerosis, Mark "continue[d] her full time pay and allow[ed] her to work part time from home for as long as she needed." *Id.*

As Mark Wise, another former employee, writes, Mark "was very different than any other boss I have ever had." Ex. 169, M. Wise. Mark "never drove a fancy car, he never wore designer clothing, and he never had any haughtiness about him. He always treated his staff with understanding, respect, care, kindness and compassion. I, for one, learned a tremendous amount from Mark Nordlicht as to how to treat one's fellow man." *Id.* Joan Janczewski adds that

"[e]mployees did not hesitate to go and speak with Mark because we knew he had our best professional interests and success at heart."  Ex. 92, J. Janczewski.

Eli Bensinger, a friend, rabbi, and former employee, explains just how much Mark cared about the people he worked with.  Ex. 31, E. Bensinger.  In 2016, when the government indictment forced Platinum to shut down, Eli says that "it wasn't [Mark's] loss that was torturing him."  *Id.* "While he was upset about the loss to his investors that liquidating the firm would cause, what was breaking him up was that he had 50 employees with families that now had no way to make a living. They would have a hard time getting jobs in the industry because [they] were all toxic by association."  *Id.*  Mark had lost his fortune and been publicly disgraced by the charges, but he was most concerned about "his portfolio managers, his secretaries, his accountants, his receptionists. That is the Mark that I know."  *Id.*

Mark has also helped people find work when he could not offer them a job himself. Raphael Jacobs, a distant relative by marriage, describes how he met with Mark when he was in college.  Ex. 91, R. Jacobs.  Mark "did not have a job in my area of interest, but [he] suggested a friend who helped me secure an interview and a job."  Raphael reflects that it was "oddly generous that a distant relative in-law who I hardly knew would give up time in his day to give guidance to a college student, who could not offer anything in return.  However, as I've come to learn over the years, this is Mark's trademark quality."  *Id.*  Mark also found work for others at great personal cost to himself.  Abraham Biderman, a friend who also works in finance, writes about how Mark called him and asked him to hire one of Mark's childhood friends who could not find work.  Ex. 37, A. Biderman.  Mark wanted Abraham to pay his friend "a very substantial salary," and Mark promised to personally cover the salary because "he [couldn't] rest when a close friend [was]

unemployed at a time when he himself was so successful financially." *Id.* Abraham says that "[Mark's] philosophy was always the same; If I was doing well, I must share it with others." *Id.*

Beyond employing those in need, Mark has always been available to provide advice and guidance. Carl Dorvil, a friend, says that Mark "always had a genuine interest in who I am as a person and always offered to help me in any way that he could." Ex. 58, C. Dorvil. "While most people say, 'Call me anytime,' it's a platitude that isn't actually meant." *Id.* But Carl has "called Mark at 2am multiple times to discuss both personal and business matters and to seek advice on different challenges that have arisen." *Id.* Robi Hartman, another friend, adds that his business success "would have never happened without Mark's foresight and encouragement" and that Mark "was always there for me when faced with difficult choices." Ex. 82, R. Hartman. Deganit and Tomer Ronen write about how, when they experienced a difficult year and were "looking for new jobs, . . . juggling our children, and struggling to do our best to be the parents and community members that we wanted to be," Mark "helped both of us find and settle into new jobs and, more importantly, he talked us through the hardest parts of that year, offering comfort and advice that helped us reach the successes that we have today." Ex. 136, D. & T. Ronen.

Mark has been generous with his money as well as his time, but he never just writes a check. He gives up his time and inspires others to give too. As Simeon Weber, a childhood friend, writes, "I draw a distinction between Mark and the average philanthropist. Mark is very involved in the causes and cases that he supports. It is never a question of just giving a check." Ex. 162, S. Weber. For example, Kerry Propper says that when Mark helped fund a documentary film about genocides, Mark "did not only help financially, he connected to the issue, and gave of his time, energy, and ideas generously." Ex. 132, K. Propper. When Laurie Bilger came to Mark seeking donations to support Miklat, which provides shelter and counseling for women who are the victims

of domestic violence, Mark did not just give money.  He and Dahlia organized a fundraiser, which created "an infusion of energy and financial commitments."  Ex. 38, L. Bilger.  Mark's impact was felt within weeks, and the money he helped raise allowed many women and children to receive clothing and holiday gifts.  *Id.*

Mark has also given generously to many other causes, too.  *See, e.g.*, Ex. 152, M. Stadtmauer (Hairy Cell Leukemia Foundation); Ex. 100, U. Klein (Merkaz Hatorani, which "deals with social issues in [Nof Hagalil, a town in Northern Israel]—Immigration absorption[,] . . . formal and informal education, women empowerment, and working with the elderly"); B. Deutsch (Lev Chesed, which provides food and assistance to the needy).  Put simply, Mark has been a "tremendous and heartfelt supporter and benefactor of those in need in his and in the broader community."  Ex. 167, M. Wildes.

