

DCP/LHE/NMA
F. #2016R00505

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 19, 2024

By ECF

The Honorable Brian M. Cogan
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re: United States v. Mark Nordlicht, et al.
            Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      On July 9, 2019, a jury returned guilty verdicts against the defendant Mark Nordlicht (the "defendant" or "Nordlicht") on Counts 6, 7 and 8 of the above-captioned indictment, which charged the defendant and his co-defendants with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count Six), conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349 (Count Seven), and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff (Count Eight).[1] The charges stemmed from the defendant's knowing and willful participation in a fraudulent scheme to defraud bondholders of an oil and gas company, Black Elk Energy Offshore Operations, LLC ("Black Elk"), from the proceeds of a lucrative asset sale ("the Black Elk Bond Scheme"). On July 12, 2023, the Court vacated Nordlicht's conviction as to Count Seven charging wire fraud conspiracy.[2] ECF Dkt. No. 1004.

      The defendant is scheduled to be sentenced on March 20, 2024. For the reasons stated below, the government respectfully requests that the Court impose a custodial term.

---

    [1]     The defendant was acquitted of Counts 1 through 5.

    [2]     The government has filed a protective Notice of Appeal as to this Order. ECF Dkt. No. 1008.

1

I.  Factual Background

   A.  Offense Conduct

The Court is deeply familiar with the facts of this case from, among other things, presiding over trial and the parties' post-trial briefing. The government therefore provides only a brief summary of the facts below, and respectfully refers to the trial record, the Presentence Investigation Report ("PSR"), the government's post-trial submissions, and the Second Circuit's November 2021 decision for further detail.

   1.  Overview of the Black Elk Bond Scheme

Nordlicht was the leader of the Black Elk Bond Scheme, in which he and his co-conspirators lied to innocent investors in order to fraudulently manipulate a vote among bondholders in Black Elk, and thereby extracted tens of millions of dollars that Nordlicht and his co-conspirators distributed to Platinum Partners, L.P. ("Platinum") investors, including their friends and family. Specifically, in 2014, as Black Elk spiraled towards insolvency, Nordlicht and his co-conspirators successfully sought to pay back the friendly preferred equity holders (and limit Platinum's losses in the event of a Black Elk bankruptcy) by: (1) orchestrating the sale of Black Elk's most valuable assets and (2) fraudulently manipulating the priority structure by which Black Elk debt and equity holders would be repaid to ensure the proceeds of the asset sales went to Platinum's investors, rather than outside holders of 13.75% secured notes (the "Black Elk Bonds"), who would otherwise have had priority to those proceeds. Nordlicht and his coconspirators successfully manipulated this priority structure by concealing his and his co-conspirators' control over certain bonds – held by certain Platinum entities (PPCO and PPLO) and a reinsurance company called Beechwood – and thereby rigging a vote of the bondholders to determine whether to consent to changes in the bond indenture that would allow the preferred equity holders (i.e., Platinum's investors, including Nordlicht's and his co-defendants' friends and family) to receive the proceeds of Black Elk's asset sales. As a result of this fraud, Nordlicht and his coconspirators looted Black Elk of approximately $70 million in proceeds, and gave that money to the preferred equity holders, who were not lawfully entitled to it.

As the government's evidence proved at trial, and as discussed further below, Nordlicht was the leader of the Black Elk Bond Scheme.

   2.  Nordlicht Led Platinum and Its Investments

In 2003, Nordlicht and his two partners, Murray Huberfeld and David Bodner, founded Platinum, which included investment funds PPVA, PPCO and PPLO. Nordlicht was the Chief Investment Officer ("CIO") of Platinum and its various hedge funds, and in his role as CIO, Nordlicht made the "final decision" regarding investments. GA.194. Co-defendant David Levy originally worked as a portfolio manager at PPVA and, in late 2014, became co-CIO of Platinum with Nordlicht. (Trial Transcript ("T") 781–83, 788–89). (Gov't Exhibit ("GX") 635) Second Circuit ("2d Cir.") Opinion at 56.

