

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ANDREW J. LEVANDER**

andrew.levander@dechert.com
+1 212 698 3683 Direct
+1 212 698 3599 Fax

July 9, 2024

**VIA ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Mark Nordlicht, et al.*, No. 1:16-cr-00640-BMC (E.D.N.Y.)

Dear Judge Cogan:

      On behalf of defendant Mark Nordlicht, we respectfully submit this Reply to the government's sentencing submission. Dkt. 1042.

      At sentencing, the Court must enter a just and proportionate sentence based upon facts found by a preponderance of the evidence. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). To assist the Court in making such a judgment, Mr. Nordlicht's sentencing memorandum contained dozens of specific assertions about the facts of this case and about Mr. Nordlicht's life—each of which was grounded in extensive citations to this Court's orders and to the trial record, as well as additional evidentiary materials that the Court may appropriately consider at sentencing. Dkt. 1041. By contrast, the government's submission is remarkable for its reliance on drive-by innuendo and for assertions in marked conflict with the record evidence. The government's submission makes no effort to ground these mischaracterizations in any citations to the record, and it refuses to engage meaningfully with any of the reasons why the unique circumstances of this case warrant leniency and a sentence of time served.

      For instance, the government does not address the evidence demonstrating that, shortly before the consent solicitation began, Mr. Nordlicht disclosed Platinum's plan to buy out Black Elk's outside bondholders with support from "friendly" bondholders to Black Elk's CEO, John Hoffman. Mr. Hoffman was ultimately responsible for any statements Black Elk made in the public consent solicitation, and he even told Black Elk's attorneys at BakerHostetler about Mr. Nordlicht's plans. *See* Dkt. 1041 at 16-18. The government does not address Mr. Nordlicht's evidence demonstrating that each time Platinum sold bonds to Beechwood, it did so for specific liquidity reasons and not for the purpose of influencing the public consent solicitation. *Id.* at 18-21. And beyond a passing concession that Mr. Nordlicht is "charitable," Dkt. 1042 at 12, the government does not discuss the extraordinary outpouring of support from 150 individuals, each of whom emphasizes the devastating effects of the past almost eight years on Mr. Nordlicht and



his family and the aberrational nature of the convicted conduct in view of Mr. Nordlicht's exemplary character and lifetime of good deeds.  Dkt. 1041 at 25-51.

Nor does the government acknowledge the collateral consequences its prosecution has had on Mr. Nordlicht and continues to have—destroying his reputation, erasing his life savings, and forcing him into bankruptcy—even though a jury ultimately rejected the bulk of the government's charges, including its sensational claim that Mr. Nordlicht had operated a $1 billion Ponzi scheme.  All of these factors weigh in favor of a lenient sentence of time served.  And leniency is especially appropriate here given that Mr. Nordlicht remains stuck in limbo even while his co-defendants have begun to move on with their lives.  Mr. Nordlicht has been subject to court supervision for nearly eight years, and this supervision has continued, with all the attendant consequences (including travel restrictions that have prevented him from visiting his father's grave in Israel), as his sentencing hearing has been repeatedly rescheduled.  Meanwhile, Mr. Nordlicht's co-defendant, Mr. Levy, received a sentence of time served six months ago, and Mr. Small's probationary sentence will expire shortly.

Additionally, the government does not, and cannot, dispute this Court's holding that Mr. Nordlicht sought to pay the outside bondholders in full and that "no reasonable jury could find beyond a reasonable doubt that Nordlicht . . . intended to defraud bondholders of the proceeds of the Renaissance sale except under [an impermissible] 'right-to-control' theory." *See* Dkt. 1004 at 10.  Mr. Nordlicht's lack of intent to defraud anyone highlights the ill-advised nature of the government's prosecution, especially in light of the Supreme Court's decision to cabin the federal fraud statutes in *United States v. Ciminelli*.  *See* 598 U.S. 306, 309 (2023).  As the Court previously recognized, the evidence "made clear that defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders **before** using the remaining proceeds to pay off the high[er]-interest preferred equity."  Dkt. 1004 at 8 (emphasis added) (alteration in original).  Thus, there is no question—as confirmed by the Francis Memo and all other pieces of evidence—that Nordlicht "expect[ed] that all independent bondholders would tender and receive the proceeds of the Renaissance sale."  *Id.*  In short, Mr. Nordlicht plainly lacked any "intent to defraud" anyone.

Although this Court has held that *Ciminelli*'s reach applied only to Mr. Nordlicht's wire fraud conviction, *see* Dkt. 1004 at 10-12, at least one court has since applied *Ciminelli* in the securities fraud context to dismiss charges—like those brought by the government here—based solely on a now-impermissible "right to control" theory.  *See United States v. Constantinescu*, No. 4:22-CR-00612, 2024 WL 1221579, at *5 (S.D. Tex. Mar. 20, 2024) (dismissing indictment alleging securities fraud because, even if the defendants "may have had an intent to deceive and an intent to deprive [potential victims] of valuable economic information," the government did "not allege a scheme to defraud consistent with . . . *Ciminelli*").  *Constantinescu* relied upon the Fifth Circuit's holding that *Ciminelli* applies to securities fraud charges under 18 U.S.C. § 1343, and that the statute must be construed similarly to the mail and wire fraud statutes.  *See United States v. Greenlaw*, 84 F.4th 325, 339 & n.6 (5th Cir. 2023).  Unlike the Fifth Circuit, the Second


The Honorable Brian M. Cogan
July 9, 2024
Page 3

Circuit has yet to interpret the securities fraud statutes since *Ciminelli* and the uncertainty post-*Ciminelli* as to whether Mr. Nordlicht's conduct was even criminal further counsels in favor of a non-custodial sentence of time served.  *See* 18 U.S.C. § 3553(a)(6).