### 3.    Mr. Nordlicht Has Dedicated His Life To His Faith And Community

Mark is deeply religious, and his lifelong commitment to the Jewish faith informs his decisions.  He has donated a tremendous amount of time, energy, and money to support his religious community in the United States and in Israel.  For instance, he has been a leader in his local synagogue and often actively participates in weekly religious services by memorizing and chanting the weekly Torah portion—about 90 verses in Hebrew.  Ex. 141, M. Saks; *see also* Ex. 134, A. Raskin; Ex. 33, J. Berlin.  Mark has been doing this since he was a child.  As Ari Parnes, a childhood friend, writes, Mark was "famous" in his community for "visit[ing] the elderly people, particularly on Saturday afternoons when we celebrated our Sabbath and had time off from school," and "very diligent[ly] and responsibl[y] . . . memoriz[ing] the weekly Torah reading and act[ing] as the Congregation Leader . . . for the local nursing home residents."  Ex. 130, A. Parnes. Later, when Mark and Dahlia moved to New Rochelle, they helped fund the synagogue for their new community.  *See* Ex. 60, M. Eagle.

42

Perhaps Mark's biggest contribution to his community, however, was his involvement in creating the Westchester Torah Academy ("WTA").[20]  Although Mark and Dahlia could afford to send their children to existing Jewish schools to receive a Jewish education, Mark was troubled that other families could not.  As Karen Chubak, a WTA parent, writes, "[t]he existence of WTA allows parents to choose to educate their children to understand their Jewish heritage without having this choice be a financial burden.  Mark knew others in his community were facing this issue and he set out, against all odds, to solve the problem."  Ex. 48, K. Chubak.  Abby Flamholz— who shares Mark's passion for affordable education—explains that, while many had recognized the problem before, "there was no one actually on the ground, coming up with a long term sustainable solution. . . . [U]ntil I began working with Mark Nordlicht."  Ex. 67, A. Flamholz.

Mark was determined to solve the problem.  As Brian Kalb tells it, Mark "approached me years ago . . . and said 'Do you want to help me start a school to solve the tuition crisis? It pains me that hard working families have to feel that they cannot send their kids to get a decent Jewish education without bowing their heads and asking for help.  There has to be a solution.'"  Ex. 94, B. Kalb.  From that point on, Mark "literally . . . spent day and night working toward building this school. He was committed and determined to succeed."  *Id.*  He did whatever it took to make WTA successful.

---

[20]  Outside of founding the WTA, Mark has been involved—largely anonymously—in the Affordable Jewish Education project.  *See* Ex. 99, J. Kiderman ("Although [Mark] could have taken a tremendous amount of credit and honor for his vision and generosity, he wanted none of it.  In fact, when we started working together Mark asked to remain anonymous, and most people I encountered in my work did not know the identity of my generous benefactor for months or even years."); Ex. 103, B. Krauss (discussing Mark's role in founding the Affordable Jewish Education Project, which "partnered with schools in New Jersey, Westchester and Long Island to develop new education methods that would allow for a dramatic decrease in tuition costs").

For instance, when WTA "took on two volunteers from Israel to help teach Jewish values and ethics" Mark and Dahlia hosted the young teachers in their home "for the entire academic year." Ex. 52, K. David.  As Rabbi Rami Strosberg, who was the principal of WTA, writes: "whenever I needed a piece of advice or a word of encouragement, I would call Meir.  No matter how busy he was, or what meeting he was in, he would take my call, help lift me up, and share a kind and encouraging word." Ex. 155, R. Strosberg.  While watching Mark work so hard to create WTA, Brian Kalb "often asked [himself], 'Why did he bother?  He didn't need this for himself.' But, that is the Mark Nordlicht that I know—always thinking of others, and how to better our community every day *without any thought for selfish gain*.'" Ex. 94, B. Kalb.