Nordlicht and his co-conspirators were involved in managing Black Elk and maintained close communication with Black Elk management about prospective Black Elk

2

acquisitions and strategic objectives.  Nordlicht also often worked out of Black Elk's offices and participated in its management meetings.

### 3. Nordlicht Founded, and Exerted Control Over, Beechwood

In or around 2013 or early 2014, Nordlicht, Huberfeld, and Bodner, as well as Mark Feuer and Scott Taylor, founded Beechwood.  BAM and BBIL were entities related to Beechwood.  Nordlicht and his associates at Platinum had significant control over Beechwood's investment decisions.  In 2013, Feuer, Huberfeld and Nordlicht outlined Beechwood's corporate terms as follows: "1-Nordlicht group to put any capital necessary to secure funds"; "2-Capital to receive 8 percent preferred return"; "3-Capital to be returned and preferred return to be re[]paid before any profit split"; "4-Feuer group to receive 750k a year in draws (deducted from their profit split) after 100 million in funds deployed"; "5-Feuer group will run the insurance end"; "6-Nordlicht group will run the investment allocation side"; "7-all profits split 50-50 to each group (After paying back the original capital)"; "8-Nordlicht group to retain all fees generated by invest[m]ents in Platinum funds."  GA.582-83.  When Beechwood was first created, Nordlicht and Levy together decided which investments would be purchased and transferred from Platinum to Beechwood.  In addition, Beechwood invested in many portfolio companies and securities in which Platinum was already invested, including Black Elk, and in the Platinum funds themselves.

In early 2014, shortly after Beechwood was founded, Levy left Platinum to become CIO of Beechwood.  (T 820-21, 884-85).  As CIO, Levy controlled the investment side of Beechwood and made investment decisions on behalf of the company on a day-to-day basis, while Feuer and Taylor ran the "insurance side" of the company.  GA.206.  During his time as CIO of Beechwood, Levy also continued to work for Platinum on Black Elk-related issues.  In addition, Platinum and Beechwood shared employees, and Platinum employees frequently worked out of Beechwood's office, which was only a few blocks away from Platinum's.  Nordlicht periodically visited the Beechwood office to take phone calls and participate in meetings.  Furthermore, although he was never a Platinum employee, Israel Wallach worked at BAM as a portfolio manager from January 2014 to March 2016 and was closely connected to Nordlicht.

### 4. Nordlicht Was Very Concerned about Black Elk's Significant Financial Problems and the Negative Effects on PPVA

In 2014, while Black Elk was experiencing financial difficulties, the company began contemplating the sale of its most valuable assets in order to raise cash.  On March 16, 2014, in response to Platinum Managing Director Daniel Small's email about the severe financial challenges Black Elk was facing, Nordlicht replied: "Happy to discuss this week and come to final arrangement. This is also the week I need to figure out how to restructure and raise money to pay back 110 million of preferred [equity in Black Elk] which if unsuccessful, w[oul]d be the end of the fund [(PPVA)]. This 'liquidity' crunch [at PPVA] was caused by our mismanagement – yours[,] David [Levy] and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted. I have been up until 3am for the last two weeks working through this issue."  GA.590.

3

On June 16, 2014, Nordlicht expressed grave concerns about PPVA's liquidity to PPVA President Uri Landesman: "I think we need to revamp the strategy on PPVA and figure out what to do. It can't go on like this or practically, we [(PPVA)] will need to wind down. This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude.  I think we can overcome this but this is code red, we can't go on with status quo."  GA.628.  Nordlicht went on to write to Landesman: "We are getting some liquidity from black elk – though not the equity. . . . Am hesitant to put myself in position of using that for reds [(redemptions)].  We just need to short term go crazy, get everyone focused, and long term try to come up with marketing pitch where we can raise even when we are illiquid."  Id.