Instead of grappling with any of the evidence in Mr. Nordlicht's sentencing submission showing why time served is a just and appropriate sentence, the government asserts that it "paints a skewed picture of [his] nature" and relies on two misleading examples to claim that he has behaved as if "he is above the law" since his arrest.[1]  Dkt. 1042 at 12.  First, the government cites **allegations** in a bankruptcy complaint to assert, as though it had been proven, that Mr. Nordlicht submitted "fraudulent bankruptcy documents" in connection with his bankruptcy proceedings.  *Id.*  Second, the government accuses Mr. Nordlicht of "attacking" a federal prosecutor and then refusing to apologize.  *Id.*  Neither assertion is supported by the preponderance of the evidence and cannot possibly serve to rebut the record evidence on Mr. Nordlicht's character, which is established in the dozens of letters submitted by people who have known him for his entire life.

First, with respect to the bankruptcy-related accusations, the government does not cite any evidence or any finding in support of Mr. Nordlicht's alleged misconduct.  Mr. Nordlicht was forced to declare bankruptcy in June 2020 because of the government's prosecution here, which—despite Mr. Nordlicht's acquittal on a majority of the charges—destroyed his business and his fortune, which was almost entirely invested in the business.  In December 2020, the receiver for the Platinum funds commenced an adversary proceeding against him in which she alleged—upon "information and belief"—that Mr. Nordlicht made false representations about his remaining assets.  *See Cyganowski v. Nordlicht*, 20-7025 (S.D.N.Y. Bankr. Dec. 7, 2020), ECF No. 1 (Complaint).  The receiver did not prove these allegations.  In August 2023, Mr. Nordlicht settled with the receiver, and earlier this year, the bankruptcy court dismissed all claims with prejudice.  *See id.* ECF No. 66 (Jan. 30, 2024); *see also In re Mark A. Nordlicht*, 20-22782 (S.D.N.Y. Bankr. Jan. 31, 2024), ECF No. 135 (granting Mr. Nordlicht a discharge under 11 U.S.C. § 727).  None of the receiver's allegations were ever adjudicated, and they have now been withdrawn.  The government offers nothing to try to prove them, much less to show they are supported by a preponderance of the evidence.  It is simply outrageous for the government to attempt to tar Mr.

---

[1]    Because the government's submission provides little evidentiary support for its efforts to dispute Mr. Nordlicht's submission, this Reply does not readdress the issues already covered in Mr. Nordlicht's sentencing memorandum.  Instead, it focuses on the two aspects of the government's submission most in need of additional context.  Nevertheless, the government's sentencing submission contains a number of other misleading (and sometimes inaccurate) factual assertions.  For instance, the government claims without citation that Mr. Nordlicht "often worked out of Black Elk's offices and participated in its management meetings." Dkt. 1042 at 3.  In fact, Mr. Nordlicht visited Black Elk's offices only a handful of times over the course of Platinum's five-year investment in the company, never worked out of them, and did not participate in management meetings.  The government appears to have conflated Mr. Nordlicht with his co-defendants.  *Cf.* Ex. 2, Nordlicht Trial Tr. 568:15-569:12; 572:2-573:2 (A. Garza testifying that Daniel Small and David Levy attended Black Elk management meetings in response to the government's question "[w]ho do you remember participating in [management] meetings from Platinum Partners?").



The Honorable Brian M. Cogan
July 9, 2024
Page 4

Nordlicht's character with unproven allegations and ask the Court to take them into account at sentencing as though they were established fact.

Second, the government's assertion that Mr. Nordlicht never apologized for losing his temper and raising his voice to an Assistant United States Attorney ("AUSA") is not correct. In fact, Mr. Nordlicht, copying his counsel, emailed an apology to the AUSA shortly after the incident occurred. *See* Ex. 1, May 7, 2019 email from M. Nordlicht. As this email shows, Mr. Nordlicht was "beyond horrified" at his actions and recognized that the incident "should never have happened and never will again." *Id.* Mr. Nordlicht sincerely sought to apologize after the incident and believed that it was undisputed that he had done so.

In preparing this Reply, Mr. Nordlicht noticed that he apparently sent his email message to the wrong email address at the time. Instead of typing ".gov," he typed ".com," and so, the AUSA may not have received the apology. The fact remains that Mr. Nordlicht has regretted this incident since it happened and sought to apologize at that time. We respectfully submit that this incident—which the Court addressed at the time by temporarily revoking Mr. Nordlicht's bail, and which Mr. Nordlicht has long regretted—should have no impact on a just and proportionate sentence for Mr. Nordlicht.

For these reasons, and for the reasons stated in Mr. Nordlicht's sentencing memorandum, we respectfully request that the Court sentence him to time served.

Respectfully,

/s/ *Andrew J. Levander*

Andrew J. Levander
Steven A. Engel
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3683
andrew.levander@dechert.com

*Counsel for Mark Nordlicht*

cc:  All Counsel (via ECF)