Today, WTA is a "bedrock of [the] community and . . . it serves as a thriving testament to Meir's tenacity and commitment." Ex. 53, M. David.  Mark led by example to make it successful. He knew that many parents might look down on the new school as a budget option.  So he enrolled his two youngest children in WTA—his other children were too old—to show that he believed in the school and its mission. *See* Ex. 81, J. Hartman.[21]

Many parents have submitted letters explaining the impact WTA has had on their lives and thanking Mark for making the school a reality.  David Bessler, for example, says that WTA "has been a life saver for so many parents." Ex. 36, D. Bessler.  He writes about his son, who recently graduated from WTA: "[My son] stood in front of the school that Meir built and spoke about our family's journey and WTA's Core Value of Humility.  This is a dream come true for my family

---

[21]   Mark did the same thing for SAR Academy, another school he supported.  Ex. 103, B. Krauss ("Mark's efforts have made a tremendous impact in our community, and continue to do so today.  What I found extraordinary is how Mark made the cause personal and enrolled his own child, his youngest, in the new, affordable school.  Though SAR Academy has vast resources, both curricular and co-curricular, Mark knew that parents who could not afford SAR tuition might be embarrassed to give the new school a try.").

and for my ancestors who sacrificed so much to get us here.  We owe this great honor and gift to Meir Nordlicht who made it all possible." Ex. 36, D. Bessler.  Others in the community have recognized that, without Mark, WTA would not have been possible.  *See* Ex. 87, A. Hoffman ("This kind of generosity goes far beyond monetary gifts, it comes from someone who sees a problem that is challenging many different people in so many different ways; and Mark feels a sense of responsibility to try and fix it."); Ex. 91, R. Jacobs ("Mark is truly driven by his desire to improve the life of his family and broader community.  He started a school for others that he did not need for his own children."); Ex. 111, J. Lyons ("Some people just write checks, but Mark always did so much more.  He literally created initiatives for better education within his charitable endeavors to ensure the maximum life results for children."); Ex. 136, D. & T. Ronen ("Now, thanks to Meir, we are both Heads of two schools that are changing the face of Jewish education."); Ex. 141, M. Saks ("This school would not have existed if Mark had not identified the need and undertaken to make it a reality.").

Mark also cares deeply about education outside of his own New York community.  For many years, he has been a key supporter of Amit, an Israel-based charity that "educate[s] the children of poor immigrants and disadvantaged homes." Ex. 53, M. David.  He has visited Amit schools every year, met with principals and staff members, and would "often personally underwrite any unmet or unforeseen need that impacted 'his kids' – changing lives for the better every time he did so, and inspiring all those in his orbit." Ex. 79, A. Goldsmith & A. Eldar.  One of the Amit schools Mark helped fund—the Fred Kahane School in Ashkelon—"enhances the lives of thousands of youth who would otherwise not have had this opportunity." Ex. 101, L. Klibanoff.  Mark took a personal interest in it (and other Amit schools he has helped fund, like the AMIT Nordlicht Religious Technological High School in Jerusalem, which was endowed by his parents)

because he wanted to "create[e] opportunities for low income and 'at risk' youth to become contributing members of society." *Id.*

Amit is just one of the many school-related charities Mark has supported. His commitment to helping and educating children runs deep. *See* Ex. 97, N. Kandler (describing Mark's contribution to "Or Me'Ofir preparatory school, for boys from the Ethiopian immigrant community, [which] helps them build character, prepares them for life"); Ex. 164, J. Weiss (describing Mark's anonymous support for the Etzion Foundation, which "provides scholarships for students in need of financial assistance, to enable their participation in a gap year program that promotes their leadership skills and strengthens their Jewish identity"); Ex. 165, D. Wiener (describing Mark's support for Shalva, "a charity that now supports 20,000 kids with special needs and their families per year"); Ex. 59, C. Druckman ("Meir . . . further[s] education in Eretz Yisrael, heading the board of the American Friends of Yeshivot Bnei Akiva, a network of yeshivas across Israel."); Ex. 166, A. Wildes ("Meir has been attentive to the needs of [American Friends of Yeshivot Bnei Akiva]'s 70 member schools, donated generously, but more importantly, he has provided valuable insight and direction in nurturing the staff of and students in our organization's schools. He always makes time to help in any way he can."); Ex. 25, D. Abromowitz (describing Mark's support for educational programs in Israel); Ex. 28, S. Axelrod (describing Mark's support for Kesharim, an organization that offers educational programs throughout the United States); Ex. 65, D. Fendel (describing how Mark helped fund protected dormitories and study halls for Talmud Academy in Sderot, Israel, a city plagued by rocket attacks); Ex. 105, S. Lankri (describing Mark's efforts to help build a yeshiva in Acre, Israel, that helped turn around the fortunes of that ancient city, including its non-Jewish residents); Ex. 154, Y. Stern (same); Ex. 86, A. Himelstein