5.  Nordlicht Expressed Disdain for the Public Consent Solicitation Process

Nordlicht was very involved in the private consent solicitation process, which he attempted to use to obtain control over the majority of Black Elk bonds.  On February 6, 2014, Nordlicht wrote to Black Elk CEO John Hoffman with a copy to in-house counsel Pichè: "John - FYI - am close to buying 20 million bonds from msd.  It will at that point be easy task to buy additional 25 if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies who will [d]o right by the company."  GA.581.  On March 3, 2014, Nordlicht updated Black Elk's CFO, Jeffrey Shulse, as well as Small, Pichè, Hoffman, and Levy: "Their [(the bondholders threatening default)] group is falling apart.  Msd just sold their position.  They still have 25 percent but likely we will have 50 percent in friendly hands relatively quickly in which case this is all academic."  GA.584.

On June 2, 2014 – after Black Elk attorney Robert Shearer had notified Shulse that the trustee for the Black Elk bondholders was not comfortable with the private consent solicitation process, and Shulse forwarded to Nordlicht the public consent solicitation documents he received from Shearer –  Nordlicht replied to Shulse, Levy, and Small: "David [Levy] – u needn't explain to me what the hell is going on and why we are wasting time on this."  GA.625-26.  Shulse replied to all: "The short answer is the trustee refused to sign unless we did the solicitation process . . . they don't trust our consents are valid because we have received a default notice in the past 60 days and we have the behind the scenes process with various dates on our consents . . . ."  Id.  Nordlicht asked what was the "quickest way to end [the] process," and Shulse replied that "[t]he quickest way is to do the formal solicitation . . . get our 51% in order . . . vote it through the DTC / BNY [(Bank of New York)] agents and end it . . . ."  GA.625.  Nordlicht replied to Levy, Small, and Shulse: "There is a disconnect here. No more talking to lawyers. David [Levy], u f'd this one up bad for no reason.  We will have one pager signed by 51% of bondholders, no trustee necessary.  It's fine.  We don't need any process.  Bondholders are being taken out, this is all moot."  Id.  The private consent solicitation process was ultimately terminated.

6.  Nordlicht Moved Black Elk Bonds from Platinum to Beechwood In Order to Rig the Public Consent Solicitation Vote

After Nordlicht and Levy failed in their attempt to amend the Indenture through the private consent solicitation process, they began to move forward with a public consent solicitation process.  On April 8, 2014 – more than three months before the consent solicitation statement was distributed to the Black Elk bondholders – Levy, Nordlicht, and Small were assessing the Black Elk bonds that they controlled at Platinum's hedge funds (PPVA, PPCO and

4

PPLO) and the Beechwood entities (BAM and, later, BBIL), which were summarized in one consolidated table. Small wrote to Platinum trader Nicholas Marzella, copying Levy, with the subject "Black Elk bonds": "Nick, can you send the holder and amount of bonds that are with each broker." GA.609. Marzella replied to Levy and Small by sending a table that showed that various Platinum and Beechwood entities held a total of $98,730,500 of the $150 million of outstanding Black Elk bonds. GA.609-10. Around this time, Nordlicht asked Wallach and another Beechwood employee, David Shirreffs, to obtain the third-party market pricing for the Black Elk bonds and to include them on their profit and loss statements going forward, so that they could monitor the price of the Black Elk bonds on a daily basis. Wallach and Shirreffs subsequently added the Black Elk bonds to their profit and loss statements for tracking purposes and kept Nordlicht apprised of the price. During April and May 2014, Nordlicht asked several times about the price of Black Elk bonds and whether BAM and BBIL were able to purchase those bonds.