(describing Mark's support for yeshivas in Akko, Ashdod, Kiryat Malachi, and Gush Etzion, and noting that "[p]ractically every region of [Israel] benefitted from Mark's kindness and interest").

\* \* \*

These many, many letters are a testament to Mr. Nordlicht's lifetime of good works.  He has dedicated himself to improving the lives of others—and he follows through, often anonymously and at great personal sacrifice, to give friends and strangers whatever they need. Helping people is one of Mr. Nordlicht's core values, and we respectfully submit that the overwhelming evidence confirming this fact highlights the aberrational nature of the offense conduct here.

Other courts, too, have considered similar evidence when imposing more lenient sentences, including non-custodial ones that fall outside of Guidelines ranges.  *See, e.g.*, *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming sentence of probation where Guidelines range was 18-24 months because defendant made an "isolated mistake" in light of his life dedicated to his family, church, and community); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming sentence of three months incarceration when Guidelines range was 63 to 78 months in part due to defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Carson*, 560 F.3d 566, 587 (6th Cir. 2009) (affirming sentence of probation when Guidelines range was 15 to 21 months because of the "nature and circumstances" of the offense and the defendant's otherwise "unblemished and exemplary record"); *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005) (affirming sentence of probation when Guidelines range was 12 to 18 months because defendant was a "law abiding citizen, who [did] an incredibly dumb thing" and "not the type of defendant the guidelines

section was designed to punish").  This Court too may properly take into account Mark Nordlicht's lifetime of dedication to his family, his community, and many others in need.

This Court highlighted similar evidence in sentencing Mr. Nordlicht's co-defendants, Daniel Small and David Levy, to non-custodial sentences.  *See* Ex. 3, Small Tr. 49:11-15, 50:2-5 (noting the "overwhelming" evidence of Mr. Small's good deeds and concluding that he was "a rather noble character who made a very bad criminal mistake," a mistake that "pales in comparison to the way he's lived the rest of his life"); Ex. 1, Levy Tr. 14:13-14 (noting Mr. Levy's "very favorable family and community and social history").  We respectfully suggest that Mr. Nordlicht's extraordinary personal history warrants similar treatment.

**B.      There Is No Need For A Custodial Sentence**

**1.      Mr. Nordlicht Has Already Been Severely Punished**

This Court has recognized in the cases of Mr. Nordlicht's co-defendants that the government's seven-year case has amply served its punitive and deterrent interests.  *See* Ex. 1, Levy Tr. 14:16-20 ("[T]he amount of press that this case has gotten and the seven-year cloud that [Mr. Levy] has struggled under is going to have all the general deterrent effect that can be squeezed out of this kind of fraud"); Ex. 3, Small Tr. 50:23-24 (noting that "having been through this since 2016" was a significant punishment for Mr. Small).  The same is true for Mr. Nordlicht.  Over the past seven years, Mr. Nordlicht and his family have suffered greatly.  As Dahlia writes:

> The shock of the arrest, the image of FBI agents with machine guns storming our home at 5am, the pain of being handcuffed with one's hands cuffed tightly behind one's back for over six hours is just the start. The press conference followed by the shame, the isolation, the humiliation, the ostracism of our family (Mark, myself and each of our children) has been unbearably painful. In addition, Mark now suffers from depression and anxiety, I have terrible PTSD and social anxiety, and each of my children suffers from anxiety in various forms and degrees.

Ex. 96, D. Kalter.