Between April 8, 2014, and July 7, 2014, Nordlicht directed that over $30 million of Black Elk bonds be sold from Platinum's funds to Beechwood. On May 13, 2014, Nordlicht instructed Wallach to purchase $8 million worth of Black Elk bonds on BAM's behalf, and instructed Marzella to sell $4 million of Black Elk bonds each from Platinum accounts at Credit Suisse and Nomura. On June 23, 2014 – the same day that Small wrote an email to Shearer, with a copy to Levy, initiating the public consent solicitation process – Nordlicht asked Wallach how many Black Elk bonds Beechwood owned and Wallach informed him that the principal value was $13,360,000. Later that day, Nordlicht emailed Marzella, copying Wallach and Shirreffs, instructing him to sell $10 million worth of Black Elk bonds from PPVA Nomura to BBIL Nomura. On July 1, 2014, Nordlicht emailed Marzella, copying Wallach, directing him to sell another $7 million in Black Elk bonds from PPVA Nomura to BBIL. On July 7, 2014, Nordlicht instructed Marzella to sell $6.7 million of Black Elk bonds from Platinum to Beechwood ($3.35 million from PPCO and $3.35 million from PPLO).

       7.       Nordlicht Intentionally Flouted the Affiliate Rule to Carry Out of the Black Elk Bond Scheme

On July 3, 2014, about two weeks before the consent solicitation was distributed to the Black Elk bondholders, Small asked Black Elk attorneys Shearer and Brittany Sakowitz to confirm "that under the TIA [(Trust Indenture Act)] if $5MM of the bonds were owned by an affiliate then in order for the consent to be approved a majority of $145MM (greater than $72.5MM) would need to consent rather than greater than $75MM." GA.636. Sakowitz replied: "Correct. Securities owned by the obligor or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the obligor must be disregarded for purposes of calculating the vote required to approve the proposal. (Trust Indenture Act, Section 316(a))." Id. Small then forwarded this exchange to Nordlicht and Levy, stating: "See below regarding the majority consent calculation." Id. On July 7, 2014, Small again emailed Nordlicht and Levy, stating that "[t]he company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. . . . Let's discuss asap . . . ." GA.641.

On July 29, 2014, at 9:29 a.m., Nordlicht wrote to himself with the subject heading, "To do today": "Black elk – 1 – need budget for post renaissance properties. We need

5

immediate p and a [(plugging and abandonment)] plan. We need plan as to how to distribute money to the right places (preferred, preferred, preferred)." GA.757.  That afternoon, Nordlicht wrote to Small with a copy to Levy asking how the sale of Black Elk's assets to Renaissance was coming along.  GA.759.  Nordlicht then asked Small and Levy: "David [Levy] – I have Beechwood at 36,422,400 in terms of ownership of bee [(Black Elk)] bonds. Dan – Do u know respective funds?"  Id.  Small responded to Nordlicht and Levy by sending the following table of Black Elk's bond holdings:

| BlackElk Bond Holders | | | | | |
|---|---|---|---|---|---|
|  | Nomura | Credit Suisse | Wilmington Trust | Total | |
| PPCO | 29,582,000 | | | 29,582,000 | |
| PPVA | | 18,321,000 | | 18,321,000 | |
| PPLO | | 13,711,000 | | 13,711,000 | |
| BAM | | | 13,360,000 | 13,360,000 | |
| BBIL | | | 23,657,000 | 23,657,000 | |
| Total | | | | 98,631,000 | |
| | | | | | |
| | | | | 80,310,000 | 150,000,000 |
| | | | | | 131,679,000 |
| | | | | | 65,839,500.0 |

(GX 764).

This table provided a breakdown of how many Black Elk bonds were owned by each of the Platinum and Beechwood entities.  The table also provided a calculation of the aggregate principal amount of bonds that were needed to consent to ensure that the amendments passed, assuming that only PPVA Credit Suisse's $18,321,000 in bonds were ineligible to vote.  In particular, the table listed the total outstanding Black Elk bonds ($150,000,000), subtracted PPVA's holdings ($18,321,000) from that number to get $131,679,000, and then listed $65,839,500 (half of $131,679,000) — i.e., the number of bonds necessary to pass the consent solicitation, assuming that the bonds held by PPCO, PPVA, PPLO, BAM, and BBIL would not be disclosed as affiliates and would be voted.  Id.