Mark's children add more details.  His daughter, Emma, says that "[w]ords cannot express the pain, suffering and punishment that my father has endured, and all of us along with him. . . . [T]he humiliation, the worry, the anxiety, and the fear have been immeasurable."  Ex. 120, E. Nordlicht.  Another of Mark's daughters, Rachel, is now especially "conscious of the preconceived notions people had when approaching [her]" because of her last name.  She was even encouraged "by countless people (including my pre-medical advisor, friends, family members, etc.) to change [her] last name" because it is stigmatized and could "hinder [her] future career."  Ex. 125, R. Nordlicht.  One of Mark's younger daughters describes how she was bullied at school and developed severe social anxiety.  Ex. 126, S. Nordlicht.  Mark's daughter-in-law, Tess, describes the "heart-wrenching" suffering that the Nordlichts have endured and how her husband—Mark's son Noah—has borne this burden "especially heavily" since he was a junior in high school.  Ex. 127, T. Nordlicht.  David Gichtin, Mark's brother-in-law, observes: "I have seen my nephews and nieces live a large portion of their young lives with the continuous threat of their father being taken away from them.  In many ways, they have been deprived of the innocence of their childhood." Ex. 71, D. Gichtin.  Richard Katz relates that "it is hard ever to forget the palpable fear and trepidation that the youngest of the Nordlicht children (not older than 7 or 8 years old at the time) expressed . . . [at] the beginning of the trial about what might happen to her father."  Ex. 98, R. Katz.

People outside Mark's family have also recognized the pain and suffering.  Mark was "dismissed from the board of [the WTA,] the very same school that he was instrumental in starting."  Ex. 38, L. Bilger; *see* Ex. 129, M. Paley ("Mark agreed to step down since he recognized that the school's success was more important than his own position on the Board.  He longed for the school to thrive and still desired to help the very same community which was shunning him.

Despite the challenging circumstances Mark was experiencing, he still considered the greater good and the benefit of others before himself."). He was stripped of honors in the synagogue. Ex. 38, L. Bilger. He was ostracized by people whom the Nordlichts believed to be friends. *Id.* One of his daughters even had to switch schools because she was being bullied so intensely. *Id.*

Any sentence that this Court imposes will come in addition to the suffering, humiliation, and financial destruction that Mr. Nordlicht and his family have already experienced because of the consequences of the prosecution. Mr. Nordlicht has served his sentence through seven years of suffering and disgrace. Further punishment is unwarranted.

### 2.   The Purposes Of Deterrence Have Been Served

As this Court recognized in sentencing Mr. Small and Mr. Levy, the suffering and humiliation described above—as well as the financial ruin to his lifelong business—has amply satisfied the interest in deterring any future unlawful conduct by Mr. Nordlicht. And the public scrutiny of his trial—encouraged by the government, which issued a press release about Mr. Nordlicht's indictment and held a press conference to announce the unsealing of the indictment— is sufficient to deter future financial crime. Indeed, in sentencing Mr. Small, this Court highlighted the collateral consequences of Mr. Small's conviction and the slow, daily punishment Mr. Small has experienced since the prosecution began in 2016 as a sufficient deterrent to warrant a non-custodial sentence. Ex. 3, Small Tr. 50:20-51:22. When sentencing Mr. Levy to time served, the Court emphasized that "this case has broken him" and has had a "devastating effect" on his life, which is "punishment enough." Ex. 1, Levy Tr. 15:11-14.

Mr. Nordlicht is no different. Even though he was acquitted of the majority of charges, his reputation has been destroyed. His family's name has been ruined. His business is gone. His resources are depleted, he declared bankruptcy in June 2020, and he is untouchable in the financial world. He receives hate mail. For almost eight years, his mother has lived in fear of how she will

survive without him.  His wife still suffers from post-traumatic stress disorder.  His children suffer from anxiety and depression, are bullied at school, and wonder if they should change their names. Even without a custodial sentence, no one could look at Mr. Nordlicht's fate and conclude that a financial crime—especially one like Mr. Nordlicht's that provided no financial benefit to himself—would be worthwhile.  The severe punishment Mr. Nordlicht and his family have endured since 2016 is punishment enough.

### 3.    There Is No Need To Protect The Public From Mr. Nordlicht

Mr. Nordlicht poses no risk of injuring the public.  The crime he was convicted of caused no loss.  And, regardless, the conviction represents an absolute aberration.  Mr. Nordlicht has dedicated his life to helping others.  As discussed above, the number of letters attesting to Mr. Nordlicht's generosity and the impact he has had on people's lives is overwhelming.  A sentence of time served, which would keep Mr. Nordlicht in society, would enable him to carry out this important work.  As Mark's daughter Rachel writes: "I beg of you to consider this good man . . . and enable his sentence to allow him to stay at home and to do what he does best – help make the world a better place."  Ex. 125, R. Nordlicht.