      On August 1, 2014, after the votes were cast, Shearer emailed Small a draft Officer's Certificate, setting forth the $18,321,000 worth of bonds that Small had disclosed as controlled by Platinum.  On August 13, 2014, Shearer followed up, asking Small to review and complete the certificate so that Black Elk could issue a press release.  Shortly thereafter, Small emailed Nordlicht and Levy with the subject heading "Officer Certificate," seeking their approval for his email response to Shearer.  GA.770.  Small wrote: "See attached wording and let me know if you are ok.  Below is a table that shows under all three scenarios there is 50% approval."  Id.  These three scenarios included counting (1) all $110 million consenting votes ($11.4 million tendered bonds plus the $98.6 million Platinum-controlled bonds that voted to consent only); (2) all consenting votes except the approximately $18 million PPVA-owned bonds; and (3) all consenting votes except the approximately $18 million PPVA-owned bonds and the approximately $43 million PPCO- and PPLO-owned bonds (which Small classified as

6

"PPVA and Possible Affil"). Id. None of these three scenarios disclosed that the Black Elk bonds that Beechwood owned were bonds that should be excluded. Id. At 8:51 a.m. the next day, August 14, 2014, Small resent his email to Nordlicht and Levy, writing: "Trustee wants to see this this morning in order to finalize results of tender/consent which ended last night. U ok with language?" Id. Nordlicht responded to Small and Levy: "K." Id.

### 8. Nordlicht Ordered Levy to Distribute the Proceeds

On the morning of August 18, 2014, PPVA CFO Joseph SanFilippo sent an email to Nordlicht, copying Levy and Manela, with the subject heading "Series E as of August 18." GA.780. The email contained a list of the Black Elk preferred equity holders, which included PPVA, PPLO, PPCO, and PPVA Black Elk Equity LLC.

On August 18, 2014, Shearer advised that Texas law might prohibit distribution of the proceeds of the Renaissance Sale. He wrote to Shulse and Black Elk General Counsel Stephen Fuerst advising them to review Texas Business Organizations Code section 101.206. The statute prohibits a limited liability company from making distributions to its members if such a distribution would render the company insolvent. Tex. Bus. Org. § 101.206.

Shulse forwarded Shearer's email to Nordlicht, Small, Levy, and Samuel Salfati and stated: "Advice of counsel . . . we need to be mindful of this in our planning." GA.781. At 4:23 pm that same day, Nordlicht forwarded Shulse's email to Levy, changing the subject heading of the email to "urgent" and writing: "David – get these wires out!!!!! Call him right now please!!!!" Id. Twenty minutes later, at 4:43 p.m. on August 18, 2014, Small wrote to Shulse with a copy to Salfati — who had recently joined Small on the three-person Black Elk Board of Directors — with the subject heading "Wires": "Jeff, on behalf of Sam Salfati and myself constituting a majority of the board of managers you are hereby authorized to wire $70MM in partial payment of Preferred E units." GA.783.

Between August 18 and August 21, 2014, Black Elk transferred proceeds from the Renaissance Sale to the defendants and the Platinum-related entities. Black Elk transferred: (1) on August 18, 2014, approximately $32.5 million to PPVA's "Black Elk" Sterling account and $15.3 million to PPVA's Sterling account; (2) on August 20, 2014, $24.6 million to PPCO's Capital One account; and (3) on August 21, 2014, $5 million to PPLO's Sterling account. In addition, on August 21, 2014, PPCO transferred – through various accounts – approximately $7.7 million to Mark Nordlicht's parents, Jules and Barbara Nordlicht, including approximately $500,000 to the Jules and Barbara Nordlicht Family Foundation; $256,679 to Levy; $102,672 to Small; and approximately $1 million to the Huberfeld Family Foundation.