### 4.    Mr. Nordlicht Does Not Need Treatment

Under Section 3553(a)(2)(D), this Court must consider the need for any sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  Mr. Nordlicht does not need any educational or vocational training, medical care, or other correctional treatment.

The PSR does note that Mr. Nordlicht has social anxiety and experiences stress related to this case, but it emphasizes that "spending quality time with his wife and children has been helpful in alleviating his stress."  PSR ¶ 87.  As the many letters discussed above establish, Mr. Nordlicht,

his family, and his community would benefit most if he were allowed to continue to make positive contributions to society.

### C.      Suitable Alternatives To A Custodial Sentence Are Available

Pursuant to Section 3553(a)(3), the Court must consider the kind of sentences available for Mr. Nordlicht.  There are many alternatives to incarceration.  Given the extensive toll this case has already taken on Mr. Nordlicht's life, time served would be an appropriate sentence.  Other non-custodial alternatives include probation, *see* U.S.S.G. § 5B1.1, home confinement, *see* U.S.S.G. § 5F1.2, and community service, *see* U.S.S.G. § 5F1.3, that would promote the interests of justice. Probation is "a sentence in and of itself," and it may "be used as an alternative to incarceration" when it can "be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."  U.S.S.G., § 5B, intro. cmt.

### D.      A Sentence Of Time Served Avoids Unwarranted Sentencing Disparities

Under Section 3553(a)(6), the Court must also consider whether its sentence would create unwarranted sentencing disparities among defendants.  Since other defendants and other people involved in the Black Elk consent solicitation face no prison time, this factor weighs in favor of a non-custodial sentence like time served.

The Court sentenced David Levy to time served, *see* Ex. 1, Levy Tr. 15:15-16, and Daniel Small to a probationary sentence of less than eleven months.  *See* Ex. 3, Small Tr. 51:21-24.  And Joseph Mann, who worked at Platinum, and Jeffrey Shulse, who was Black Elk's CFO, received deferred prosecution agreements from the government.  Dkts. 843 & 878 (orders dismissing the indictments against Mann and Shulse).  Mr. Shulse, in particular, managed the consent-solicitation process and would seem at least as culpable as Mr. Nordlicht.  Mr. Shulse directly communicated with Rob Shearer, Black Elk's outside counsel, and figured prominently in the emails that the

Second Circuit relied on in determining that Mr. Nordlicht's conviction was not a manifest injustice.  *See United States v. Landesman*, 17 F.4th 298, 332 (2d Cir. 2021).  Others, like John Hoffman (Black Elk's CEO), Marizza Piché (Black Elk's General Counsel), and Rob Shearer, were never charged and have avoided criminal liability altogether.  Sentencing Mr. Nordlicht to a custodial sentence when others involved in the Black Elk bond vote have not faced charges, much less prison time, would create a significant, unwarranted sentencing disparity.

The Court may reach that same conclusion when comparing this case to other financial convictions, where the defendant did not benefit from the convicted conduct and had no intent to harm anyone.  *See United States v. Musgrave*, 647 F. App'x 529, 537 (6th Cir. 2016) (affirming sentence of one day of imprisonment, followed by home confinement and probation—a departure from the Guidelines range of 57 to 71 months imprisonment—when defendant's criminal conduct involved "only one transaction," he "received no profit from his crimes," and he had no intent to "line his own pockets with someone else's hard-earned money"); *United States v. Prosperi*, 686 F.3d 32, 46-47, 49-50 (1st Cir. 2012) (affirming sentence of six months home monitoring and three years of probation—a departure from the Guidelines range of 87 to 108 months—when district court found there was "no evidence that the defendant . . . intended to enrich himself personally or intended to harm [purported victims] in any specific sense").  Indeed, when this Court sentenced Mr. Small, it noted that although the convicted conduct was "serious," it "wasn't a serious crime to rob people" and "not as bad as most frauds that we have in this court."  Ex. 3, Small Tr. 48:18-22; *see also* Ex. 1, Levy Tr. 13:10-13 (noting that this case was unusual in that "there really weren't financial losses to anybody").  The same conclusion is warranted here.

**E.    There Is No Need For Restitution Or Forfeiture**

Finally, Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense."  Because the Court has already held that there were no victims and

there was no loss, there is no need for any restitution.  Dkt. 1003 at 52 n.14; Dkt. 1005 at 6.