### B. Nordlicht Attacked a Federal Prosecutor During Trial

On May 2, 2019, during a break in the trial testimony of victim witness Abraham Gulkowitz, Nordlicht attacked an Assistant U.S. Attorney prosecuting this case. Specifically, Nordlicht and his wife walked north through the 8th floor lobby of the federal courthouse away from Your Honor's courtroom. At the same time, the four Assistant U.S. Attorneys prosecuting this case and another Assistant U.S. Attorney walked south towards Your Honor's courtroom. When the prosecutors saw Nordlicht and his wife approach, they moved to the west side of the

7

lobby to ensure that Nordlicht and his wife had ample room to continue walking north on the east side of the lobby.  As the Assistant U.S. Attorney who had been eliciting testimony from Mr. Gulkowitz at trial (the "Prosecutor") moved out of the way to allow Nordlicht and his wife to pass, Nordlicht suddenly leaned in front of his wife and angrily shouted at the Prosecutor: "You have no fucking morals."  As Nordlicht's wife grabbed onto his suit coat in an effort to restrain him, Nordlicht continued to curse and pursued the Prosecutor in a rage while screaming, in substance, "you know the investor calls," which had been referenced in Mr. Gulkowitz's testimony.  For approximately 12 seconds, Nordlicht continued yelling and tried to free himself from his wife's grasp as two of the Prosecutor's colleagues stood between Nordlicht and the Prosecutor to ensure that Nordlicht was not able to continue his physical pursuit of the Prosecutor.

As a result of this attack, on May 6, 2019, Your Honor revoked Nordlicht's bail and ordered him detained based on his violation of his conditions of release; namely, Your Honor found that Nordlicht had forcibly intimidated an Assistant U.S. Attorney prosecuting this case on account of the performance of her official duties.  See 18 U.S.C. § 111(a)(1).  Your Honor ordered Nordlicht released from custody the following day.

### C. The Court's Post-Trial Decision and the Government's Appeal

Following post-trial briefing, on September 27, 2019, this Court granted Levy's motion for a judgment of acquittal on Counts Six, Seven and Eight pursuant to Rule 29 and his motion for a new trial in the alternative pursuant to Rule 33; and Nordlicht's motion for a new trial on Counts Six, Seven and Eight pursuant to Rule 33.  This Court acquitted Levy on the ground that the evidence presented at trial purportedly was insufficient to establish Levy's criminal intent. (ECF Dkt. No. 799 at 27-32).  This Court found the evidence sufficient to sustain Nordlicht's convictions and therefore denied his Rule 29 motion.  (Id. at 18-27).  This Court nevertheless granted Nordlicht's motion for a new trial under Rule 33, on the ground that the government purportedly presented insufficient evidence to prove Nordlicht's knowledge and intent. (Id. at 33-37).

On January 7, 2020, the government appealed this Court's post-trial decision.  On November 5, 2021, the Second Circuit vacated this Court's order and judgment granting Nordlicht's and Levy's post-trial motions and remanded for further proceedings consistent with its opinion.

## II. Sentencing Guidelines Range

### A. Guidelines Calculation

The government respectfully submits that the appropriate United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") calculation is set forth below:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus:  Gain Exceeded $65,000,000 (§§ 2B1.4(b)(1), 2B1.1(b)(1)(M)) | +24' |

8

| | |
|---|---:|
| Plus: Sophisticated means (§ 2B1.1(b)(10)) | +2 |
| Plus: Offense Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: Defendant was an Organizer, Leader, Manager or Supervisor (§ 3B1.1(c)) | <u>+2</u> |
| Total Offense Level: | <u>37</u> |

Nordlicht has a criminal history score of zero, and thus a Criminal History Category of I. PSR ¶ 83. Based on a total offense level of 37 and a Criminal History Category of I, the defendant's Guidelines range of imprisonment is 210 to 262 months.

On July 18, 2023, the Court entered an order finding that the fraud scheme at issue resulted in no loss and thus harmed no victims. ECF Dkt. No. 1005. The government has filed a protective Notice of Appeal as to that order. ECF Dkt. No. 1009. Additionally, at the sentencing of Daniel Small, the court concluded that the fraud scheme was not sophisticated. November 15, 2023 Tr. at 31-32.[3] Anticipating that the Court will apply these prior rulings, with which the government respectfully disagrees, the government respectfully submits that the resulting calculation should be:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus: Defendant was an Organizer, Leader, Manager or Supervisor (§ 3B1.1(c)) | <u>+2</u> |
| Total Offense Level: | <u>9</u> |

Because the government submits that Nordlicht is eligible for a leadership enhancement, he is not eligible for the two-level reduction as a zero-point offender. U.S.S.G. § 4C1.1(10). As Nordlicht falls within Criminal History Category I, the government submits that the applicable Guidelines range is 4 to 10 months, again adopting the Court's prior calculation, to which the government maintains its objections.