Similarly, the Court should not order any forfeiture.  The purpose of forfeiture is to disgorge ill-gotten gains, but Mr. Nordlicht did not receive anything from the offense.  Indeed, as the trial record clearly demonstrates, there were no gains at all stemming from the offense.  Particularly in light of the devastating financial impact these seven years of prosecution have had on Mr. Nordlicht and his family, no criminal forfeiture is warranted.

## **CONCLUSION**

For the reasons set forth above, Mr. Nordlicht respectfully requests that the Court impose a non-custodial sentence of time served with no restitution or forfeiture.

Dated:  March 6, 2024

DECHERT LLP

By: */s/ Andrew J. Levander*
       Andrew J. Levander
       Steven A. Engel
       Three Bryant Park
       1095 Avenue of the Americas
       New York, New York 10036
       Telephone: (212) 698-3500
       Fax: (212) 698-3599
       andrew.levander@dechert.com
       steven.engel@dechert.com

*Attorneys for Defendant Mark Nordlicht*

## APPENDIX A

| PSR ¶ NO. | CORRECTION |
| :---: | :--- |
| 9 | Mr. Nordlicht was not responsible for Beechwood's investment strategy. |
| 12 | Mr. Nordlicht was responsible for Platinum's various hedge funds as CIO, and he was involved in many of the funds' investments.  However, he was not "intimately involved" in Black Elk, and he did not attend any Black Elk management meetings. |
| 13 | Mr. Nordlicht did not discuss Black Elk's financial difficulties with Black Elk management or the possibility of putting Black Elk into bankruptcy.  The quoted document does not involve Mr. Nordlicht. |
| 14 | Several of Black Elk's oil properties generated positive cash flow in 2014 after the Renaissance Sale, making the final sentence of this paragraph inaccurate. |
| 20 | The Black Elk Trustee was uncomfortable with the private consent process because there was no effective "strike" date to assure a proper count of the votes as of a specific ownership date.  The discomfort had nothing to do with Platinum having voted the bonds it owned or the propriety of those votes. |
| 21 | The statement that "[t]he solicitation would permit Black Elk . . . to repay Platinum and other BE Preferred Equity holders before BE Bondholders with funds from the Renaissance Sale" is inaccurate.  As the Court recognized, Mr. Nordlicht "wanted all non-affiliated bondholders to tender their bonds and be paid in full," and "defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders before using the remaining proceeds to pay off the high[er]-interest preferred equity."  Dkt. 1004 at 7-8.  Because all bondholders were given the opportunity to tender, the solicitation would have given them the opportunity to be repaid first.  Only bondholders who elected to remain as holders would be paid after the preferred equity holders. |
| 23 | It is not true that "the defendants moved a significant portion of the BE Bonds that they controlled to Beechwood" in order "[t]o accomplish th[e] goal" of "ensur[ing] that the Consent Solicitation vote passed."  In the run-up to the bond vote, Beechwood purchased Black Elk bonds on five different occasions—once from activist bondholders and the rest from the Platinum funds.  These purchases began well before the public consent solicitation, at a time when the defendants believed that all affiliates were permitted to participate in the consent vote. |

|  | Moreover, the evidence demonstrates that every one of the purchases was for a reason unrelated to the consent solicitation. The first transaction was occasioned by the bondholders' interest in selling their position and the others arose because Platinum had particular reasons to sell the Black Elk bonds in exchange for cash to generate the liquidity necessary to make other investments or to meet margin calls. |
|---|---|
| 24 | This paragraph conflicts with paragraph 8, which states that Beechwood was "founded by Mark Feuer and Scott Taylor." Beechwood was not "created" by Mr. Nordlicht, Murray Huberfeld, and David Bodner. |
| 27 | Murray Huberfeld did not work at Beechwood or Platinum in 2014. |
| 28 | The email was written one year before Beechwood was actually formed, and there was no evidence presented that Beechwood was actually established with this structure. To the contrary, evidence was presented showing that Beechwood's ownership and voting rights upon its 2014 formation were different from what was described in this March 2013 email. *See* Dkt. 907-2. |
| 29 | There is nothing in this paragraph, or the record, to support the conclusion that Mr. Nordlicht intended to "maintain the appearance of separation" between Beechwood and Platinum. Platinum and Beechwood were indisputably separate companies, and there was no evidence of any affirmative act to obscure their relationship. In addition, Mr. Nordlicht did not use the word "control" in a technical, legal sense in these emails. |
| 30 | Defendants and Mr. Small were assessing Black Elk bonds in one consolidated table on April 8, 2014 during the private consent process, when counsel had not objected to affiliates participating in the consent process. |
| 32 | This paragraph omits the fact that the trades in question predated Mr. Small's July 7, 2014, email to Mr. Nordlicht and Mr. Levy stating that "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority." See PSR ¶ 38. There was no evidence presented at trial to suggest that the trades referenced were intended to move bonds to Beechwood to avoid disclosure, and in fact, each of these trades was done for documented, specific business reasons that were unrelated to the consent solicitation. |
| 46 | The statement that "the defendants were able to extract the proceeds of the Renaissance Sale . . . and transfer the money to themselves" is inaccurate as |