---

[3] The government has filed a protective Notice of Appeal from the Judgment entered as to Dan Small. ECF Dkt. No. 1031.

B. <u>Nordlicht's Guidelines Objections</u>[4]

In his sentencing memorandum, dated March 6, 2024, ECF Dkt. No. 1041 ("Def. Memo"), the defendant submits that a leadership enhancement is not warranted and that, moreover, a mitigating role reduction applies. Def. Memo. at 9-12. The government disagrees.

Virtually every factor set forth in Guidelines Section 3B1.1, which Nordlicht cites in his sentencing submission, weighs in favor of applying the leadership enhancement. The evidence at both trials definitively established that Nordlicht was the primary orchestrator of the fraud scheme. In addition to his role as the head of Platinum Partners and a founder of Beechwood, the evidence supports an inference that Nordlicht conceived and oversaw the scheme from start to finish. PSR ¶¶ 21-22, 33, 46, 50, 58. It is indisputable that Nordlicht was, among other things, directly responsible for discreetly transferring the bonds from Platinum's books to Beechwood's books, <u>id.</u> at ¶¶ 32-34, directing Small's communications with Black Elk's counsel, <u>id.</u> ¶ 40, 50, directing Beechwood's vote in the consent solicitation, <u>id.</u> ¶ 48-49, and directing the distribution of the proceeds of the scheme. <u>Id.</u> ¶ 58. Each of these were key parts of the fraudulent scheme and were entirely directed by Nordlicht.

Nordlicht had a leadership role in every aspect of the scheme and directed the actions of his co-conspirators. It is difficult to conceive of what additional evidence could possibly be necessary to establish the propriety of a 2-level leadership enhancement. To not apply such an enhancement would be directly contrary to the evidence. By the same token, Nordlicht's argument that he should be entitled to a mitigating role is frivolous.[5]

III. <u>The Appropriate Sentence</u>

Recognizing that the Court has declined to impose custodial sentences to Nordlicht's co-defendants, the government respectfully submits that such a sentence is warranted as to Nordlicht in view of his individual circumstances.

A. <u>The Applicable Law</u>

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to

---

[4] Nordlicht makes dozens of factual objections to the PSR. Def. Memo at 55-58. The government has addressed those reflecting the Guidelines calculation herein. Otherwise, objections to paragraphs 1-53 and 93 either seek to relitigate Nordlicht's guilt or positively frame certain of the government's evidence and should be rejected. His objections to paragraphs 82 – 88 and 97- 99 relate to personal information as to which the government lacks sufficient facts to take a position.

[5] Nordlicht's argument that he should be afforded a two-level role reduction because David Levy received it is also baseless. While the government objected to any role reduction for Levy as not supported by the evidence, the fact that Levy received one from the Court does not mean it should apply to Nordlicht. The evidence at both trials established that Nordlicht's role in the scheme was more involved than Levy's and merits an enhancement, not a reduction.

secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

    B.    <u>Nature and Circumstances of the Offense</u>

As an initial matter, the defendant's conduct in this case was extremely serious. Nordlicht, the principal of an SEC-registered investment adviser, covertly used his secret control of an affiliate company to effect a fraud on the holders of publicly traded bonds, for the benefit of friends and family and insiders of his funds. This type of criminal conduct undermines public confidence in the securities markets. When such schemes are perpetrated by individuals who are otherwise leaders in their communities, as Nordlicht paints himself to be, others learn by their

11

example. A non-custodial sentence would send a message to the investing community, and to the public, that the wealthy and powerful can get away with criminal conduct.