| | |
|---|---|
| | applied to Mr. Nordlicht.  Mr. Nordlicht did not receive any money from the Renaissance Sale proceeds.  In addition, the word "extract" is incorrect.  Black Elk paid the preferred equity holders to meet its legal obligation and thereby retire a high-interest obligation; defendants did not take the money from Black Elk as though it were stolen. |
| 47 | Mr. Nordlicht did not conceal anything from the lawyers at BakerHostetler.  Before the consent solicitation, Mr. Nordlicht told Black Elk's CEO that Platinum planned to "redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million," leaving "$90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself."  Dkt. 971-3.  This information was conveyed to BakerHostetler, which documented it in a July 2014 memo to Black Elk.  *Id.*  The Court recognized that Black Elk and BakerHostetler learned this information from Mr. Nordlicht.  *See* Dkt. 1004 at 5; *see also* Dkt. 971-7.  Moreover, Mr. Shearer testified that he discussed the other Platinum bonds with Mr. Small before the public consent solicitation closed and therefore knew about the other Platinum-owned bonds in time to stop the Indenture from being amended had there been any material issue. |
| 53 | Black Elk did not transfer any proceeds from the Renaissance Sale to any defendant or to any co-conspirator.  Mr. Nordlicht did not receive any funds, directly or indirectly, from the offering. |
| 56 | Mr. Nordlicht was not the CIO of Beechwood.  Mr. Nordlicht did not "direct[] other individuals to transfer funds from Platinum to Beechwood."  To the contrary, Beechwood transferred funds to Platinum in exchange for the purchase of Black Elk bonds (and for reasons unrelated to the consent solicitation).  In addition, there were not 10 or more victims, as discussed below, and an enhancement under U.S.S.G. § 3B1.1.(c) is inappropriate. |
| 64 | There were not 10 or more victims. |
| 66 | As discussed below, Mr. Nordlicht was not an "organizer, leader, manager, or supervisor in criminal activity" and should not receive a two-level enhancement under U.S.S.G. § 3B1.1(c).  Instead, he should receive a two-level reduction under U.S.S.G. § 3B1.2(b) because of his minor role. |
| 68 | Mr. Nordlicht's adjusted offense level should be 5, not 11. |
| 71 | Mr. Nordlicht's total offense level should be 3, not 9. |

57

| | |
|---|---|
| **82** | Mr. Nordlicht's son, Noah, has graduated from Yeshiva University, is married, and works as an accountant.  Mr. Nordlicht's daughter, Emma Nordlicht, is attending Barnard College.  She is no longer studying in Israel. |
| **84** | Mr. Nordlicht has resided at the same address since 2004, not 2014. |
| **88** | Mr. Nordlicht "experimented with marijuana on one occasion in 2018" while he was in California, where marijuana was legal under state law. |
| **93** | Mr. Nordlicht did not "operate" Beechwood, and the Government did not allege that he did.  Mark Feuer was the CEO of Beechwood, and Scott Taylor was the President.  Mr. Nordlicht had no role at Beechwood.  In addition, Mr. Nordlicht did not "retain a $5 million yearly profit."  His earnings were reinvested through the company, not distributed for his own use or retention. |
| **97** | The rental property in Florida was owned by Mr. Nordlicht's wife, not Mr. Nordlicht.  The proceeds of the sale went to pay off the mortgages on the property and to pay Mr. Nordlicht's legal expenses. |
| **99** | Mr. Nordlicht agrees with the Probation Office that he overestimated his monthly clothing expense.  A more accurate estimate is $500.  Mr. Nordlicht's household includes seven people who rely on that clothing expense.  The earlier estimate included extraordinary clothing expenses related to the wedding of one of Mr. Nordlicht's daughters. |