        C.        <u>Nature and Circumstances of the Defendant</u>

While Nordlicht is undeniably a charitable man, his sentencing submission paints a skewed picture of the defendant's nature. In addition to his involvement in the instant fraud scheme, Nordlicht has been sued by the SEC receiver appointed by this Court to preserve the assets of the Platinum funds and accused of submitting false and fraudulent bankruptcy documents in an effort to conceal his assets. See Cyganowski v. Nordlicht, 20-7025 (S.D.N.Y. Bankr.), ECF Dkt. Nos. 1 (Complaint), 57 (Settlement Agreement). Notably, Nordlicht submitted the allegedly fraudulent bankruptcy documents in question in June 2020—after the trial in this case.

Additionally, as the Court is aware, Nordlicht engaged in menacing conduct during the course of the trial, attacking a prosecutor in the courthouse hallway. While Nordlicht claims to have apologized to all involved for his conduct, the prosecutor in question has no recollection of any apology and the record only reflects an apology, from Nordlicht's counsel, to an AUSA who was not even present in Court on the day of his attack. (Tr. of Bail Revocation Hearing, May 6, 2019 at 4). Indeed, the transcript also reflects that the AUSA told him, in the presence of counsel, to apologize to the other prosecutors but that Nordlicht did not because they were going "to do it officially in writing as soon as [counsel] became aware that the government was going to make more of this than [counsel] originally anticipated." Id. To date, no apology has been provided. In his interview with the Probation Department, he referred to it as a "Will Smith moment," and did not apologize for his conduct in any way. Nordlicht even minimizes the conduct in his sentencing letter referring to it as an "unadjudicated and uncharged incident, which caused only a momentary disruption in the proceedings." To those affected, the attack of a prosecutor, in a federal courthouse, during a criminal trial, was far more than a "momentary disruption in the proceedings." In sum, Nordlicht's conduct since his arrest is consistent with a belief that he is above the law, and that he should be able to conduct his affairs as he sees fit, without recourse or consequence. A non-custodial sentence would serve only to confirm this belief, which the government submits is misplaced.

        D.        <u>The Need for Deterrence</u>

A substantial custodial sentence is also necessary here in order to ensure that the sentencing goals of deterrence are appropriately met. The defendant has taken no responsibility for his conduct, in any way. The government understands that the defendant wishes to preserve his appellate opportunities. That said, in spite of all the evidence of repeated criminal conduct throughout the scheme, presented at both trials, the defendant has refused in his sentencing memorandum, or anywhere else, to acknowledge any wrongdoing on his part. In fact, the defendant's entire sentencing submission is devoted to portraying himself as a wrongfully convicted, innocent man. Nordlicht repeatedly ignores the jury's verdict and the Second Circuit's reinstatement of that verdict and asserts that he is innocent, did not mean to defraud investors and did nothing wrong.

Moreover, after the trial in this case the defendant took steps to conceal his assets in connection with his bankruptcy filing, as alleged in the Receiver's complaint, reflecting that a criminal conviction was insufficient to deter him from engaging in future fraudulent conduct. The government respectfully submits that a custodial term will provide specific deterrence. Taken together, the foregoing demonstrates that Nordlicht has not been specifically deterred in any way from future criminal conduct. A sentence of incarceration would start to send the message that his conduct was wrong and cannot be repeated.

Further, in cases involving sophisticated fraud, the need for general deterrence is acute. The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); see also United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white collar crime is "of central concern to Congress"). Courts have found it to be an important sentencing factor in fraud cases, because it is believed to be most effective in such cases. See Martin, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation omitted); United States v. Gupta, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (observing where a crime is hard to detect, "others similarly situated to the defendant must therefore be made to understand that when you get caught, you go to jail").

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a custodial sentence, which is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/ David Pitluck
        David Pitluck
        Lauren Elbert
        Nicholas Axelrod
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Defense Counsel (by e-mail and ECF)
        United States Probation Officer Roberta Houlton (by e-mail)